M2m2OrtBail kjc

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               22 Cr. 91 (RA)

BILLY ORTEGA,
            Defendant.
------------------------------x              Bail Application

                                             February 22, 2022
                                             12:40 p.m.
```

Before:

                HON. RONNIE ABRAMS,

                              District Judge

APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY: MICHAEL R. HERMAN
    MICAH F. FERGENSON
    Assistant United States Attorneys

DAWN M. FLORIO
    Attorney for Defendant Ortega

Also Present:

Harry Meyer, Intern, USAO

Dayshawn Bostic, Pretrial Services Officer, SDNY

1           (Case called)
2           THE COURT:  Has everyone had the opportunity to
3  review the Pretrial Services report and had sufficient time to
4  do so?
5           MS. FLORIO:  Yes, your Honor.
6           MR. HERMAN:  Yes, your Honor.
7           THE COURT:  And are we ready to get started?
8           MR. HERMAN:  Yes, your Honor.
9           THE COURT:  Ms. Florio, would you like to be heard.
10           MR. HERMAN:  Yes, your Honor.  Would it be okay if I
11  sat?  I just have some difficulties with my knee.  I had a knee
12  replacement surgery.
13           THE COURT:  Yes, that's fine.  Just speak into the
14  microphone, please.
15           MS. FLORIO:  Your Honor, I did have an opportunity to
16  review the pretrial services report, which recommends release
17  with conditions for Mr. Ortega.  However, your Honor, I have
18  submitted a bail package.  Did your Honor receive that?
19           THE COURT:  I did.
20           MS. FLORIO:  So I actually have recommended even more
21  stringent requirements for Mr. Ortega.
22           THE COURT:  Let's keep in mind that the Pretrial
23  Services office has not reviewed the evidence in this case,
24  didn't have access to the government's letter, and so they are
25  only making their recommendation based on limited information.

1  I have more information before me.
2  But please proceed, with that said.
3  MS. FLORIO:  Yes, your Honor.  I understand.  That's
4  why I am proposing a more stringent package than what pretrial
5  had represented.
6  So I just want to tell you a little bit about my
7  client before I talk about what I feel would be appropriate
8  with respect to the bail package.
9  First, I just want to let the Court know that my
10  client has tremendous family support.  His partner is present
11  in court, as well as his mother, his father, his sister, his
12  brother, his cousins, his mother-in-law.  Family and friends
13  are also present here.
14  I do want to point out to the Court that my client has
15  a very severe learning disability, and he was receiving
16  governmental assistance because he has difficulty with memory
17  loss, with processing information, and he suffered with that
18  throughout a big portion of his life.  He also had an accident
19  which tremendously impacted that later on in his life.
20  Your Honor, my client was home at the time that the
21  agents came to arrest him.  He was actually taking his daughter
22  down to the bus.  There was a search warrant that was executed
23  on the home.  At that particular time, he and his partner were
24  not in the best of terms, and he had all his bags packed to
25  move to his own apartment.  So when the -- when the search

1   warrant was executed, his bags were pretty much packed.

2             There was money in the house, but it was $8,000.  It
3   wasn't an exorbitant amount of money.  It was money that both
4   him and his partner had collected.  She works.  She is
5   self-employed.  She makes a very good salary.

6             There were no drugs found in the apartment.  There was
7   no paraphernalia found in the house.

8             The children were in the house, as well as dogs were
9   in the house.  And his passport was in the house, and it was
10  seized.

11            THE COURT:  I had thought that the passport was in
12  what -- and you all will correct me if I am wrong -- in what
13  the government has described as a to-go bag, and so it was the
14  money, it was the passport, it was the Social Security card, it
15  was a driver's license.  I don't know if anything was in it.  I
16  was not aware that there were other bags.  Were there bags with
17  his clothes and the like.

18            MS. FLORIO:  Yes.  All his belongings were basically
19  packed up and ready to go because they were separating at that
20  time.  They had an argument, and he was moving out and
21  therefore his passport was there, his belongings were there.
22  It was not just a bag for him to leave.  It was a bag for him
23  to move to another apartment.  Previously to that, he had lived
24  with his mom.  So it was decided that he was going to be moving
25  out of the residence because they had, you know, had a fight.

1    In fact, his partner was interviewed extensively by
2 the agents at the time.  I actually was on the phone with his
3 partner when she -- when agents had entered the apartment and
4 I -- not that I heard the conversations between them, but I was
5 aware of what was going on.  She fully cooperated.  She spoke
6 to the agents, as well as my client fully cooperated.
7    It was very scary for the children and especially the
8 child that was with Mr. Ortega when he was stopped at the --
9 right outside of his home taking his child to the bus stop.  He
10 was basically a stay-at-home dad for like the last six years,
11 taking care of the children while his partner worked.
12    I do want to point out to the Court that my client has
13 no criminal convictions.  He is not a flight risk.  He assures
14 the Court that he will come back each and every time.  He has
15 very good family support, as the Court can see.
16    Even though we know it is a very, very serious case,
17 what I have proposed, your Honor, I believe it is a very
18 substantial bail package to ensure that my client will return
19 to Court.  I have laid everything out in my submission.  I am
20 proposing --
21    THE COURT:  Let me just stop you and ask, he is
22 unemployed, correct, and your position is that he had that
23 amount of cash because of his girlfriend's job, is that right?
24    MS. FLORIO:  Yes.  And also he gets money from his
25 SSI.

1    THE COURT: All right. You may proceed.

2    MS. FLORIO: So, your Honor, respectfully, I am asking
3 the Court to grant pretrial release with the following
4 conditions. I am asking that Mr. Ortega be released on a
5 $500,000 bond that would be secured by the following suretors:

6    One would be his cousin, Carlita Zapata, who is a
7 catering and event manager. She has an estimated yearly income
8 of $110,000.

9    The other suretor would be Jorge Ortega, which is his
10 uncle. He works for the New York City Department of
11 Corrections. He makes approximately $92,000 per year.

12    The third suretor would be Louis Alberto Ortega, which
13 is his uncle, who works for the New York City Department of
14 Sanitation who makes approximately $89,000 per year.

15    The fourth person is Junior Zapata, which is his
16 cousin. He is a bartender at Carmine's, a restaurant in
17 Manhattan, and makes approximately $70,000 per year.

18    The fifth person would be Kenneth Ortega, who is his
19 brother, who works for Jetblue Airways, and his approximate
20 income is $55,000 per year.

21    The sixth person would be Stephen Ortega, his brother,
22 who works for the New York City Health and Hospitals. He makes
23 $53,000 per year.

24    His sister, Melanie Quesada, she works for JPMorgan
25 Chase and makes $53,000 per year.

1      Louis Ortega, his father, who is a manager at a fabric
2 store, his approximate income is $44,000 per year.
3      And also the address of 46 Edgewood Avenue, Ringwood,
4 New Jersey, which is owned by Hope Cooper, which is his
5 partner, with an approximate equity of $290,000, the home is
6 worth about $500,000, but the equity that is left in the house
7 is about $290,000.
8      So when you take everything into consideration, all of
9 these people, who make very good incomes, as well as the
10 property that can -- we can put a lien on, I submit, your
11 Honor, that that is a substantial bail package.  The family has
12 worked very hard on it to make sure that -- I mean, these are
13 excellent people who have excellent jobs who support their
14 family member.  Most of them are here today in court.  Some
15 people couldn't come because they are actually -- you know,
16 they couldn't get off of work.
17      But, your Honor, I believe there are -- there is a
18 combination of circumstances that would allow Mr. Ortega to
19 overcome the presumption and for him to overcome the
20 presumption of dangerousness and the flight risk.  He has never
21 warranted before.  He has always appeared at each and every
22 day.  He has no criminal record.  He absolutely assures the
23 Court he will come back to court to fight these charges.  He
24 understands the seriousness of his case and we, most
25 respectfully, are asking that you grant our bail package.

THE COURT: All right. Thank you.

Would the government like to be heard or any of the members of the victim's families?

MR. HERMAN: Yes, your Honor. I would like to recognize the members of the victim's families who would request the opportunity to be heard either before or after the government's --

THE COURT: Whatever you or they would prefer. They can just come to the podium.

MR. HERMAN: Okay. Well, why don't I give a statement; and then if the Court allows, the victims would like to be heard.

THE COURT: Sure.

MR. HERMAN: We submitted a written opposition when we learned this morning that Mr. Ortega sought a bail application.

In the government's view, there is no condition or combination of conditions that would adequately protect the community and assuage the substantial risk of flight here.

This is a presumption case for good reason. The defendant operated a dangerous narcotics delivery service from his home using numerous cell phones. That operated for a substantial period of time, approximately three years.

On a single day in March of 2021, an awful day, he sold drugs, using a friend of his, that killed three victims.

Families of some of those victims are here today.  The victims thought they were receiving cocaine, but instead they received cocaine that was laced with fentanyl, a much more powerful synthetic opioid that is saturating our communities, both here and around the country, and leading to devastating death and destruction.

The defendant then learned these victims died for the reasons we put in our submission.

He even warned one of the victims don't do too much and then called that victim two or three times after he sent that text.  She didn't answer because she had died.

He also called one of the other victims.  That knowledge did not deter Mr. Ortega from continuing this deadly delivery service.  Rather, he continued doing exactly what he was doing with one exception.  He changed phones, showing his consciousness of guilt.

The text message with the courier, the codefendant Rainey, shows a screenshot of a drug testing kit which the government believes was sent because Ortega wanted to test his drugs to see what could have caused the death of these victims.

Now, the government believes that the charges already contained in the indictment are more than sufficient to satisfy the government's burden of detention here, but this investigation is ongoing.  We are investigating several

1  additional overdoses, including an additional fatality that
2  predated the fatalities charged in this case, that we believe
3  may be tied to this delivery service.
4          With respect to the arrest and the search warrant,
5  our understanding is quite different, of course, than what
6  the defense put forward by proffer.  The defendant appeared
7  to be living in a basement in this large home in rural
8  New Jersey.  It's a four-bedroom home with a ton of property.
9          He had a bed in the basement.  He had clothes in the
10 basement.  It did not appear that he was packing up to leave.
11 There was luxury clothing everywhere.  There was a Rolex watch.
12 There were numerous cell phones, which the government is in the
13 process of accessing, which are consistent with the operation
14 of a narcotics delivery service.  There was indications of
15 substantial assets in addition to the go bag.
16         With respect to the criminal history, there are quite
17 a few sealed arrests in this case; and while we don't normally
18 ascribe a lot of, you know, any real weight to arrests — I
19 understand they are not convictions — to the extent the defense
20 believes that he's been a completely law-abiding person his
21 whole life, we would dispute that.
22         And the fact that he knew about these deaths and
23 continued operating supports the notion that deterrence is
24 very important in this case, and he would not be deterred even
25 by this arrest if he wasn't deterred by that.

1           Unless the Court has any questions, I would ask for an
2    opportunity for the victims to be heard.
3           THE COURT:  Yes, please.
4           Hi.  Good afternoon.
5           MR. GHAHRAMANI:  Good afternoon, your Honor.  I'm
6    Sassan Ghahramani, Julia Ghahramani's father.
7           THE COURT:  Thank you for being here today, and I just
8    want to tell you how sorry I am for your loss.
9           MR. GHAHRAMANI:  Thank you very much.
10          This is our daughter Julia Ghahramani.  My wife and
11   Julia's sister Kim are in the row over there.
12          THE COURT:  How old was she?
13          MR. GHAHRAMANI:  Julia was 26 years old, your Honor.
14   She had -- this is her graduation picture from Columbia.  She
15   had just graduated from Columbia Law School, through COVID,
16   taking her bar, had just started a new job at a law firm.  She
17   was a beautiful -- our first daughter, beautiful young woman.
18   Everything to live for.
19          She was staying at home.  She went back to her
20   apartment that week to finish up some work.  She had a lot of
21   work.  She had just started her new job.  And we couldn't
22   reach her. We were shocked.  We were stunned to find out that
23   she was poisoned with fentanyl.
24          We -- I hear the defendant's attorney talk about how
25   the defendant's children were upset when he was arrested.

1    It's really difficult to listen to that in this courtroom,
2    your Honor, when our daughter was destroyed, was murdered.
3            We have read the transcripts from the complaint.
4    Julia just -- I could talk about her forever.  Just so you
5    know, she was a warrior for justice.  She entered the law
6    profession.  When she was in junior high school, she wrote
7    that she wanted to change the world for the better.
8            She organized a March for Our Lives demonstration.
9    She was one of the organizers, spoke here on the steps.  She
10   volunteered.
11           After she died, her law firm dedicated an honor to
12   immigrants rights and *pro bono* award.  She had only been there
13   for a few months.  She was our loving daughter and a beautiful
14   girl, and from our -- we keep the word "murder."  I know this
15   is not the charge and I'm not a lawyer.  This is not the
16   charge, it's not murder.  But for us it is poisoning.  It is
17   murder.
18           I think of in the days of prohibition when alcohol
19   was illegal, if a young woman walks into a bar and orders a
20   drink, and there is poison in the drink and she dies, they
21   don't say she died from alcohol or from alcoholism or anything
22   like that.  It's clear that she was poisoned, and that this was
23   murder.
24           And I think because it's a question of drugs, it all
25   gets tied up in trafficking and all these other heinous crimes,

when, in fact, it is such a callous disregard for human life. There is a misperception. Ever since Julia died, every day I get things about fentanyl deaths. I don't think I need to tell you what's going on in this country. And today there is something about five people who died in Colorado, cocaine laced with fentanyl.

And I read things like dealers put fentanyl in because it's cheap. Do they? Because there's lots of things that are cheap that you can put in cocaine or you can put in any substance. They put fentanyl in it because it's so, so, so addictive.

I find it hard to imagine a more heinous criminal than Mr. Ortega. And I'm sorry that the family, maybe they are wonderful people, but, you know, to say, you know, you had learning disability problems doesn't take away from the fact that you killed three people and God knows how many other people.

And the texts and all that shows that they knew exactly what they were doing. They knew exactly what they were doing, your Honor. And the -- I just -- to -- to let a callous murderer, who is -- he put drugs in that everybody -- who doesn't know that fentanyl is potentially lethal and deadly? And they put it in there. Why? To make this victim's family's son, our daughter, other innocent children addicted and clients of theirs with callous disregard for their lives.

So how many dollars did you make off of that?  So now we are supposed to believe that, oh, you are willing to risk killing these people for making a few bucks and now, oh, you are going to put up your family a pledge for 500,000 when your life is potentially at stake in prison and that we shouldn't be worried because why exactly?  I fail to understand that logic.

I will leave it here.  I don't know if, Lily Ann, you have anything to add or Kim.

THE COURT:  Thank you for being here today.  I can only imagine how hard it is.

MR. GHAHRAMANI:  Thank you very much.

MS. MARDEN:  Hi.  I'm Lily Ann Marden, Julie's mother. Sassan said pretty much everything I want to say except just the incredible sadness that we have every day.  Every moment of every day Julia is not here because of him and because of those two who were here.

This did not need to happen.  Why?  Why did it have to happen?  Only because of his selfishness.  He knew.  He knew that that was potentially lethal.  He warned Amanda.  He didn't warn Julia.  Maybe Julia would have known.  I don't know.  But he knew and he did it anyway.  He called five or seven times to check to see if Julia would answer the phone, and she was dead already.

So I don't -- he does not -- he should be in jail for

the rest of his life.

MR. GHAHRAMANI:  The text is:  "Oh, ah-ha, this is a little stronger than the last one, ha ha."  "Ha ha."

THE COURT:  Thank you all again, and I'm so sorry again for your loss.

MS. GHAHRAMANI:  Hi, your Honor.  My name is Kimberly Ghahramani.  I'm Julia Ghahramani's sister.  I wrote something that I would like to read, as well.

THE COURT:  Thank you, Kimberly.

MS. GHAHRAMANI:  My sister was 26 years old when Billy Ortega handed her death on March 17, 2021, the same age that I am now.  As a 26-year-old girl living in New York City, following in my sister's footsteps, I don't feel safe knowing that he is walking the streets of New York involving himself in illegal activities for one reason only: to benefit himself with no care or concern for the collateral damage he causes on the way.

Why let him out to say goodbye to his family before being sent away, something I never got to do to my sister?  To just hand him that?  These men murdered my sister.

Because of Billy Ortega, I will never see my sister again. I will never walk into my home to find her arms wide open to hug me, hear her hearty laugh, soak in her big sister love and advice.  She won't be my bridesmaid at my wedding. She won't be there to watch my parents get old, to get old

with me, because of him.

If let on bail, Billy Ortega will have no way of making an income except through illegal activities. To let him out is to fail to bring justice to Julia, to Ross, to Amanda. To let him out is to put other innocent people at risk of unknowingly losing their lives. Billy Ortega is a murderer and should be treated as such. Billy Ortega does not deserve the freedom to walk the streets of New York while Julia, Amanda, and Ross lay beneath him in their graves.

Thank you, your Honor.

THE COURT: Thank you.

Good afternoon.

MS. LACKEY: Judge, my name is Lauren Lackey. I'm Ross Mtangi's mother. My daughter Shamisa was sitting there, Ross's baby that was born after he passed away, and Ross's fiancée.

My son -- we lived in very modest means in Rhode Island, subsidized housing. My son earned -- got tuition to go to college. He worked hard. He worked very, very hard for everything he had. And he had friends that we saw die through the years. And Ross made a choice of what he wanted to do for his family.

You have been blessed with a lovely family that seems to support you. And I pray for his family and I pray for your children, just as I pray for my grandson who will never, never

1   meet his father, who had just turned 40 years old.  My first
2   grandchild.  Three weeks after burying my son, I'm in the
3   delivery room delivering my grandson.
4            And all I want to say to you is you had an
5   opportunity.  You knew where these three people were at.  You
6   knew where my son was.  You delivered to him, had someone
7   deliver.  You knew where the two women were.  You checked on
8   them.  You knew it was going bad.  It was going bad.
9            So back in the day, when I was young, what would we
10  do?  A man would drop a dime and could make an anonymous phone
11  call:  Go check on somebody in room such and such.  Go up to
12  this.  Just make an anonymous phone call.  It probably would
13  have been too late.  It probably would have.  Most definitely.
14  But you know what?  I would have respected you maybe a smidgen,
15  a smidgen, for doing the right thing.  Because you knew these
16  people.  You joked, you laughed.  You knew them.  You weren't
17  selling to a stranger on the corner.
18           I pray for your family, I pray for you.  And you know
19  what? My life is pretty much over now.  I have a wonderful
20  daughter.  See this is our family.  One row.  You have all the
21  support, and it wasn't enough for you.  It wasn't enough.  Now
22  we are one less and we are heartbroken.
23           Thank you.
24           THE COURT:  Thank you so much for being here today.
25           Is there anyone else who would like to be heard today?

1       MS. FLORIO:  Your Honor, I'm sorry.  May I just say
2  one other thing?
3       THE COURT:  Yes.  Go ahead.
4       MS. FLORIO:  I put it in my bail application, but I
5  also want to just stress to the Court that my client -- part
6  of the bail application was that my client would be, you know,
7  under home incarceration and home detention with GPS
8  monitoring.  I didn't put that forth in my argument, but it is
9  in my bail package.
10       THE COURT:  And I read it.  Thank you very much.
11       Would anyone like to be heard?  As you all know,
12  victims are permitted under the law to be heard at every stage
13  of a case, but they are also welcome in my courtroom to be
14  heard at any time.  All right.
15       So I am ready to rule.  My understanding is no one
16  else would like to be heard.
17       In short, the defendant's motion for bail is denied.
18       In assessing whether pretrial detention is warranted
19  under 18 United States Code § 3142(g) courts must assess the
20  nature and circumstances of the offense charged; the weight of
21  the evidence against the person; the history and
22  characteristics of the person, including, among other factors,
23  family ties, employment, financial resources, past conduct,
24  criminal history, and whether the person was on release pending
25  trial and the nature and seriousness of the danger to any

1   person or the community that would be posed by the person's
2   release.
3            Because the defendant has been charged with a drug
4   offense punishable by sentence exceeding ten years, there is a
5   rebuttable presumption that no condition or combination of
6   conditions exists that will ensure the defendant's appearance
7   or the safety of the community.  He has been unable to rebut
8   that presumption today.
9            The government has met its burden by showing by clear
10  and convincing evidence that defendant poses a danger to the
11  community.  Defendant's narcotics delivery service operated for
12  a lengthy period of time going back to at least 2019.  The
13  government has also proffered evidence suggesting that he
14  continued to operate this service, albeit with a different
15  phone, notwithstanding the knowledge that three of his buyers
16  had died from a fentanyl overdose, which is highly probative
17  of dangerousness from my perspective.  This evidence includes
18  several texts and calls from the defendant to the victims on
19  the day they died that went unanswered and photos of home drug
20  testing kits sent to the defendant indicating that he wished
21  to test his drugs.  Additionally, records show that the
22  defendant texted one of the victims after the drugs were
23  delivered warning her not to do too much because the batch was
24  strong.
25           While it's not clear that the defendant knew that the

1   drugs were laced with fentanyl as opposed to him simply

2   selling a strong batch of cocaine, or at least I don't have

3   that evidence before me, taking all of the proffered evidence

4   together, I find the defendant poses a danger to the community.

5       In addition, the fact that he faces a substantial

6   20-year mandatory minimum sentence suggests that he may indeed

7   be a flight risk.  The fact that law enforcement found what

8   the government is referring to as the "go bag" at his home

9   containing thousands of dollars, jewelry, a passport, and other

10  identification documents also suggests that he has the means,

11  ability, and readiness to flee at any moment.

12      While I appreciate that Mr. Ortega has proffered an

13  alternative reason for this evidence, I am not persuaded that

14  he has overcome the presumption in this case.

15      Accordingly, he will be detained pending trial.

16      Are there any other applications at this time?

17      MS. FLORIO:  No, your Honor.

18      MR. HERMAN:  No, your Honor.

19      THE COURT:  All right.  Thank you all.  We are

20  adjourned.

21                              oOo