UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                         :

UNITED STATES OF AMERICA        :

                                      :

          - *v.* -                :          S4 22 Cr. 91 (RA)

                                        :

BILLY ORTEGA,                  :
      a/k/a "Jason,"          :

                                        :

                    Defendant.      :
------------------------------------------------------x

# THE GOVERNMENT'S MOTIONS *IN LIMINE*

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Micah F. Fergenson
Michael R. Herman
Robert B. Sobelman
Assistant United States Attorneys

   - Of Counsel -

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND ........................................................................................................ 1

ARGUMENT ............................................................................................................. 4

I.      The Court Should Admit Evidence of the Operation of Ortega's Narcotics Delivery Service
        Concerning Other Drugs, Identity Evidence, and Evidence of CW-1's Prior Dealings with
        Ortega as Direct Evidence of the Conspiracy, Background, or Pursuant to Rule 404(b) .... 4

        A.   Applicable Law ................................................................................. 5
        B.   Discussion ........................................................................................ 8

II.     The Court Should Preclude Evidence and Argument Concerning the Potential Punishment
        or Consequences of Conviction .......................................................................... 14

III.    The Court Should Preclude Evidence and Argument That Would Invite Nullification .... 15

IV.     The Court Should Order the Defendant to Comply with his Rule 16(b) Obligations........ 16

CONCLUSION.......................................................................................................... 20

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in support of its motion for certain rulings in advance of the trial of defendant Billy Ortega scheduled for January 18, 2023. Specifically, the Government seeks the following rulings:

1. The Court should admit (i) evidence that Ortega's narcotics delivery service distributed other drugs in addition to cocaine, fentanyl, and acetylfentanyl, (ii) evidence establishing Ortega's identity as the leader of the narcotics delivery service, and (iii) evidence regarding a cooperating witness's prior dealings with Ortega, as direct evidence of the charged conspiracy, as background, and pursuant to Rule 404(b).

2. The Court should preclude evidence and argument concerning the potential punishment or consequences that the defendant faces if convicted.

3. The Court should preclude evidence and argument that would invite juror nullification.

Lastly, the Government respectfully requests that the Court order the defendant to comply with his reciprocal discovery obligations pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure by no later than Monday, January 9, 2023.

## BACKGROUND

Superseding Indictment S4 21 Cr. 91 (RA) (the "Indictment") charges Billy Ortega with operating a narcotics delivery service that distributed drugs that killed three people, and with possessing a firearm in furtherance of that narcotics conspiracy. (*See* Dkt. 70). Count One charges narcotics conspiracy resulting in death, in violation of 21 U.S.C. § 846. Specifically, Count One charges that the conspiracy Ortega operated was in effect from at least 2015 until February 2022, and involved the distribution and possession with intent to distribute: five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A); and mixtures and substances containing fentanyl and acetylfentanyl, in violation of 21 U.S.C. § 841(b)(1)(C). Count One further charges that the use of controlled substances distributed by Ortega on or about March 17, 2021 resulted in the deaths of Julia Ghahramani,

1

Amanda Scher, and Ross Mtangi.   Counts Two, Three, and Four charge Ortega in separate substantive counts with distributing the drugs that resulted in the deaths of Ghahramani, Scher, and Mtangi, respectively, on or about March 17, 2021, each in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.   Count Five charges Ortega with use and carrying of a firearm during and in relation to, or possession of a firearm in furtherance of, the narcotics conspiracy charged in Count One, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.

The charges arise from an investigation conducted by the New York City Police Department ("NYPD") and other agencies into the fatal narcotics poisonings of Ghahramani, Scher, and Mtangi (collectively, the "Victims").   On March 18, 2021, NYPD officers and emergency medical personnel were called, separately, to Ghahramani's and Scher's Manhattan apartments and to a Manhattan hotel room where Mtangi was staying.   All three Victims were found unresponsive and pronounced dead on the scene.   Responding officers found identical translucent black baggies containing a white powdery substance at all three locations.   The white powdery substance in the recovered baggies and/or drug paraphernalia at each of the scenes tested positive for the presence of fentanyl and cocaine, and the substances at Ghahramani's apartment also contained trace amounts of acetylfentanyl (a fentanyl analog).   Consistent with those lab results—as well as the presence of those substances in each of the Victims' blood found by certified medical toxicologists—the Office of the Chief Medical Examiner of the City of New York ("OCME") determined that Ghahramani died from acute intoxication due to the combined effects of fentanyl, acetylfentanyl, and cocaine; Scher died from acute intoxication due to the

2

combined effects of fentanyl and cocaine; and Mtangi died from acute intoxication due to the combined effects of fentanyl, cocaine, and ethanol.[1]

Text messages on Scher's and Ghahramani's cellphones show that, on several occasions, including on March 17, 2021, they communicated with the user of the telephone number 646-421-5555 (the "5555 Drug Dispatcher Phone") regarding drug deliveries. (*See* Compl. ¶¶ 7(a), (e)). As detailed in the Complaint, the Government's investigation identified Ortega as the user of the 5555 Drug Dispatcher Phone and the leader of the conspiracy.

On February 1, 2022, law enforcement agents executed an arrest warrant for Ortega and a search warrant for his residence in West Milford, New Jersey. Law enforcement agents recovered several devices in the search of Ortega's New Jersey residence, including the 5555 Drug Dispatcher Phone. Among other evidence, the recovered 5555 Drug Dispatcher Phone contains selfies of Ortega and the text messages with victims Scher and Ghahramani (which were also recovered from their phones), as well as text messages with victim Mtangi (whose phone's contents law enforcement has been unable to access). Moreover, shortly after the Victims died, Ortega switched the phone number associated with the 5555 Drug Dispatcher Phone, but all of the prior communications with 646-421-5555 remained on the phone.

Also on February 1, 2022, law enforcement agents arrested one of Ortega's co-conspirators, who worked as a courier for Ortega's delivery service—*i.e.*, delivered Ortega's drugs to customers on behalf of Ortega for a small fee—and delivered the fatal drugs to the victims on March 17, 2021. Subsequent to his arrest, that co-conspirator became a cooperating witness ("CW-

---

[1] Mtangi's toxicology indicated that he had had consumed about two to three alcohol beverages prior to his death. The medical examiner who performed the autopsy on Mtangi will opine that fentanyl and cocaine were the but-for causes of Mtangi's death and that the alcohol on its own could not have caused his death.

1") with the Government.  The Government expects CW-1 will testify—consistent with the contents of seized cellphones and iCloud accounts—that Ortega operated the narcotics delivery service for years, from at least approximately 2015 up until the time of the arrests.  CW-1 will explain that Ortega's mother—co-defendant Josefina Marine—was an active participant in the conspiracy who stored his drugs at her apartment in the Fulton Houses; provided those drugs to couriers, such as CW-1; and received money from the couriers, such as CW-1, which Marine stored in one of her safes and which were protected by guns supplied by Ortega.  Periodically, Ortega would come to Marine's apartment to collect the narcotics proceeds.  In addition, Ortega would utilize several other individuals, including his brother ("CC-1"), to break down and bag cocaine in Marine's apartment.

At trial, the Government expects to prove its case primarily through law enforcement and cooperating witness testimony, electronic evidence (including from Ortega's iCloud accounts and from his many cellphones), photographs of the fentanyl and acetylfentanyl-laced cocaine Ortega directed CW-1 to deliver to the Victims' Manhattan locations shortly before their deaths, medical and toxicology evidence, and historical cellsite location data on the 5555 Drug Dispatcher Phone.

## <u>ARGUMENT</u>

### I.  The Court Should Admit Evidence of the Operation of Ortega's Narcotics Delivery Service Concerning Other Drugs, Identity Evidence, and Evidence of CW-1's Prior Dealings with Ortega as Direct Evidence of the Conspiracy, Background, or Pursuant to Rule 404(b)

First, the Government respectfully submits that it should be permitted to offer (1) evidence that Ortega's narcotics delivery service distributed narcotics in addition to fentanyl, acetylfentanyl, and cocaine; (2) evidence concerning the nature and history of the relationship between CW-1 and Ortega, as further described below; (3) evidence of Ortega's lies to his bank about his income and tax liability as identity evidence and to show efforts to conceal the true sources of his income (*i.e.*,

4

narcotics trafficking); and (4) evidence obtained from an iCloud account linked to the 5555 Drug Dispatcher Phone showing Ortega owing child support payments on that iCloud account as proof that Ortega operated that iCloud account.  As described below, this evidence is admissible as direct evidence of the charged conspiracy, as background, and pursuant to Rule 404(b).

### A.    Applicable Law

Rule 404(b) of the Federal Rules of Evidence prohibits admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith."  Fed. R. Evid. 404(b).  The Rule allows the introduction of such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  *Id.*

As a preliminary matter, in determining whether other act evidence is subject to Rule 404(b) at all, the Second Circuit has explained that evidence of other criminal activity is admissible without reference to Rule 404(b) if the evidence: (1) "arose out of the same transaction or series of transactions as the charged offense"; (2) "[is] inextricably intertwined with the evidence regarding the charged offense"; or (3) "is necessary to complete the story of the crime [on] trial." *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989).  In such cases, the evidence is considered intrinsic or direct proof of the charged crimes. *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012).

Evidence of acts not specifically charged in the underlying indictment may also be admissible as background evidence where it is used to (i) explain the development of the illegal relationship between co-conspirators or between the defendant and a cooperating witness; (ii) explain the mutual criminal trust that existed between co-conspirators or between the defendant and a cooperating witness; and/or (iii) place charged events in context.  *See, e.g.*, *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (uncharged acts are admissible background where they

provide "context of certain events relevant to the charged offense"); *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."); *United States v. Agudelo*, 141 F. App'x 13, 15-16 (2d Cir. 2005).

Even if the evidence is subject to Rule 404(b), the Second Circuit "has adopted an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004); *see also United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011). Evidence is admissible under Rule 404(b) if it is: (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)).

Applying this approach, the Second Circuit has routinely approved of the admission of "other acts" evidence with respect to the issues of knowledge, intent, and/or motive. *See, e.g.*, *United States v. Thomas*, 54 F.3d 73, 81-82 (2d Cir. 1993); *United States v. Meyerson*, 18 F.3d 153, 166-67 (2d Cir. 1994). Where the defendant claims his conduct has an innocent explanation, the admission of evidence of other acts is particularly appropriate. *See, e.g.*, *Zackson*, 12 F.3d at 1182 ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged."). When other act evidence is offered to show knowledge or intent,

"such evidence must be sufficiently similar to the conduct at issue to permit the jury to draw a reasonable inference of knowledge or intent from the other act." *United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011). The other act evidence "need not be identical to the charged conduct to show knowledge or intent pursuant to Rule 404(b)" but it must "provide[] a reasonable basis for inferring knowledge or intent." *Id.* at 32-33. The defendant's knowledge and intent are in issue unless the defendant has unequivocally conceded that element of the offenses with which he is charged. *See, e.g.*, *United States v. Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989); *see also United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (when the defendant "disavows awareness that a crime was being perpetrated" and the Government bears the burden of proving knowledge "as an element of the crime, knowledge is properly put in issue").

The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b). *United States v. Brady*, 26 F.3d 282, 286 (2d Cir. 1994). Where evidence is offered for a proper purpose under Rule 404(b), it may be excluded only if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. *Zackson*, 12 F.3d at 1182; Fed. R. Evid. 403. The Second Circuit has found admission appropriate where the offered evidence "'did not involve conduct any more sensational or disturbing than the crimes with which [the defendants were] charged.'" *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). The Second Circuit has repeatedly held that evidence properly admissible under Rule 404(b) is not unduly

7

prejudicial so long as the court gives a limiting instruction to the jury explaining the purpose for

the evidence.  *See United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996); *United States v. Rosa*,

11 F.3d 315, 334 (2d Cir. 1993).

**B.      Discussion**

1)   Evidence Showing Ortega's Distribution of Additional Controlled Substances
     Is Admissible

The Government expects to offer evidence that Ortega distributed, in addition to cocaine,

fentanyl, and acetylfentanyl, other controlled substances, including the following: Viagra,

Adderall, Xanax, Percocet, marijuana, mushrooms, ecstasy, methamphetamine,

methylenedioxymethamphetamine (or "MDMA"), and cocaine base (or "crack cocaine").  The

Government expects this evidence to come in the form of witness testimony and documentary

evidence from cellphones used by the defendant and others.  For example, a note on an iPhone

seized from the defendant's residence in New Jersey is titled "Just keep in mind Menu top shelf"

and then provides the following list:

> Christina ✻ Best in the city
> Molly World
> Ecstasy
> Shrooms
> Tabs
> Viagra More on Monday
> Adderall
> Xanax bars
> Perk Yellow bananas
> Perk pinks 10s
> Perk 30mg Blues
> Flower grass

The Government expects testimony explaining coded drug slang.  For example, "Christina" is

slang for crystal meth (methamphetamine), "Molly" is slang for MDMA, "Tabs" is slang for

lysergic acid diethylamide ("LSD"), "Perk" is slang for Percocet, and "Flower grass" is slang for

marijuana.  As another example, a note on the same iPhone includes the text message "6:24 pm dived 500$ 4 hard"—"hard" being slang for crack cocaine.  CW-1 will likewise testify that, in addition to cocaine, he delivered other narcotics, such as ecstasy, molly, and Adderall, on behalf of Ortega.  That testimony is consistent, moreover, with text messages between Ortega, using the 5555 Drug Dispatcher Phone and other cellphones, and CW-1.

Such evidence is admissible as direct evidence of the charged narcotics delivery service conspiracy.  While the objects of the conspiracy specified in the Indictment are fentanyl, acetylfentanyl, and cocaine, direct evidence is "not confined to that which directly establishes an element of the crime."  *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  Indeed, the delivery service's distribution of other controlled substances fits squarely into the Second Circuit's description of intrinsic or direct proof.  *Carboni*, 204 F.3d at 44.  Ortega's distribution, through his delivery service, of the other controlled substances described above is part and parcel of his distribution of cocaine, fentanyl, and acetyl fentanyl.  Ortega distributed all of the substances through the same delivery service, using the same co-conspirators and couriers, operating out of the same central location, and communicating with the same cellphones.  In other words, Ortega's distribution of the other controlled substances (1) "arose out of the same transaction or series of transactions as the charged offense"; (2) "[is] inextricably intertwined with the evidence regarding the charged offense"; or (3) "is necessary to complete the story of the crime [on] trial."  *Towne*, 870 F.2d at 886.  In addition, these other controlled substances are not "any more sensational or disturbing" than the distribution of fentanyl and its analog, much less the three deaths that resulted, and is thus not barred by Rule 403.  *Pitre*, 960 F.2d at 1120.  Accordingly, evidence relating to the

distribution of these other controlled substances is admissible as direct evidence of the charged

narcotics delivery service conspiracy.[2]

    2)  <u>CW-1 Should Be Permitted to Testify about Relevant Past Dealings with the Defendant</u>

The Government expects CW-1 will testify regarding the nature and history of his

relationship with Ortega, including the following.  First, CW-1 will testify that, in approximately

March 2018, Ortega paid CW-1 $1,000 to put the insurance for Ortega's car under CW-1's name.

Ultimately, the plan fell through, and CW-1 returned the $1,000.  CW-1 understood that Ortega's

car was in the name of Ortega's mother and would be used in connection with the narcotics

conspiracy, and that Ortega had asked CW-1 to put the insurance in CW-1's name so as to avoid

tying the car directly to Ortega.  CW-1's expected testimony is consistent with contemporaneous

text messages between CW-1 and Ortega contained on CW-1's phone that was seized at CW-1's

arrest.  Second, absent an agreement by the defendant not to raise the issue on cross-examination,

CW-1 will testify that he, Ortega, and CC-1 were arrested in or about November 2016 on state

robbery charges.  (*See* Compl. (Dkt. 1) ¶ 12(a)).  CW-1 will testify that the arrests occurred after

a fight broke out after a night of drinking; CW-1 was punched and fell to the ground.  The charges

against CW-1, Ortega, and CC-1 were dismissed.

Such testimony is admissible as direct evidence of the defendant's participation and role in

the narcotics trafficking conspiracy.  These events "arose out of" CW-1's criminal dealings with

Ortega, are "intertwined" with them, and "complete the story of the crime on trial."  *Towne*, 870

F.2d at 886.  Put differently, these events supply "background for the events alleged in the

---

[2] Alternatively, even assuming Rule 404(b) applied, such evidence is also admissible under Rule 404(b) to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, and lack of accident.

indictment"—namely, the charged narcotics conspiracy—and serve as proof of the association among its co-conspirators. *Daly*, 842 F.2d at 1388. Moreover, testimony that Ortega sought to maintain assets in the names of others is admissible as evidence of the defendant's efforts to conceal his assets and the true source of the income allowing him to acquire those assets (*i.e.*, narcotics trafficking). And it also shows the nature of the relationship between CW-1 and Ortega—namely, that Ortega trusted CW-1 as a participant in the conspiracy. Accordingly, testimony about both events is admissible as direct evidence. Additionally, and in the alternative, testimony concerning the car insurance scheme is also admissible under Rule 404(b) to show the defendant's motive, opportunity, intent, preparation, knowledge, absence of mistake, and lack of accident with respect to his narcotics trafficking and the income he derived from it. Such testimony would not be unfairly prejudicial because it involves conduct no more "sensational or disturbing than the crime with which [he is currently] charged." *Pitre*, 960 F.2d at 1120 (quoting *Roldan–Zapata*, 916 F.2d at 804).

   3)   Ortega's Lies to a Bank About His Income and Tax Liability Are Admissible

The Court should admit evidence relating to a bank account held in Ortega's name. As an initial matter, the bank-related evidence is admissible as direct evidence of his participation in the narcotics trafficking conspiracy because they prove that Ortega was the user of relevant iClouds and cellphones used in furtherance of the conspiracy, because Ortega provided the bank—in connection with this account that was held in Ortega's true name—with identifiers (*e.g.*, the email address "kingbilly0812@gmail.com") linked to those iClouds and cellphones. Additionally, the bank-related evidence includes recorded calls in which the defendant makes misrepresentations to the bank about, among other things, the source of his income and his tax obligations. In a recorded call on or about September 10, 2021, between Ortega and a bank employee, Ortega inquired about

increasing his credit limit.  Ortega told the bank employee, in substance and in part, that his total annual income was "up to 80" thousand dollars and that his income was not subject to taxation because he has "a dog kennel."  Ortega's misrepresentations about the source of his income and tax liability are admissible as evidence of his efforts to conceal the true source of his income (*i.e.*, narcotics trafficking), and, thus, as direct evidence of the charged conspiracy.  In the alternative, such misrepresentations are also admissible, under Rule 404(b), to show the defendant's motive, opportunity, intent, preparation, knowledge, absence of mistake, and lack of accident with respect to his narcotics trafficking and the income he derived from it.  And, again, this evidence is not unfairly prejudicial because it involves conduct no more "sensational or disturbing than the crime with which [he is currently] charged."  *Pitre*, 960 F.2d at 1120 (quoting *Roldan–Zapata*, 916 F.2d at 804).

4) <u>Evidence from an iCloud Account Indicating that "Billy Ortega" Owed Child Support Is Admissible to Show that Ortega Was the User of that Account</u>

Absent a stipulation that the defendant used and controlled the relevant iCloud accounts, the Government intends to offer evidence from one of the defendant's iCloud accounts regarding child support owed by the defendant as proof of the identity of the user of that iCloud account – *i.e.*, the defendant – and his ownership and control over that iCloud account and the cellphones linked to that account.  Specifically, the Government's evidence may include a photograph from an iCloud account with an Apple ID that began with "michlop812" (the "michlop812 iCloud") that is a screenshot of an iMessage conversation on an iPhone.[3]  The last text received in the conversation states: "Welp at least we know your phone is working well to forward my calls.

---

[3] As described in the Complaint, the michlop812 iCloud was one of two iCloud accounts used by Ortega that listed the 5555 Drug Dispatcher Phone as the account's two-factor authentication phone number.  (*See* Compl. (Dkt. 1) ¶¶ 9-11).

We've had multiple conversations about your MINUTE responsibilities when it comes to [name of apparent minor child] and you have yet to get a grasp on it. I mean WTF IS REALLY WRONG WITH YOU BILLY ORTEGA ?" (Compl. (Dkt. 1) ¶ 11(a)).

This evidence is admissible under Rule 404(b) as identity evidence demonstrating the defendant is the user of relevant iClouds and cellphones.  Nor is it barred by Rule 403, because the probative value of such evidence is not "substantially outweighed" by the danger of unfair prejudice.  *Zackson*, 12 F.3d at 1182.  To be sure, that Ortega did not pay child support is undoubtedly serious and distasteful.  But it is far from "more sensational or disturbing than the crimes" for which he will stand trial.  (*Id.*).  As charged in the Indictment, the Government's evidence at trial will establish that the defendant operated a narcotics delivery for *years*; that he caused the deaths of three different individuals in a single night by delivering them "cocaine" that was laced fentanyl; that, despite his apparent knowledge of those deaths, he continued dealing drugs until his arrest; that his family members, including his mother, were co-conspirators, and he used his mother's apartment as the base of operations; and that he supplied his co-conspirators with firearms to protect the money and the drugs in the apartment.[4]  By comparison, the fact that Ortega did not pay child support is not unfairly prejudicial when it is otherwise admissible as identity evidence.  And to the extent there exists a risk of unfair prejudice, this Court can cure it

---

[4] The Government notes that its evidence at trial will include co-conspirator statements made in furtherance of the conspiracy that are clearly admissible under Rule 801(d)(2)(E).  These include statements from co-defendants Marine and William Drayton, CC-1, and other co-conspirators who worked for the drug delivery service.  The co-conspirator statements take the form of text messages and oral statements made to CW-1, about which CW-1 will testify.

by giving a limiting instruction as to the proper purpose of the evidence.  *See Pipola*, 83 F.3d at

566; *Rosa*, 11 F.3d at 334.

## II.    The Court Should Preclude Evidence and Argument Concerning the Potential Punishment or Consequences of Conviction

The defendant should be precluded from offering evidence or argument concerning the

potential punishment or consequences that he faces if convicted.  If convicted of the five counts in

the Indictment, Ortega faces a mandatory minimum sentence of 25 years' imprisonment and a

maximum term of life imprisonment.  *See* 21 U.S.C. §§ 841(b)(1)(A), 841(b)(1)(C); 18 U.S.C. §

924(c)(1)(A)(i).  In addition, the Government believes that Ortega's sentencing exposure under

the relevant United States Sentencing Guidelines call for a recommended sentence of life

imprisonment, to be followed by five years' imprisonment.[5]  Where the jury has no role at

sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to

what sentence might be imposed.'"  *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting

*Rogers v. United States*, 422 U.S. 35, 40 (1975)).  This is so for good reason: argument concerning

punishment "invites [jurors] to ponder matters that are not within their province, distracts them

from their factfinding responsibilities, and creates a strong possibility of confusion."  *Id.*  There is

no proper basis for the defendant to put these issues before the jury in any form, and the defendant

should not be permitted to offer evidence or argument inviting the jury to consider them.  *See, e.g.*,

*United States v. Avenatti*, No. 19 Cr. 374, Dkt. 288 (JMF) (S.D.N.Y. Jan. 13, 2022) (Tr. 9-10)

("anything that adverts to possible punishments, including possibility of incarceration, however

obliquely, is improper and will not be permitted," including, for example, a statement in opening

or closing arguments that the defendant's "liberty is at stake," which would be "a not-so-thinly

veiled reference to the prospect of incarceration, which is altogether improper").

---

[5] The Government previously provided Ortega with a *Pimentel* letter with this calculation.

### III.     The Court Should Preclude Evidence and Argument That Would Invite Nullification

The defendant should be precluded from offering evidence of aspects of his life that may tend to elicit the jury's sympathy, such as his family background, children, health, age, religion, or any other similar personal factors.

Evidence and argument that makes the defendant appear sympathetic for reasons unrelated to the charges at issue should also be excluded as inviting the jury to acquit a defendant even where the evidence proves his guilt beyond a reasonable doubt.  Juries are not "to act based on their . . . sympathy."  *United States v. Stroming*, 838 F. App'x 624, 627 (2d Cir. 2021); *see, e.g.*, *United States v. Mustaga*, 753 F. App'x 22, 37 (2d Cir. 2018) ("The district court correctly recognized that evidence of solitary confinement could be used for the improper purpose of provoking juror sympathy.").  Any attempt to encourage such sympathy is therefore an attempt at nullification, which is itself plainly improper.  *See, e.g.*, *Thomas*, 116 F.3d at 615 (Jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent.").

In keeping with these principles, the defendant should be precluded from offering evidence and argument concerning his family background, children, health, age, religion, or other similar personal factors, absent a showing that such factors bear on guilt.  *See, e.g., United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, No. S9 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of [d]efendant's family and personal status" as not "relevant to the issue of whether [d]efendant committed the crimes charged"); *United States v. St. Rose*, No. 11 Cr. 349 (SJ), 2012 WL 1107659, at *1 (E.D.N.Y. Apr. 2, 2012) (precluding evidence of

the defendant's immigration status because it does "not bear on the [d]efendant's innocence or guilt"). Such evidence is irrelevant to the jury's determination of guilt and should be precluded.

## IV.    The Court Should Order the Defendant to Comply with his Rule 16(b) Obligations

Pursuant to Federal Rule of Criminal Procedure 16(b)(1)(A), if a defendant "requests disclosure under Rule 16(a)(1)(E) and the government complies," then the defendant must permit the Government to inspect any documents in the defendant's "possession, custody, or control," which the defendant intends to use in his "case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A).

On March 17, 2022, at the time of the Government's first discovery production, the Government requested, in writing, reciprocal disclosures from the defendant pursuant to Rule 16(b). In its subsequent discovery productions, the Government reiterated its request for reciprocal discovery.

On December 20, 2022, the Government provided written disclosure, pursuant to Fed. R. Crim. P. 16(a)(1)(G) of the expert testimony of ten proposed experts that the Government intends to offer at trial.[6] In that letter, the Government again reiterated its request for reciprocal discovery. Later that day, the Government again requested, via email, whether the defense will be disclosing any experts or producing and Rule 16(b) discovery. One of the defendant's attorneys responded that he would "defer to" one of the defendant's other attorneys "on this issue." That other attorney did not respond to the Government's inquiry.

---

[6] As the Government informed the Court at the arraignment and conference on December 16, 2022, the defendant has indicated that, presently, he will not stipulate to any narcotics testing or medical evidence. Accordingly, among the ten expert witnesses that the Government noticed are (i) three NYPD criminalists who tested the narcotics found at the scenes of each of the three Victims; (ii) two medical toxicologists who tested the Victims' blood; and (iii) two medical examiners who examined the Victims' bodies to determine their cause of death. The remaining two expert witnesses are a cellsite location expert and an expert in narcotics trafficking. The Government remains amenable to entering into straightforward stipulations to obviate the need to call most of these expert witnesses, should the defense change its position on stipulations.

To date, although the Government first requested reciprocal discovery more than nine months ago and trial is a few weeks away, the defendant has produced no reciprocal discovery materials in response to the Government's request.  Accordingly, the Court should require the defendant to produce all documents and evidence subject to disclosure under Rule 16(b), including, but not limited to, substantive, non-impeachment evidence and expert disclosure materials, on or before January 9, 2023.

*First*, Rule 16(b) unambiguously imposes on the defendant an obligation to produce materials he intends to introduce during a defense case-in-chief.  This obligation is triggered by the Government's production of discovery under Rule 16(a).  *See* Fed. R. Crim. P. 16(b)(1) (requiring disclosure "[i]f a defendant requests disclosure under Rule 16(a)(1)(E) and the Government complies").  When the defendant "avail[s] himself of the strategy to obtain discovery of the government, he must comply with the requirement for reciprocal discovery." *United States v. Ryan*, 448 F. Supp. 810, 810-11 (S.D.N.Y. 1978), *aff'd*, 594 F.2d 853, 811 (2d Cir.); *see* Fed. R. Crim. P. 16 Advisory Committee Note—1974 Amend. ("The majority of the Advisory Committee is of the view that . . . the giving a broader right of discovery to the defense is dependent upon giving also a broader right of discovery to the prosecution.").

Put simply:

> Rule 16 presents a defendant with certain options that may require her to make difficult choices.  On the one hand, a defendant can forego discovery of the evidence that the government intends to use in its case-in-chief, and thereby avoid being required to disclose the evidence that she intends to use in support of her defense.  On the other hand, the defendant may decide that it is more important to know what evidence the government intends to use at trial, than it is to avoid disclosure of the defense's evidence.  Rule 16, however, does not allow the defendant to have it both ways, i.e., she cannot obtain the government's evidence without disclosing her own evidence (other than impeachment evidence).

*United States v. Larkin*, No. 12 Cr. 319 (JCM), 2015 WL 4415506, at *5 (D. Nev. July 20, 2015). Here, the defendant has made his choice by requesting and receiving the Government's discovery productions, and he must now be required to comply with his reciprocal obligations under Rule 16. He should not be permitted to "have it both ways." *Id*.

On that basis, courts in this District "routinely set a deadline for [Rule 16(b)] disclosures at least a few *weeks* before the start of trial, even over defendants' objections," and before they have made a final decision to introduce an item at trial. *United States v. Shea*, No. S2 20 Cr. 412 (AT), Dkt. No. 206 (S.D.N.Y. May 4, 2022). Although "[a] defendant would always like more information about the government's case before revealing anything about his or her own," Rule 16 "conditions a defendant's disclosure obligations on the government's having made certain specified disclosures, not on the government's laying open its entire case or the defendant's satisfaction." *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2011 WL 723530, at *5 (S.D.N.Y. Feb. 25, 2011). For instance, in *United States v. Huntress*, the court rejected the argument that the defense need not provide reciprocal discovery because it had "not made any decision as to whether it will be putting a case on at trial, as we do not know if the government will meet its burden of proof at trial." No. 13 Cr. 199 (WMS), 2015 WL 631976, at *33 (W.D.N.Y. Feb. 13, 2015); *see also, e.g.*, *United States v. Maxwell*, No. 20 Cr. 330 (AJN), Dkt. No. 297 (S.D.N.Y. June 2, 2021) (setting a defense Rule 16 deadline of three weeks before trial, over the defendant's objection); *United States v. Madonna*, No. 17 Cr. 89 (CS), Dkt. No. 655 (S.D.N.Y. Mar. 1, 2019) (requiring "Defendants to produce reverse Rule 16 discovery" thirty-three days before trial and stating that "[t]he Court enforces Rule 16 and will if appropriate preclude evidence that has not been turned over" by the defense (citing *United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017))); *United States v. Lobo*, No. 15 Cr. 174 (LGS), 2017 WL 1102660, at *5 (S.D.N.Y.

Mar. 22, 2017) (requiring defense production under Rule 16 with no trial date set, over defendants' objections); *United States v. Jasper*, No. 00 Cr. 825 (PKL), 2003 WL 223212, at *4 (S.D.N.Y. Jan. 21, 2003) (explaining that "[a]llowing [the] defendant to defer the provision of such discovery until a final determination regarding whether or not [to] put an expert witness on the stand would seem to frustrate" the goal of allowing the government a fair opportunity to prepare).

*Second*, permitting the defendant to further delay disclosure of Rule 16 materials would only serve the purpose of facilitating gamesmanship and delay the orderly proceedings of trial. Upon receipt of reciprocal discovery, the Government will need to review the materials and may choose to take investigative steps of its own to, among other things, evaluate the authenticity or completeness of those materials and locate relevant rebuttal evidence. The Government also must review those materials to make determinations as to whether to make any objections on admissibility grounds, and the Court will in turn need time to resolve such objections. The defendant should be required to produce any discoverable materials to the Government on or before January 9, 2023, to allow the Government fair preparation for trial and, if possible, to help the Court and the parties streamline the trial—particularly where the Government has now noticed ten expert witnesses and the Government has not received any notice as to whether the defense intends to disclose any experts. *See, e.g.*, *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991) (affirming preclusion of evidence defendant had failed to produce and explaining that permitting defendant to use documents the prosecution had not timely seen "would have given the defense an unfair advantage"); *United States v. Shea*, No. S2 20 Cr. 412 (AT), Dkt. No. 206 (S.D.N.Y. May 4, 2022) ("remind[ing]" Defendant that "the Court has 'broad discretion in fashioning a remedy' to address any instances of a party's non-compliance with their Rule 16 obligations, including 'ordering the exclusion of evidence' where it finds that Defendant could have timely disclosed

19

such evidence under Rule 16, but chose not to do so." (quoting *United States v. Lee*, 834 F.3d 145, 158 (2d Cir. 2016))); *United States v. Napout*, No. 15 Cr. 252 (PKC), 2017 WL 6375729, at *8 (E.D.N.Y. Dec. 12, 2017) (describing the "approach used by many courts": "if the Court determine[s] that a Defendant could have made timely disclosure, but failed to timely do so, the defendant ran the risk that the exhibit would be excluded").

Accordingly, the Court should require the defendant to produce to the Government all documents and evidence subject to disclosure under Rule 16(b), including, but not limited to, substantive, non-impeachment evidence and expert disclosure materials, no later than January 9, 2023.

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be granted, and the Court should grant the Government's request to order the defendant to comply with his Rule 16(b) discovery obligations.

Dated:  New York, New York
        December 30, 2022

                            Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney

                    By:    /s/
                            Micah F. Fergenson
                            Michael R. Herman
                            Robert B. Sobelman
                            Assistant United States Attorneys
                            (212) 637-2190/2221/2616

20