

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 23, 2023

**BY ECF**
Hon. Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

  Re: *United States v. Billy Ortega*, S4 22 Cr. 91 (RA)

Dear Judge Abrams:

  The Government respectfully submits this letter to highlight the legal instructions likely to be relevant to the jury's consideration of the defense theory, pursuant to the Government's colloquy with the Court on January 20, 2023 (*see* Tr. 232).

  The defense has articulated at least three different, and seemingly inconsistent, versions of their theory, each of which appears to rely entirely upon the defendant's anticipated testimony:

- On January 16, 2023, the defense stated, in a letter to the Court:

  Ortega's defense is that co-defendant and co-conspirator Kaylen Rainey was specifically told never to obtain narcotics from the subject specific cocaine supplier with Mexican connections because her cocaine was laced with deadly amounts of fentanyl. Rainey specifically agreed he would not do so, but approximately 1 month later Rainey violated said agreement. Unknown to Ortega Rainey went to said supplier, obtained cocaine which Rainey knew to be laced with fentanyl, and sold that cocaine on the same night to Amanda Scher, Julia Ghahramani, and Ross Mtanji [*sic*]."

  (Dkt. No. 95 at 1.)

- On January 19, 2023, the defense stated, in its opening statement:

  [The defendant] wants to tell you that he had absolutely no knowledge, none whatsoever, that the cocaine that was being delivered to his street customers, who he cared for very much,

Amanda Ross and Julia, who he'd known for a long period of time, you will hear that he never wanted to hurt them. And you will hear that he had no knowledge whatsoever that the drugs that the cooperator gave to them was deadly, that it contained fentanyl.

You will hear that the cooperator in this case didn't care. You will hear in this case that Billy Ortega had instructed the cooperator not to serve anyone with anything except what he normally served them, which was cocaine.

* * *

Now, you're going to hear from Billy Ortega that he had met with a potential supplier of cocaine sometime before March 17. And you're going to hear him talk about how that supplier, when he received those drugs, it was tested by someone, and he rejected those drugs, and he sent the cooperator with those drugs that probably contained fentanyl back to that supplier.

And he specifically instructed that cooperator not to ever sell those drugs, not to ever deliver those drugs.

* * *

You will hear testimony that Billy Ortega instructed the cooperator to give those bad drugs back and never use them. You'll hear testimony that Billy Ortega assumed that those drugs were taken back to that particular supplier.

You will hear that those people that the cooperator served at Billy's direction, Billy told the cooperator not to use the drugs that they had gotten from the supplier a while ago.

You will hear that the cooperator didn't do what he promised to do and that on his own, without Billy's knowledge or consent, he went behind Billy's back, and he was greedy, and he didn't care. . . . He did this as an independent deal secretly.

And you will hear and you will see from the cooperator that the cooperator was the fatal courier. It was the cooperator on his own, independently, like an independent contractor went, served Amanda, served Julia, and served Ross.

(Tr. 44, 46-47.)

2

- On January 20, 2023, in a colloquy with the Court, the defense stated:

  > Ms. Florio said that Billy Ortega specifically told Rainey not to distribute those drugs because he knew that they were potentially poison and the source from which they came was dangerous and never to go there.
  >
  > That's all we're saying, that his conspiratorial role specifically did not include the distribution of those drugs. And he made it known, and he agreed that he wouldn't do it. But, nevertheless, Rainey did it anyway.
  >
  > \* \* \*
  >
  > Our defense is that [the defendant] specifically told Rainey that I am not dealing with this supplier. Rainey went to that supplier on his own and did his own transaction, and it had nothing to do with Billy Ortega.
  >
  > Billy Ortega, for that purpose, had withdrawn from any conspiratorial agreement he had with Rainey, told Rainey not to do it. And said that I do not in, in my drug-dealing, deal with that supplier.
  >
  > \* \* \*
  >
  > It's just not that [the defendant] was surprised it contained fentanyl. He told Rainey not to deal with that person, period. I'm not going to deal with that person. I, as a conspirator, I, as a drug dealer, do not deal with that person.
  >
  > \* \* \*
  >
  > [The defendant] had a specific agreement not to deal with this dealer. There is also a reasonably foreseeable standard that applies. When you're telling somebody not to deal with this supplier and the other person says, okay, at this point, it's not reasonably foreseeable to him that Rainey is going to go back and do it anyway. That's the second part of it. He never had an agreement to distribute drugs from this person. He was dealing with many runners. He was dealing with many kinds of drugs.
  >
  > As to this supplier, he knew it was poison. He told Rainey, I'm not going to have anything to do with it. And when you're dealing with me, never, ever go to that person and distribute drugs on my behalf. That's the defense.

  (Tr. 107, 109, 111-12.)

At this time, the Government does not believe it is productive for the Court to attempt to harmonize the three versions of the defense theory articulated by counsel or attempt to rule on whether any particular version might be a viable legal defense or require a curative instruction or supplemental jury charge. Rather, the Government suggests that the Court revisit this issue after the defendant testifies, at which time his account of what purportedly occurred will be able to be ascertained with greater clarity.

Regardless of the defendant's precise theory, the applicable legal principles are well-settled:

<u>Count One</u> (Narcotics Conspiracy Resulting in Death)

- "[T]he reasonably foreseeable acts . . . of any member of the conspiracy and in furtherance of the common purpose of the conspiracy are deemed under the law to be the acts of all the members and all the members are responsible for such acts . . . ." Thus, "any acts . . . made in furtherance of the conspiracy by persons also found by [the jury] to have been members of that conspiracy may be considered against the defendant. This is so even if such acts were done . . . in the defendant's absence and without his knowledge." (Gov't Requests to Charge (Dkt. No. 81), Request No. 11.)

<u>Counts Two, Three, and Four</u> (Narcotics Distribution Resulting in Death)

- "It is not necessary for the Government to show that the defendant himself physically committed a crime in order for [the jury] to find him guilty. If [the jurors] do not find beyond a reasonable doubt that the defendant physically committed a crime, [they] may, under certain circumstances, still find him guilty of the crime as an aider and abettor or as willfully causing the crime." (Gov't Requests to Charge, Request No. 14.)

<u>Counts One, Two, Three, and Four</u>

- "The defendant is responsible for the victim's death if either one of two conditions has been proven: <u>First</u>, if the defendant personally and directly participated in the transaction that resulted in the victim's death, such as directing or coordinating the sale of the drugs to the victim; or, <u>second</u>, the distribution of the cocaine and/or fentanyl and/or acetylfentanyl that caused the victim's death was either known to the defendant or was reasonably foreseeable to him. This does not require that the death of the victim was itself intended or even foreseeable to the defendant. Rather, it requires only that [the jury] find that the distribution of the drugs that [the jury] find caused the death of the victim was either committed and/or directed by the defendant *or* that it was reasonably foreseeable to him." (Gov't Requests to Charge, Request No. 13; *see also* Gov't Requests to Charge, Request No. 14 (incorporating by reference Request No. 13 for Counts Two, Three, and Four); *accord* Tr. 124 (Court instructing the jury that "the defendant may be held responsible for causing another person's death through distributing illegal drugs to that person or causing another individual to distribute illegal drugs to that person, even if he did not intend to cause the other person's death.").)

- "[T]he law permits a defendant to be found guilty of a narcotics offense, including a narcotics offense causing death, assuming all the elements of the crime are proven beyond a reasonable doubt[,] where the defendant intended to distribute one drug, such as cocaine, but actually distributed or caused another individual to distribute another drug or another drug containing a mixture such as fentanyl."  (Tr. 124-25 (Court instructing the jury); *accord* Gov't Requests to Charge, Request No. 12 ("With respect to any act or acts in which the defendant was personally involved, you do not need to find that he knew what type of drugs were involved or that he knew the exact quantity of drugs that were involved; he only had to know that the substances involved in the offense were drugs.").).

After the defendant's testimony, the Government will be prepared to provide its views on whether any curative instructions or supplemental jury charges may be necessary.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/
Micah F. Fergenson
Michael R. Herman
Robert B. Sobelman
Assistant United States Attorneys
(212) 637-2190 / - 2221 / -2616

5