UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          22 Cr. 91 (RA)

BILLY ORTEGA,

                Defendant.

------------------------------x
                                            New York, N.Y.
                                            January 19, 2023
                                            9:45 a.m.

Before:

                    HON. RONNIE ABRAMS,

                                        District Judge
                                            and a Jury


                        APPEARANCES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
BY:  MICHAEL R. HERMAN
        MICAH F. FERGENSON
        ROBERT B. SOBELMAN
        Assistant United States Attorneys

DAWN M. FLORIO LAW FIRM, PLLC
        Attorneys for Defendant
BY:  DAWN M. FLORIO
        DECLAN J. MURRAY
        -and-
        B. ALAN SEIDLER

Also present:

Alex Frenchman, Paralegal Specialist, U.S. Attorney's Office
Christine Woods, Paralegal Specialist, U.S. Attorney's Office
Susan Ruiz, Special Agent, Homeland Security Investigations

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everyone.  You can be

3   seated.  We will be bringing in the jury shortly.

4          Is everyone ready for opening statements?

5          MS. FLORIO:  Yes, your Honor.

6          MR. FERGENSON:  We are, your Honor.

7          THE COURT:  Who will be giving the opening statement

8   on behalf of the government.

9          MR. FERGENSON:  I will, your Honor.

10         THE COURT:  Ms. Florio, will you be?

11         MS. FLORIO:  Yes.

12         (Pause)

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning, everyone.

3          As I had said yesterday, what we are going to hear

4   this morning is opening statements.  Opening statements are

5   neither evidence nor argument but road maps of what the

6   lawyers expect you will hear during the course of this trial.

7          And with that, why don't we begin with the government.

8   Mr. Fergenson.

9          MR. FERGENSON:  Ross was 40 years old.  Amanda was 38.

10  Julia was only 26.  They didn't know one another, but they each

11  struggled with drugs and addiction.

12         On March 17, 2021, they each contacted the same drug

13  dealer——this man, the defendant, Billy Ortega.  For years, he

14  had been selling drugs, fueling addiction.  Now Ross, Amanda,

15  Julia, they ordered cocaine from the defendant that day, and he

16  sent one of his runners, a courier, to deliver the drugs.  They

17  had ordered cocaine from the defendant before, and they knew

18  that someone would deliver the drugs that very same day to

19  their doors, but they had no idea that the defendant's drugs

20  that day were different; different and deadly.  They contained

21  fentanyl, a powerful, deadly drug, far more dangerous than

22  cocaine, a drug so powerful it can stop you from breathing.

23         Unaware, they used the defendant's drugs, and they

24  died.  Their bodies were found the next day.

25         Amanda's body was in her apartment.  After taking the

defendant's drugs, she collapsed, face down, on her coffee
table.

          Ross took the defendant's drugs and crumpled to the
floor next to the bed in his Manhattan hotel room.

          Julia was found in her apartment.  She took the
defendant's drugs, she sat down on her couch, and that was
where her best friend found her body the next day.

          Julia, Amanda, Ross.  They didn't live together.
They didn't even know each other.  They had only one thing in
common:  On March 17, 2021, they each ordered cocaine from the
defendant and they each received a deadly dose instead.

          And the defendant?  He knew his drugs had killed that
day.  But all his other customers didn't.  So he just kept on
selling drugs, kept on directing his runners to deliver his
drugs——drugs he kept at an apartment in Manhattan, the same
apartment where he kept his guns, and that's why we are here
today.  Because the defendant was a drug dealer who worked
with others to sell drugs for years.  The defendant protected
his drugs and his drug money with guns, and the defendant's
drugs caused the deaths of three different New Yorkers in a
single day.  Three people in one day.

          Over these next few minutes, I am going to tell you
what the evidence at this trial will show and how we are going
to prove beyond a reasonable doubt that the defendant is
guilty.

1          So first, what will the evidence show?  For years, the

2    defendant was the leader of a drug crew selling thousands of

3    dollars worth of drugs a week.  His drug dealing was high-end,

4    delivery on demand——cocaine, Ecstasy, all different kinds of

5    pills.  Just text defendant an address and an order and, for a

6    price, he would have your drugs delivered the very same day.

7          Now, the defendant got away with it for years because

8    he was careful.

9          He didn't use his real name with customers.  He went

10   by "Jason."

11         And the defendant didn't deliver the drugs himself.

12   He paid people, people he trusted——close friends, family

13   members——to deliver his drugs.  He called them his runners.

14         And the defendant used code in his text messages with

15   customers.  A bag of cocaine was an "invite."  With runners, it

16   was "will."  So saying "go deliver five will," that meant go

17   deliver five bags of cocaine.

18         And lastly, the defendant didn't keep his drugs at his

19   own house.  He lived out in New Jersey.  He used his mother's

20   apartment in Manhattan as the stash house, the hub for his

21   drug business.  That's where the defendant's runners picked up

22   drugs, dropped off money.  In that apartment, inside two

23   locked safes, the defendant kept his drugs and his drug money.

24   And to protect his drugs and his cash, he kept guns at the

25   stash house.

1              Now, while the defendant's drug dealing lasted for

2      years, part of this trial will focus on a single day—March 17,

3      2021—the day the defendant's drugs killed three New Yorkers.

4      Julia, Ross, Amanda.

5              And the evidence is going to show that the defendant

6      knew his drugs had killed the three victims.  How did the

7      defendant respond?  Did the defendant finally get out of the

8      game?  Just leave the drug business for good?  No.  He just

9      changed his phone number and immediately kept selling more

10     drugs.  Business as usual.  For the defendant, for this drug

11     dealer, those three tragic deaths were just the cost of doing

12     business.  That's what the evidence at this trial is going to

13     show.

14             How is the government going to prove it, prove to you

15     that the defendant is guilty?  You are going to see and hear

16     several different types of evidence.  You will see the

17     defendant's own words in countless text messages.  You will

18     see him arranging drug deals with customers, see him directing

19     his runners to deliver his drugs.  You will see his text

20     conversations with Julia, with Amanda, with Ross, arranging the

21     delivery of the drugs that killed them.

22             (Continued on next page)

23

24

25

1      MR. FERGENSON:  You will see that before the

2  defendant's drugs were delivered to any of the three victims,

3  the defendant received a text from a defendant customer warning

4  the defendant that his drugs had just almost killed someone

5  else.  Those text messages, they're on the defendant's own cell

6  phone, found inside his house in New Jersey.

7      You're also going to hear from witnesses.  Julia's

8  best friend will tell you how she found Julia's body in her

9  apartment next to the defendant's drugs.  You'll hear from

10  police officers who responded to the scenes of the three

11  deaths.  You'll see photographs of the black baggies containing

12  the defendant's deadly drugs.

13      You're going to hear expert testimony about how

14  dangerous fentanyl is, how it causes death.  And you're going

15  to hear from one of the defendant's drug runners.  He will give

16  you an inside view of how the defendant ran his drug business

17  for years.

18      He'll tell you where the defendant stashed his drugs,

19  how they were packaged, and how the defendant paid him to

20  deliver the defendant's drugs to the defendant's customers.  He

21  will tell you how the defendant kept guns at the stash house to

22  protect his product and his money.  Finally, he will tell you

23  how on March 17, 2021, the defendant sent him to deliver the

24  defendant's drugs that killed Julia, Ross, and Amanda.

25      Now, the runner committed serious crimes.  He's pled

1    guilty to those crimes and is cooperating with the government

2    in the hopes that he will receive a reduced sentence in his own

3    case.

4          You should keep that in mind when you evaluate his

5    testimony.  Listen to his testimony carefully, and you'll see

6    that the runner's testimony matches up with all the other

7    evidence in the case, evidence like the defendant's own words,

8    the text messages of the defendant himself arranging drug

9    deliveries.

10          Now, I'm about to sit down.  At the end of this trial,

11   once you've heard all the evidence, I'll have a chance to speak

12   to you again.  Between now and then, I'm going to ask you to do

13   three things:

14          First, pay close attention to the evidence.

15          Second, follow Judge Abrams' instructions on the law.

16          And third, use your common sense, the same common

17   sense and good judgment you use every day.

18          If you do those three things, you will reach the only

19   verdict that is consistent with the evidence and the law, that

20   the led a crew selling dangerous drugs; that he used guns to

21   protect his drug business; and that the defendant's drugs

22   caused Ross' death, caused Amanda's death, and caused Julia's

23   death, that the defendant, Billy Ortega, is guilty.

24          THE COURT:  Thank you.

25          Ms. Florio, would you like to give an opening

1    statement?

2           MS. FLORIO:  I would.  Thank you very much.

3           May it please the Court.

4           Ladies and gentlemen of the jury, good morning.  My

5    name is Dawn Florio, and along with Declan Murray and Alan

6    Seidler, we will be representing our client, Mr. Billy Ortega.

7    First and foremost, I want to thank each and every one of you

8    for your patience and your extreme attention during the jury

9    selection process.

10          Now, this process can be very tedious.  But it is

11   incredibly important to have jurors who can be fair, be hungry

12   for the facts, and use their common sense.

13          Now, after hearing the government's opening statement,

14   everyone must be thinking, why are we even here?  Billy Ortega

15   must be guilty of each and every charge.

16          However, ladies and gentlemen, you must keep an open

17   mind.  And just because Billy Ortega was arrested is not

18   evidence.  Just because Billy Ortega was indicted is not

19   evidence.  Just because Billy Ortega is on trial is not

20   evidence.  What the government said is not evidence.  What I

21   say is not evidence.  It is the government's obligation to

22   prove to you, beyond a reasonable doubt, each and every

23   element, as well as the identity of the perpetrators.

24          Now, Billy Ortega is presumed innocent throughout this

25   whole entire trial.  The government has the burden to prove

1    everything, the elements, beyond a reasonable doubt.  And under

2    no circumstances does that burden ever shift to Billy Ortega or

3    the defense.  It remains with the prosecution from the

4    beginning to the end of this trial, until all of you go into

5    deliberate.

6            Now, you are going to hear a lot of testimony in this

7    case.  And you must pay careful and close attention to

8    everything that is said, all the witnesses, all the evidence

9    that will be presented, stipulations, and the lack of evidence

10   in this case.

11           Now, ladies and gentlemen, a trial is sort of like

12   buying a house.  When you buy a home, you have to consider

13   many, many factors.  You assess it, you evaluate it, and you

14   sort of vet everything you see.  And you don't buy a house and

15   it's a nice neighborhood or you like the paint or it has a

16   pretty garden.

17           No.  You must also have an examine of the interior of

18   the house -- does it have a leaky roof?  Are they termites?  Is

19   it drafty?

20           So a trial is the same thing.  You have to take the

21   outside of the house, the inside of the house, the direct

22   examination that is going to be presented by the government, as

23   well as the cross-examination that is going to be presented by

24   the defense.  And you put that all together, and you make your

25   decision.

1            Now, any individual can take the stand.  They can put

2     their left hand on the Bible and raise their right hand and

3     swear to tell the truth, the whole truth, and nothing but the

4     truth, so help me God; or they can affirm to tell the truth.

5     But just because a person gets on the stand and gives testimony

6     doesn't mean they're telling the truth.  That's why we have

7     trials.  It's you, the triers of fact, that have to evaluate

8     the credibility of each and every witness that takes the stand.

9            Now, a person who takes the stand, they can tell you

10    red is blue.  Blue is red.  The moon is made out of green

11    cheese.  However, if you're not there, you have to look for

12    corroboration.

13           You have to look to see the witness who takes the

14    stand, are they accurate?  Are they telling the truth?  Are

15    they exaggerating?  Are they getting a deal?  Are they getting

16    a benefit from their testimony?  Are they getting immunity for

17    what they're saying?

18           Now, the government mentioned there's an individual

19    who's called a "cooperator" who will be testifying in this

20    case.  The government referred to that person as a "runner."

21           I'm not going to say his name in opening statement

22    because you'll have plenty of time to evaluate his testimony,

23    but he is a cooperator.  That means that he committed crimes.

24    That person was the one who delivered drugs to Amanda, to

25    Julia, and to Ross.  That is the person who killed Amanda,

1  Ross, and Julia.

2           Now, that person is not testifying out of the goodness

3  of his heart.  That person is testifying because he is going to

4  get a benefit from his testimony.  And you're going to hear

5  about his cooperation agreement, a deal that he signed with the

6  government.  After a long period of time, he has to earn the

7  cooperation of the government before he can enter into an

8  agreement.

9           You're going to hear about this agreement.  You're

10  going to hear about everything he pled guilty to, and you're

11  going to hear that the minimum sentence would be 25 years.

12  You're going to hear that the maximum sentence he could receive

13  would be a life sentence.

14          And you'll also going to hear about the cooperation

15  agreement.  He has to tell the truth.  And it's the judge, at

16  the end of the day, who determines what his sentence will be.

17          However, you will also hear from the testimony at this

18  trial that the cooperator knows that the information that he

19  gives, it will be taken into consideration by the government.

20  The government will write a letter, which is called a 5K1

21  letter, to the judge.  And it will be the judge who determines

22  what sentence he will get.

23          Now, Billy Ortega, who is the defendant in this case,

24  he has a constitutional right not to testify.  And if he

25  decided not to testify, you would have to listen to the judge's

1  instruction that you couldn't hold it against him.  And you

2  could not draw any negative inference to him not testifying.

3         However, ladies and gentlemen, you are going to hear

4  Billy Ortega on the stand.  He has given up his constitutional

5  right not to testify, and he wants you to hear what happened.

6  He wants you to hear the other side of the story.

7         Normally you hear maybe only one side of the story.

8  But he wants to tell you exactly what happened.  He wants to

9  tell you that he had absolutely no knowledge, none whatsoever,

10 that the cocaine that was being delivered to his street

11 customers, who he cared for very much, Amanda Ross and Julia,

12 who he'd known for a long period of time, you will hear that he

13 never wanted to hurt them.  And you will hear that he had no

14 knowledge whatsoever that the drugs that the cooperator gave to

15 them was deadly, that it contained fentanyl.

16        You will hear that the cooperator in this case didn't

17 care.  You will hear in this case that Billy Ortega had

18 instructed that cooperator not to serve anyone with anything

19 except what he normally served them, which was cocaine.

20        You are going to hear evidence that is going to be

21 coming out throughout this trial through my client.  And I want

22 you to pay very careful and close attention to the testimony of

23 the cooperator in this case and the testimony of my client

24 because those are the two people that were there.  Those are

25 the two people that can give you the most information about

1    really what happened that fateful day.

2            Now, there's not going to be a lot of argument about

3    many things in this case.  For example, there are going to be

4    many stipulations that both the government and the defense

5    entered into, for example, cell phone provider records, cell

6    phone extracts, bank records of my client, photographs, maps,

7    internet source providers, video footage, and the New York City

8    Housing Authority records.  They're all stipulations.  We all

9    agreed upon that.

10           However, the other thing that the government and the

11   defense don't disagree on is that Billy Ortega is a drug

12   dealer.  Now, you don't have to take our word for it because

13   Billy Ortega is going to get on the stand and tell you that he

14   sold drugs.

15           He's going to tell you that he sold many different

16   types of drugs, a whole list of drugs.  For example, there are

17   going to be text messages.  And he'll admit he sold cocaine.

18   He sold molly.  He sold ecstasy.  He sold mushrooms.  He sold

19   acid tabs.  He sold Adderall, Xanax, Percocet, marijuana, and

20   Viagra.

21           However, in all the text messages and all the

22   testimony, you will not see any evidence whatsoever -- no text

23   messages, no extrinsic evidence -- of fact that Billy Ortega

24   ever sold fentanyl or heroin.  He did not have any text

25   messages about acetafentanyl, and you'll hear from experts what

1  that means.

2       Now, you're going to hear from Billy Ortega that he

3  had met with a potential supplier of cocaine sometime before

4  March 17.  And you're going to hear him talk about how that

5  supplier, when he received those drugs, it was tested by

6  someone, and he rejected those drugs, and he sent the

7  cooperator with those drugs that probably contained fentanyl

8  back to that supplier.

9       And he specifically instructed that cooperator not to

10 ever sell those drugs, not to ever deliver those drugs.  You

11 see, Billy had those long-time customers, and he had

12 relationships with them.

13      As the government told you, he was very responsive to

14 his customers.  Yes, it's a business.  But he also had

15 long-standing relationships.  He knew Amanda, Ross, and Julia

16 for a long period of time.  And he would never want -- you'll

17 hear testimony -- to hurt them, to kill them.

18      You will hear testimony that Billy Ortega instructed

19 the cooperator to give those bad drugs back and never use them.

20 You'll hear testimony that Billy Ortega assumed that those

21 drugs were taken back to that particular supplier.

22      You will hear testimony that the cooperator had

23 promised that he would never use those drugs to supply any of

24 Billy's customers.  You will hear testimony that on the day of

25 March 17, other people were also served and the only people

1    that the cooperator served were Amanda, Julia, and Ross.

2            You will hear that those people that the cooperator

3    served at Billy's direction, Billy told the cooperator not to

4    use the drugs that they had gotten from the supplier a while

5    ago.

6            You will hear that the cooperator didn't do what he

7    promised to do and that on his own, without Billy's knowledge

8    or consent, he went behind Billy's back, and he was greedy, and

9    he didn't care.  He did not care.  He wanted to make as much as

10   money as possible because he was going to keep that money.

11   Billy was not getting any of that money.  He did this as an

12   independent deal secretly.

13           And you will hear and you will see from the cooperator

14   that the cooperator was the fatal courier.  It was the

15   cooperator on his own, independently, like an independent

16   contractor went, served Amanda, served Julia, and served Ross.

17   And you will even see video footage of the cooperator going to

18   their apartments, and you'll see still photographs as well.

19           Ladies and gentlemen, this is a very, very intense

20   case.  There is a lot of evidence that you are going to receive

21   as members of the jury.  And it's a very, very sad and tragic,

22   tragic, tragic case because these three people -- Amanda, Ross,

23   and Julia -- were professional people, beautiful people, had

24   their whole lives ahead of them, and their lives were taken

25   away.  But they weren't taken away by Billy Ortega.  They were

1    taken away by the cooperator.

2           Now, Billy Ortega takes full responsibility for his

3    drug-dealing.  He takes full responsibility for what he's

4    guilty of, and he's guilty of, the evidence will show, of being

5    a drug dealer.

6           But, ladies and gentlemen, the evidence will not show

7    and there will be a lack of credible evidence to show, in any

8    way, shape, or form, that Billy Ortega is responsible for the

9    death of Julia, is responsible for the death of Amanda, is

10   responsible for the death of Ross.

11          And the evidence will also show that the guns that the

12   cooperator will speak about, Billy Ortega did not have any

13   knowledge of any guns.  And he didn't need any guns for his

14   drug-dealing because the evidence will show that it was the

15   cooperator who, on his own, had a gun and sent a text message

16   to someone else.  They were not Billy's gun.

17          You will also hear in this case that Billy's home that

18   he lived in in New Jersey -- it was searched.  There was a

19   search warrant.  No drugs.  No guns.

20          You will also hear that the apartment in Manhattan

21   that his mother lived in, that also the cooperator lived in at

22   times, was searched.  No guns, no safes, no drugs.

23          Ladies and gentlemen, you will hear evidence that

24   there is a pattern here; that the cooperator delivered the

25   tainted, dangerous drugs to Julia.  And then he blames Billy.

1    He delivers the tainted drugs to Amanda.  He blames Billy.  He

2    delivers the fatal drugs to Ross, and he blames Billy.  He

3    possesses a gun, and he blames Billy.

4            Now, ladies and gentlemen, Billy Ortega has waited a

5    long time to go to trial and for you to hear the evidence in

6    the case and for you to decide what is credible and what is not

7    credible.  And he's fighting these charges.  He's fighting

8    these charges like Floyd Mayweather.

9            We thank you for being hungry for the truth in this

10   case, for your commitment to listening to all of the evidence

11   that will be presented, both on direct examination, as well as

12   cross-examination.

13           Ladies and gentlemen, you are the ones who will

14   decide, after being presented with all of the evidence in this

15   case, what you believe and what you don't believe and who you

16   believe and who you don't believe.

17           And basically, jurors, your greatest job is to keep an

18   open mind.  It's that your mind should be like a parachute,

19   open at all times.  If you don't have an open mind and you

20   don't open -- you don't pull the string for the parachute and

21   you're jumping out of the plane, you're going to crash and

22   burn.

23           So, ladies and gentlemen, because there's going to be

24   a lot of evidence in this case and very, very emotional

25   testimony -- this is a tragedy -- you must keep sympathy out of

1    this case.  You must not speculate.  You must stick to the

2    evidence and the lack of evidence.

3         Your mind needs to be open like a sponge to soak all

4    of the evidence up.  And you must not keep any prejudice that

5    you have about drug-dealing and really stick to the evidence.

6    Do not speculate as I said before.  If you use your common

7    sense and your tools that you have in your everyday life,

8    you'll be able to discover what the real evidence is in this

9    case.

10        Now I'm going to sit down.  But you, ladies and

11   gentlemen, come from all walks of life.  Some of you are

12   younger; some of you are older.  Some of you come from

13   different religious backgrounds.  But what you all have in

14   common is your common sense.

15        And at the end of this case, I'm asking you to hold

16   Billy Ortega responsible for what he actually did.  And I'm

17   going to ask you to find him not guilty of the deaths, the

18   tragic deaths, of Amanda, Julia, and Ross and to find him

19   not guilty of the gun.

20        So our position is very clear.  The government has to

21   prove all the elements.  And at the end of the trial, we just

22   ask you to look at everything and also to look at the evidence

23   and the lack of evidence.  Thank you very much.

24        THE COURT:  All right.  Thank you.

25        So now we're going to turn to the evidentiary portion

1    of the trial.  The government can call its first witness.

2              MR. HERMAN:  Your Honor, can we have a brief sidebar

3    before the witness first.

4              THE COURT:  Sure.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MR. HERMAN:  Your Honor, we're just very concerned

3    that the opening statement gave a very misleading impression

4    and an incorrect impression, that the defendant never intended

5    to distribute fentanyl and only intended to distribute cocaine

6    and that he should be acquitted.  According to the law that the

7    Court gave in the questionnaire about this very is issue,

8    question 17 said --

9              THE COURT:  I'm going to cut you off.

10             I'm not at all surprised you're raising this.  I'm a

11   little surprised you haven't raised it earlier because I think

12   it was very clear from the defendant's papers what their

13   defense was going to be.

14             But I don't want to keep the jury waiting.  So we can

15   talk about it.  If you want to write a letter on it today, you

16   can do that.  And we can talk about it first thing in the

17   morning.

18             MR. SEIDLER:  Your Honor, he instructed the witness

19   not to distribute that cocaine.  He could distribute cocaine as

20   long as it wasn't laced with fentanyl.  He was told

21   specifically not to distribute that particular batch of

22   cocaine.  That's all she said.

23             THE COURT:  I think what would be more helpful, again,

24   because we only have a very short day today is, why don't you

25   submit letters to me today on this.  And if I think a curative

1  instruction is appropriate, I'll give it first thing in the

2  morning.  I don't want to keep the jury waiting.

3          So I'm happy to have a letter from you, Mr. Seidler,

4  or you, Ms. Florio, as well.  If you could get it me today by

5  3:00, then we can address it first thing in the morning.  Why

6  don't you come tomorrow.  Come at 9:30.  We'll talk about this

7  issue, and we'll have more time.  But your objection is noted

8  for the record.

9          MR. HERMAN:  Yes, your Honor.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court; jury present)

2                    MR. HERMAN:  Your Honor, the government called Natalia

3    Mrozek.

4                    THE COURT:  I'll just note, if at any time the jury

5    can't hear anybody, please just raise your hand.  Thank you.

6     NATALIA MROZEK,

7           called as a witness by the Government,

8           having been duly sworn, testified as follows:

9                    THE DEPUTY CLERK:  Please state your name and spell it

10   for the record.

11                   THE WITNESS:  My name is Natalia Mrozet, N-a-t-a-l-i-a

12   M-r-o-z-e-t.

13                   THE COURT:  Good morning.  I'm just going to ask you

14   to speak very loudly and clearly and into the microphone.  It

15   can be very difficult to hear in here with the high ceilings.

16                   Thank you.  You may proceed.

17   DIRECT EXAMINATION

18   BY MR. HERMAN:

19   Q.  Good morning, Ms. Mrozek.

20                   Can you hear me?

21   A.  Yes.

22   Q.  Ms. Mrozek, how old are you?

23   A.  I am 29.

24   Q.  Where do you reside?

25   A.  I live in Manhattan.

1    Q.  Are you employed?

2    A.  Yes, I am.

3    Q.  What type of work do you do?

4    A.  I'm an art director.  So I manage photo shoots for Moët

5    Hennessy.

6    Q.  What kind of company is Moët Hennessy?

7    A.  They sell champagne and liquor.

8    Q.  What type of photo shoots do you work on?

9    A.  Various.  I shoot both product and models with the bottles,

10   so just anything that you would see in a store on a display

11   when your purchasing a bottle or on social media or the words

12   on the streets.

13   Q.  Did you grow up in New York?

14   A.  No.  I grew up in Warsaw in Poland.

15   Q.  When did you move from Poland to the U.S.?

16   A.  I moved to the United States in 2012.

17   Q.  Why did you move to the U.S.?

18   A.  I relocated with my family.  I was a senior in high school.

19   So I moved, and I graduated from high school here.

20   Q.  Did there come a point in time when you met a woman named

21   Julia Ghahramani?

22   A.  Yes.

23   Q.  How did you meet her?

24   A.  I met her in spring of 2012.  We were both seniors in high

25   school at the time.  And I just moved, as I mentioned.  So I

1    didn't know many people in the U.S.  Julia was hosting a party

2    which she kindly invited me to without knowing me at all.

3         And I remember we just spent the entire evening

4    talking and getting to know each other and talking about my

5    experiences from Poland and her experiences in Connecticut.

6    And we made a plan to go to Poland that summer which we

7    actually did.

8         And the next day, I got a text from her saying that

9    this is probably weird, but I really like you.  Do you want to

10   be friends?

11        To which I responded, it's not weird at all.  I would

12   love to be friends.  And that's how our friendship started.

13        MR. HERMAN:  Mr. Frenchman, can you please show the

14   witness what has been marked as Government Exhibit 8.

15   Q.  Ms. Mrozek, do you recognize this image?

16   A.  This is Julia.

17        MR. HERMAN:  Your Honor, the government offers

18   Government Exhibit 8.

19        THE COURT:  Any objection?

20        MS. FLORIO:  No objection.

21        THE COURT:  Admitted.

22        (Government's Exhibit 8 received in evidence)

23        MR. HERMAN:  Mr. Frenchman, can you please publish

24   that exhibit.

25   Q.  Ms. Mrozek, did you stay in touch with Julia after

1   graduating high school?

2   A.   Yes.  I went to college in New York.  I went to Parsons,

3   and Julia went to Columbia.  So we both stayed in New York

4   City.  So we saw each other frequently.

5           MR. HERMAN:  Thank you, Mr. Frenchman.

6   Q.   Did Julia graduate from college?

7   A.   Yes, she did.

8   Q.   Did she go to school after college?

9   A.   Yes.  She went to Columbia Law School.

10  Q.   Did she graduate from law school?

11  A.   She did.

12  Q.   Where did she after graduating?

13  A.   Well, she worked -- after graduating from undergrad, she

14  worked at NBC for a while.  And then after she graduated from

15  law school, she was employed at Akin Gump law firm in New York

16  City.

17  Q.   Now, to your knowledge, had Julia used cocaine during the

18  time you knew her?

19  A.   Yes, she has.

20  Q.   To your knowledge, did she ever use fentanyl intentionally?

21  A.   Absolutely not.

22  Q.   Directing your attention to March of 2021, where were you

23  living at that time?

24  A.   I was living on the Lower East Side at 185 Avenue C.

25  Q.   Where was Julia living?

1    A.  Julia and I lived one block away from each other.  So she

2    was living at 185 Avenue B.

3    Q.  And how old was Julia around that time?

4    A.  At the time, Julia was 26.

5    Q.  How old were you?

6    A.  27.

7    Q.  Did you see Julia a lot around March of 2021?

8    A.  Yes, I did.  We saw each other almost daily.  It was

9    still -- at the time, the city was just getting out of the

10   pandemic COVID reality.  So most things were still on lockdown.

11           So we would just, you know, spend a lot of time

12   together at her place or at my place working together, taking

13   dinners together, watching reality TV.  So I saw her almost

14   daily.

15   Q.  Did Julia suffer from any mental illness?

16   A.  Yes.  She had told me she suffered from bipolar disorder.

17   Q.  Did she take any medication to treat that disorder?

18   A.  She took some mood suppressants, yes.

19   Q.  Did there come a point in time when you learned that her

20   medication was delayed?

21   A.  Yes.  That was a week before Julia's passing.  There was

22   some sort of mixup at CVS where her prescription wasn't

23   refilled in time.  So she wasn't able to get her medication for

24   a few days.

25   Q.  What did you do?

1  A.  She reached out to me and her sister.  We both live in New

2  York City, and she was very much aware that she was feeling

3  worse, significantly worse, because of that.  So, you know, she

4  asked us to just spend time with her and be with her.

5          So we spent the entire weekend with her just trying to

6  cheer her up -- going to restaurants, getting dinner, watching

7  movies.  On Monday, and I spent the whole day working from her

8  apartment.  Yes.

9  Q.  And when you spent all this time with her, did you spend

10  some of it at her apartment?

11  A.  Yes, we did.

12  Q.  Did you see any drugs in her apartment when you were there?

13  A.  No.

14  Q.  During this time, did you learn that Julia was behind on

15  her work?

16  A.  Yes.  Well, you know, she had a hard time focusing because

17  of the medication.  So she couldn't stay on top of the workload

18  that she had at the law firm that she worked at.  My

19  understanding was the workload was very demanding.

20          It was her first year.  She wanted to perform well.

21  She wanted to stay on top of it.  Because of this, she wasn't

22  really able to focus and get her work done for about a week.

23  So I know that at the time of her passing, she was very

24  stressed out about catching up on everything.

25  Q.  When you say "because of this," are you referring to her

1    medication being delayed?

2    A.   Yes.

3    Q.   Now, in light of being behind on her work, did she ask you

4    for something?

5    A.   Yes.  She did.  My roommate had ADD.  She had an Adderall

6    prescription.  And Julia asked me if I could get her Adderall

7    pills so she could catch up on her work.

8    Q.   How long before Julia's death did she ask you for the

9    Adderall?

10   A.   That was four days before her death.

11   Q.   Did you give her Adderall?

12   A.   No, I did not.  I said that I believed it was unwise for

13   her health.

14   Q.   Now, did there come a point in time when you stopped

15   hearing from Julia?

16   A.   Yes.  It was March 17, and I noticed because Julia and I --

17   we would text constantly or be in some sort of communication.

18   So the last message I received from Julia was March 17, right

19   before noon.

20        Then we didn't talk for a couple of hours, which was

21   perfectly normal.  And then I reached out back the same

22   afternoon.  By the time I haven't heard from her for half a day

23   at this point, I got nervous.  So, you know, I messaged her

24   around 10:00 p.m. saying, hey, why are you not answering me?

25   I'm worried.  I followed up again at 1:00 a.m. being, Julia,

1    I'm really worried now.

2         We communicate on WhatsApp so we can see if a message

3    is delivered, if a message is seen.  So the messages that I've

4    sent at 1:00 a.m., I saw on WhatsApp that they're not even seen

5    any more.  I saw by then that Julia's status was offline since

6    noon.  So that told me that she has not checked her phone since

7    noon which made me very nervous.

8         So I just messaged her.  I tried to call her multiple

9    times.  And I actually just said, call me the moment you wake

10   up at the time still thinking that -- I knew she had a lot of

11   work.

12        It is possible that she turned off her phone so that

13   no one disturbs her.  It's possible that she's sleeping.  But I

14   messaged her the next day again at 7:00 a.m. again, like, are

15   you up?  Call me.  No responses.

16        And then Julia's sister also called me expressing

17   similar concern.  Her family has also not heard from Julia for

18   over a day at this point.  So the last message I sent to her

19   was at 10:30.  And I just said, I'm coming over.

20        MR. HERMAN:  Mr. Frenchman, can you show the witness

21   what is marked as Government Exhibit 420.

22   Q.  Ms. Mrozek, do you recognize what's depicted on your

23   screen?

24   A.  Yes.  That's our text conversation.

25   Q.  Does that conversation appear to come from your phone?

1  A.  Yes.  That's a screenshot from my phone.

2          MR. HERMAN:  The government offers, your Honor,

3  Government Exhibit 420.

4          THE COURT:  Any objection?

5          MS. FLORIO:  No, your Honor.

6          THE COURT:  Admitted.

7          (Government's Exhibit 420 received in evidence)

8          MR. HERMAN:  Please publish this exhibit.

9  Q.  Ms. Mrozek, can you please walk the jury about what this

10  exhibit is and what you were saying before about how Julia

11  hadn't received some of your messages.

12          (Discussion off the record)

13          MR. HERMAN:  Do you know if the jurors were able to

14  see the earlier exhibit?

15          THE COURT:  The jury is nodding so they can see it.

16  But we'll try to fix that as soon as possible so that the

17  public can see it as well.  Thank you.

18  BY MR. HERMAN:

19  Q.  Ms. Mrozek, can you again walk the jury through what this

20  exhibit is and why you believe Julia hadn't received certain

21  messages.

22  A.  So this is what conversations look like on WhatsApp.  And

23  essentially they have a check system where every message that

24  is received and seen has two blue checks next to it.  So you

25  see that none of those text messages have two blue checks.  So

1    I knew Julia never read any of them.

2            Then the messages that are received on the phone but

3    not read have two gray checks.  So the messages coming through

4    up until 7:15 p.m. have been received to her phone but never

5    read by her.

6            And then all the phone messages where there is only

7    one check, that shows that the message had been sent but has

8    been never delivered to her phone because presumably it was

9    turned off.

10   Q.  Ms. Mrozek, what time was the first message that Julia did

11   not receive?

12   A.  It was at 10:38 p.m.

13   Q.  And it says 22:38 there.

14           Is that 24-hour time?

15   A.  24-hour time.

16   Q.  What date was that?

17   A.  That was March 17.

18   Q.  Do you see in the bottom of this exhibit you wrote:  "I'm

19   coming over"?

20   A.  Yes.

21   Q.  Did you in fact go over to Julia's apartment on March 18,

22   2021?

23   A.  I did.

24           MR. HERMAN:  Thank you, Mr. Frenchman.  You can take

25   down the exhibit.

1    Q.  What happened when you got to her apartment?

2    A.  Well, I came to her apartment.  I lived right around the

3    block.  So it took me maybe five minutes to get there.  The

4    front doors were closed.  I was buzzing and calling, but I got

5    no answer.  So someone else living in the building just let me

6    in.

7         And I walked up to Julia's apartment, and I was

8    banging on the door trying to call her.  And there was no

9    answer.  So I knocked on the door of one of the neighbors, and

10   I asked if they happened to have a phone number for the

11   superintendent.  So I waited for the superintendent, and I got

12   inside of Julia's.

13   Q.  What happened when you got inside of Julia's apartment?

14   A.  I walked in, and I saw Julia sitting on her couch, which I

15   presume she might be just unconscious at the time.  So I

16   approached her calling out her name hoping that she would

17   respond.  Once I approached her and touched her, I realized

18   that she was not unconscious, and I called 911.

19   Q.  What happened after you called 911?

20   A.  Well, as I was waiting for the responders, I was walking

21   around Julia's.  She was 26.  It's not normal that someone who

22   is 26 dies.  So I was trying to figure out what happened.

23        So my first thought was, well, maybe she committed

24   suicide because she was young.  So I was looking around,

25   looking for anything that would explain this like pills or a

1    note, suicide note.

2         The only thing that I actually was able to find was

3    the opposite of a suicide note.  It was pinned up on her

4    fridge, and it was like a self-empowerment note that she wrote

5    to herself at the time that she was not feeling too great just

6    saying, you got this, just words of affirmation.

7         MR. HERMAN:  Mr. Frenchman, can you show the witness

8    Government Exhibit 825.

9    Q.  Ms. Mrozek, do you see the photograph on your screen?

10   A.  This is the note that I found.

11   Q.  The note that you just testified about seeing in Julia's

12   apartment?

13   A.  That's correct.

14        MR. HERMAN:  Your Honor, the government offers

15   Government Exhibit 825.

16        THE COURT:  Any objection?

17        MS. FLORIO:  No objection.

18        THE COURT:  Admitted.

19        (Government's Exhibit 825 received in evidence)

20        MR. HERMAN:  Mr. Frenchman, can you try to blow up the

21   note and this image for the jury, please.

22   Q.  Ms. Mrozek, can you just explain your impression of the

23   note when you saw it.

24   A.  The note says "Guide to Sanity."  Right?  My impression is

25   this is a note of a young woman who clearly is struggling but

1  at the same time just hopeful.  And she really was making plans

2  to be good and call or see a friend or family every day.  Yeah.

3          MR. HERMAN:  Thank you, Mr. Frenchman.

4  Q.  Now, Ms. Mrozek, while waiting for police to arrive, did

5  you see any drugs in the apartment?

6  A.  I did.  There was a plate with some cocaine and what I

7  presumed at the time was cocaine in the kitchen.

8  Q.  Did the police eventually arrive?

9  A.  They did.

10 Q.  Did anybody else arrive?

11 A.  Well, when I called 911, I said that I think my friend

12 died.  So I don't know if that's standard, but police arrived

13 with firemen and with paramedics as well.

14 Q.  Did Julia's family also arrive?

15 A.  Family also arrived.  Yes.

16 Q.  Did you eventually go live with Julia's family?

17 A.  Yes.  That day after, you know, we were -- we could leave,

18 I went with Julia's family.  And I stayed with them for a

19 while.

20 Q.  About how long did you stay with them?

21 A.  I believe it was a little over a month.

22          MR. HERMAN:  One moment, your Honor.

23          (Discussion off the record)

24          MR. HERMAN:  I have no further questions, your Honor.

25          THE COURT:  Any cross-examination?

 1          MS. FLORIO:  Yes, your Honor.

 2    CROSS-EXAMINATION

 3    BY MS. FLORIO:

 4    Q.  Good morning.

 5          Can you hear me well?

 6    A.  Yes.

 7    Q.  Thank you.

 8          So prior to March 17 of 2021, how long had you known

 9    Julia for?  How many years?

10    A.  That would be, doing math, almost ten.

11    Q.  And during the time that Julia was in college, you were

12    also friends with her; is that correct?

13    A.  Yes.  That is correct.

14    Q.  And you would characterize Julia as your best friend like a

15    sister?

16    A.  Yes.  That is true.

17    Q.  And is it true that Julia would buy cocaine from a person

18    by the name of Mack?

19    A.  Yes.  That is true.

20    Q.  And that Julia had bought cocaine for a long period of

21    time.  Correct?

22    A.  Yes.

23    Q.  And that then Julia went to another dealer possibly?  Or

24    you don't know?

25    A.  I don't know.

1          MS. FLORIO:  I have no further questions.  Thank you.

2          THE COURT:  All right.  Any redirect?

3    REDIRECT EXAMINATION

4    BY MR. HERMAN:

5    Q.  Ms. Mrozek, do you know who delivered the drugs that you

6    thought were cocaine that were in Julia's apartment on the day

7    she died?

8    A.  No.

9          MR. HERMAN:  No further questions, your Honor.

10         (Witness excused)

11         THE COURT:  The government can call its next witness.

12         MR. FERGENSON:  The government calls detective Roy

13   Uber.

14    WITNESS        ,

15       called as a witness by the PARTY            ,

16       having been duly sworn, testified as follows:

17         THE DEPUTY CLERK:  Thank you.

18         Please be seated and please state and spell your name

19   for the record.

20         THE WITNESS:  Detective Roy Abounaoum, R-o-y

21   A-b-o-u-n-a-o-u-m.

22   DIRECT EXAMINATION

23   BY MR. FERGENSON:

24   Q.  Good morning, detective.

25   A.  Good morning.

1   Q.  Where do you work?

2   A.  I work in the NYPD.

3   Q.  What's your title?

4   A.  Detective.

5   Q.  How long have you been a title?

6   A.  Over seven years.

7   Q.  How long have you worked for the NYPD?

8   A.  Over 15 years.

9   Q.  Which unit are you currently assigned to?

10  A.  I currently work in the intelligence unit.

11  Q.  What does the NYPD intelligence unit do?

12  A.  Specifically my unit, my team, we investigate foreign

13  terrorist organizations and anyone affiliated with them in the

14  United States and New York who are monetarily supporting

15  outside terrorism organizations.

16  Q.  Do you have any particular focus?

17  A.  Yes, do I.

18  Q.  What is it?

19  A.  I have a case on the southern Lebanese terrorist

20  organization, Hezbollah.

21  Q.  Are you of Lebanese descent?

22  A.  Yes, I am.

23  Q.  How long have you been a detective in the NYPD intelligence

24  bureau?

25  A.  A little over a year.

1    Q.  What are some of your duties and responsibilities as a

2    detective in the NYPD intelligence bureau?

3    A.  To stop money flow coming to New York City from outside the

4    country to support Hezbollah.  My daily activities could be I

5    speak to informants a lot.  I follow up leads that come in via

6    hotlines.  This group has particular criminal activities in New

7    York City.  I try to infiltrate those criminalities and put a

8    stop to it to disrupt the money flow.

9    Q.  Now, prior to joining the intelligence unit, where did you

10   work?

11   A.  Manhattan south narcotics.

12   Q.  Now, you said the term "manhattan south."

13        Can you explain to the jury what Manhattan south.

14   A.  NYPD has split the borough of Manhattan into two entities,

15   Manhattan south and Manhattan north.  The line is on 59th

16   Street.  So anything south of 59th Street, so the bridges, was

17   my geographical jurisdiction.

18   Q.  And you said you worked in narcotics in Manhattan south.

19   Right?

20   A.  Yes.

21   Q.  How long did you work in Manhattan south narcotics?

22   A.  About seven years.

23   Q.  Why did you choose to go work in the narcotics division?

24        MS. FLORIO:  Objection.

25        THE WITNESS:  I was passionate about --

1          THE COURT:  Sorry.  There was just an objection.  Yes.

2     Sustained.

3          You can move to the next question.  Thank you.

4     BY MR. FERGENSON:

5     Q.  Now, detective, were there different units within Manhattan

6     south narcotics?

7     A.  Yes.

8     Q.  Would you please give us an overview of the units that you

9     worked in.

10    A.  Sure.  I started off on a module.  It's a precinct based.

11    I had duties just to investigate narcotics complaints and do

12    buy-and-bust operations on a daily basis in certain precincts

13    in Manhattan south.

14          A buy-and-bust operation is where we step out for the

15    day and an undercover walks around a certain area and tries to

16    buy narcotics from people on the street, and we immediately

17    arrest them.  There is no long-term investigation.  It just

18    ends there.  I did that for two years.

19          I moved on to the tactical response team, which was

20    more based on short-term investigations.  And it gave me the

21    ability to investigate anywhere in Manhattan south.  I wasn't

22    bound to just one specific area, one precinct.

23          After that unit, I went to the major case unit where

24    we focused on larger scales, lengthier investigations, over a

25    year.  I was involved in wiretaps and multiple

1   multiple-defendant indictments.

2           After that unit, I went to the overdose unit where I

3   investigated fatal and nonfatal overdoses.

4   Q.  Now, the last thing you mentioned was the overdose unit;

5   right?

6   A.  Yes.

7   Q.  Roughly what time period were you in the overdose unit?

8   A.  From January 2019 until I left for the intelligence bureau

9   around December of '21.

10  Q.  So in March 2021, you would have been a detective in the

11  overdose unit; right?

12  A.  Yes.

13  Q.  What were some of your duties and responsibilities as a

14  detective in the overdose unit?

15  A.  Just to investigate fatal and nonfatal overdoses, to find

16  out who sold a batch of a certain narcotic that resulted in

17  overdose.

18  Q.  Now, you said both fatal and nonfatal overdoses.

19  A.  Yes.

20  Q.  What's an example of a nonfatal overdose?

21  A.  A nonfatal overdose is when somebody gets saved by NARCAN.

22  Q.  What's NARCAN?

23  A.  It's a pharmaceutical drug used to counteract opioid.

24  Q.  Detective, have you received training on how to conduct

25  narcotics investigations?

1   A.   Yes.

2   Q.   Approximately how many narcotics investigations have you

3   participated in?

4   A.   Hundreds.

5   Q.   What about narcotics overdose investigations?

6   A.   Over 200.

7   Q.   In your roughly two years as a detective in the overdose

8   unit in Manhattan south, could you estimate how many overdoses

9   you responded to.

10  A.   Over a hundred.

11  Q.   Roughly what percentage were fatal?

12  A.   Probably 50 percent.

13  Q.   Roughly what percentage of the fatal overdoses involved

14  fentanyl?

15  A.   Like 75 percent.

16  Q.   Now, generally speaking, how would you typically learn of

17  an overdose?

18  A.   Patrol or patrol units, uniformed officers, would either

19  call our command, our base.  And they would inform us that

20  they're at a scene of a potential overdose.

21       Or we would get informed by a hospital, someone on the

22  hospital staff, who found out later on that this is an

23  overdose.  They would contact the NYPD, and we would get in

24  touch with our command, and we would go out and respond to it.

25  Q.   What determined which overdose unit detective responded to

1   a scene?

2   A.  It was just a rotation via a list, and it just went in

3   order.

4   Q.  Would you please walk us through some of the common steps

5   you would take when responding to a fatal overdose.

6   A.  Sure.  You would get a call that there's a potential fatal

7   overdose at a location.  I would respond with a teammate.  Our

8   first steps would be to interview the person who found the

9   deceased.

10          Once we determine how long -- we try to get a baseline

11  of how long the person hasn't been in contact with anybody -- I

12  would search the apartment for any paraphernalia or any

13  narcotics that are on the scene.  If there was any, the

14  responding patrol officer would take that and invoice it.  And

15  I would submit it for lab testing further down the road.

16          I would look for a cell phone.  That's the most

17  important piece of evidence in these cases is a cell phone.  I

18  would take possession of the cell phone, make sure it's charged

19  in my possession the whole time.  And then I would drop it off

20  to our computer crime squad for them to open it up and extract

21  all the data.

22          I would review any surveillance video.  In Manhattan

23  south, we have a lot of hotels.  We would respond to overdoses

24  in hotels.  We would get the management of the hotel to do the

25  lock interrogation -- who came in, who came out, how many

1    swipes, who was the last person to enter the room and at what

2    time.

3    Q.  Detective, I want to go back to one thing you mentioned

4    just to explain.

5    A.  Sure.

6    Q.  You used the term "invoice" with respect to any

7    paraphernalia or drugs found at the scene.

8            What does "invoice" mean?

9    A.  Just we have a system where we take evidence.  It's a bunch

10   of drop-down menus to just describe what the item is -- how

11   many, quantity; the color; any descriptive information on it.

12   And then the system generates a unique number to it.  And we

13   place that item in a serialized bag, and it gets stored for

14   safekeeping or evidence.

15   Q.  Is that also sometimes called "vouchering"?

16   A.  Yes.

17   Q.  You also said that the victim's cell phone was the most

18   important piece of evidence in these cases.

19           Why is that?

20   A.  Well, today most people purchase drugs from someone they

21   know and they have a relationship with.  People aren't

22   typically walking around the streets anymore buying on lines

23   and things like that.

24           So there would always be a conversation of, hey, I'm

25   looking to get this much.  There would be sometimes a price or

1    a time.  It just has a lot of information that we could

2    pinpoint who, when, and where the deceased got the narcotics

3    from.

4    Q.  I'd like to direct your attention now to March 18, 2021.

5             Were you working that day?

6    A.  Yes, I was.

7    Q.  Did you respond to any fatal overdoses that day?

8    A.  Yes.

9    Q.  How many?

10   A.  I believe one.

11   Q.  Do you recall the victim's name?

12   A.  Yes.

13   Q.  Who was it?

14   A.  Julia Ghahramani.

15   Q.  Now, I want to talk about your response in a moment.

16            But let me first quickly ask you:  Are you familiar

17   with the term "case detective"?

18   A.  Yes.

19   Q.  What's the case detective?

20   A.  It's the person whose job it is to do the investigation.

21   Q.  Were you the case detective for Julia's fatal overdose for

22   a time?

23   A.  At the beginning of it, yes.

24   Q.  For about how long?

25   A.  Two months.

1   Q.  Now, aside from preparing for your testimony today, were

2   you involved with the investigation after that?

3   A.  No.

4   Q.  Did you participate in any arrests?

5   A.  No.

6   Q.  Any search warrants?

7   A.  No.

8   Q.  Let's turn back to your response to Julia's death on

9   March 18, 2021.

10  A.  Okay.

11  Q.  Do you recall where Julia's body was found?

12  A.  Yes.

13  Q.  Where?

14  A.  Inside of an apartment on a couch in the living room.

15  Q.  Do you recall today the address of that apartment?

16  A.  Yes.

17  Q.  What was it?

18  A.  185 Avenue B, Apartment 6G.

19          MR. FERGENSON:  Your Honor, at this time the

20  government offers a stipulation agreed to between the parties

21  that is marked as Government Exhibit S4.

22          THE COURT:  It will be admitted.  You can publish it

23  to the jury.

24          (Government's Exhibit S4 received in evidence)

25          MR. FERGENSON:  "It's hereby stipulated and agreed

1    between the parties that:

2            "1:  The following government exhibits are true and

3    accurate images of the following people."

4            I'm not going to read the whole chart at this time.

5    But Government Exhibit 8 is Julia Ghahramani.

6            "2:  The following government exhibits are true and

7    accurate maps and images of the following addresses."

8            And I'm not going to read the whole chart.  Again, but

9    13A and 13B are 185 Avenue B, New York, New York.

10           Pursuant to this stipulation, the government offers

11   Government Exhibits 1 through 10 and subparts A and B of

12   Government Exhibits 11 through 17.

13           THE COURT:  Those exhibits will be admitted as well.

14           (Government's Exhibits Government Exhibits 1 through

15   10, subparts A and B of Government Exhibits 11 through 17

16   received in evidence)

17           MR. FERGENSON:  Mr. Frenchman, can we please pull up

18   Government Exhibit 13A.

19   Q.  Detective, what's shown in this exhibit?

20   A.  A digital map of 185 Avenue B.

21   Q.  There's a pinpoint with that address?

22   A.  Yes.

23   Q.  What neighborhood is this?

24   A.  East Village.

25           MR. FERGENSON:  Mr. Frenchman, can you please pull up

1    Government Exhibit 13B.

2    Q.  Detective, what's shown in this exhibit?

3    A.  That's the front of the building.

4    Q.  Now, when you responded on March 18, were you by yourself

5    or with a partner?

6    A.  No.  I was with a partner.

7    Q.  Who?

8    A.  Detective Dawn Hagerty.

9    Q.  Who, if anyone, was there when you arrived?

10   A.  When I got to the scene, the responding officers were

11   there.  I was met by one of Julia's friends.  I think her name

12   was Natalia.  She's the one who found Julia's deceased body.

13        I saw family members in the hallway.  It was a dark

14   hallway, carpeted hallway.  One of the family members was on

15   the floor crying, like sitting down crying.  I'm not sure who

16   it was.

17        I remember my first conversation was with Natalia.  I

18   pulled her to the side trying to figure out what had happened,

19   if she knew where Julia had gotten the cocaine that killed her.

20   Q.  After you spoke with Natalia, did you enter the apartment?

21   A.  Yes, I did.

22   Q.  When you entered the apartment, what did you see?

23   A.  Julia's body, deceased body, on her couch in the

24   living room.

25   Q.  Did you find any suspected narcotics?

1    A.  Yes.  There was a plate on the kitchen counter that had

2    three baggies on it.  One had a substantial amount of cocaine

3    left in it.  There was a credit card with residue on it and

4    another like piece of paper, something used to roll.  From my

5    experience, it's used to sniff the drug.

6              MR. FERGENSON:  Mr. Frenchman, can you please show the

7    witness what's marked as Government Exhibit 820.

8    Q.  Detective, what's shown in this exhibit?

9    A.  A photo of Julia's kitchen.

10             MR. FERGENSON:  The government offers Government

11   Exhibit 820.

12             THE COURT:  Any objection?

13             MS. FLORIO:  No.

14             THE COURT:  It will be admitted.

15             (Government's Exhibit 820 received in evidence)

16             THE COURT:  Were these part of the stipulation?

17             MR. FERGENSON:  No, your Honor.

18             THE COURT:  You may proceed.  Thanks.

19   BY MR. FERGENSON:

20   Q.  The suspected drugs you found, where were they?

21   A.  There's a white plate right near the dishwasher, right on

22   top of the dishwasher on the counter.

23   Q.  Just so we have a sense of it, with respect to the layout

24   of the apartment, where was the kitchen in relation to where

25   you saw Julia's body?

1    A.  It was kind of like an open-concept apartment.  From that

2    point of view on the photo, Julia would have been behind me.

3            MR. FERGENSON:  Mr. Frenchman, can you please show the

4    witness what has been marked as Government Exhibit 823.

5    Q.  Detective, what's this?

6    A.  That's a closer photo of the counter with the plate and the

7    baggies I referred to.

8            MR. FERGENSON:  The government offers Government

9    Exhibit 823.

10           MS. FLORIO:  No objection.

11           THE COURT:  Admitted.

12           (Government's Exhibit 823 received in evidence)

13   BY MR. FERGENSON:

14   Q.  Now, I want to focus you on the right side.

15           Do you see the plate there?

16   A.  Yes.

17           MR. FERGENSON:  Mr. Frenchman, can you please pull up

18   Government Exhibit 824 for the witness.

19   Q.  Detective, what's this?

20   A.  It's a closer photo of what I spoke about.

21           MR. FERGENSON:  The government offers Government

22   Exhibit 824.

23           THE COURT:  Any objection?

24           MS. FLORIO:  No objection, your Honor.

25           THE COURT:  Admitted.

1                    (Government's Exhibit 824 received in evidence)

2      BY MR. FERGENSON:

3      Q.  Now, detective, could you please explain what's shown in

4      this photograph.

5      A.  Sure.  There are two bags that are smoke colored, like

6      black translucent bags, one that's still on the plate.  It

7      seems to be about halfway full of a white powdery substance;

8      another clear zip bag next to it that's almost empty; a credit

9      card with residue next to it; and the roll, rolled up paper,

10     used to sniff is on the plate also.

11                    MR. FERGENSON:  Mr. Frenchman, could you zoom in on

12     the black baggie on the left, please.

13     Q.  Detective, you had mentioned a bag that appeared to have

14     drugs still in it.

15                    Is this the one you're referring to?

16     A.  Yes.

17                    MR. FERGENSON:  Mr. Frenchman, we can zoom out.

18     Q.  Now, detective, we talked about this earlier.  But remind

19     us.

20                    What's an invoice or a voucher?

21     A.  A serialized number that we use to keep track of evidence.

22     Q.  What was done with the drugs at this scene?

23     A.  It was vouchered.

24     Q.  Do you recall the last four digits of the voucher number

25     for these items?

1    A.  Not off the top of my head, no.

2          MR. FERGENSON:  Mr. Frenchman, can we just show the

3    witness only what's marked as Government Exhibit 849.

4    Q.  Detective, you can take a look at that.  And when you're

5    done, let me know.

6    A.  Okay.  I'm done.

7          MR. FERGENSON:  Thank you, Mr. Frenchman.  You can

8    take that down.

9    Q.  Did that refresh your recollection?

10   A.  Yes.

11   Q.  What were the last four digits?

12   A.  0052.

13   Q.  Detective, did you see anything else of note in the

14   kitchen?

15   A.  Yes.  I saw a whiteboard, like a magic marker whiteboard.

16         MS. FLORIO:  I'm sorry.  I couldn't hear.

17         THE COURT:  If you could just repeat that.

18         THE WITNESS:  I saw a whiteboard on Julia's

19   refrigerator.  It was kind of like a to-do list but more on a

20   motivational capacity and not like a chore.  In the middle of

21   it in big letters, it said:  "No drugs."

22         MR. FERGENSON:  Mr. Frenchman, can you publish for

23   everyone Government Exhibit 825.

24   Q.  What's this, detective?

25   A.  That's what I was referring to.

1          MR. FERGENSON:  You can take that down, Mr. Frenchman.

2    Q.  Now, detective, where was Julia's body?

3    A.  On the couch in her living room.

4          MR. FERGENSON:  Mr. Frenchman, can you please show the

5    witness what's marked as Government Exhibit 822.

6    Q.  Detective, what's shown here?

7    A.  Julia's body.

8          MR. FERGENSON:  The government offers Government

9    Exhibit 822.

10          MS. FLORIO:  No objection, your Honor.

11          THE COURT:  It will be admitted.

12          (Government's Exhibit 822 received in evidence)

13          MR. FERGENSON:  Mr. Frenchman, can you please publish.

14    Q.  Detective, remind us.  You said it was an open concept.

15          But where was this living room in relation to the

16    kitchen?

17    A.  The kitchen would be right behind the point of view.

18          MR. FERGENSON:  Mr. Frenchman, can you please show the

19    witness what's marked as Government Exhibit 826.

20    Q.  Detective, what's this exhibit?

21    A.  Julia's body.

22          MR. FERGENSON:  The government offers Government

23    Exhibit 826.

24          MS. FLORIO:  No objection, your Honor.

25          THE COURT:  Admitted.

1        (Government's Exhibit 826 received in evidence)

2        MR. FERGENSON:  Mr. Frenchman, can you please publish

3   to the jury.

4        Thank you, Mr. Frenchman.  We can take that down.

5   Q.  Now, detective, you said the cell phone is often the most

6   important part of your investigation.  Right?

7   A.  Yes.

8   Q.  Were you able to recover a cell phone at Julia's apartment?

9   A.  Yes.

10  Q.  Now, were you able to open and access the phone's contents

11  immediately?

12  A.  No.

13  Q.  Why not?

14  A.  It was password locked.

15  Q.  Were you eventually able to get access to the phone?

16  A.  Yes.

17  Q.  How?

18  A.  One of Julia's family members reached out to me.  They had

19  found the pass code written on a piece of paper a few weeks,

20  like six weeks, after her passing.

21       MR. FERGENSON:  Your Honor, at this time, the

22  government offers another stipulation agreed to between the

23  parties.  It's marked as Government Exhibit S2.

24       Mr. Frenchman, can you please publish S2 for the jury.

25       Let's go to page 3.  I'm not going to read the whole

1    stipulation right now.

2              Let's zoom on paragraph 13, please.

3              "It's hereby stipulated and agreed between the parties

4    that Government Exhibit 122 is a Samsung Galaxy S10 Plus,

5    assigned phone number 203-964-7043, that belonged to Julia

6    Ghahramani and was lawfully recovered from 185 Avenue B,

7    New York, New York, on March 18, 2021.

8              "Government Exhibit 122-0 and its subparts are true

9    and accurate copies of the contents extracted from the cell

10   phone that is marked as Government Exhibit 122.  For example,

11   Government Exhibit 122-1 is a subpart of Government Exhibit

12   122-0."

13             Mr. Frenchman, we can take that down for now.

14   Q.  Now, you said eventually you were able to open the phone;

15   right?

16   A.  Yes.

17   Q.  Did you review messages on the phone?

18   A.  Yes, I did.

19   Q.  Were there particular messages of interest to you?

20   A.  Yes.

21   Q.  Who were those messages with?

22   A.  The contact name was something along the lines of Mr. Save

23   Your Night.

24             MR. FERGENSON:  Mr. Frenchman -- excuse me, your

25   Honor.

1          Pursuant to the stipulation I read earlier, the

2    government offers Government Exhibit 122-01 through Government

3    Exhibit 122-03.

4          THE COURT:  They'll be admitted.

5          (Government's Exhibits 122-01 through 122-03 received

6    in evidence)

7          MR. FERGENSON:  Mr. Frenchman, could you please

8    publish what's in evidence as Government Exhibit 122-01.

9    Q.  Detective, what's shown here?

10   A.  The contact information for Mr. Save Your Night.

11   Q.  Did that contact name suggest anything to you?

12   A.  That was possibly the person who sold her the narcotics.

13   Q.  Could you please read the number for Mr. Save Your Night.

14   A.  Sure.  1-646-421-5555.

15   Q.  Now, if I refer to that as the 5555 number or the 5555

16   phone, will you know what I'm referring to?

17   A.  Yes.

18          MR. FERGENSON:  Mr. Frenchman, can you please publish

19   Government Exhibit 122-02.

20   Q.  Detective, what's shown here?

21   A.  The messages between Julia and Mr. Save Your Night.

22   Q.  And these messages are with the same contact we just looked

23   at, the 5555 number?

24   A.  Yes, it is.

25   Q.  What's the date of these messages?

1   A.   Wednesday, March 17, 2021.

2   Q.   What time is the first message sent on March 17, 2021?

3   A.   2:02 p.m.

4   Q.   Now, detective, I want to do a read-aloud of these messages

5   with you.  I'll read Julia's messages, and you read Mr. Save

6   Your Night's from the 5555 phone.

7        Okay.

8   A.   Okay.

9        (Reading)

10       Hey.

11       Hey, what's up.

12       Can you come through?  Last time was three hours late.

13  Not to be rude.  So can you make sure accurate ETA today,

14  please.

15       My apologies.  I'll send him right now if you want.

16       That would be great.  Thank you.  Really appreciate

17  it.  185 Avenue B, number 6G.

18       No worries we family.

19       MR. FERGENSON:  Please scroll down, Mr. Frenchman.

20       (Reading)

21       LMK the ETA when you can.

22       Okay.  10 min.

23       Can you come upstairs, please, instead of me going to

24  car.

25       Okay.  Yeah.  He's going up.

1                Awesome.

2                Hey, hey, you there?

3     BY MR. FERGENSON:

4     Q.   Did Julia respond to those last two messages?

5     A.   No.

6     Q.   What time were those messages sent?

7     A.   8:31 and 8:46 p.m.

8     Q.   Also on March 17?

9     A.   Yes.

10    Q.   What, if anything, did these messages suggest to you,

11    detective?

12                MS. FLORIO:  Objection.

13                THE COURT:  Sustained.

14    BY MR. FERGENSON:

15    Q.   Detective, have you investigated drug delivery services?

16    A.   Yes.

17    Q.   What's a drug deliver service?

18    A.   It's when a person who wants to purchase drugs would call a

19    phone number.  And either the person who picked up the phone

20    and received the message would deliver themselves or send a

21    "dispatch service," send someone else to fulfill the deal.

22                MR. FERGENSON:  Mr. Frenchman, we can take that down

23    for now.

24    Q.   Now, detective, I want to turn to some of the other

25    investigative steps you took.

1   A.   Okay.

2   Q.   What's a doorbell camera?

3   A.   A doorbell that has a camera on it that would let the

4   resident know, see an accurate video or live feed of who's at

5   the door.

6   Q.   What's a doorbell camera involved in your investigation

7   here?

8   A.   Yes.

9   Q.   Were you able to obtain images for Julia's doorbell?

10  A.   Yes.

11          MR. FERGENSON:   Your Honor, the government offers

12  another stipulation between the parties marked as Government

13  Exhibit S7.

14          Mr. Frenchman, please publish Government Exhibit S7.

15          I'm just going to read paragraph 1 at this time:

16          "It's hereby stipulated and agreed between the parties

17  that Government Exhibit 500 contains true and correct copies of

18  images taken by a camera attached to a doorbell located at 185

19  Avenue B, New York, New York, and include accurate dates and

20  times of the doorbell camera footage.

21          "Government Exhibits 501 and 502 and true and correct

22  video clips taken from a security camera located outside 185

23  Avenue B, New York, New York, on March 17, 2021."

24          Pursuant to this stipulation, the government offers

25  Government Exhibits 500A, 500B, and 501 through 507.

1          THE COURT:  Admitted.

2          (Government's Exhibits 500A, 500B, and 501 through 507

3   received in evidence)

4          MR. FERGENSON:  Mr. Frenchman, please publish

5   Government Exhibit 500A.

6   Q.  Detective, what's this detective?

7   A.  It's the list of stills that I received from the doorbell

8   camera.

9   Q.  Let's walk through this together.  And let's start at the

10  bottom image.

11         Mr. Frenchman, could you please zoom in on that row.

12         Detective, what's shown on the far left?

13  A.  A photo of a person at the door.

14  Q.  What's that person wearing?

15  A.  A baseball cap, blue mask, tan jacket, and it looks like a

16  strap to a shoulder bag.

17  Q.  And then towards the center, do you see the name Julia

18  Ghahramani?

19  A.  Yes.

20  Q.  Beneath that, what's the date and time?

21  A.  March 17, 2021, 14:48, which is 2:48 in military time.

22  Q.  And on the far right, it says:  "6G."

23         What's that?

24  A.  That's the apartment number.

25  Q.  So what do you understand this to be showing?

1    A.  Can you repeat that.

2    Q.  What do you understand this to be showing here?

3    A.  That Julia had opened the door for this gentleman to come

4    in.

5            MR. FERGENSON:  Mr. Frenchman, let's zoom out.  Let's

6    zoom on the fourth image from the bottom, third from the top.

7    It's actually fine.

8    Q.  Detective, let me direct your attention there.

9            Now, is the time here still roughly 2:48 p.m.?

10   A.  Yes.

11   Q.  This is still March 17; right?

12   A.  Yes.

13   Q.  What's happening on the far left?

14   A.  The gentleman is gaining entry to the building.

15           MR. FERGENSON:  Now, Mr. Frenchman, could you please

16   add on the right Government Exhibit 122-02.

17   Q.  Now, detective, on the right, that's the same text chain we

18   were looking at earlier; right?

19   A.  Yes.

20   Q.  Also from March 17?

21   A.  Yes.

22           MR. FERGENSON:  Now, Mr. Frenchman, on the right, can

23   you please go to page 2.

24   Q.  You no, detective, I want to focus you on the messages that

25   say:  "Hey, 10 min."

1          Do you see those?

2    A.  Yes.

3    Q.  What time are those messages sent?

4    A.  2:36 p.m.

5    Q.  So 2:36 p.m. is about 12 minutes before the images shown on

6    the left of the individual entering the apartment?

7    A.  Yes.

8    Q.  Now, in response to that:  "Hey, 10 min text," what does

9    Julia say in response?

10   A.  "Can they come up the stairs, please, instead of me going

11   to the car."

12         MR. FERGENSON:  Now, Mr. Frenchman, you can take that

13   down.

14   Q.  Now, in addition to the doorbell camera, did you also

15   review surveillance video from outside Julia's apartment

16   building?

17   A.  Yes.

18         MR. FERGENSON:  Mr. Frenchman, can you please pull up

19   Government Exhibit 501.

20   Q.  Detective, do you recognize what's shown here?

21   A.  Yes.

22   Q.  What will this video show?

23   A.  This will show the gentleman walk into the building.

24         MR. FERGENSON:  Mr. Frenchman, can you please play the

25   video.

1              (Video played)

2              MR. FERGENSON:  Mr. Frenchman, can we please pause.

3    Q.   Detective, who just walked into the screen?

4    A.   The person that entered Julia's building at 2:48 p.m.

5    Q.   What kind of bag is the individual wearing?

6    A.   A shoulder bag, a one-strap shoulder bag.

7    Q.   Did that have any significance to you?

8    A.   Yes.

9    Q.   What was it?

10   A.   How drug couriers carry their product when they're moving

11   about the city.

12   Q.   And that individual is looking at his phone; right?

13   A.   Yes.

14             MR. FERGENSON:  Mr. Frenchman, let's play the

15   remainder of the video.

16             (Video played)

17   BY MR. FERGENSON:

18   Q.   By the way, detective, there was no time stamp on the

19   video; right?

20   A.   Correct.

21   Q.   But that doorbell camera had an entry time of about

22   2:48 p.m.?

23   A.   Yes.

24             MR. FERGENSON:  Mr. Frenchman, can you please pull up

25   Government Exhibit 502.

1    Q.  Detective, do you recognize what's shown here?

2    A.  Yes.

3    Q.  What will this video show?

4    A.  The gentleman leaving the building.

5            MR. FERGENSON:  Mr. Frenchman, you can go ahead and

6    play the video, please.

7            (Video played)

8            MR. FERGENSON:  Thank you, Mr. Frenchman.  We can take

9    it down.

10   Q.  Now, detective, you said earlier that at a certain point,

11   you stopped being the case detective.  Right?

12   A.  Yes.

13   Q.  The case detective is the lead investigator?

14   A.  Yes.

15   Q.  Why did you stop being the case detective for Julia's

16   death?

17   A.  On this day, we had three overdoses, all coinciding with

18   the same product, which meant it came from the same place.  So

19   initially we had three detectives working with the same goal,

20   to identify where and who sold this drug from, to the point

21   where the majority of the work was concluded by us.  So we just

22   consolidated to one detective to handle it from there on after,

23   approximately six weeks of investigating.

24   Q.  Now, detective, while you were on the case, were you able

25   to identify the man in the mask we just saw?

1    A.  No.

2    Q.  While you were on the case, were you able to identify the

3    user of the 5555 phone number?

4    A.  No.

5    Q.  Why not?

6    A.  I didn't get into Julia's phone until the end of my

7    investigation, until I handed it off.  It was within days of

8    receiving the pass code.  It was already going to be

9    consolidated to one detective at that point.

10   Q.  You said getting into the phone is typically the most

11   important part of your investigation.  Right?

12   A.  Yes, it is.

13             MR. FERGENSON:  May I have a moment, your Honor?

14             THE COURT:  Yes.

15             (Pause)

16             MR. FERGENSON:  No further questions, your Honor.

17             THE COURT:  Thank you.

18             So I had indicated yesterday that today we're going to

19   have a short day.  Tomorrow we're going to sit a full day

20   from --

21             MS. FLORIO:  So sorry to interrupt, your Honor, but I

22   have no questions.  So there is no need to bring the detective

23   back.

24             THE COURT:  I appreciate you telling me that.

25             You can step down.

1              THE WITNESS:  Thank you, your Honor.

2              THE COURT:  Thank you very much.

3              (Witness excused)

4              THE COURT:  All right.  So, as I noted yesterday,

5    we're going to have a short day today.  So we're going to

6    adjourn for the day today.  Please remember don't discuss the

7    case at all.

8              Don't do any research.  Just continue to keep an open

9    mind.  Your breakfast will be waiting for you at 9:45 tomorrow.

10   We will start at 10:00 and go a full day until 5:00.  Thank you

11   again and have a nice day.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court; jury not present)

2                    THE COURT:  Everyone can be seated.  Thank you.

3              We had at sidebar decided that we would meet tomorrow

4    at 9:30 to address the outstanding legal issues.  I just wanted

5    to advise you all that one of the jurors advised my deputy of

6    one thing that she did not say during jury selection which is

7    specifically that her husband is a physician at Otisville.  So

8    I just wanted to advise you all that she just said --

9                    THE DEPUTY CLERK:  She just said, I didn't notify you

10   that it was at Otisville.  She said it was a federal facility

11   but didn't indicate that it was a prison.

12                   THE COURT:  So I just -- she hadn't specified that it

13   was specifically a prison as opposed to some other kind of

14   federal facility.  So I wanted to advise you about that; that

15   we have been so notified.

16                   MS. FLORIO:  Which juror was this?

17                   THE DEPUTY CLERK:  Juror number 13, alternate number

18   1.

19                   THE COURT:  It's juror 13 or alternate number 1.

20                   Thank you, all.  See you all tomorrow.

21              MR. SEIDLER:  Your Honor, tomorrow morning at 9:30,

22   are we going to discuss DeLaura?

23                   THE COURT:  We're going to talk about DeLaura, and

24   we're going to talk about the government's motion for a

25   corrective instruction after the defense opening.

1          And we can also address the remaining motions in

2    limine, the ones that I have reserved ruling on.  So we'll do

3    that at 9:30.

4          MR. SEIDLER:  Okay.  I may not be able to be here for

5    9:40 because I assumed we were going to start at 10:00.

6          THE COURT:  We don't have to address DeLaura tomorrow.

7    We can address DeLaura when we have time.  So we don't have to

8    do that tomorrow.

9          Thanks, everyone.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25