UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

　　　　　v.                          22 Cr. 91 (RA)

BILLY ORTEGA,

　　　　　　　　Defendant.

------------------------------x

　　　　　　　　　　　　　　　　　New York, N.Y.
　　　　　　　　　　　　　　　　　January 24, 2023
　　　　　　　　　　　　　　　　　9:30 a.m.

Before:

　　　　　　　　　HON. RONNIE ABRAMS,

　　　　　　　　　　　　　　District Judge
　　　　　　　　　　　　　　　and a Jury

　　　　　　　　　　　　APPEARANCES

DAMIAN WILLIAMS
　　　　United States Attorney for the
　　　　Southern District of New York
BY:　MICHAEL R. HERMAN
　　　MICAH F. FERGENSON
　　　ROBERT B. SOBELMAN
　　　Assistant United States Attorneys

DAWN M. FLORIO LAW FIRM, PLLC
　　　　Attorneys for Defendant
BY:　DAWN M. FLORIO
　　　DECLAN J. MURRAY
　　　　-and-
B. ALAN SEIDLER

Also present:

Alex Frenchman, Paralegal Specialist, U.S. Attorney's Office
Christine Woods, Paralegal Specialist, U.S. Attorney's Office
Susan Ruiz, Special Agent, Homeland Security Investigations

1

2              (Trial resumed)

3              (In open court; jury not present)

4              MR. SEIDLER:  Ms. Florio got hung up.

5              THE COURT:  Can we start with the witness back on the

6    stand.  Thanks.  Thank you.

7              MR. SOBELMAN:  His attorney just wants to speak with

8    him.

9              THE COURT:  Either way.  Sure.  Whatever is easier for

10   you.

11             My law clerk emailed you about white that Ms. Von

12   Dornum should not be off trial, but the jury should be charged

13   in her case by about 10:30.  So maybe we can address that issue

14   on the morning break.

15             (Trial resumed)

16             THE COURT:  Is everyone ready for the jury?

17             MS. FLORIO:  Yes.

18             THE COURT:  Great.  Thank you.

19             (Continued on next page)

20

21

22

23

24

25

1            (In open court; jury present)

2            THE COURT:  Good morning, folks.  You may all be

3    seated.

4            Mr. Rainey, I'm going to remind you that you're under

5    oath.

6            You may proceed, Mr. Fergenson.

7            MR. FERGENSON:  Thank you, your Honor.

8    KAYLEN RAINEY,

9         called as a witness by the Government,

10        having been duly sworn, having been previous sworn,

11    testified as follows:

12    DIRECT EXAMINATION (Cont'd)

13    BY MR. FERGENSON:

14    Q.  Good morning, Mr. Rainey.

15    A.  Good morning.

16            MR. FERGENSON:  Mr. Frenchman, can we publish

17    Government Exhibit 908.

18    Q.  Now, Mr. Rainey, do you recall when we stopped yesterday,

19    you had just been discussing this floor plan?

20    A.  I do.

21    Q.  This was the floor plan for Josefina's apartment; right?

22    A.  Yes.

23    Q.  Just to refresh us, let's just go through the bedrooms.

24            Whose bedroom was BR1?

25    A.  That's Josefina's room.

1    Q.  And BR2?

2    A.  Kevin's bedroom.

3    Q.  And BR3?

4    A.  That was my bedroom.

5         MR. FERGENSON:  Mr. Frenchman, let's show the witness

6    now what's marked as Government Exhibit 413.

7    Q.  Mr. Rainey, what's this a photo of?

8    A.  That's the hallway to the apartment, the four closets, two

9    on the right and two on the left.

10        THE COURT:  Any objection?

11        MS. FLORIO:  No objection.

12        THE COURT:  Admitted.

13        (Government's Exhibit 413 received in evidence)

14   BY MR. HERMAN:

15   Q.  Mr. Rainey, could you explain to us what we're looking at

16   here.  This is the hallway that led to the bedrooms and the

17   bathroom.  The four closets there in the hallway, the first

18   three were storage closets.

19        The second closet on the l-e-f-t hand side, that was

20   the closet with the safe and the drugs.  On the right in the

21   corner, that is the bathroom.  And straight ahead, that was

22   Kevin.  Straight ahead where the door is open, that was Kevin's

23   bathroom.

24        MR. FERGENSON:  Mr. Frenchman, you can take that down,

25   and let's pull up what's now in exhibit as Government Exhibit

1    111-34.  Let's actually go to page 34 of this exhibit,

2    Mr. Frenchman.  Can we blow up the bottom texts.  Let's do two

3    at the same time if we can.

4    Q.  Mr. Rainey, these are also messages taken from your phone.

5    Right?

6    A.  Yes.

7    Q.  And these are also with the 5555 number?

8    A.  Yes.

9    Q.  And the date of these messages is July 1, 2019?

10   A.  Yes.

11   Q.  Now I'm going to read the blue messages, and I'll ask you

12   to read the green.  Just as a reminder, the blue messages are

13   coming from the 5555 phone.  Right?

14   A.  Correct.

15   Q.  And whose phone was that?

16   A.  Billy's.

17        MR. FERGENSON:  Thank you, Mr. Frenchman.  Okay.

18   "Q. Hey, after this, go straight to the crib, bro, so you can

19   give her what you needed to, and before you giver it to her,

20   give me the account."

21        Scroll down, please, Mr. Frenchman.

22   "A. Lght 1350.

23   "Q. Plus the 60 aight.  $1,410.  Right?

24   "A. Yup.

25   "Q. I forgot to ask.  How much will you have put away?

1   "A. You do remember I know safe password.  Right?"

2              MR. FERGENSON:  Can you scroll up, Mr. Frenchman.

3   Q.  Mr. Rainey, do you see how a response to that is a file

4   that ends in .opus?

5   A.  Yes.

6   Q.  Is that a voice note file?

7   A.  I believe so.

8              MR. FERGENSON:  We're now going to go to Exhibit

9   1111-34A.

10             So, Mr. Frenchman, can you please add on the right

11  that audio file, please.

12             (Audio played)

13  BY MR. FERGENSON:

14  Q.  Mr. Rainey, before that voice note, the defendant had asked

15  you how many will you have on you; right?

16  A.  Yes.

17             MR. FERGENSON:  Mr. Frenchman, let's just play that

18  one more time.

19             (Audio played)

20  BY MR. FERGENSON:

21  Q.  Now, Mr. Rainey, you said that's why I was asking if you

22  had any loose ones.

23             What did you understand that to mean?

24  A.  If I had any loose baggies of cocaine.

25  Q.  When he said, "I did the count on the will," what did you

1    understand that to mean?

2    A.   That he was counting the bags of cocaine.

3         MR. FERGENSON:   Mr. Frenchman --

4    Q.   Mr. Rainey, I should have asked you:  Do you recognize the

5    voice in that audio note?

6    A.   Yes.  It's Billy.

7         MR. FERGENSON:   Mr. Frenchman, let's go back to the

8    text, Government Exhibit 111-34.  Let's go back to where we

9    were.  It's page, I believe, 37.  Can you zoom in on the green

10   text at the bottom, the response.

11   Q.   Mr. Rainey, how did you respond to that voice note?

12   A.   "Just 1 pack."

13   Q.   What did you mean by that?

14   A.   I only had one pack of cocaine.

15   Q.   And how many baggies of cocaine are in a pack?

16   A.   Ten.

17   Q.   Now, Mr. Rainey, earlier in your text exchange you said,

18   you know I know the safe password; right?

19   A.   Yes.

20   Q.   What were you referring to there?

21   A.   A couple of days prior to that was one of the times that I

22   had the safe password.

23   Q.   What was in the safe?

24   A.   The drugs.

25   Q.   The drug safe?

 1   A.  Yes.

 2          MR. FERGENSON:  Now, Mr. Frenchman, let's go to

 3   Government Exhibit 111-39.  We can go to page 12.  If we could

 4   zoom on the top two texts, please.

 5   Q.  All right.  Mr. Rainey, I'll read the blue, and you read

 6   the green.  We're just going to read this one page:

 7   "Q. Hey, did you get to the crib already or not yet?

 8   "A. Just got here.

 9   "Q. Wait for me.  I'm 25 min away."

10          MR. FERGENSON:  Thank you, Mr. Frenchman.  We can zoom

11   out.  If you can scroll up, please.

12   Q.  Mr. Rainey, what was the "crib"?

13   A.  Josefina's apartment.

14   Q.  Did you live there too?

15   A.  Yes.

16   Q.  What did you understand Billy to be saying in this brief

17   text exchange?

18   A.  Asking me if I had got to the house already so I can let

19   him in when he gets there.

20          MS. FLORIO:  I'm so sorry.  I couldn't hear the last

21   part.

22          THE WITNESS:  Asking me if I was at the house already,

23   so when he got there, I could open the door for him.

24   BY MR. FERGENSON:

25   Q.  This is an example of how Billy would come to the

1   apartment?

2   A.  Yes.

3   Q.  Now, we'll come back to more texts with Billy, Mr. Rainey.

4   But I want to switch to Lenny.

5        You had testified yesterday that Lenny was one of the

6   people, another runner you sold drugs with.  Right?

7   A.  Yes.

8   Q.  And he sold drugs for Billy; right?

9   A.  Yes.

10       MR. FERGENSON:  Mr. Frenchman, let's pull up

11  Government Exhibit 111-120, please.

12  Q.  Can you zoom on the participants, just so we can see.

13       Now, Mr. Rainey, you see your name is listed there as

14  owner.  Right?

15  A.  Yes.

16  Q.  And there's another number.

17       What's the other number?

18  A.  917-378-6460.

19  Q.  And whose number is that?

20  A.  Lenny's.

21       MR. FERGENSON:  Now let's zoom out, please.

22       Mr. Frenchman, can you zoom in on the messages two at

23  a time so we can scroll in and read these.

24  Q.  Mr. Rainey, I'll ask you to read the green ones.  I may

25  stop you at certain points just to ask you sort of what's

1    happening in the messaging.  So you go ahead and read the

2    green, please.

3    "A. You came to the crib today?"

4    BY MR. FERGENSON:

5    Q.  Again, what was the crib?

6    A.  Josefina's apartment.

7    Q.  And Lenny responds -- I'm sorry.

8          The date of these messages is September 19, 2019.

9    Right?

10   A.  Yes.

11   Q.  Lenny responds:

12   "Q. No.  Why?

13   "A. Cuz last night I went to see somebody for 3, but when I saw

14   them, they wanted more.  So I gave them more and kept the extra

15   bread LOL, but I only got 2 will, and BA want me to work

16   tonight, and I would, but I need another bag, and I but I can't

17   tell him that cuz he think I got 7 so he'd obviously ask LOL."

18   Q.  Let's stop here and break this down.

19          When you said:  "Cuz last time, I went to see somebody

20   for three, what did you mean there?

21   A.  I went to see someone for Billy that wanted three bags of

22   cocaine.

23   Q.  You went to see a customer?

24   A.  Yes.

25   Q.  And when you said:  "When I saw them, they wanted more.  So

1   I gave them more," what did that mean?

2   A.  They wanted an extra bag or two.  I'm not sure how many.

3   So I sold it to hem.

4   Q.  When you say you kept the extra bread, what's "bread"?

5   A.  Money.

6   Q.  So you kept the extra money?

7   A.  Yes.

8   Q.  And as a result, you say:  "But I only got two will."

9         What did that mean?

10  A.  I only had two baggies of cocaine left.

11  Q.  And you say, "And BI want me to work tonight."

12        Who is BI?

13  A.  Billy.

14  Q.  And you say:  "And I would."

15        Does that mean you would have worked that night?

16  A.  Yes.

17  Q.  You say:  "But I would need another bag and but I can't

18  tell him that cuz he think I got 7."

19        When you say:  "I would need another bag," what do you

20  mean by that?

21  A.  I would need another bag of cocaine.

22  Q.  Why don't you tell Billy that?

23  A.  Because then he would have known that I was missing some.

24  It wouldn't have added up.

25  Q.  Did you sometimes lie to Billy about drugs like this?

1   A.  There was a couple times, but there wasn't much opportunity

2   to do that because he knew what we had at all times for the

3   most part.

4   Q.  What about cab expenses?  Would you sometimes inflate your

5   cab expenses?

6   A.  There were a few times where I caught the train and would

7   keep the cab fare.  Yes.

8   Q.  Why would you do those things?

9   A.  Just to pocket the extra money.

10          MR. FERGENSON:  Now let's keep scrolling down.

11  Q.  Now, what did you say next?

12  "A. If you had came to the crib today, I could have just said I

13  gave to the rest to L, but you didn't.  So I can't."

14  Q.  What did you mean by that?

15  A.  If Lenny would have came to the apartment that day, then I

16  would have just been able to tell Billy that I gave all of the

17  left-over drugs to him, to Lenny.  But because he didn't come

18  to the apartment, I couldn't do that.

19  Q.  So the reference to L there, that's Lenny?

20  A.  Yes.

21          MR. FERGENSON:  Go down.

22  Q.  What do you say next?

23  "A. Oh, well, LOL."

24  "Q. And Lenny responds:  "Shit.  Where my bread at.  I'm

25  supposed to get paid.  But you can't just sneak into the safe?

```
 1    If you want the code, I give it IDC."
 2            Mr. Rainey, what's your understanding of what "IDC"
 3    means?
 4    A.  I don't care.
 5            MR. FERGENSON:  Scroll down.
 6    Q.  What do you say next?
 7    "A. I got all the bread from last night.  I'm ready too.  What
 8    is it?"
 9    Q.  What's the "it" you're asking for?
10    A.  The password to the safe.
11    Q.  And what did you say next?
12    "A. Yeah.  The bread in my drawer.  That's why I'm surprised
13    you wasn't here because I know it's payday.  Laugh my ass off.
14    "Q. 12123.  I might have to change it.  LMAO."
15            Let's pause there.  This 12123, what did you
16    understand that to be?
17    A.  The safe password.
18            MR. FERGENSON:  Go down.
19    Q.  That you, this dumb N-word ain't call me at all."
20            Mr. Rainey, who did you understand that to be
21    referring to there?
22    A.  Lenny.
23            MR. FERGENSON:  Scroll down.
24    Q.  What did you say?
25    "A. Go ahead.  Shit.  Laugh my ass off."
```

1   "Q. And yesterday that shit where you went to Grand, he told me

2   to go and then changed his mind to send you just cause I said I

3   wasn't going back to block LML."

4          What did you understand Lenny to be saying there?

5   A.  That is the day that Billy had sent me to Grand Street.  He

6   had told Lenny to go back, but he changed his mind because

7   Lenny said he wasn't coming back to the apartment.

8   Q.  That's what "back to the block" meant?

9   A.  Yes.

10  Q.  Now, Mr. Rainey, Lenny sent you the safe pass code here.  I

11  think you explained earlier there were times when you had the

12  drug safe pass code.  Right?

13  A.  Yes.

14  Q.  Have you taken drugs out of the safe yourself at times?

15  A.  Only on that occasion.

16         MR. FERGENSON:  Mr. Frenchman, we can go ahead and

17  take that down.

18  Q.  Now, Mr. Rainey, you talked about summer 2019.

19         Did you start working for Billy less often around that

20  fall of 2019?

21  A.  Yes.  I was doing days for two months I believe, June and

22  July.

23  Q.  And why did you start working less for Billy?

24  A.  I had started a job.  I had started working at Johnny

25  Utah's.

1    Q.  What's Johnny Utah's?

2    A.  It's a bar/restaurant.

3    Q.  Where is Johnny Utah's?

4    A.  It's on the east side, midtown Manhattan.

5    Q.  And what kind of work did you do there?

6    A.  I was a waiter.

7        MR. FERGENSON:  Mr. Frenchman, can you pull up what's

8    in evidence as Government Exhibit 616.

9    Q.  Mr. Rainey, just directing you to the top left, do you see

10   where it says Johnny Utah's?

11   A.  Yes.

12   Q.  Who is this check made out to?

13   A.  To me.

14   Q.  And the address underneath your name, what's that address?

15   A.  That was my address where I was living.

16   Q.  Is that Josefina's?

17   A.  Yes.

18   Q.  What's the date of this check?  I'm directing you to the

19   top right.

20   A.  September 13, 2019.

21   Q.  Was that around the time you started working at Johnny

22   Utah's?

23   A.  Yes.

24       MR. FERGENSON:  Mr. Frenchman, let's take that down.

25   Q.  Mr. Rainey, I apologize if you said this already.

1                About how long did you work at Johnny Utah's?

2   A.  A little over a month.

3   Q.  Where did you work after that?

4   A.  I started working Zuma.

5   Q.  What is Zuma?

6   A.  Zuma is a restaurant, bar/lounge.  It's in Times Square,

7   east side.

8   Q.  What did you do at due has?

9   A.  I was a waiter.

10  Q.  How long did you work as a waiter at Zuma?

11  A.  A little over two years.

12              MR. FERGENSON:  Now, Mr. Frenchman, can you pull up

13  Government Exhibit 111-40.

14  Q.  Let's zoom in on the bottom two texts.

15              Mr. Rainey, this is again messages from the phone with

16  the 5555 number; right?

17  A.  Yes.

18  Q.  And the date of these messages is November 23, 2019.  Billy

19  texts you:  "Yo did you start working at the 40 40?"

20              Mr. Rainey, what's the 40 40?

21  A.  The 40 40 is a club/lounge in Manhattan.

22  Q.  How did you respond?

23  A.  "A better sport."

24  Q.  What did you say next?

25  "A. Zuma.  Why?"

1          MR. FERGENSON:  Mr. Frenchman, you can take that down.

2   Q.  Was that around the time you started working at Zuma?

3   A.  Yes.

4   Q.  Mr. Rainy, did Zuma stay open during the COVID-19 pandemic

5   heights in 2020?

6   A.  No.  We closed March 2020.

7          MR. FERGENSON:  Mr. Frenchman, can we put up

8   Government Exhibit 111-44, please.  Can we go to page 51.

9   Let's zoom in on the top two texts so that we can read these.

10  Q.  Now, Mr. Rainey, these are more texts with the 5555 number.

11  The date of these texts is March 27, 2020.

12          Can you remind us, to mark the date, what was

13  happening in New York City from a health perspective in

14  March 2020.

15  A.  We were locked down because of COVID-19.

16  Q.  Can you read your two messages here, please.

17  "A. Call ma.  Need m."

18  Q.  Who is ma?

19  A.  Josefina.

20  Q.  What's m?

21  A.  Molly.

22          MR. FERGENSON:  Go down, Mr. Frenchman.

23  Q.  The response:  "I already did."

24          What did you understand him to be saying there?

25  A.  He had already called Josefina's to tell her I needed the

1    Molly.

2    Q.   Why did you ask Billy to ask Josefina's to give you drugs.

3    A.   Billy had to approve it whenever we needed anything.  We

4    had to get it from Josefina, and she had to approve it with

5    Billy.

6    Q.   Whose rule was that?

7    A.   Billy's.

8              MR. FERGENSON:  Mr. Frenchman, let's pull out

9    Government Exhibit 111-52 and just look at the first page.

10   Let's zoom on the top two.

11   Q.   Now, these are more texts with the 5555.  This one is dated

12   September 25, 2020.

13             Do you see that, Mr. Rainey?

14   A.   Yes.

15   Q.   What did you say on that day?

16   "A. Tell ma put a pack out."

17   Q.   Who is "ma"?

18   A.   Josefina.

19   Q.   When you say "put a pack out," what are you asking for?

20   A.   A pack of cocaine.

21   Q.   Billy responds:  "Cool."  Scroll down one.

22             He asked:  "You took out the one from earlier.

23   Right."

24             What's he referring to?

25   A.   A pack of cocaine.

 1            MR. FERGENSON:  Mr. Frenchman, let's just keep reading

 2    a little bit of this chain.  Let's scroll down.

 3    Q.  What did you respond to Billy?

 4    "A. Yes.

 5    Q.  Billy wrote:  "Cool."

 6            And he asked you:  "Do you still have enough to see

 7    the next person?"

 8    "A. Not no more.

 9    "Q. Damn okay."

10            Keep scrolling.  And then 11 minutes later or so,

11    Billy writes:  "Hey, bro, I need you to stop by the Zip store

12    and pick up a big Ziploc bag, not the sandwich one, the big one

13    with the zipper."

14            Keep scrolling up.

15            What did you say in response?

16    "A. You mean buy a box?

17    "Q. Billy says yeah LOL.

18    "A. If I can find some."

19    Q.  And Billy writes:  "I hope you do LOL.  If they don't have

20    the big one, the small one works also."

21            What did you respond?

22    "A. I got."

23    Q.  Now, Mr. Rainey, what did you understand Billy to be asking

24    you to do?

25    A.  To go to the store and purchase a bag of Ziplocs, Ziploc

```
 1   baggies.

 2   Q.  I'm sorry?

 3   A.  To purchase a bag of Ziploc bags.

 4   Q.  What were Ziploc bags used for?

 5   A.  To keep the cocaine in.

 6           MR. FERGENSON:  Mr. Frenchman, we can take it down.

 7   Q.  Mr. Rainey, you also talked about working with an

 8   individual named William Drayton.

 9           Do you remember that?

10   A.  Yes.

11   Q.  In 2020, which is the time period you were working at, was

12   Will also working as a runner?

13   A.  Yes.

14           MR. FERGENSON:  Mr. Frenchman, can you please pull up

15   Government Exhibit 11-116.  And zoom in on the participants.

16   Q.  Now, you're a participant here.  It's from your phone.

17   Right?

18   A.  Yes.

19   Q.  Can you read the other number, please.

20   A.  551-248-2481.

21   Q.  Who is that?

22   A.  Will.

23           MR. FERGENSON:  Zoom out, please.  Do you know what,

24   Mr. Frenchman.  Why don't we skip ahead to page 3.  Let's start

25   there.  Thank you, Mr. Frenchman.  Okay.
```

 1   Q.  Now, the blue texts are from Will here; right, Mr. Rainey?

 2   A.  Yes.

 3   Q.  So I'll read those:

 4   "Q. You wanna do it today?

 5   "A. Just tell him make sure Josefina's leave a pack out."

 6   Q.  Now explain to us:  What are you guys saying here?

 7   A.  Will asked me if I could cover that day for him, and I told

 8   him to just let Billy know to let Josefina know to leave a pack

 9   of cocaine out so that I can cover the day for him.

10   Q.  And Will was also a runner for Billy?

11   A.  Yes.

12          MR. FERGENSON:  Mr. Frenchman, let's go to Exhibit

13   111-115.

14   Q.  Mr. Rainey, this is another set of messages with that same

15   number, Will's number?

16   A.  Yes.

17          MR. FERGENSON:  Mr. Frenchman, zoom out.  Let's go to

18   page 2.  Let's zoom on the two blue messages.

19          So I'll read these messages from Will:

20   "Q. Can you do today for me.  I got to do some shit in the

21   city."

22          Please keep scrolling.

23   "A. Yeah.

24   "Q. Cool.  Thanks man.  I'll tell Bill."

25          When Will asked you if you could do today for him,

1    what was your understanding of him to be asking?

2    A.  If I could cover the day for him and deliver cocaine.

3    Q.  And Will writes back:  "I'll tell Bill."

4         Who is Bill?

5    A.  Billy.

6    Q.  Who needed to know who was working delivering drugs?

7    A.  Billy.

8         MR. FERGENSON:  Mr. Frenchman, let's go to Exhibit

9    111-117.

10   Q.  This is another set of messages with that same number,

11   Will's number?

12   A.  Yes.

13        MR. FERGENSON:  And we're going to read these

14   messages, Mr. Frenchman.  So you can start with the one on this

15   page.

16   Q.  And now just to mark the date of this first message, it's

17   May 30, 2021.  Right?

18   A.  Yes.

19   Q.  Now read your message, please, Mr. Rainey.

20   A.  "I'm trying to go half on a car for the day so we can go to

21   Billy's.  I'll drive there.  You back.

22   "Q. Go now and come back tonight?

23   A.  No.  Like 7ish and come back later.

24   "Q. I thought we going tonight and staying?

25   "A. Yes, fool.  Staying until when though?

1    "Q.  I thought we staying 'till Monday?

2    A.  Yeah, but a Zip gonna cost a lot if we not leaving early.

3    Let me see."

4             MR. FERGENSON:  Mr. Frenchman, we can pause there, and

5    you can zoom out.

6    Q.  Mr. Rainey, so you texted about going to Billy's.

7             Where were you talking about going?

8    A.  To West Milford, New Jersey.

9    Q.  Whose house was that?

10   A.  Billy's.

11   Q.  And you also mentioned getting a Zip.

12            What's a Zip?

13   A.  A Zip is a Zipcar.  It's a ride share app where you can

14   pick up car rentals from like car lots or anywhere where cars

15   are picked.

16   Q.  Did you ever use Zip cars when dealing drugs for Billy?

17   A.  Yes.

18   Q.  How would you use them?

19   A.  I would just rent a car.  And then when I was sent the

20   address, I would just go to the address.

21   Q.  Using the Zipcar?

22   A.  Yes.

23   Q.  You had testified earlier that you'd been to Billy's house

24   in West Milford?

25   A.  Yes.

1    Q.  And are you talking about here going to that same house?

2    A.  Yes.

3    Q.  Now, Mr. Rainey, we also talked about how the way you

4    normally get drugs is Billy would tell his mom to give you the

5    drugs.  Right?

6    A.  Yes.

7    Q.  Did Billy ever tell you to pick up drugs from a different

8    apartment in the Fulton Houses?

9    A.  Yes.  Will's.

10   Q.  And where was that apartment in the Fulton Houses?

11   A.  It was across the street from our apartment near where

12   Josefina lived.

13   Q.  Did you do that on occasion?

14   A.  Yes.

15   Q.  Why?

16   A.  Billy had told me to.

17   Q.  What's your understanding of whose drugs you were picking

18   up from Will's apartment in the Fulton Houses?

19   A.  They were Billy's.

20   Q.  Now, let me ask you:  Was Will always at that Fulton House

21   apartment?

22   A.  No.  He eventually moved to New Jersey.

23   Q.  So when Will wasn't there, how would you pick up drugs from

24   that apartment?

25   A.  Will's mother.

1   Q.  Did you know why Billy's drugs were being kept in Will's

2   mother's apartment at times?

3   A.  I don't know.

4   Q.  Now, Mr. Rainey, we've looked at a lot of messages.  We've

5   talked about delivering drugs for Billy.  Let's change topics

6   generally.

7          Mr. Frenchman, you can take this down.

8          Would Billy ever ask you to make payments for him?

9   A.  Yes.  He's asked me to pay his phone bill on a few

10  occasions.

11         MR. FERGENSON:  Mr. Frenchman, let's pull up an

12  example of them, Exhibit 111-53.

13         Why don't we skip ahead to page 25, please.

14         Now let's zoom in on the top two blue texts, please.

15  Q.  Mr. Rainey, these are more texts with that 5555 phone.

16  I'll read the blue.  The date of the first one is September 28,

17  2020.

18         Do you see that?

19  A.  Yes.

20  "Q. Morning, bro.  Hey, when you have a chance, can you pay

21  this bill at T-Mobile, 646-853-6897."

22         Can you scroll down.

23  "A. Yeah.

24  "Q. 80-95."  Let me pause there.

25         What did you understand "80-95" to mean?

1   A.  That was how much the phone bill was.

2   Q.  How would you pay a bill at T-Mobile?

3   A.  Cash.

4           MR. FERGENSON:  Scroll down, please.

5           Then Billy sends a dollar sign.  "Thanks, bro."

6           Keep scrolling, please.

7   Q.  What did you say, Mr. Rainey?

8   A.  "Tell ma pass it to me before she leave cuz I gave her all

9   the bread."

10  Q.  What are you asking Billy to do there?

11  A.  To tell Josefina to pass me the money so I can pay the

12  bill, the phone bill.

13          MR. FERGENSON:  Keep scrolling down.  Billy says:

14  "Okay.  Cool."

15          Keep scrolling.

16          Billy writes:  "She's passing you $800.  100 for

17  T-Mobile.  Then 700 for Verizon.  He's going to have a new

18  phone for me.  I'm not sure if it's 700 or 700".

19  Q.  Then how do you respond?

20  A.  "All right."

21  Q.  Then the next text says:  "500 East 85th Street, New York,"

22  with a Zip code, "3 will $600."

23          What did you understand that to mean?

24  A.  500 East 85th Street was the address of the client, and

25  they were getting three baggies of cocaine, and they were

 1    giving me $600.

 2             MR. FERGENSON:  Mr. Frenchman, let's jump down to page

 3    34, please.  Let's zoom in on the top two texts, please.

 4    Q.  Now, Mr. Rainey, this is still the same day, September 28,

 5    2020.

 6             Do you see that?

 7    A.  Yes.

 8    Q.  What did you write at about 4:30 p.m.?

 9    "A. It's prepaid.  Right?  No name."

10    Q.  What are you asking?

11    A.  If the phone was prepaid, was a prepaid phone, if they

12    require a name to pay the bill.

13             MR. FERGENSON:  Go down, Mr. Frenchman.

14    Q.  And Billy responds:  "Yep.  No name."  Keep scrolling down.

15             Keep scrolling down, please.

16             Billy writes:  "Thanks bro.  You see they trying to

17    catch ghost.  No name, baby.  No name."

18             You can stop there.

19             Mr. Rainey, what did you understand Billy to be saying

20    there?

21    A.  They was trying to catch him.  With anonymous, having no

22    name, no attachments or anything made you like a ghost.  So

23    harder to detect.

24    Q.  Who would be crying to catch him?

25    A.  Police, anybody who wanted to get in contact with him.

```
 1              MR. FERGENSON:  Mr. Frenchman, we can zoom out.
 2   Q.  Mr. Rainey, did you sometimes also pay for the 5555 number
 3   too?
 4   A.  I believe so.
 5              MR. FERGENSON:  Mr. Frenchman, can you pull out
 6   Government Exhibit 111-75.  Let's zoom on the bottom message,
 7   please.  We're going to read a couple, so two at the same time.
 8   Q.  Mr. Rainey, more messages with the 5555 phone, Billy's
 9   phone.  This one is dated February 16, 2021.
10              Do you see that?
11   A.  Yes.
12   Q.  And I'm going to direct you to focus on the bottom left,
13   and then we'll scroll down.
14              Bill says:  "Hey, bro.  When you have a chance, can
15   you pay this bill."
16              Let's scroll down:  "Phone is disconnected.  Probably
17   why we didn't get a call yesterday."
18              What did you say?
19   "A. How much is it?"
20   Q.  What were you asking?
21   A.  How much was the phone bill.
22              MR. FERGENSON:  Mr. Frenchman, scroll down.
23              THE WITNESS:  "Count for Sunday was only $65.  I need
24   the rest."
25   BY MR. FERGENSON:
```

 1    Q.  What were you saying there?

 2    A.  I only had $65 from the count the previous day from the

 3    proceeds from making deliveries, and I needed more money if I

 4    was going to pay the phone bill.

 5            MR. FERGENSON:  Now, your Honor, pursuant to

 6    stipulation S1, which is in evidence, the government offers

 7    Government Exhibit 201D.

 8            THE COURT:  It will be received.

 9            (Government's Exhibit 201D received in evidence)

10            MR. FERGENSON:  Mr. Frenchman, can you please pull up

11    Government Exhibit 201D.  If you could publish that.

12    Q.  Now, Mr. Rainey, this is an Excel document.  I want to

13    focus you on row 2.

14            Mr. Rainey, focusing on row 2, column E first, do you

15    see that it says February 16, 2021, 12:42 p.m.?

16    A.  Yes.

17    Q.  And column F and H, the amount listed there is 93.74.

18            Do you see that?

19    A.  Yes.

20            MR. FERGENSON:  Mr. Frenchman can you scroll to the

21    right, please.  We're going to go to column U.

22    Q.  Mr. Rainey, do you see in column U it says T-Mobile?

23    A.  Yes.

24    Q.  And in column 3, it says prepaid?

25    A.  Yes.

1  Q.  Now, in row 2, which was the February 16, 2021, payment,

2  what does it say under column P, the name on the card/bank

3  account?

4  A.  Kaylen Rainey.

5  Q.  Who is that?

6  A.  Me.

7  Q.  And February 16, 2021, that's the same day as the text

8  messages we were just looking at; right?

9  A.  Yes.

10  Q.  Mr. Rainey, there is actually a second payment to the 5555

11  phone listed here.

12          Do you see that in row 3?

13  A.  Yes.

14  Q.  What's the name of that second payment?

15  A.  Jorge Ramos Cruz.

16  Q.  Who is Jorge?  Remind us.

17  A.  Jorge was a friend from the neighborhood.  He was also a

18  runner.

19  Q.  Did he also bag up drugs?

20  A.  Yes.

21  Q.  For Billy?

22  A.  Yes.

23          MR. FERGENSON:  Mr. Frenchman, let's go back now to

24  some more messages.  Let's go to Government Exhibit 111-75.

25  Q.  Mr. Rainey, in addition to asking you to pay his prepaid

1  phone bills, did Billy ask you to otherwise move money for him?

2  A.  Repeat the question.

3  Q.  Did Billy ask you to also receive and send money for him?

4  A.  Yes.

5        MR. FERGENSON:  Mr. Frenchman, let's go down to page

6  4.  Let's zoom only top two for how.

7  Q.  Now, Mr. Rainey, these messages are still February 16,

8  2021.  That's the same day we were just looking at.  Right?

9  A.  Yes.

10  Q.  At 2:11 p.m., what do you text to Billy?

11  A.  He just sent $400.

12        MR. FERGENSON:  Go down, Mr. Frenchman.  Can you

13  please zoom on the title of Billy's response.  Thank you.

14  Q.  Now, Mr. Rainey, Billy sends you a photo; right?

15  A.  Yes.

16  Q.  Are you able to read the first two words in that photo?

17  A.  JPay app.

18  Q.  JPay app?

19  A.  Yes.

20  Q.  What is the JPay app?

21  A.  JPay is an application where you can send inmates

22  commissary.

23  Q.  What is commissary?

24  A.  Commissary is money for inmates in jail.

25  Q.  Do you see the line beneath the picture that says "Title"?

 1    A.  Yes.

 2    Q.  Please read the title.

 3    "A. Hey, bro.  Send $200 to this and keep $160 for you and say

 4    it's from Billz Downtown Chelsea."

 5    Q.  Would Billy sometimes ask you to send money to inmates?

 6    A.  A couple of times, yes.

 7    Q.  Would he tell you why he was sending money to inmates?

 8    A.  No, just that they were his friends.

 9    Q.  Why did you send money to inmates for Billy?

10    A.  To my knowledge, he didn't have any bank accounts or

11    anything.  So he couldn't do it himself.  So asked me if I

12    could do it for him.  He would give me the money, and I would

13    do it for him.

14         MR. FERGENSON:  Mr. Frenchman, let's go to page 6.

15    Q.  Do you see Billy here on February 20, 2021, he said:  "I

16    have someone sending you a rack"?

17         Do you see that, Mr. Rainey?

18    A.  Yes.

19    Q.  What's a "rack"?

20    A.  A "rack" is slang for a thousand dollars.

21         MR. FERGENSON:  Mr. Frenchman, let's zoom out.  Let's

22    go to page 26.  Let's zoom on the bottom message.

23    Q.  Now, Mr. Rainey, this is February 24, 2021.  This is soon

24    after you had sent money to the inmate via JPay; right?

25    A.  Yes.

 1   Q.  And what did you write in this message?

 2   A.  "Your boy said good looks, and he appreciate you.  He wants

 3   your number so he can speak to you."

 4   Q.  And by "your boy," who are you referring to?

 5   A.  The guy that I sent the money to on JPay.

 6        MR. FERGENSON:  Scroll down, please.

 7   Q.  What did you then ask Billy?

 8   "A.  Give him this one?"

 9   Q.  What is "this one"?

10   A.  The phone number that I was texting back, the 5555.

11   Q.  And Billy writes back:  "Nah."  Do you see that right?

12   A.  Yes.

13   Q.  Did Billy tell you why he didn't want the 5555 number being

14   sent to the inmate in jail?

15   A.  No.

16        MR. FERGENSON:  Mr. Frenchman, let's go to a new text.

17   Let's go to government Exhibit 111-71.

18   Q.  Would Billy ever direct you to go and deliver money to

19   people in prison.

20   A.  Yes.

21        MR. FERGENSON:  Mr. Frenchman, let's go to page 62 of

22   this exhibit, please.  Let's zoom in on that.  Thank you.

23   Q.  Mr. Rainey, these are more messages with the 5555 phone.

24   Right?

25   A.  Yes.

 1   Q.  And the date is December 28, 2020.

 2           What do you write to Billy in that first message?

 3   "A.  Yo.  What is this money for?"

 4   "Q.  Hey, can you take it to 187th Street, Fort Washington.

 5   There's $2,100 there.  2k passing it.  The 100 is for get a Zip

 6   for the day."

 7           So what did you understand billing to be saying there,

 8   Mr. Rainey?

 9   A.  Asking me if I could take the money to 187th Street and

10   pass it to -- give the person $2,100 and take $100 and get a

11   Zipcar for the day.

12   Q.  You said earlier sometimes you used Zipcars to make drug

13   deliveries for Billy?

14   A.  Yes.

15           MR. FERGENSON:  Let's scroll down, Mr. Frenchman.

16   Q.  Do you see, Mr. Rainey, there's a missed voice call?  And

17   then Billy messages you at 6:45, about 6:44 p.m.:  "Hey, how

18   long to you there?

19   "A.  Is this another one of your cute baller friends."

20           MR. FERGENSON:  Keep scrolling.

21           THE WITNESS:  "This my hood.  So I know these niggas

22   around here.  Be fine."

23   BY MR. FERGENSON:

24   Q.  And Billy writes back:  "It's my cousin Murder, but he'll

25   probably send one of his workers."

1          Mr. Rainey, do you recall meeting Billy's cousin

2  Murder?

3  A.  I met someone, but I don't know if that was him or not.

4  Q.  And his cousin Murder, do you know if that was his real

5  name?

6  A.  I'm not sure.

7  Q.  Do you know why Billy called him cousin Murder?

8  A.  No.

9  Q.  Do you have an understanding of where the $2,000 that Billy

10  told you to bring to his cousin Murder came from?

11  A.  It was sent to my -- it was sent to me through Zelle.  I

12  don't remember who it came from.

13  Q.  Do you remember ever meeting any of Murder's workers?

14  A.  I met someone to give them the money.

15  Q.  Do you know the names of any of Murder's workers?

16  A.  No.

17  Q.  Do you recall Billy discussing his dealings with Murder on

18  any other occasions?

19  A.  No.

20  Q.  Was this an example of Billy directing you to deliver cash

21  to people he did business with?

22  A.  Yes.

23  Q.  And here, it was Murder?

24  A.  I assume so, yes.

25          MR. FERGENSON:  Mr. Frenchman, let's take it down,

1    please.

2    Q.  Mr. Rainey, now, in addition to sending money to people,

3    delivering cash to people, paying Billy's phone bills, did

4    Billy ever ask you to put things or assets of his in your name?

5    A.  Yes.  There was one time where Billy had asked me if I can

6    get a car insured under my name.

7    Q.  Roughly when did that happen?

8    A.  I believe this was 2018, 2018.

9    Q.  Did you end up doing that?

10   A.  I did.

11   Q.  Tell us about that.

12        What happened?

13   A.  Billy had wanted to put a car on the road for Kevin and

14   Lenny to be able to use.  So he asked me if I can get the car

15   insured under my name.  He would give me $1,000, and I would be

16   able to use the vehicle whenever I needed to whenever it wasn't

17   in use.

18   Q.  Billy wanted you to put the insurance in your name.

19        Who was the listed owner of the car?

20   A.  I believe Josefina was.

21   Q.  Not Billy?

22   A.  No.

23   Q.  Now, you said Billy would pay you $1,000.

24        Did he in fact pay you $1,000?

25   A.  Yes.

1    Q.  And what ended up happening with that money?

2    A.  Two years later, I ended up having to give it back.  He had

3    asked me if I wanted to get the car insured again because the

4    first time that we did it, it didn't work out, the insurance.

5    They canceled it like after about a month.  So about two years

6    later, he asked me if I could do it again.  And I told him I

7    didn't want to, and he told me to pay the $1,000 back, and I

8    did.

9    Q.  Do you recall what went wrong with the insurance maybe

10   around back in 2018?

11   A.  He had told me that the insurance company didn't receive

12   proof of address in time.  So that's why they canceled it.

13   That's all I knew.

14   Q.  But was there in fact a car, Billy's car?

15   A.  Yes.

16   Q.  Had you seen it?

17   A.  Yes.

18   Q.  What kind of car was it?

19   A.  I believe it was a Nissan.

20   Q.  And that Nissan was in Josefina's name, not Billy's name?

21   A.  Yes.

22   Q.  All right.  Now, we looked at some messages getting into

23   the year 2021.

24           How often did you work for Billy in 2021?

25   A.  I did a couple of days a week for a few months for about a

 1    year.

 2    Q.  Do you recall how many days a week you were working?

 3    A.  I did three.

 4    Q.  Did you do those -- would you do a day in a shift?  Or were

 5    they full days?

 6    A.  They were full days.

 7    Q.  In addition to yourself, who was working for Billy's drug

 8    business that year?  2021.

 9    A.  Me, Will, Jorge, Michael.

10    Q.  And you continued delivering drugs for Billy until you got

11    arrested?

12    A.  Yes.

13    Q.  Now, Mr. Rainey, I want to talk about bagging up.  You've

14    used the phrase "bagged up" before.

15    A.  Yes.

16    Q.  Have you bagged up before?

17    A.  I have once or twice.

18    Q.  Can you generally tell us about the process of bagging up.

19    A.  When I had did it, we used just a scale, a spoon.  And you

20    just put the amount that goes in each bag on the scale to weigh

21    it.  And then you just put it in the Ziploc baggie, and each

22    pack had 10 baggies in it.  So you just packaged them 10 per

23    pack.

24    Q.  Now, you said you put it into the small baggies.

25            What would be the thing that you were putting into the

1   small baggies?

2   A.  Cocaine.

3   Q.  How much cocaine would that be?  What was the size of the

4   cocaine you were bagging up?

5   A.  They were grams I believe, a gram per baggie.

6   Q.  And then before you put it into the bags, how was the

7   cocaine packaged?

8   A.  The time that I did it, it was like a block like this size.

9   Q.  And I could see you're making a shape with your hands.

10          Could you compare the shape the size of the cocaine to

11  some kind of common evidence item that people might recognize.

12  A.  Like a melon.

13  Q.  Like a watermelon or a cantaloupe?

14  A.  Like a cantaloupe.

15  Q.  Mr. Rainey, you said you bagged up yourself.

16          Have you seen people bag up?

17  A.  Yes.

18  Q.  Before I get to that, you said you used a scale.

19          Would you take any safety precautions when you were

20  bagging up too?

21  A.  Yes.  We were gloves, a mask.

22  Q.  Turning to people you've seen bagging up, how many times

23  have you seen people bag up?

24  A.  Over the years that I was around, I would say somewhere

25  north of 30.

 1   Q.  Where would you see them bagging up?

 2   A.  The apartment, Josefina's apartment.

 3   Q.  Any particular room usually?

 4   A.  Usually it was in Kevin's room.  There have been a couple

 5   of occasions where the kitchen was used.

 6   Q.  In Kevin's room, what surface would you use?

 7   A.  The dresser.

 8   Q.  And who have you seen bag up?

 9   A.  I've seen Lenny bag up.  I've seen Edgar bag up.  I've seen

10   Jorge bag up.  I've seen Billy bag up on one occasion.

11   Q.  On the occasions where you bagged up or you saw people bag

12   up, roughly how long might that take?

13   A.  It would depend on how much you had.  At the time I did it,

14   I didn't have much.  So it took like an hour-and-a-half.

15   Q.  Do you recall approximately how many baggies you filled?

16   A.  Around 70.

17   Q.  How did you know what to do when you did it?

18   A.  Billy had showed me.

19   Q.  Was Billy with you when you did it?

20   A.  Yes.

21   Q.  Mr. Rainey, were you paid for bagging up?

22   A.  Yes.

23   Q.  How much?

24   A.  I think like $150.

25   Q.  Who paid you?

```
 1    A.  Billy.
 2    Q.  To your knowledge, did other people get paid for bagging up
 3    when they did it?
 4    A.  Yes.
 5    Q.  Now, Mr. Rainey, when you bagged up, would you add anything
 6    else to that cantaloupe of cocaine when you were putting it in
 7    the baggies?
 8    A.  No.
 9    Q.  To your knowledge, did other people?
10    A.  Not that I know of.
11    Q.  And the cantaloupe of cocaine, do you know where that would
12    come from?
13    A.  No.
14    Q.  Would you ever go -- withdrawn.
15         Now, Mr. Rainey, was there a phrase that you all would
16    use to describe bagging up?
17    A.  It's considered "homework."
18    Q.  You guys called it "homework"?
19    A.  Yes.
20         MR. FERGENSON:  Mr. Frenchman, can you go to
21    Government Exhibit 111-126.
22    Q.  Now, Mr. Rainey, this is with the 6460 number you said
23    earlier was Lenny's number.
24    A.  Yes.
25         MR. FERGENSON:  Now, Mr. Frenchman, we're going to
```

1    read a few messages.  So let's zoom in so we can read two at

2    the same time.

3    Q.  All right.  Now, the date is May 27, 2019.  And Lenny asks

4    you:  "Yo, bro, you home?"

5         Mr. Rainey, where would "home" be?

6    A.  In the Fulton Houses, Josefina's apartment.

7         MR. FERGENSON:  Let's keep scrolling down.

8         Can you read that.

9         THE WITNESS:  "Nah.

10   "Q. You don't mind if I use your room to do the 'homework' got

11   nowhere else to do it."

12        Scrolling down.

13        What do you write there?

14   "A. My door looked.

15   "Q. I know it looked, but it can open easily with a card."

16        What do you see?

17   "A. I mean, if you need my room, then go ahead.  LOL."

18   Q.  He said:  "All right though.  Thanks."

19        And you say:  "Just make sure you close and lock it

20   when you're done."

21        Mr. Frenchman, can you scroll back up to the homework

22   test.

23        Mr. Rainey, when he asked you if he could do the

24   homework in your room, what is your understanding of him to be

25   asking you?

1    A.  If he can bag up the cocaine in my room.

2    Q.  And you said that's okay as long as he locked your door

3    again after?

4    A.  Yes.

5    Q.  Was that something that would happen on occasions?  People

6    would open your locked door?

7    A.  Yes.

8    Q.  And use your room for bagging up?

9    A.  It happened a couple of times.  Yes.

10           MR. FERGENSON:  Mr. Frenchman, we can take that down.

11   Q.  Mr. Rainey, we've talked about how there were safes in

12   Josefina's apartment to store drugs and money.  I want to

13   change topics and talk about guns.

14           Did you ever see guns at Josefina's apartment?

15   A.  Yes.

16   Q.  How many guns?

17   A.  Two.

18   Q.  Do you recall when you first saw a gun in the apartment?

19   A.  I believe it was 2020.

20   Q.  And how often roughly was a gun in the apartment?

21   A.  I've only seen the gun somewhere around ten times.  But to

22   my knowledge, it was usually kept in Kevin's room.  It has been

23   kept in my dresser on a few occasions.

24           (Continued on next page)

25

 1                MS. FLORIO:  I'm sorry, I didn't hear that.

 2                THE WITNESS:  That it's been kept in my room on a few

 3     occasions, but it was usually kept in Kevin's room, to my

 4     knowledge.

 5     BY MR. FERGENSON:

 6     Q.  And you lived in that apartment with Josefina and Kevin,

 7     right?

 8     A.  Yes.

 9     Q.  What, if anything, did they say about guns in the

10     apartment?

11     A.  Josefina has mentioned her having a gun in her closet.  I

12     have never seen it, though.  And Kevin, I knew he had -- he

13     usually kept the gun in his drawer.

14     Q.  Was it your understanding that a gun was regularly kept at

15     the apartment?

16     A.  Yes.

17     Q.  Why was a gun kept at the apartment?

18     A.  I would assume to --

19                MS. FLORIO:  Objection.

20     BY MR. FERGENSON:

21     Q.  What was your understanding of why a gun was kept at the

22     apartment?

23                MS. FLORIO:  Objection.

24                THE COURT:  I will allow you to answer that just

25     based on your own knowledge; not what someone else told you or

1   someone else thought, but based on your own knowledge or your

2   own understanding.

3   A.  To protect the drugs and the drug money.

4   Q.  Now, Mr. Rainey, you said you have seen two guns, right?

5   A.  Yes.

6   Q.  What was the first gun you saw?  What did it look like?

7   A.  It was a black handgun, pistol.

8   Q.  Turning to the second gun you have seen, what did that gun

9   look like?

10  A.  It was a smaller handgun, like a gray one.

11  Q.  What about the black pistol, the first gun, who have you

12  seen hold that gun?

13  A.  Kevin, Billy, that's pretty much it.

14  Q.  And the second gun, who have you seen hold that gun?

15  A.  Kevin.

16  Q.  Now, you have said you have seen Billy hold the black

17  pistol, right?

18  A.  Yes.

19  Q.  One time or multiple times?

20  A.  One time that I can remember.

21  Q.  Roughly when was that?

22  A.  2020.

23  Q.  And tell us about that.  What happened?  What did you see?

24  A.  I was -- I walked in the apartment, and Billy was in

25  Kevin's room.  I was going towards my room through the hallway.

1    I saw Billy and Kevin talking.  Billy had the gun in his hand

2    and he kind of set it on the dresser.

3    Q.  When you saw Billy with the gun in Kevin's room, do you

4    know why he had the gun out?

5    A.  No.

6    Q.  Mr. Rainey, to your knowledge, where did the two guns come

7    from?

8    A.  Billy.

9           MS. FLORIO:  Objection.

10           THE COURT:  Just to your knowledge.  Again, don't say

11    what someone else -- just to your knowledge, do you know where

12    the gun came from?

13           THE WITNESS:  Billy.

14    BY MR. FERGENSON:

15    Q.  Did Billy ever talk about guns?

16    A.  He has.

17    Q.  Did Billy -- to your knowledge did Billy have guns at his

18    house in New Jersey?

19    A.  To my knowledge, yes.

20    Q.  Why do you believe that?

21           MS. FLORIO:  Objection.

22           THE COURT:  Overruled.  So what's the basis of your

23    knowledge?  Did you see something?  Did someone say something

24    to you?

25    A.  Someone said something to me.  Billy has mentioned having

 1    guns at his house.

 2            THE COURT:  The objection is overruled.

 3    BY MR. FERGENSON:

 4    Q.  Did you ever actually see a gun at Billy's house in

 5    New Jersey?

 6    A.  Not that I remember.

 7    Q.  Mr. Rainey, you also said that Josefina talked about having

 8    a gun.

 9    A.  Yes.

10    Q.  What would she say?

11    A.  She just mentioned having a gun in her closet for

12    protection.

13    Q.  Was it your understanding that that was the black pistol or

14    the gray pistol or a different gun?

15    A.  A different gun.

16    Q.  Did you ever see that gun?

17    A.  No.

18    Q.  Mr. Rainey, what kind of words would people use when

19    talking about a gun?

20    A.  Strap was a common word.

21            MS. FLORIO:  I'm sorry?

22    A.  Strap.

23    Q.  Can you repeat that again, Mr. Rainey?

24    A.  Strap.  That's a common nickname for a gun.

25            MS. FLORIO:  I'm so sorry.  I still can't hear.

1          MR. FERGENSON:  He said strap.

2   A.  Strap.

3   Q.  Mr. Rainey, did you ever see any ammunition?

4   A.  Yes.

5   Q.  Where?

6   A.  In the dresser.

7   Q.  Did you see that ammunition inside a clip or outside a

8   clip, as well?

9   A.  Inside and outside.

10  Q.  Did you ever hold one of the guns in the apartment?

11  A.  I did.

12  Q.  Which one?

13  A.  The black gun.

14  Q.  And why?

15  A.  I had took a picture of it and sent it to my friend.

16  Q.  You said sometimes that gun would be in your bedroom.

17  Where would it be kept in your bedroom?

18  A.  In my dresser.

19  Q.  Why would it be in your dresser?

20  A.  Billy would leave it in my dresser sometimes if Kevin

21  wasn't around or wasn't home.

22  Q.  You know, roughly can you give us a sense how often it

23  would be in your dresser?

24  A.  It's been in my dresser about four times, maybe like a

25  couple days.

1    Q.  Mr. Rainey, did you ever take that gun out on a drug

2    delivery?

3    A.  No.

4    Q.  Did you ever take it out of the apartment with you for

5    protection?

6    A.  No.

7    Q.  Did you ever take it out of your bedroom?

8    A.  No.

9    Q.  But have you held that gun when it was in your bedroom?

10   A.  Yes.

11   Q.  Mr. Frenchman, can you please pull up Government Exhibit

12   111-124.  You can zoom on this message.  Actually, why don't we

13   look at the participants first.  Thank you.

14           All right.  Mr. Rainey, this is a chat between you and

15   Booty.  Who is Booty?

16   A.  That's my best friend.

17   Q.  Zoom out.  Let's zoom on the message.

18           Mr. Rainey, you see Booty -- is Booty a man or a

19   woman, Mr. Rainey?

20   A.  A woman.

21   Q.  She says to you on July 10, 2021, "Getting me a gun as soon

22   as I touch down."  Do you see that?

23   A.  Yes.

24   Q.  And she sends a JPEG file and that's marked as 111-124A.

25   Do you see that?

1  A.  Yes.

2  Q.  Mr. Frenchman, let's add on the right that exhibit.

3          Now, Mr. Rainey, this image she sent you, is that a

4  phone screenshot?

5  A.  Yes.

6  Q.  And it's a screenshot of a *Texas Tribune* article, right?

7  A.  Yes.

8  Q.  And I will read the headline.  "Texans can Carry Handguns

9  Without a License or Training Starting September 1, After

10  Governor Greg Abbott Signs Permitless Carry Bill Into Law."

11          Were you or Booty living in Texas at this time?

12  A.  No.  We were planning to move there.

13  Q.  And what is your understanding of -- actually, withdrawn.

14          Let's actually keep looking at the messages for a

15  moment.  Mr. Frenchman, on the left, can you please scroll

16  down?  And let's zoom on your response.  And, Mr. Rainey, what

17  did you write back to Booty?

18  A.  "Oh, hun, you didn't know?  Lol."

19  Q.  And then you sent a message and what did you -- sorry.  You

20  sent a photo what.  Did you write with that photo?

21  A.  "I'm getting more."

22  Q.  Mr. Frenchman, can you add on the right the photo that's

23  sent, Government Exhibit 111-124B.

24          Now, Mr. Rainey, why did you send her a photo of the

25  gun?

1    A.  Just to show off.  We were talking about guns and getting

2    some when we were going to move to Texas, so I showed her that

3    there was one in the house.

4    Q.  Now, where is this photo taken?

5    A.  My bedroom.

6    Q.  How do you know that?

7    A.  I recognize the floor and the sheet.

8    Q.  Which gun was that?

9    A.  That was the black one.

10   Q.  The black pistol?

11   A.  Yes.

12   Q.  What else is in your hand between your fingers?

13   A.  A joint of marijuana.

14   Q.  And Mr. Rainey, just to clarify, you said there was a black

15   pistol and also a gray handgun, right?

16   A.  Yes.

17   Q.  Was the gray handgun ever kept in your bedroom?

18   A.  No.

19   Q.  Did you ever handle the gray handgun?

20   A.  No.

21   Q.  Did you ever take a photo of it?

22   A.  I don't believe so.

23   Q.  Mr. Frenchman, if we can take that down.  Let's go down to

24   Government Exhibit 111-125.

25           And Mr. Rainey -- maybe we just zoom on the first text

1    just so that we can see the participants.

2              Mr. Rainey, this isn't with the 5555 number.  Can you

3    read the other participant in this conversation besides you?

4    A.  646-530-4115.

5    Q.  And who was using that number?

6    A.  Billy.

7    Q.  And now the date here is September 4, 2021.  And

8    Mr. Frenchman, let's zoom out so we can see two texts at a

9    time, just to make it easier.  You can do -- yeah.  Okay.  We

10   are going to be scrolling down, Mr. Frenchman, so you may want

11   to do the full bar.  Thank you.

12             Mr. Rainey, I will ask you to start reading the green

13   texts and I will read the blue.

14   A.  "So niggas eat all my fruit snacks and don't leave me no

15   bud?  K."

16   Q.  Sorry to interrupt.  You sent that message at 3:30 a.m.,

17   right?

18   A.  Yes.

19   Q.  And keep going.  I apologize.

20   A.  "K."

21   Q.  And Billy responds at 3:32 a.m. "Come over."

22             Keep scrolling, please.

23   A.  "And niggas took my toy."

24   Q.  You sent that text about almost seven hours later at 10:25

25   a.m., right?

 1  A.  Yes.

 2  Q.  Okay.  Let's scroll down.

 3       And Mr. Rainey, you see Billy responds with a voice

 4  note, an audio message?

 5  A.  Yes.

 6  Q.  Mr. Frenchman, can you please play Government Exhibit

 7  111-125A.

 8       (Audio played)

 9  Q.  Mr. Rainey, did you hear him say:  "I had to make two runs,

10  and where I was going I needed it.  I'm bringing that shit back

11  today"?

12  A.  Yes.

13  Q.  You had -- before you got that audio message, you had said

14  "N words took my toy"?

15  A.  Yes.

16  Q.  What were you referring to?

17  A.  The gun.

18  Q.  Which gun?

19  A.  The black one.

20  Q.  The one we looked at the photo of in your room?

21  A.  Yes.

22  Q.  Why did you call it "my toy" or "my gun"?

23  A.  Just joking.

24  Q.  Was it sometimes kept in your room?

25  A.  Yes.

1  Q.  Now, Billy's response -- and Mr. Frenchman, can we play it

2  one more time, please?

3          (Audio played)

4  Q.  Mr. Rainey, what did you understand Billy to be saying to

5  you there?

6  A.  He was making two runs and -- where he felt like he needed

7  to take the gun with him.

8  Q.  He said two runs.  What did you understand that to mean?

9  A.  Drug-related.

10  Q.  And when he said he was "bringing that shit back today,"

11  what did you understand "that shit" to be?

12  A.  The gun.

13  Q.  What you had called "the toy"?

14  A.  Yes.

15          THE COURT:  I wonder if it would be a good time to

16  take the morning break, Mr. Fergenson?

17          MR. HERMAN:  Yes, your Honor.  I was just about to

18  suggest that.

19          THE COURT:  Now?  All right, folks.  Just remember,

20  keep an open mind and don't discuss the case.

21          (Continued on next page)

22

23

24

25

1          (Jury not present)

2          THE COURT:  You may be seated.

3          All right.  So I see that we have Ms. Von Dornum,

4  Maurice Whyte's attorney here, so why don't we address that

5  issue now?  I didn't realize Ms. Florio stepped out.  Do you

6  have another five minutes?

7          MS. VON DORNUM:  I believe so, your Honor.

8          THE COURT:  Until you get a call.  I think what it

9  may make sense to do is take our five-minute break now while

10 Ms. Florio is out and then have this conversation when she

11 gets back.  Thanks.  Thank you, Ms. Von Dornum.

12         (Recess)

13         THE COURT:  Everyone can be seated.  Thanks.  You are

14 welcome to stand at the podium or even at your own table.

15         (Pause)

16         THE COURT:  Ms. Florio, whenever you are ready, we

17 have Ms. Von Dornum here on behalf of Maurice Whyte.

18         So would you like to be heard, Ms. Von Dornum?  I

19 received your letter.  Is there anything else you would like to

20 say on her behalf or anything else?  Thank you for being here

21 today.

22         MS. VON DORNUM:  Of course.

23         Yes.  I would just like to put some additional facts

24 on the record that have come to my attention since I wrote my

25 letter, and that is that not only did Mr. Murray and Ms. Florio

1    meet with Ms. Whyte without my permission, they had at least

2    one other client of theirs who is held at the MDC who is not

3    Mr. Ortega approach Ms. Whyte in the unit and speak to her

4    about testifying and ask her to meet with them.  I believe this

5    use of another client, of another detained defendant is highly

6    inappropriate and not only violates the ethical rules but puts

7    Ms. Whyte in some danger depending on her response to that

8    person on the unit.  So in addition to my concerns about

9    counsel contacting Ms. Whyte without me, this use of another

10   client to contact her on the unit I think is highly

11   inappropriate and concerning.

12           THE COURT:  Mr. Murray, do you want to respond?

13           MR. MURRAY:  Your Honor, throughout all this, our firm

14   nor a member of our firm did not --

15           THE COURT:  And should I ask Mr. Seidler separately?

16   Are you intentionally --

17           MR. MURRAY:  I'm not.  Mr. Seidler, to my knowledge,

18   has had no involvement with Ms. Whyte whatsoever.

19           MR. SEIDLER:  I have never spoken to Ms. Whyte.

20           MR. MURRAY:  I did not, Attorney Florio did not

21   initiate these communications or in any way instruct anybody,

22   any client to initiate them.

23           A client in that area brought down a letter stating

24   that Ms. Whyte wanted to talk to Billy Ortega's lawyers.  It

25   does not violate the ethical rules, as I discussed yesterday,

 1   because it was not a communication about the subject of the

 2   representation that the Federal Defenders undertake of

 3   Ms. Whyte.  There is no indication, no notice of appearance in

 4   any way stating that they represent Ms. Whyte in connection

 5   with the matter of the United States of America v. Billy

 6   Ortega.

 7        I did not ask any questions about Ms. Whyte's case.  I

 8   Made it abundantly clear that Ms. Whyte did not have to speak

 9   to us.  I was informed that somebody wanted to speak to Billy

10   Ortega's lawyers, to me; made clear they did not have to do so

11   if they didn't want to; that if they wanted representation,

12   they could have it; and if they wanted to end that meeting, to

13   not speak to me for any reason whatsoever, all they had to do

14   was say so.  We did not initiate this communication.  It is not

15   about the area of the subject of the representation with the

16   party.  And I --

17        THE COURT:  Sorry.  When you say "they," are you

18   referring to Ms. Whyte?

19        MR. MURRAY:  The communications -- I will clarify.

20   The communications -- the communications that I had with

21   Ms. Whyte were not about the subject of the Federal Defenders'

22   representation of Ms. Whyte.  The communications were I

23   received a letter stating that Ms. Whyte wished to speak with

24   Billy Ortega's lawyers and informed Ms. Whyte when I called her

25   down, again, that she did not have to talk to me if she did not

1    want to; that if she wanted to have a lawyer present, she was

2    welcome to; that I was Billy Ortega's lawyer, representing his

3    interests, I was not her lawyer, did not represent hers; and if

4    for any reason she did not want to speak to me or wanted to end

5    that meeting, she could have.  And had anything been

6    communicated to me that in any way indicated that Ms. Whyte had

7    representation in -- related to the subject we were discussing,

8    that she wished to have counsel or anyone present or that she

9    did not want to talk to me for any reason whatsoever, that wish

10   would have been respected.

11        THE COURT:  How did your client know to reach out to

12   Ms. Whyte?

13        MR. MURRAY:  So my understanding of it, your Honor,

14   was it -- was heard through kind of through the grapevine that

15   there was an individual in the MDC who had information that

16   would be beneficial to Mr. Ortega.

17        THE COURT:  How did your client know you were

18   representing Mr. Ortega?

19        MR. MURRAY:  My assumption is that they knew it was

20   us based on other clients we have, that it came up that they

21   had the same lawyer as Mr. Ortega.  Again, I never really

22   inquired into how that information was initially communicated

23   to anyone.  I didn't see a need to.

24        MS. VON DORNUM:  Your Honor, I don't mean to

25   interrupt, but if I could just note that prior to the

1    situations that Mr. Murray is describing, a few days prior, he

2    had called me and said that he wished to speak to Ms. Whyte.

3    Given that he initiated that and then a few days later another

4    one of his clients seeks her out and discusses this matter,

5    that at least gives me pause as to his representations.

6            However, I will say that when he called me, I made

7    clear that I represent Ms. Whyte, I did not say it was limited

8    to the criminal matter, and in fact, because of circumstances

9    as to how she was Rule 20ed to our district, I had previously

10   been appointed by Magistrate Judge Scanlon to represent her in

11   all matters relating to her prison conditions and other pending

12   cases because this was a Rule 20 and unusual circumstances.  I

13   made clear to Mr. Murray that I represented her and I don't

14   think he can take it into his own hands to determine the scope

15   of that representation.

16           MR. MURRAY:  Your Honor, I think my response to that

17   would be, one, that, again, to lay out what the scope of the

18   representation is, to say that someone's representation is

19   this -- essentially unlimited in scope, that all other pending

20   matters includes cases to which Ms. Whyte is not a party, I

21   just don't think is something that that holds true.  There was

22   no discussion of Ms. Whyte's case.  And again, that -- the --

23   Ms. Whyte reached out with that letter --

24           THE COURT:  You are saying she reached out just

25   coincidentally.  You reached out to Ms. Von Dornum indicating

1    your desire to reach out to Ms. Whyte and then coincidentally

2    Ms. Whyte reached out to one of your other clients.

3         MR. MURRAY:  We had already heard that Ms. Whyte may

4    have this information, reached out to Attorney Von Dornum,

5    reached out for follow-up on multiple occasions and received no

6    response.  When I received the letter stating that Ms. Whyte

7    wished to speak to us and was willing to do so without counsel

8    present, I called Ms. Whyte down.  Ms. Whyte never indicated

9    that she was represented by counsel in connection with this

10   matter and the matters that were discussed and, again, had that

11   representation been made in any way, that meeting would have

12   ended.

13         I also have to, frankly, say that I take some issue

14   with Ms. Von Dornum's statement of essentially stating that

15   they do not -- that she does not really believe this sequence

16   of events.  It's a pretty serious accusation.  It's an

17   incredibly serious accusation.

18         THE COURT:  But I'm just trying to get a sense -- a

19   better understanding from your perspective the sequence of

20   events.

21         So you called Ms. Von Dornum.  You asked to speak to

22   Ms. Whyte or you indicated your desire to speak to Ms. Whyte.

23   Ms. Von Dornum indicated that she represented Ms. Whyte.  Is

24   that correct so far?

25         MR. MURRAY:  Yes.  Although there was no indication in

1    that conversation that it extended beyond the -- Ms. Whyte's

2    criminal case.

3           THE COURT:  Did you ask to speak to Ms. Whyte?

4           MR. MURRAY:  Yes.  We had preliminary -- we said we

5    wanted to.  We had preliminary discussions.  My memory of the

6    conversation was that there was indication, as I said

7    yesterday, that they might be more comfortable with a paralegal

8    from their office being there due to Ms. Whyte's mental health

9    issues, but I do not recall any statement being made that I was

10   not to speak to Ms. Whyte nor that they wanted to represent or

11   did represent her in connection with anything related to

12   Mr. Ortega's case.

13          THE COURT:  Ms. Von Dornum, is it your recollection

14   that you were asked permission by Mr. Murray for him to speak

15   with Ms. Whyte?

16          MS. VON DORNUM:  My recollection is that Mr. Murray

17   said that he would like to speak to her.  I said I will have to

18   talk to her first.  I will let you know if she is willing to do

19   so.  If she is willing to do so, I would like someone from my

20   office to be there.  Because we never got to the second part,

21   because she did not indicate to me that she was willing to do,

22   so we did not discuss further arrangements and Mr. Murray did

23   not contact me when he got this letter from Ms. Whyte.

24          THE COURT:  And I am just looking at Rule 402 in front

25   of me which refers to the subject of the representation with a

1   person the lawyer knows to be represented by another lawyer.

2   Is it your position that Mr. Murray did indeed speak with

3   Ms. Whyte about something regarding -- that this -- something

4   regarding the subject of your representation?

5           MS. VON DORNUM:  So he certainly asked her detailed

6   questions about her criminal history and about whether she had

7   any fraud convictions or the like, all of which is going to go

8   directly to her sentencing in my case.  It is also the fact

9   that I understand the government, if she does testify, may

10  charge her with a false statement or a perjury charge which

11  would very much impact her pending case before Judge Gujarati.

12          THE COURT:  You spoke to her lawyer.  She told

13  you—and you will tell me if you dispute this—that she needed

14  to talk to her before she could even speak to you and that if

15  she was going to speak to you that it had to be with a

16  paralegal, and nonetheless you approached her.

17          MR. MURRAY:  The phrase I recall was, like -- your

18  Honor, in addition, I'm receiving information in the form of a

19  letter that this individual does wish to speak to me.

20  Ms. Whyte --

21          THE COURT:  Is that a coincidence, just to go back to

22  the other client that you happen to have, at about the same

23  time that you are speaking to Ms. Whyte's lawyer to talk to

24  Ms. Whyte, one of your clients just happens to have contact

25  with Ms. Whyte?  That's a coincidence?

1           MR. MURRAY:  I can say categorically, your Honor, that

2    I did not instruct any of our clients to have or in any way try

3    to get Ms. Whyte to speak with us or testify.  The information

4    I received is that Ms. Whyte wanted to speak to us.

5    Additionally --

6           THE COURT:  That came out of the blue?

7           MR. MURRAY:  It came through initially and, again, we

8    had gotten into contact with Ms. Von Dornum and then later that

9    Ms. Whyte still wished to speak to us.  I had nothing to do

10   with that statement being passed along.

11          Additionally, I have to say that the idea that the

12   government is telling somebody's lawyer that if they provide

13   testimony, which we submit is truthful——there is no reason to

14   not believe anything that Ms. Whyte said to me——that they will

15   charge her with perjury to dissuade her from testifying, I

16   frankly think it is a massive issue and is frankly a way to

17   make it within the scope of the representation so that we can't

18   call a witness who, as we have stated previously, would be

19   dispositive in this case.

20          THE COURT:  All right.

21          MS. VON DORNUM:  Your Honor, may I put one other fact

22   on the record?  I apologize.

23          THE COURT:  Please do.

24          MS. VON DORNUM:  I want to note I did not inform

25   Mr. Murray what unit Ms. Whyte was on and that information is

1  supposed to be confidential.  So that, too, worries me that not

2  only is another client of their firm approaching her but that

3  client somehow knows that she is on his unit, who she is, and

4  her relationship to this case.  All of that gives me safety

5  concerns and is why the MDC protects unit information so

6  closely.

7          THE COURT:  I'm not going to a rule right now, and I'm

8  not going to rule, among other things, on whether there was --

9  you know, whether you violated Rule 4.2, but at the very least

10  you violated the spirit of it.  I mean, you -- you went to her

11  lawyer to ask permission and you didn't get permission and yet

12  you reached out to her without her attorney present or anyone

13  from that office.

14          It is also just -- I still don't even understand if

15  your position is it was a total coincidence that Ms. Whyte knew

16  to go to one of your other clients to get in touch with you.

17  How would she have known that?

18          MR. MURRAY:  Your Honor, people in the MDC talk.

19  There are people who are on the same unit.  And the fact that

20  two individuals on the same unit are discussing their cases and

21  that that information comes up, I don't think that is in any

22  way strange.  Individuals speak about their cases while in the

23  MDC, and --

24          THE COURT:  It's just a coincidence that shortly after

25  you approached Ms. Whyte's lawyer, she approached another one

1  of your clients without you asking that client to reach out to

2  her?

3           MR. MURRAY:  I don't know who approached who, but I

4  did not ask them to reach out to that -- to Ms. Whyte, no.  And

5  the fact that -- I did not.  And the fact of the matter is, we

6  reached out after the initial conversation, I reached out via

7  e-mail at least one additional time, via call at least two

8  additional times, and Ms. Von Dornum did not get back to me,

9  and time was of the essence.  The fact is that the Federal

10 Defenders is a large organization.  They have the staff.  This

11 Court I submit, your Honor, would not have given a blanket

12 adjournment of the trial until such time as Ms. Von Dornum's

13 trial concluded and, again, this is information which I submit

14 is dispositive in this case.

15          THE COURT:  I think you could have gone back to

16 Ms. Von Dornum and said that.  There are lots of people in her

17 office who could have helped assist, but she told you --

18          MR. MURRAY:  I reached back out.

19          THE COURT:  -- not to do this and you did it any way.

20          MR. MURRAY:  I reached back out and called on at least

21 two other occasions, and nobody got back to me from that

22 office, your Honor.

23          THE COURT:  All right.  So I'm not going to decide

24 this today.  I don't want to keep the jury waiting.  At a later

25 date I also want to hear the government out, including as to

1    whether they allegedly told Ms. Whyte that if she testified to

2    what she said she wanted to testify to that they were going to

3    charge her with perjury.  So I --

4          MS. VON DORNUM:  Your Honor, can I just clarify on

5    that, the government has not spoken to Ms. Whyte.  The

6    government informed me that if she were to testify falsely.

7    They didn't say what facts that would be.  They just said of

8    course if she were to testify falsely, there could be a false

9    statement or perjury charge.  They didn't connect that to any

10   particular fact or testimony.  So I didn't take it, and I

11   certainly didn't convey it as a threat, but rather as the

12   traditional warning, once you are under oath, you know, be

13   very, very careful that you are being truthful.

14         THE COURT:  Okay.  Is there anything else about --

15   just while you are here, is there anything else you want to

16   tell us about the threats and why she feels like there is a

17   concern for her safety?  I shouldn't say threat.  I should say

18   you articulated a concern for her safety, and is there anything

19   else you want to say about that?

20         MS. VON DORNUM:  Yes, your Honor.  I mean, she is

21   uniquely vulnerable.  She is a trans female inmate who is very

22   small and has been repeatedly sexually abused at other

23   facilities by both inmates and COs.  She is on a unit where

24   people are placed there to be protected, cooperators and other

25   people who are vulnerable.  For another inmate to approach her,

1    know her business, and in front of other people advise that she

2    should testify and should talk to these lawyers, I think, puts

3    her in a precarious position no matter which choice she makes.

4         I was concerned that it would end up with her being

5    put in the SHU.  That almost happened last night.  It was

6    averted through MDC legal, and instead they moved Mr. Rainey,

7    who has not threatened her to my knowledge, but just because of

8    the potential conflict.  But as to this other client, that is

9    someone who is now very aware of all choices she makes and who

10   supervised her in her writing of letters to Mr. Ortega's

11   counsel.

12        THE COURT:  Okay.  All right.  As I said, I'm not

13   going to rule on it now.  Thank you very much for coming in

14   today.  This was helpful.  But we will bring the jury in and we

15   will talk about it further at a later date.

16        MS. VON DORNUM:  Thank you, your Honor.

17        (Ms. Von Dornum not present)

18        (Continued on next page)

19

20

21

22

23

24

25

```
 1                    (In open court; jury present)
 2              THE COURT:  You may proceed, Mr. Fergenson.
 3   Q.  Mr. Rainey, we've covered a number of topics.  I want to
 4   turn to a new topic now.  I want to talk about a particular
 5   day, March 17, 2021.
 6              Did you deliver drugs for Billy that day?
 7   A.  Yes.
 8   Q.  Did you know you were delivering fentanyl that day?
 9   A.  No.
10   Q.  Did Billy ever tell you at the time that you were
11   delivering fentanyl?
12   A.  No.
13   Q.  After March 17, did Billy ever tell you that he had
14   delivered fentanyl?
15   A.  No.
16   Q.  Did Billy ever tell you that three of his customers died?
17   A.  No.
18   Q.  When did you learn that?
19   A.  The day I was arrested, February 1, 2022.
20   Q.  Now, before that, at the time, did March 17, 2021, seem
21   different from any of the other days you delivered the
22   defendant's drugs?
23   A.  Not at all.
24   Q.  Did you do anything differently that day?
25   A.  No.
```

 1  Q.  Did you do anything differently after that day?

 2  A.  No.

 3  Q.  Were you still delivering drugs for Billy?

 4  A.  Yes.

 5  Q.  If the drugs you delivered on March 17 had killed someone,

 6  is that something you would have wanted to know?

 7  A.  Absolutely.

 8  Q.  Would you have expected Billy to tell you that?

 9  A.  Yes, I would.

10  Q.  Why?

11  A.  We were friends, and that's an important detail to let

12  someone know, if you have them working with you or for you.

13  Q.  Would you have wanted to know it was fentanyl?

14  A.  Yes, I would.

15  Q.  Why?

16  A.  I had heard enough about fentanyl around that time to know

17  that it was dangerous, and that's not something that I would

18  knowingly ever deal with.

19          MR. FERGENSON:  Okay.  I want to go through some

20  messages now.  Mr. Frenchman, please pull up Government Exhibit

21  111-10.

22  Q.  Now, Mr. Rainey, these are more messages with the 5555

23  phone.  Right?

24  A.  Yes.

25  Q.  Now, earlier, we had looked at WhatsApp chats.

```
 1                Are these chats WhatsApp or iMessages?

 2   A.  IMessages.

 3                MR. FERGENSON:  Let's go down to page 16,

 4   Mr. Frenchman.  Mr. Frenchman, can you blow up the top two.

 5   Q.  So this is on March 16, 2021.

 6                Mr. Frenchman, I want you to scroll down.  I want to

 7   focus on the blue texts.

 8                Mr. Rainey, this blue text from Billy on March 16,

 9   2021, at 4:32 p.m. says 303 Lexington Avenue.

10                Do you see that?

11   A.  Yes.

12   Q.  And it says $300.

13                Do you see that?

14   A.  Yes.

15                MR. FERGENSON:  Mr. Frenchman, can you add on the

16   right Government Exhibit 15B.

17   Q.  Mr. Rainey is that the front of 303 Lexington Avenue on the

18   right?

19   A.  Yes.

20                MR. FERGENSON:  Mr. Frenchman, if you could blow up

21   the text again.  I mean like both.  Thank you.  We're going to

22   scroll down.

23   Q.  Mr. Rainey, how do you respond at about 4:46 p.m. on

24   March 16, 2021?

25   A.  "Here."
```

1    Q.  Where were you?

2    A.  I was at the address, 303 Lexington Avenue.

3    Q.  When you say:  "Yo," and then Billy texts you, "Coming

4    out," what did you understand that to mean?

5    A.  That the customer was coming outside.

6    Q.  About six minutes later, what do you write?

7    A.  "What's taking him so long?"

8    Q.  Billy responds:  "I'm calling him."

9         Scroll down.

10        And then at about 5:00 p.m., what do you write?

11   "A.  It's cold.  What's going on?"

12   Q.  Bill writes to you at 5:12 p.m.:  "Room 1106."

13        What did you understand Billy to be saying there?

14   A.  That was the customer's room number.  He was telling me the

15   customer's room number so I could go upstairs and deliver the

16   drugs to them.

17   Q.  This is March 16, 2021.  This is the day before March 17.

18   Right?

19        MR. FERGENSON:  Mr. Frenchman, if you can zoom out,

20   and if you can take down the picture on the right, please.

21        I want to go to March 17.  Mr. Frenchman, can you

22   please scroll to page 22.  Page 22, Mr. Frenchman.  The bottom

23   two texts, please zoom in on those.

24        Mr. Frenchman, I actually apologize.  Do you mind just

25   scrolling up slightly.

1  Q.  Okay.  These two messages on the left, these are messages

2  from Billy; right?

3  A.  Yes.

4  Q.  And the top one is March 16, 2021, a little after 10:00

5  p.m. And the next one is the first message on March 17.

6         Do you see that?

7  A.  Yes.

8  Q.  It comes in a little after 1:00 p.m.?

9  A.  Yes.

10  Q.  Billy texts you:  "Hey, buddy, do you want to take over

11  today?"

12         Do you see that?

13  A.  Yes.

14  Q.  What did you understand that to mean?

15  A.  If I wanted to make deliveries that day.

16  Q.  Was March 17 going to be one of your regular delivery days,

17  or were you going to be covering?

18  A.  I was covering.

19         MR. FERGENSON:  Scroll down, please.

20  Q.  How did you respond?

21  "A. I can."

22  Q.  Billy writes back:  "Cool."

23         And then at 1:17 p.m., Billy writes:  "hey, you have M

24  and Es?"

25         What's M and E?

```
 1   A.  M is Molly, and E is refers to ecstasy.

 2   Q.  How do you reply?

 3   A.  "Neither."

 4   Q.  When you were out of drugs, whose drugs would be given to

 5   you?

 6   A.  Billy's.

 7   Q.  Now, what do you text him on 1:23 p.m.?

 8   A.  "$490 yesterday."

 9   Q.  What's that?

10   A.  The count, profits from the deliveries that day.

11          MR. FERGENSON:  Let's keep scrolling down.

12   Q.  You text him then:  "On a call."

13          What does that mean to you?

14   A.  I was on a phone call, and Billy had called me.

15   Q.  And then at 1:25 p.m. Bill asked:  "You need will?"

16          Do you see that?

17   A.  Yes.

18   Q.  Remind us.  What's will?

19   A.  Cocaine.

20   Q.  And, Mr. Rainey --

21          Mr. Frenchman, I'll ask you to scroll back up.

22          Do you see there's no response between that text and

23   the next text which is at 2:12 p.m.  And it's an address.

24          Do you see that?

25   A.  Yes.
```

 1   Q.  Now, to the best of your recollection, do you know why

 2   there was not a reply there?

 3   A.  I had received the drugs.  So there was no reason to

 4   respond back.

 5             MS. FLORIO:  I'm sorry.  I couldn't hear the answer.

 6             THE WITNESS:  I had received the drugs from Josefina.

 7   So there was no reason to reply back.

 8   BY MR. FERGENSON:

 9   Q.  And you testified about this earlier, but who would

10   authorize Josefina giving you drugs?

11   A.  Billy.

12   Q.  Now, Mr. Rainey, do you recall if this day Billy got you

13   cocaine from someone else?

14   A.  No.

15   Q.  Did you go get cocaine from somewhere else, not Josefina or

16   Billy?

17   A.  No.

18   Q.  Who were the suppliers of cocaine that have given you drugs

19   to deliver?

20   A.  Only Billy.

21   Q.  Was there any other place you could have gotten drugs that

22   day?

23   A.  No.

24   Q.  Would you have some other source of cocaine at that time?

25   A.  I've never had any sources of cocaine.

1  Q.  Other than Billy?

2  A.  Other than Billy, no.

3  Q.  Who have you ever picked up cocaine for?

4  A.  Billy.

5  Q.  In your life?

6  A.  In my life, yes.

7  Q.  All right.

8          MR. FERGENSON:  Now let's turn back to the messages

9  reading.

10         On March 17 at 2:11 p.m. Billy texts you:  "185 Avenue

11 B, Number 6G "and then 200$."

12         Mr. Frenchman, can you add on the right Government

13 Exhibit 13B.

14 Q.  Mr. Rainey, on the right there, is that 185 Avenue B?

15 A.  Yes.

16         MR. FERGENSON:  Mr. Frenchman, can you please add on

17 the top two, and we'll start scrolling down.  You can scroll

18 down, Mr. Frenchman.

19 Q.  After sending you, the address, the dollar amount, a few

20 seconds later, Billy texts you:  "Let me know ETA when you have

21 it."

22         What did you understand Billy to be saying to you

23 there?

24 A.  Let me know the time, the estimated time, that I will be at

25 that address.

1   Q.  To deliver drugs?

2   A.  Yes.

3   Q.  Now, Billy didn't specify in that text which drug to

4   deliver.

5       Which drug did you understand you were delivering?

6   A.  Cocaine.

7   Q.  Why is that?

8   A.  Because that's what I was given.  That's all I had, and

9   that's all I knew it was.

10      MR. FERGENSON:  Mr. Frenchman, scroll down.

11  Q.  How do you respond to Billy's messages?

12  A.  "Lght 10 minutes."

13  Q.  So the "lght" text is at 2:12 p.m. and then 20 or so

14  minutes later at 2:25 p.m., you said ten minutes.  Is that

15  right?

16  A.  Yes.

17  Q.  When you said, ten minutes, what were you saying?

18  A.  That I will be at that address in 10 minutes.

19  Q.  Billy responds:  "Cool."

20      You can scroll up, Mr. Frenchman.

21      So 2:35 p.m. you say 10 minutes.

22      Mr. Frenchman, I'm going to ask you to zoom out.  And

23  now on the right, can you please replace that exhibit with

24  Government Exhibit 500-A.

25      Mr. Rainey, focusing you on the right side of the

 1    screen, do you see in the top left it says 185 Avenue B?

 2    A.  Yes.

 3    Q.  And then in the center columns, do you see it says the name

 4    Julia Gharhamani?

 5    A.  Yes.

 6    Q.  And beneath that, there are dates and times.  The date and

 7    time is March 17, 2021, at roughly 2:48 p.m.

 8    A.  Yes.

 9    Q.  Now, in the far left column, there are photos of a person

10    entering 185 Avenue B.

11              Who is that?

12    A.  Me.

13    Q.  And at 2:48 p.m., that's about 12 minutes after you sent

14    that 10 minutes text on the left?

15    A.  Yes.

16    Q.  And you sent that text to Billy; right?

17    A.  Yes.

18    Q.  Did you deliver Billy's drugs to 185 Avenue B, Apartment

19    6G, on March 17, 2021?

20    A.  Yes.

21    Q.  Why?

22    A.  Billy had told me to.

23              MR. FERGENSON:  Mr. Frenchman, we can take down the

24    exhibit on the right, and let's go back to the texts.  Let's go

25    to the following page, please.  Let's zoom on these messages.

1  Q.  Now, Mr. Rainey, let's talk about the message on the top

2  left first.

3        We just looked at that delivery at about 2:48 p.m.  At

4  about 4:00 p.m., the same day, Billy texts you another address.

5  He says:  "37 Warren.  10 will.  1k."

6        What did you understand that to mean?

7  A.  37 Warren was the address, they were getting 10 baggies of

8  cocaine, and I was getting $1,000 for it.

9  Q.  Now, in response to that, Mr. Rainey, you write:  "Is this

10  pack 100s or 200s?"  Three minutes later.

11        What were you asking Billy?

12  A.  If the pack that I had received were $100 baggies or $200

13  baggies.  Around that time, there were different -- there was a

14  difference.

15  Q.  Now, Mr. Rainey, you had worked the day before too, on

16  March 16.  Right?

17  A.  Yes.

18  Q.  And you had made Billy's deliveries that day; right?

19  A.  Yes.

20  Q.  So if the next day, on March 17, you're asking him the

21  price of the baggies in the March 17 pack, what does that

22  suggest to you?

23  A.  That I was given a new pack.

24  Q.  On March 17?

25  A.  Yes.

1          MR. FERGENSON:  Mr. Frenchman, I want you to scroll

2    down, please.

3    Q.  Billy responds to your text:  "$200.  5.  Blacks."

4          Mr. Rainey, what did you understand Billy to be saying

5    to you?

6    A.  The black baggies were $200.  So the person was getting

7    five of those.

8          MR. FERGENSON:  Mr. Frenchman, can you scroll up just

9    to see.  It's a little difficult when the bubbles are so large.

10   Q.  The order had been for 10 will 1k.  Right?

11   A.  Yes.

12   Q.  So when he says $200 bags, five of the black, did you

13   understand that to mean that the pack you had been given was

14   two $100 black baggies?

15   A.  Yes.

16         MR. FERGENSON:  Let's keep scrolling down, please.

17   Q.  And the blacks, that was the color of the baggies; right?

18   A.  Yes.

19         MR. FERGENSON:  Mr. Frenchman, can we just scroll back

20   up to that text.  Withdrawn.  Mr. Frenchman, let's keep

21   scrolling down.

22   Q.  Now you respond back to that, Mr. Rainey, by saying:  "You

23   lucky I'm on point."

24         What did you mean by that?  What were you saying?

25   A.  I meant that he was lucky that I asked and didn't give the

1  person more drugs than what they were supposed to be getting.

2  Q.  So if you had given that customer ten $200 bags but only

3  got $1,000, you would have lost $1,000.  Right?

4  A.  Correct.

5  Q.  And then Billy writes back to you:  "The last person you

6  saw, you gave them 2 or 1?"

7          Scroll down.

8          Mr. Rainey, when he asked you:  "The last person you

9  saw," which address did you understand him to be referring to?

10 A.  185 Avenue B.

11 Q.  And when he says two or one, what did you understand him to

12 be asking?

13 A.  Whether it's two baggies of cocaine or one.

14         MR. FERGENSON:  Scroll down.

15 Q.  And how did you respond?

16 A.  One.

17 Q.  And then you delivered one baggie to 185 Avenue B?

18 A.  Yes.

19 Q.  And Billy writes back:  "Cool."

20         Now, Mr. Rainey, you then text at 4:28 p.m.:  " Here."

21         Where were you?

22 A.  I was at 37 Warren.

23         MR. FERGENSON:  Mr. Frenchman, we can zoom out just to

24 make it a little faster.  We're going to keep scrolling.

25 Q.  Mr. Rainey, you're saying:  "Here!!!  Yo."

 1           Were you waiting for the client?

 2   A.  Yes.

 3           MR. FERGENSON:  Scroll down, please.  And then,

 4   Mr. Frenchman, can you blow up the top two.

 5   Q.  And then at 4:33 p.m. Billy texts you:  "Coming."

 6           What did you understand that to mean?

 7   A.  That a client was coming downstairs to meet me.

 8   Q.  At 37 Warren Street?

 9   A.  Yes.

10   Q.  Now, 13 minutes later, Billy sends you a new text.  This

11   one is:  "303 Lexington Avenue, $300.  2 of the black.  Room

12   1106".

13           Now, Mr. Frenchman can you now add on the right

14   Government Exhibit 15B.

15           Now, Mr. Rainey, on the right, that's 303 Lexington

16   Avenue; right?

17   A.  Yes.

18   Q.  Is that the same address you had delivered to the day

19   before?

20   A.  Yes.

21   Q.  In fact, is it the same room, Room 1106?

22   A.  Yes.

23   Q.  Just to clarify and make sure we're all tracking, when he

24   says:  "$300, two of the black," what did you understand Billy

25   to be telling you?

 1   A.  That he would be giving me $200 for two black baggies of

 2   cocaine.

 3          MR. FERGENSON:  Now, Mr. Frenchman, can you add on the

 4   right or, if you have to pull it up separately, Government

 5   Exhibit 506.

 6          Mr. Frenchman, you can go ahead and play it.  If you

 7   could actually -- you can skip ahead to about 30 seconds in.

 8          (Video played)

 9          MR. FERGENSON:  Pause it.

10   Q.  Mr. Rainey, who is that?

11   A.  That's me.

12   Q.  Do you have your phone out?

13   A.  Yes.

14          MR. FERGENSON:  Mr. Frenchman, keep playing.

15          (Video played)

16          MR. FERGENSON:  We can stop it there.

17   Q.  Mr. Rainey, did you deliver Billy's drugs to Room 1106 on

18   March 17, 2021?

19   A.  Yes.

20   Q.  Why?

21   A.  Billy had told me to.

22          MR. FERGENSON:  Mr. Frenchman, let's go back to

23   Government Exhibit 111-10.  We're going to go to page 31,

24   Mr. Frenchman.  Let's zoom in on the two blue.  You can scroll

25   down.  Scroll down, please.  Thank you.

1   Q.  Now, Mr. Rainey, Billy texts you that 303 Lexington Avenue

2   message at 4:46 p.m.  About an hour and 15 minutes later, he

3   sends a new text.  He says:  "50 e 8th street.  $200.  Your

4   girl."

5          What did you understand that to mean?

6   A.  50 East 8th Street was the address.  She was getting $200,

7   a baggie of cocaine.  And he said "your girl" because I had

8   delivered drugs to her on a couple of occasions, and she was

9   nice.

10  Q.  Did you know her name on March 17?

11  A.  No, I did not.

12         MR. FERGENSON:  Mr. Frenchman, let's keep scrolling.

13  Q.  At about 6:55 p.m., what do you write back?

14  A.  "Tell 8th I'm here ."

15  Q.  And a few seconds later, what do you write?

16  A.  "Yo."

17         MR. FERGENSON:  Going down.

18  Q.  The next one, the next text, is the following morning.

19         So, Mr. Frenchman, scroll up, please.

20         These are your last messages on March 17.

21         Mr. Frenchman, I'm going to ask you to zoom out, and

22  I'll ask you to add on the right Government Exhibit 14B.

23         Mr. Rainey, that's 58 East 8th Street on the right.

24  Right?

25  A.  Yes.

 1    Q.  Now, your message to "Tell 8th I'm here," is at 6:55 p.m.

 2            Mr. Frenchman, can you now play Government Exhibit

 3    507, please.

 4            (Video played)

 5            MR. FERGENSON:  Thank you.  Just pause for a moment.

 6    Q.  Mr. Rainey, who is the individual shown in that frame?

 7    A.  Me.

 8            MR. FERGENSON:  I'm going to pause at 14.

 9    Q.  Now, Mr. Rainey, do you see that the time stamp there says

10    6:52 p.m.?

11    A.  Yes.

12    Q.  That's maybe three minutes before you texted Billy:  "Tell

13    8th I'm here"?

14    A.  Yes.

15    Q.  Now, he had called 50 East 8th Street your girl.  Right?

16    A.  Yes.

17    Q.  Why did you text Billy to tell her you were there?

18    A.  We didn't have contact with the clients.  Only Billy did.

19            MR. FERGENSON:  Mr. Frenchman, we can keep playing.

20            (Video played)

21            MR. FERGENSON:  All right.  We can stop it.  We can

22    take that down.

23    Q.  Mr. Rainey, did you deliver Billy drugs to 50 East 8th

24    Street on March 17, 2021?

25    A.  Yes.

1   Q.   Why?

2   A.   Billy had told me to.

3   Q.   Now, Mr. Rainey, the day after those March 17 deliveries,

4   did Billy ask you to do anything of note?

5   A.   Billy asked me if I could Google, look up, where he could

6   purchase a drug test kit from.

7   Q.   What's a drug test kit.

8   A.   It's to test the drugs, what's in the drugs.

9   Q.   Had you ever used one before?

10  A.   No, I have not.

11  Q.   Have you used one ever?

12  A.   No, I have not.

13  Q.   How did you know where to get one?

14  A.   I just Googled it on my phone.

15  Q.   Did you go and get a drug test kit for Billy?

16  A.   No, I did not.

17  Q.   Do you recall why you didn't get one?

18  A.   I was never asked to get one.  I was just asked to look up

19  where he could get one.

20  Q.   Did Billy tell you why he was asking you to do that?

21  A.   He didn't.

22  Q.   Had Billy asked you to look up where you could get a drug

23  test kit before?

24  A.   No.

25  Q.   Did you ask Billy why he wanted you to do that now?

1   A.  No.

2   Q.  Why not?

3   A.  I didn't think it was abnormal for a drug dealer to want to

4   look up where to get a kit from that tested drugs.

5   Q.  And did he say anything else to you about the drug test?

6   A.  No.

7   Q.  Do you know if he actually got a drug test kit?

8   A.  I bought it.

9   Q.  Did he tell you the result of any drug test?

10  A.  No.

11  Q.  Now, Mr. Rainey, around this time, did Billy ask you to go

12  pick up drugs you had delivered to a customer?

13  A.  Yes.

14  Q.  And did he tell you why?

15  A.  No.

16  Q.  Did you ever have an understanding that there was a bad

17  batch?

18  A.  Yes.  He had mentioned that.

19  Q.  So what did you understand "bad batch" to mean?  What did

20  that mean?

21  A.  Typically if someone refers to a batch of drugs they

22  purchased, whether weed or anything is bad, that usually means

23  it's not strong enough.

24  Q.  What did Billy ask you to do with the bad batch you picked

25  up from the customer?

1   A.  To put it to the side.

2   Q.  Did you put that bad batch to the side?

3   A.  Yes.

4   Q.  What ended up happening with the bad batch?

5   A.  He asked me to throw it away, and I did.

6   Q.  Did he ever tell you that it was fentanyl?

7   A.  No.

8   Q.  If you had known there was fentanyl in the drugs you were

9   delivering, would you have done anything differently?

10  A.  Absolutely.  I would have never made another delivery

11  again.

12  Q.  Why?

13  A.  Again, I had heard enough about fentanyl to know that it

14  was dangerous.  That's not something that I would risk my life

15  for.

16  Q.  Other peoples' lives?

17  A.  Or others, yes.

18  Q.  Did Billy ever tell you he tried to contact the other

19  people he had had you deliver his drugs to that day and they

20  never responded?

21  A.  He didn't.

22  Q.  He didn't tell you that?

23  A.  No.

24  Q.  Did Billy ever tell you people died?

25  A.  No.

1              MR. FERGENSON:  Mr. Frenchman, let's go back to the

2    messages after March 17.  Let's go to Government Exhibit

3    111-10.  We can go to page 33, please.  Actually,

4    Mr. Frenchman, just scroll up just a little bit so we can see

5    the text before this.

6              Scroll up a little more just for context.  Let's blow

7    up -- we're going to go through these messages.  Let's blow up

8    the bottom two for now.

9    Q.  All right.  So, Mr. Rainey, we looked at this before.  You

10   got your last message on March 17 at 6:56.  And then the first

11   message the following day, March 18, is at 9:26 a.m.

12             What did you message Billy?

13   A.  "$1,470 yesterday."

14   Q.  What was that?

15   A.  That was the profits from the drug deliveries the day

16   before.

17   Q.  The count?  That was the count?

18   A.  Yes.

19             MR. FERGENSON:  Mr. Frenchman, scroll down, please.

20   Q.  Billy responds:  "Thanks, bro.  Be right back.  NP."

21             What's NP?

22   A.  No problem.

23   Q.  Now, your NP text is at 9:31 a.m. And then you have another

24   message about a little less than four minutes later where you

25   say, "lght."  But there is no message in between.

1          Do you recall why that is?

2    A.  Billy had sent me a voice note.  For iPhones, when you send

3    voice notes, you can either keep the message or, after two

4    minutes, they disappear.

5    Q.  Did you keep the message Billy sent you?

6    A.  No.

7    Q.  Let's keep scrolling down.

8          Then at 9:36 a.m., what do you write?

9    A.  "I WalMart, Walgreen's, Target."

10   Q.  We'll get to the next text in a moment, but just the "I"

11   and then the "WalMart, Walgreen's, Target," what were you

12   saying to Billy there?

13   A.  Those were the locations that I had seen where you could

14   pick up a drug test kit.

15   Q.  And then the voice note that expired, what do you recall

16   telling Billy in that?

17   A.  That was me responding where you could get a kit from.

18   Q.  That happens at about 9:30 in the morning.  At a little

19   over hour later, you message Billy.  Again, there's no message

20   before that, but you say:  "I passed it to ma."

21         What were you saying there?

22   A.  I was telling Billy that I had passed the count, the money

23   that I had made the day before, to Josefina.

24   Q.  The count?

25   A.  Yes.

1    Q.  And then a minute later, you say:  "It's different brands."

2              What were you saying there?

3    A.  That the drug test kids were different brands.

4              MR. FERGENSON:  Let's scroll down.

5    Q.  And you sent Billy two screenshots.

6              Do you see that?

7    A.  Yes.

8              MR. FERGENSON:  Mr. Frenchman, we can look at them one

9    at a time or we can put both up, whatever is easiest.

10   Q.  All right.  So this is the first screenshot.

11             What's this a screenshot of?

12   A.  Drug test kits.

13             MR. FERGENSON:  Mr. Frenchman, let's do the next one.

14   Q.  What's this a screenshot of?

15   A.  More drug test kits.

16   Q.  Were they screenshot of different brands of drug tests?

17   A.  Yes.

18             MR. FERGENSON:  Mr. Frenchman, we can focus again on

19   the left-hand side text.  Thank you.  All right.  Now,

20   Mr. Frenchman, can you zoom.  We're going to focus on the next

21   text.

22   Q.  All right.  So, Mr. Rainey, your message with the

23   screenshots is still the morning of the 18th.  And then the

24   next message is dated March 19, 2021.  But it's only about 27

25   minutes after midnight.  Right?

 1   A.  Yes.

 2   Q.  So this is kind of like late at night on the 18th.  Fair?

 3   A.  Yes.

 4   Q.  And you text Billy:  "You got my charger bro?"

 5       First of all, "Charger," what were you referring to?

 6   A.  My phone charger.

 7   Q.  Why did you ask Billy if he had your phone charger?

 8   A.  I had just got home, and Josefina had told me that Billy

 9   was there that day.  So he was using my charger.  So I asked

10   him if he had took it with him because it wasn't in my room.

11   Q.  So the day after the March 17 texts and after the morning

12   in which he asked you about getting a drug test kit, Billy went

13   to Josefina's apartment to your knowledge?

14   A.  To my knowledge, yes.

15   Q.  He lived far away in New Jersey; right?

16   A.  Yes.

17       MR. FERGENSON:  Mr. Frenchman, let's keep scrolling

18   down.

19   Q.  Maybe -- I don't know -- 3 1/2 hours later in the very

20   early morning hours or the very late at night hours I guess,

21   Billy writes you:  "Hey, bro.  It's in Kevin room by the door

22   outlet."

23       What did you understand Billy to be saying there?

24   A.  My phone charger was in Kevin's room in the phone outlet.

25       MR. FERGENSON:  Mr. Frenchman, can we zoom out and

1    scroll down.

2    Q.  Mr. Rainey, that March 19 text at 3:54 a.m., there are no

3    more texts after that; right?

4    A.  No.

5    Q.  To your recollection, did Billy ever text you again using

6    the 5555 number?

7    A.  No.

8    Q.  Did he start using different numbers?

9    A.  Yes.

10   Q.  Mr. Rainey, after March 17, 2021, did you change your phone

11   number?

12   A.  No.

13   Q.  Why not?

14   A.  I didn't feel like I had a reason to.

15          MR. FERGENSON:  Mr. Frenchman, let's turn to a new

16   text chain, Government Exhibit 111-118.

17   Q.  Now, Mr. Rainey, this is a message between you and another

18   number.

19          Could you please read that other number.

20   A.  646-945-5367.

21          MR. FERGENSON:  Zoom out, please.  And let's zoom in

22   on the first two messages.

23   Q.  All right.  So focusing on the top left in blue, that 5367

24   number texts you about 12 hours after the last 5555 text we

25   just looked at on March 19.

 1  A.  Yes.

 2  Q.  And it says:  "Yo, was good, bro.  You in the crib."

 3      What do you write back?

 4  A.  "Who is this?"

 5  Q.  And the 5367 number responds:  "Billz."

 6      Who is Billz?

 7  A.  Billy.

 8  Q.  Let's just continue reading this chain for a little while.

 9      Mr. Frenchman, I'll just ask you to scroll.

10      Mr. Rainey, you read the green, please.

11  "A. Oh, nah."

12  Q.  Just for context, what were you say "oh, nah" to?

13  A.  That I wasn't at in the apartment.

14  Q.  That was when he asked you if you were in the crib?

15  A.  Yes.

16  "Q. Oh, damn.  How long till you back okay.

17  "A. Not for another hour or so.

18  "Q. Okay.  Hey, bud.  You home?

19  "A. LOL, no.  Shortly for a minute."

20  Q.  That's at about a little after 6:00 p.m.; right?

21  A.  Yes.

22  Q.  And then at 6:21 p.m., what do you say?

23  "A. I'm here."

24  Q.  And then Billy replies, "LOL.  Thank God."

25      What do you write back?

1    A.  "Laugh my ass off.  Yah need a better system."

2    Q.  And then at 6:58 p.m. "Hey, open."

3            We can pause there.

4            Mr. Rainey, can you explain.  what was happening here

5    A.  Billy was coming to the apartment.  He asked me if I was

6    home to let him inside.  So when I got home, I let him in the

7    apartment.

8    Q.  Do you know why Billy didn't have a key?

9    A.  No.

10           MR. FERGENSON:  Mr. Frenchman, let's keep scrolling

11   down slightly, please.

12   Q.  All right.  Now this is the bottom text.  That's first text

13   in the following day.  And at 12:40 p.m. Billy writes -- and

14   this following day.  That's March 20, 2021, three days after

15   March 17.  Right?

16   A.  Yes.

17   Q.  Billy texts you:  "Hey, bro.  Have my boy meeting you at

18   3:34, right in front."

19           Do you see that?

20   A.  Yes.

21           MR. FERGENSON:  Scroll.

22   Q.  And how do you write back?

23   A.  "For?"

24   Q.  Question mark?

25   A.  Yes.

1    Q.  Billy responds:  "He's passing you some food."

2          What did you understand Billy to be saying?

3    A.  He was going to be giving me some drugs.

4    Q.  "Food" is drugs?

5    A.  Yes.

6    Q.  Is that common slang?

7    A.  Yes.

8    Q.  And then Billy texts you a location.  He says:  "18th

9    Street between 10th and 11th under the bridge."

10         About how far would that be from Josefina's apartment,

11   your apartment?

12   A.  It was a block away.

13         MR. FERGENSON:  Scroll down.

14   Q.  And Billy texts you:  "It's a GMC little truck or Saturn.

15   LOL."

16         How do you reply?

17   "A. Ok."

18   Q.  And Billy writes:  "Let me know when you're walking over so

19   he can keep an eye out for you."

20         Keep scrolling.

21         What did you write?

22   A.  "I'm walking up.  All black."

23   Q.  When you said, "All black," what was that?

24   A.  All black was what I was wearing.

25   Q.  And Billy writes:  "Cool.  Let me know when you're back in

```
 1    the crib."

 2              Keep scrolling.

 3              And then Billy texts an address.

 4              You write "lght."

 5              Keep scrolling.  And then at 3:57:59 on March 20, you

 6    say:  "I'm in the crib."

 7              Why did you text Billy that?

 8    A.  He had told me to let him know when I was back in the

 9    apartment.

10    Q.  When you were back in the apartment after picking up the

11    drugs?

12    A.  Yes.

13    Q.  When Billy sent you to go pick up those drugs on March 20,

14    three days after March 17?

15    A.  Yes.

16    Q.  Do you recall what kind of drugs?  Did you know?

17    A.  I didn't know.  It was wrapped up.

18              MR. FERGENSON:  Mr. Frenchman, we can stop there.

19    Let's go to a new text chain, Government Exhibit 111-76.

20    Q.  All right.  Now this is a chat with you and another phone

21    number.

22              What's that phone number?

23    A.  646-530-4115.

24              MR. FERGENSON:  We can zoom.  We're going to read the

25    first couple of messages.
```

1    Q.  So the first text comes in March 20, 2021.  That's the same

2    day we were just looking at where you got passed the food?

3    A.  Yes.

4    Q.  This is at 9:27 p.m.

5            Do you see that?

6    A.  Yes.

7    Q.  And the message says:  "Hi, Hoe."

8            Keep scrolling down.

9            How do you respond?

10   A.  "Who is this?"

11   Q.  A few minutes later, there are six addresses.

12           Do you see that?

13   A.  Yes.

14   Q.  Is it fair to say those are drug deliveries to Billy's

15   customers?

16   A.  Yes.

17   Q.  Who was using this 4115 number?

18   A.  Billy.

19   Q.  Is that the phone number that Billy used most of the time

20   to send you on deliveries from March 20, 2021, until you were

21   arrested?

22   A.  Yes.

23   Q.  Did Billy ever say why he started using this number?

24   A.  No.

25   Q.  Or why he stopped using the 5555 number?

1    A.  No.

2            MR. FERGENSON:  Mr. Frenchman, we can zoom out,

3    please.  Let's go to page 13.  Let's zoom in on the bottom two.

4    Q.  All right.  Now, Mr. Rainey, top left, blue message,

5    March 21, 2021, next day, four days after March 17, Billy texts

6    you:  "Hey, bro.  37 Warren Street.  Give him 5 blacks."

7            What did you understand that to mean?

8    A.  To give 37 Warren Street five black baggies of cocaine.

9    Q.  And you wrote back:  "Ok."

10           Do you see that?

11   A.  Yes.

12           MR. FERGENSON:  Mr. Frenchman, let's scroll down.

13   Q.  And then Billy says, on March 21, the day after he had sent

14   you to go pick up food:  "He's going to give you the old batch

15   back."

16           Do you see that?

17   A.  Yes.

18   Q.  What did you understand him to be saying?

19   A.  That that person was going to be giving me back the last

20   batch that he had received of drugs.

21   Q.  And we saw you delivered that on March 17; right?

22   A.  Yes.

23   Q.  At Billy's direction?

24   A.  Yes.

25   Q.  Whose drugs were you delivering?

1    A.  Billy's.

2    Q.  Now, you then asked:  "Why not throw it out?"

3            Why did you ask that?

4    A.  I assumed they were bad.  That's why he was going to be

5    giving them back.  You don't really hear too much about people

6    exchanging or returning drugs.  So I just thought it was weird,

7    and I asked him why the guy didn't just throw them out.

8    Q.  Now, you said that they were bad.

9            Was it your understanding that they were too weak or

10   too strong?

11   A.  I thought too weak.

12   Q.  Now, you used, for instance, marijuana before?

13   A.  Yes.

14   Q.  If there was bad marijuana, what would that mean to you?

15   A.  That I didn't get high.

16   Q.  It was too weak?

17   A.  Yes.

18           MR. FERGENSON:  Let's scroll down, Mr. Frenchman.

19   Q.  Now, what is Billy telling you to do when you ask him:

20   "Why not throw it out?"

21   A.  Put it to the side for him.

22   Q.  He said:  "Put it to the side for me."  Right?

23   A.  Yes.

24   Q.  What's the "it" he wanted you to put to the side?

25   A.  The batch that the guy, the one customer, was giving me

 1   back.

 2            MR. FERGENSON:  Mr. Frenchman, let's keep scrolling

 3   down.  Let's just scroll up just to focus on the top right.

 4   Q.  After he tells you to put it to the side for him, after

 5   Billy tells you that, what do you respond with?

 6   A.  "LOL.  Ok."

 7   Q.  Why did you write LOL ok"?

 8   A.  I thought he was being cheap and was going to try to resell

 9   it.

10   Q.  Resell the cocaine that was too weak?

11   A.  Yes.

12            MR. FERGENSON:  Mr. Frenchman, we can zoom out.  We're

13   going to go to page 60, please.

14   Q.  Now, Mr. Rainey, did you go pick up the old batch from 37

15   Warren?

16            Mr. Frenchman, please zoom on the bottom two.

17   A.  I believe I did.

18   BY MR. FERGENSON:

19   Q.  These messages we're looking at are two days later,

20   March 23, 2021.  At 11:40 a.m., Billy texts you:  "Hey, throw

21   out that will.  Also asp."

22            What did you understand him to be saying?

23   A.  To throw out that batch that he asked me to put to the

24   side.

25   Q.  What's "asp"?

```
 1   A.  As soon as possible.

 2   Q.  Does that appear to be a typo to you?

 3   A.  Yes.

 4   Q.  What did you ask him?

 5   A.  "The old stuff that dude gave me?"

 6   Q.  Who are you referring to?

 7   A.  37 Warren Street.

 8           MR. FERGENSON:  Scroll down, please.  Billy responds:

 9   "Yes, please."

10           You write:  "OK."

11   Q.  We talked about this before, but what did you end up doing

12   with that old batch?

13   A.  I threw it out.

14   Q.  Is that what Billy told you to do?

15   A.  Yes.

16           MR. FERGENSON:  Let's take that down for now,

17   Mr. Frenchman.

18   Q.  Mr. Rainey, we've looked at a lot of messages between you

19   and the defendant.  I'm going to show you just one more set of

20   them.

21           Mr. Frenchman, can you pull up Government Exhibit

22   111-78.  If you can go to page 7.  Zoom in on the top two,

23   please.

24           Mr. Rainey, this is about two weeks after March 17.

25   These are your texts with the 4115 number.  Right?
```

1    A.  Yes.

2    Q.  Were you still delivering drugs for Billy then?

3    A.  Yes.

4    Q.  When he texts you almost identical texts that say:  "60

5    East 8th Street 2 will $300."

6            Now, I think we all now know what that means.

7            Mr. Frenchman, can you scroll down, please.

8            What did you write back?

9    A.  "50 or 60?"

10   Q.  What were you asking?

11   A.  I thought he made a typo and he meant to send me to 50 East

12   8th because I've never been to 60, and I just thought it was

13   weird to, you know.

14           MR. FERGENSON:  Mr. Frenchman, can you scroll down,

15   please.

16   Q.  He writes back:  "60.  Someone else."

17           How do you respond?

18   A.  "Oh."

19           MR. FERGENSON:  Let's scroll down.  Let's zoom in on

20   that last message.

21   Q.  Mr. Rainey, what did you say next?

22   A.  "Imma still go stop by and get a plate for my girl."

23   Q.  By "my girl," who are you referring to?

24   A.  The woman that lived at 50 East 8th Street.

25   Q.  You said you were going to get a plate.

1          What did you mean by that?

2   A.  A couple times that I had delivered drugs to her, she was

3   cooking.  And it smelled really good, and I complimented her on

4   it.  She offered me food each time.  I declined.

5   Q.  You called her "my girl."

6          Did you know her name?

7   A.  No, I didn't at the time.

8          MR. FERGENSON:  Mr. Frenchman, can you please add on

9   the right Government Exhibit 9.

10  Q.  Do you recognize her?

11  A.  Yes.

12  Q.  Do you know her name now?

13  A.  Yes.

14  Q.  What is it?

15  A.  Amanda Scher.

16  Q.  What do you remember about her?

17  A.  She was a really sweet lady.  Like I said, she cooked the

18  times that I saw her, and it smelled really good.  I thought

19  she was a good cook.

20  Q.  Was anyone else there at times when you were delivering

21  drugs?

22  A.  Just her dog.

23  Q.  Do you know what kind of dog?

24  A.  It was a small, little dog, very energetic.

25  Q.  Now, when you brought this up two weeks after March 17, did

1  Billy say anything had happened with her?

2  A.  No.

3  Q.  When you read these messages recently, how did that make

4  you feel?

5         MS. FLORIO:  Objection.

6         THE COURT:  Give me one second.

7         Why don't you rephrase that.

8  BY MR. HERMAN:

9  Q.  Reading these messages, what's your reaction?

10        MS. FLORIO:  Objection.

11 BY MR. FERGENSON:

12 Q.  How did the fact that Billy didn't say anything about

13 her -- what did you think of that?

14        MS. FLORIO:  Objection.

15        THE COURT:  Sustained.

16        MR. FERGENSON:  I'll move on.

17        You can take that down, Mr. Frenchman.

18 Q.  Mr. Rainey, you were arrested on February 1, 2022.  Right?

19 A.  Yes.

20 Q.  Immediately after you were arrested, did you agree to speak

21 with the agents who arrested you?

22 A.  Yes.

23 Q.  Did they interview you?

24 A.  Yes.

25 Q.  Was that interview the same day of your arrest?

```
 1   A.  Yes.

 2   Q.  About what time were you arrested?

 3   A.  Like 7:00 in the morning.

 4   Q.  Roughly how many hours had passed from your arrest until

 5   the interview?

 6   A.  Like I want to say two hours.

 7   Q.  Was a lawyer there with you?

 8   A.  No.

 9   Q.  Before the interview, did you talk with a lawyer?

10   A.  No.

11   Q.  Did you tell the full truth in that first interview?

12   A.  No.

13   Q.  Why did you lie at first?

14   A.  I had a lot going through my mind finding all of that out.

15   I was scared.  I was nervous.  I was confused.  I was upset.

16   And I also wanted to -- a piece of me wanted to still protect

17   me or my friends.

18   Q.  Which friends?

19   A.  Billy and Will.

20   Q.  You were trying to protect Billy?

21   A.  Yes.

22   Q.  Now, at some point after that first interview, did you have

23   a chance to meet with a lawyer?

24   A.  Yes.

25   Q.  After you met with your lawyer, what did you decide to do
```

1    in your case?

2    A.  I cooperated fully and truthfully.

3    Q.  Did you tell the full truth after that?

4    A.  Yes, I did.

5    Q.  Did you tell the full truth today?

6            MS. FLORIO:  Objection.

7            THE COURT:  Overruled.

8    BY MR. FERGENSON:

9    Q.  Did you tell the government, when you were cooperating,

10   about the full scope of the conduct in this case that you knew

11   about?

12   A.  Yes.

13   Q.  Did you tell the government everything about your crimes?

14   A.  Yes.

15   Q.  Did you tell the government all the people you committed

16   crimes with?

17           MS. FLORIO:  Objection.

18           THE COURT:  Why don't we adjourn now or stop now just

19   for the lunch break.  And we can discuss this privately at that

20   point.

21           Just remember don't discuss the case and keep an open

22   mind.

23           (Continued on next page)

24

25

1                (In open court; jury not present)

2                THE COURT:  Everyone can be seated.  Thanks.

3                I'm happy to hear you out, Ms. Florio.

4                MS. FLORIO:  Our objection is because these statements

5     are prior -- they are prior statements made.  So they're

6     hearsay.

7                MR. SEIDLER:  Your Honor, can I just add to that, if I

8     may.

9                THE COURT:  Why don't we just have one person make

10    arguments at a time.

11               MR. SEIDLER:  I will write notes, and she can read my

12    notes.  You know, there are three people here, Judge.

13               THE COURT:  I understand.  But one person can argue

14    each issue.  I don't understand why you need two people arguing

15    every issue.

16               He was talking about his testimony today as I

17    understood the questions.

18               Is that right?  Or were you talking about in the past?

19    Those last questions.

20               MR. FERGENSON:  Your Honor, what we're merely

21    covering --

22               THE COURT:  No.  I'm asking you.  At the very end, the

23    questions to which -- I'm not asking you generally.  I'm asking

24    you about those specific questions.

25               MR. FERGENSON:  Yes, your Honor.  We're talking about

 1   proffers but not his substance of the statements in the

 2   proffers, just sort of what cooperating is.

 3          MS. FLORIO:  So, your Honor, my objection is that it's

 4   hearsay.  Because the veracity hasn't been challenged, it's a

 5   prior consistent statement.

 6          THE COURT:  I don't think it's hearsay to ask because

 7   he's not saying what he said being admitted for the truth of

 8   the matter.  But I do think that a lot of this is really more

 9   properly brought on redirect, to the extent that you're trying

10   to bolster him in advance of cross-examination in the same way

11   that the cooperation agreement itself is generally brought up,

12   introduced, on redirect as opposed to direct.

13          But I don't think it's hearsay.  I'm not sure why it's

14   hearsay to say, "Did you tell the truth?"

15          MS. FLORIO:  Well, I think there were more questions

16   about like what was said in the proffer?  You know, did you

17   tell the truth in the proffer?  What was said in the proffer

18   with respect to like tell the truth?

19          THE COURT:  The first question was -- I'm just looking

20   at the transcript -- "Did you tell the full truth today?"

21   That's not hearsay.

22          MS. FLORIO:  And I objected to that question.

23          THE COURT:  What's the basis of your objection to:

24   "Did you tell the full truth today?"

25          MS. FLORIO:  My objection is that I feel it's an

 1  improper question because it's not for him to decide whether --

 2  you know, what the truth is.

 3          THE COURT:  I'm going to overrule that.  Again, my

 4  concern was more sort of with bolstering and that it's more

 5  appropriately brought once he's, essentially the defense, to

 6  the extent they do it, accuse him of lying.  But I'm not going

 7  to strike the record.

 8          MR. FERGENSON:  Thank you, your Honor.  I would just

 9  note his credibility was questioned in the opening.  They

10  suggested that his testimony would not be the truth in the

11  opening already.

12          We're not planning to introduce on direct the

13  cooperation agreement.  We completely understand your Honor's

14  point and the suggestions, and they are very well-taken.

15          THE COURT:  Thank you.

16          Again, I'm less concerned with hearsay with these

17  particular questions than I am with bolstering.  So you'll move

18  on after the break to something else.  And then on redirect, to

19  the extent his credibility is challenged, you can ask those

20  kinds of questions.

21          MR. FERGENSON:  Your Honor, without introducing the

22  cooperation agreement, are we allowed to explain to the jury

23  that he entered into a cooperation agreement?

24          THE COURT:  Yes.

25          MR. FERGENSON:  Just at a high level, what does that

 1    require you to do?

 2              THE COURT:  I think so.  The reason is that the

 3    cooperation agreement itself is bolstering his testimony.

 4    That's why it's not introduced.  He's not bolstering himself.

 5    Again, I think that they're more properly asked on redirect.

 6              But the reason that the cooperation agreement itself

 7    doesn't come in is because it essentially bolsters his

 8    testimony.  So I'm not going to strike any of the record.  I

 9    think that those are questions he'll be asked at some point and

10    answers he'll give.  But we are going to move on.

11              I will see you all at 2:00.  Thank you.

12              (Luncheon recess)

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                A F T E R N O O N   S E S S I O N
 2                          2:00 p.m.
 3          (Jury not present)
 4          THE COURT:  Is everyone ready to get started?
 5          MR. FERGENSON:  Your Honor, I just wanted to make sure
 6   I didn't inadvertently misunderstanding the colloquy we just
 7   had before the break.
 8          THE COURT:  Yes.
 9          MR. FERGENSON:  I don't want to run afoul of the
10   Court's ruling.
11          We are not planning to introduce the cooperation
12   agreement, but we were going to kind of go over, you know, did
13   you plead guilty to a cooperation agreement, had you been
14   sentenced yet, you know, the --
15          THE COURT:  That's all fine.
16          MR. FERGENSON:  Okay.  Understood.  I just wanted to
17   make sure.
18          THE COURT:  No, that's all fine.
19          And then as I already noted, you can introduce the
20   cooperation agreement on redirect assuming his credibility is
21   attacked with respect to the agreement on cross.
22          I do want to talk for another minute about Maurice
23   Whyte.
24          Does the government want to be heard on this issue?
25   Because I promised defense counsel that I would let them know
```

1    what my ruling is on his testimony, her testimony, excuse me,

2    prior to cross.

3            MR. HERMAN:  Your Honor, respectfully, we, just -- as

4    the Court deferred ruling with respect to DeLaura, we don't

5    think the defendant is entitled to a ruling with respect to

6    Ms. Whyte in advance of their cross.

7            THE COURT:  The difference is, at least as alleged by

8    the defense, I think that there is a much clearer basis to call

9    Ms. Whyte than there is DeLaura, namely, under Rule 613(b).

10   And that's the language that I read the other day.

11           MR. HERMAN:  Judge, again, we just think the Court

12   doesn't need to rule now.  The circumstances of Ms. Whyte's

13   proposed testimony are new facts are emerging rapidly and we

14   would just like an additional opportunity to evaluate them

15   before giving you our final position.

16           THE COURT:  I will tell you, I am going to rule that

17   she can testify.  If new facts come into your possession that

18   you think changes the analysis that I am just going to read

19   briefly now, you will let me know, and it may be that I alter

20   the ruling if appropriate to do so.  But based on the

21   information I have now, I think it is appropriate to allow her

22   testimony.

23           So the defense seeks to call Maurice Whyte for the

24   purpose of establishing a prior inconsistent statement by

25   Kaylen Rainey, specifically, the defense alleges that although

1    Mr. Rainey has and is expected to continue to testify that

2    Billy Ortega was the source of the narcotics that he

3    distributed to the victims on March 17, Mr. Rainey previously

4    told Ms. Whyte, while incarcerated with her at the MDC, that

5    this was not true.  Rather, the defense alleges that Ms. Whyte

6    is expected to testify that Mr. Rainey said that he separately

7    obtained the narcotics from a different source without

8    Mr. Ortega's knowledge but that he would not share this account

9    with the government.  Federal Rule of Evidence 613 provides

10   that extrinsic evidence of a witness's prior inconsistent

11   statement is admissible only if the witness is given the

12   opportunity to explain or deny the statement and an adverse

13   party is given an opportunity to examine the witness about it

14   or if justice so requires.

15              I find that the statements that Mr. Rainey allegedly

16   made to Ms. Whyte could constitute a prior inconsistent

17   statement and that the defense should be permitted to call

18   Ms. Whyte to testify regarding those statements.  Of course, as

19   Rule 613(b) provides, Mr. Rainey shall be given the opportunity

20   to explain or deny the statement, and the government will have

21   the opportunity to cross-examine Ms. Whyte regarding the

22   alleged statements.

23              The Second Circuit has observed, for instance, that a

24   third-party's characterization of a witness's statement can

25   constitute a prior statement of the witness where the witness

1    has subscribed to that characterization.  It's a quote from the

2    *Strother* case, 49 F.3d at 875.  Mr. Rainey will thus have the

3    opportunity to explain whether he would subscribe to

4    Ms. Whyte's characterization of this alleged statement at the

5    MDC.  *See also* the *DiNapoli* case, 557 F.2nd 964, 65.

6           As to any allegations of impropriety by Mr. Murray or

7    the defense more generally, although I will say that I am

8    deeply troubled by the conduct that we discussed this morning,

9    the Court finds that even if the contact with Ms. Whyte without

10   her counsel present could be characterized as professional

11   misconduct, the appropriate avenue to handle such allegations

12   is not to prejudice Mr. Ortega's defense, so the Court will

13   thus not preclude Ms. Whyte's testimony on that basis.

14          With that, why don't we bring Mr. Rainey back in and

15   bring in the jury.

16          MR. SEIDLER:  Your Honor, has a decision been made as

17   to DeLaura?

18          THE COURT:  Not yet.  As I said earlier, I'm going to

19   wait and hear the cross-examination of DeLaura --

20          MR. SEIDLER:  Your Honor.

21          THE COURT:  -- of Rainey before I make my decision as

22   to DeLaura.

23          MR. SEIDLER:  If I may, at minimum, Rainey said on

24   direct examination that he agreed not to commit additional

25   crimes and he has been doing that according to DeLaura.

1              THE COURT:  You have made your record.  Thanks.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury present)
 2                    THE COURT:  Everyone can be seated.  You may proceed,
 3    Mr. Fergenson.
 4    BY MR. FERGENSON:
 5    Q.  Mr. Rainey, when we broke, we were talking about what
 6    happened after your arrest.  Do you recall that?
 7    A.  Yes.
 8    Q.  Did you ultimately enter into a cooperation agreement with
 9    the government?
10    A.  Yes.
11    Q.  And when you entered that cooperation agreement, were you
12    required to plead guilty to a number of federal crimes?
13    A.  Yes.
14    Q.  Which crimes?
15    A.  Conspiracy to distribute narcotics resulting in death and
16    gun possession.
17    Q.  Why did you plead guilty to those charges?
18    A.  Because I was guilty.
19    Q.  Have you been sentenced for those crimes?
20    A.  No, I have not.
21    Q.  What's your understanding of the maximum sentence you face
22    as a result of those crimes?
23    A.  Life in prison.
24    Q.  What's your understanding of the mandatory minimum you face
25    for your crimes?
```

```
 1   A.  25 years.

 2   Q.  Who will sentence you?

 3   A.  Judge Abrams.

 4   Q.  What's your understanding of what you agreed to do under

 5   the cooperation agreement?

 6   A.  Provide the government with truthful information in regards

 7   to my crimes and the people who I have committed the crimes

 8   with and to also not commit any more crimes.

 9   Q.  And if you do those things, what's your understanding of

10   what the government will do?

11   A.  They will provide the judge with a 5K1 letter.

12   Q.  What does the 5K1 letter do?

13   A.  It lets the judge know if I provided the government with

14   substantial information in regards to the case and any crimes I

15   have committed with others.

16   Q.  With respect to the mandatory minimum, if the government

17   writes a 5K letter, what effect does that have?

18   A.  The judge can go below the mandatory minimum.

19   Q.  If the government writes a 5K letter, what's the lowest

20   sentence a judge can give you?

21   A.  Time served.

22   Q.  And if the government writes a 5K letter, what's your

23   understanding of the maximum sentence a judge can give you?

24   A.  Life.

25   Q.  And do you understand that -- is it your understanding that
```

1    the 5K letter will have everything you have done, good and bad?

2    A.  Yes.

3    Q.  What promises have you been given about what sentence you

4    will receive?

5    A.  None.

6    Q.  What's your understanding of whether the government will

7    recommend any specific sentence to Judge Abrams?

8    A.  They won't.

9    Q.  And even if the government sends a 5K letter, does

10   Judge Abrams have to sentence you to less prison time?

11   A.  No.

12   Q.  Now, Mr. Rainey, are you hoping to get a lower sentence

13   because you cooperated?

14   A.  I am.

15   Q.  How long have you been in jail?

16   A.  A year.

17   Q.  What sentence are you hoping for?

18   A.  Time served.

19   Q.  Do you know whether you will actually receive a lower

20   sentence because you cooperated?

21   A.  I do not.

22   Q.  As you understand it, what would happen if you were to lie

23   here today?

24   A.  Then my 5K1 letter gets thrown out.

25   Q.  And what would happen to your cooperation agreement?

1    A.  It gets thrown out as well.

2    Q.  If you lose your cooperation agreement will you be able to

3    withdraw your guilty plea?

4    A.  No.

5    Q.  With respect to your testimony, what will determine whether

6    you get a 5K letter?

7    A.  Whether I testify truthfully and let them know all the

8    crimes that I have committed and don't commit any further

9    crimes.

10   Q.  As you understand it, does anyone have to be convicted

11   before you receive a 5K letter?

12   A.  No.

13   Q.  Now, Mr. Rainey, you were arrested on February 1, 2022.

14   Was Billy also arrested that day?

15   A.  Yes.

16   Q.  Has Billy spoken to you since you were arrested?

17   A.  Yes.

18   Q.  And let's exclude anything today or in this courtroom right

19   now.  How many times have you and Billy spoken?

20   A.  Twice.

21   Q.  Since your arrest.

22   A.  Two times.

23   Q.  We will talk about them in turn.

24          When was the first time?

25   A.  On our way to court we had entered the elevator to come

1   upstairs to the holding area, and Billy came next to me in the

2   elevator and said that he was told from his lawyer that I was

3   talking and that I shouldn't talk, and he said if I talk then

4   he won't be able to protect me.

5   Q.  Now, in the elevator, how close was Billy to you?

6   A.  He was right next to me, shoulder to shoulder.

7   Q.  What was his demeanor?

8   A.  He was angry.

9   Q.  Were other people in the elevator?

10  A.  Yes, like seven.

11  Q.  How close was his face to your face?

12  A.  Right next to mine.

13  Q.  When he said, My lawyer says you've been talking, what did

14  you understand him to be saying?

15  A.  That his lawyer told him that I was cooperating.

16  Q.  When he said that if you talked he can't protect you, what

17  did you understand him to be saying?

18  A.  That if I was cooperating, he wouldn't be able to protect

19  me from harm.

20  Q.  Were you in jail at the time?

21  A.  Yes.

22  Q.  What's your understanding of what can happen to cooperators

23  in jail?

24  A.  Yes.

25  Q.  What is your understanding of what can happen to

1    cooperators in jail?

2            MS. FLORIO:  Objection.

3            THE COURT:  Sustained.

4            MS. FLORIO:  Your Honor, at the appropriate time I

5    would just ask for an instruction.

6            THE COURT:  All right.

7            So, ladies and gentlemen, I'm going to instruct you

8    that evidence of Mr. Ortega's presence in jail, I think you

9    heard testimony about a holding cell, but that, his presence in

10   jail, is being received solely to explain certain conversations

11   he may have had with Mr. Rainey.  So you are not to consider

12   that evidence for any other purpose, specifically, you are not

13   to consider that Mr. Ortega was incarcerated in your

14   deliberations.  This is simply context to explain the

15   circumstances under which the conversations came about.

16           You may proceed.

17   BY MR. FERGENSON:

18   Q.  Mr. Rainey, when Billy told you he wouldn't be able to

19   protect you when you were in jail, what did you understand him

20   to be saying?

21   A.  That he wouldn't be able to help me if any harm came my

22   way.

23   Q.  The second time Billy spoke to you after you were arrested,

24   when was the second time?

25   A.  We were on a van coming back from court and he turned to

1   the side and he said, oh, you should have kept your mouth shut.

2   Q.  Now, did he say that softly or loudly?

3   A.  He said it loud and aggressive.

4   Q.  Were other people on the van?

5   A.  Yes.

6   Q.  Were you asked any questions after Billy said loudly you

7   should have kept your mouth shut?

8   A.  Yes, somebody had turned and asked me if I was talking --

9          MS. FLORIO:  Objection.

10         THE COURT:  Give me one second, please.

11         I'm going to allow it.  I think it goes to state of

12  mind.  It's not being admitted for the truth.  So you can

13  answer that question.

14  A.  Someone asked me if I was cooperating against him.

15  Q.  What did you say?

16  A.  I said no.

17  Q.  Why did you say no?

18  A.  Because cooperating in jail isn't a good reputation.

19  People get hurt for that.  And if I were to say yes, I could

20  have gotten hurt.

21  Q.  Now, outside of being in a courtroom together, putting

22  aside today, are those the only two times you and Billy have

23  been in the same place together since your arrest?

24  A.  Yes.

25  Q.  Both times he told you not to talk to the government?

1   A.  Yes.

2   Q.  Both times he told you not to cooperate?

3   A.  Yes.

4   Q.  Both times he threatened you?

5           MS. FLORIO:  Objection.

6   A.  Yes.

7           THE COURT:  Why don't you rephrase and watch the

8   leading.  Okay?

9   BY MR. FERGENSON:

10  Q.  Mr. Rainey, those two times, were you in fact in the

11  process of cooperating with the government?

12  A.  Yes.

13  Q.  And when Billy spoke to you those two times, just at a high

14  level, what did you understand him to be telling you?

15          MS. FLORIO:  Objection.

16          THE COURT:  Overruled.  It just goes to his state of

17  mind and his understanding.

18          You can answer.

19  A.  I took them as threats.

20          MR. FERGENSON:  No further questions.

21          THE COURT:  All right.  Cross-examination.

22          MS. FLORIO:  Thank you, your Honor.  Good afternoon.

23  CROSS-EXAMINATION

24  BY MS. FLORIO:

25  Q.  Good afternoon, Mr. Rainey.

```
 1   A.  Good afternoon.

 2   Q.  Mr. Rainey, you said you grew up in Buffalo, correct?

 3   A.  Yes.

 4   Q.  And you said that you wanted to move to New York City,

 5   correct?

 6   A.  Yes.

 7   Q.  And you said you wanted to move to New York City because

 8   you wanted to experience city life, correct?

 9   A.  Yes.

10   Q.  And when you moved to New York City, you indicated that you

11   moved in around 2012, correct?

12   A.  Yes.

13   Q.  And you were about 20 years old, correct?

14   A.  Yes.

15   Q.  And you are 31 years old now, correct?

16   A.  Yes.

17   Q.  And you said when you first came to New York City that you

18   worked in hospitality, correct?

19   A.  Yes.

20   Q.  But your real goal was to be in entertainment, correct?

21   A.  Yes.

22   Q.  And you were a waiter, correct?

23   A.  Yes.

24   Q.  You were a promoter?

25   A.  Yes.
```

```
 1   Q.   And when you say a promoter, what do you mean by promoter?

 2   A.   A party promoter.

 3   Q.   And when you say a party promoter, what exactly did you do?

 4   A.   Promote events, different events, parties, clubs.

 5   Q.   And as a party promoter, you would also have to attend

 6   those events, correct?

 7   A.   Yes.

 8   Q.   And when you attended those events, they were mostly in

 9   clubs?

10   A.   Some of them, yes.

11   Q.   And when you were in clubs, there was a lot of drug dealing

12   going on, correct?

13   A.   Yes.

14   Q.   And what kind of drugs were around when you were promoting

15   these parties initially?

16   A.   Marijuana, cocaine, Molly.

17   Q.   And is Molly different from Ecstasy?

18   A.   They are somewhat similar.

19   Q.   And what is the difference?

20   A.   I'm not sure.  I just know that they are similar.

21   Q.   And you had indicated that you had taken Molly, correct?

22   A.   Yes.

23   Q.   And when you took Molly, what kind of effects did it have

24   on you?

25   A.   Molly made you excited, you were just happy, euphoric.
```

1    Q.  And you also indicated that you smoked marijuana, correct?

2    A.  Yes.

3    Q.  And you smoked marijuana almost every other day?

4    A.  Yes.

5    Q.  And you also did edibles?

6    A.  Yes.

7    Q.  And what are edibles?

8    A.  Edibles are food-infused marijuana.

9    Q.  And when you were promoting these parties, you were dealing

10   with a lot of individuals with respect to getting people to the

11   parties, correct?

12   A.  Yes.

13   Q.  In fact, what were some of the things that you used to have

14   to do?

15   A.  Post on social media; a lot of networking at different

16   events, if I'm out; just meeting people.

17   Q.  And would you also be in contact with the owners of the

18   establishment?

19   A.  Not necessarily the owners; management or just whoever

20   worked in those departments.

21   Q.  So management you would be -- you would mean the people

22   that were actually the club owners, correct?

23   A.  Not the club owners, just people who worked for the

24   establishments.

25   Q.  And about how many clubs did you attend while you were a

1   party promoter?

2   A.   A lot.  I've been to a lot of clubs.

3   Q.   Would it be more than ten?

4   A.   I would say around ten.

5   Q.   Would it be more than ten?

6   A.   Around ten.

7   Q.   And how often would you go to these clubs?

8   A.   I was out at events a lot.

9   Q.   Would you say on the weekends?

10  A.   Weekends, yes, sometimes weekdays.

11  Q.   And would it be several times a week?

12  A.   No.

13  Q.   And when you were at -- when you were at these clubs, did

14  you do any drugs?

15  A.   I didn't have any dealings with any drugs other than

16  marijuana, Molly at times.

17  Q.   But when you were in the clubs, you bought marijuana,

18  correct?

19  A.   No, I didn't.

20  Q.   Well, you said that you used to smoke marijuana, correct?

21  A.   Yes.

22  Q.   And where would you get your marijuana from?

23  A.   I'm a social smoker, so I smoke when I'm around it, so

24  usually friends or people who I have around it, they would give

25  me some, we would all smoke together.

1   Q.  And you never sold marijuana --

2   A.  No.

3   Q.  -- when you were in the clubs.

4   A.  No.

5   Q.  And you would drink in the clubs?

6   A.  Yes.

7   Q.  And you would be around other people who sold drugs,

8   correct?

9   A.  Yes.

10  Q.  And when you would go to the clubs, you would dress, you

11  know, in designers, designer clothing, correct?

12  A.  Not all the time.

13  Q.  But sometimes, correct?

14  A.  Sometimes, yes.

15  Q.  And you, before you were arrested, you had social media,

16  correct?

17  A.  Yes.

18  Q.  And what social media did you have?

19  A.  I have Twitter, Instagram, Facebook.

20  Q.  And what social platforms were you most active on?

21  A.  Twitter and Instagram.

22  Q.  And did you have pictures of yourself on Instagram?

23  A.  Yes.

24  Q.  And did you have pictures of yourself in expensive

25  clothing?

1   A.  Yes.

2   Q.  And when you had pictures of yourself in expensive

3   clothing, what kind of clothing did you have?

4   A.  Some of it was designer clothing, some of it is just

5   different brands that I work with.

6   Q.  So when you first came to New York City from Buffalo, you

7   indicated that you worked at the airport, correct?

8   A.  Yes.

9   Q.  And how long did you work at the airport for?

10  A.  About seven months.

11  Q.  And you got fired from the airport, correct?

12  A.  Yes.

13  Q.  And why did you get fired?

14  A.  I don't remember.

15  Q.  You don't remember?

16  A.  No.

17  Q.  I mean, did you steal at the airport?

18  A.  No.

19  Q.  Did you -- were you late at the airport?

20  A.  I may have been late a few times.

21  Q.  Did you get fired because you did something wrong?

22  A.  No.

23  Q.  Why did you get fired?

24  A.  Again, I'm not sure.

25  Q.  Do you recall when you were meeting with the government

1  that you had told the government that you got fired because

2  you felt that you were being discriminated against by

3  Hispanics?

4  A.  Yes.

5  Q.  Does that refresh your recollection as to why you got

6  fired?

7  A.  Yes.

8  Q.  So when you first came to New York City from Buffalo, what

9  other jobs did you have?

10  A.  After I got fired from the airport, I started working at

11  Blue Ribbon Sushi which is a restaurant/lounge.  I was a waiter

12  there.

13  Q.  And when you were a waiter, what part of New York City was

14  this establishment?

15  A.  Lower East Side.

16  Q.  And you would come into contact with a lot of people,

17  correct?

18  A.  Yes.

19  Q.  And a lot of people who did drugs, correct?

20  A.  No.

21  Q.  And there were drug dealers, correct?

22  A.  No.

23  Q.  How long did you work at the restaurant for?

24  A.  A little over two years.

25  Q.  What years did you work for the restaurant?

1    A.  2013 to 2015.

2    Q.  You indicated that you had worked at the Highline Ballroom,

3    correct?

4    A.  Correct.

5    Q.  And you said that you worked there for approximately four

6    years?

7    A.  Yes.

8    Q.  And you indicated that you had gotten the paycheck from

9    Highline Ballroom, correct?

10   A.  Yes.

11   Q.  And you banked at Bank of America?

12   A.  Yes.

13   Q.  And we saw a pay stub from Bank of America, correct?

14   A.  Yes.

15   Q.  And Bank of America, did you have like a military status?

16   A.  The government had showed me that.  I wasn't aware of it,

17   though.

18   Q.  Well, when -- what did the government show you?

19   A.  They showed me my bank account and it said something about

20   a military account.

21   Q.  And you get statements from Bank of America, correct?

22   A.  Yes.

23   Q.  And how long did you bank with Bank of America?

24   A.  I have had my bank account since I was at least 15.

25   Q.  And would it be fair to say that you never noticed that

1   your statement said military account?

2   A.  I didn't notice.

3   Q.  And when you applied to Bank of America, did you tell them

4   you were in the military?

5   A.  No.

6   Q.  So for all these years you have had a bank account that was

7   for military people, correct?

8   A.  I don't know.

9   Q.  So you were never in the military, correct?

10  A.  No, I wasn't.

11  Q.  You never served your country, did you?

12  A.  No.

13  Q.  You were never in the Army, correct?

14  A.  No.

15  Q.  You were never in the Navy, correct?

16  A.  No.

17  Q.  You were never in the Air Force, correct?

18  A.  No.

19  Q.  But you had an account from Bank of America that entitled

20  you to military privileges, correct?

21  A.  Not that I am aware of.

22  Q.  I'll move on.

23          So you indicated that you started as a host at the

24  Highline Ballroom, correct?

25  A.  Correct.

1    Q.  And what is a host?

2    A.  A host is someone who takes the tickets when guests come

3    in.  We seat guests at tables.  We also did coat check.

4    Q.  And you also did marketing, correct?

5    A.  Yes.

6    Q.  And you worked there for many years, correct?

7    A.  Yes.

8    Q.  And you stopped working there basically because the

9    pandemic hit, correct?

10   A.  No, I stopped working at Highline Ballroom because we

11   closed in February of 2019.

12   Q.  And the Highline Ballroom, it had a big venue, correct?

13   A.  Yes.

14   Q.  And it held about 900 people, correct?

15   A.  Yup.

16   Q.  And you hosted in that particular -- you also hosted at

17   that particular time, those four years, nightclubs, parties,

18   and concerts and corporate events, correct?

19   A.  Yes.

20   Q.  And you indicated on direct examination that drugs were all

21   over the Highline Ballroom, correct?

22   A.  Yes.

23   Q.  And you met a lot of drug dealers, correct?

24   A.  I didn't meet a lot of drug dealers, no.

25   Q.  Well, you met a lot of people that took drugs, correct?

1    A.   Yes.

2    Q.   And you also met a lot of people that sold drugs, correct?

3    A.   I met a few.

4    Q.   So Billy Ortega was not the only person that you met that

5    was a drug dealer, correct?

6    A.   No.

7    Q.   In fact, in your capacity as a promoter and as a sort of

8    entrepreneur in marketing, correct, you would say that you

9    came into contact with a lot of people who took drugs,

10   correct?

11            MR. FERGENSON:  Objection, your Honor, compound.

12            THE COURT:  Why don't you break that down, please.

13            MS. FLORIO:  Sure.

14   BY MS. FLORIO:

15   Q.   So on your Instagram, do you describe yourself as a

16   professional shit-talker?

17   A.   Yes.

18   Q.   And basically that you mastered being -- that "I mastered

19   it," that's what your profile says, correct?

20   A.   My profile says, "I have mastered this thing called life."

21   Q.   And a professional shit-talker, what does that mean to

22   you?

23   A.   I'm a personality.  I want to work in entertainment, as

24   you have mentioned.  Working in radio, podcasting, so joking

25   around, talking about topics, that's just what I do.

1    Q.  But you indicated that you were a professional shit-talker,

2    correct?

3    A.  Yes.

4    Q.  And in fact, that is on your Instagram account on the

5    profile, correct?

6    A.  Yes.

7    Q.  And while you were working in the Highline Ballroom, you

8    indicated that Molly was very common, correct?

9    A.  Yes.

10   Q.  And that Molly came in a crystal powder form?

11   A.  Yes.

12   Q.  And you yourself would ingest it, correct?

13   A.  Yes.

14   Q.  You actually have to put it in your mouth?

15   A.  Yes.

16   Q.  And you indicated that the way you took Molly is that you

17   put it with -- you put it with food, correct?

18   A.  I took Molly with my drink.

19   Q.  I'm sorry, with your drink.

20           And you never took Molly when you were working at the

21   Highline Ballroom, correct?

22   A.  No.

23   Q.  At the four years that you were working at the Highline

24   Ballroom, it's your testimony that you never took any drugs

25   while you were working.

1   A.  I took drugs while I was there but I wasn't working.

2   Q.  And during the years that you were working at the Highline

3   Ballroom, what shifts would you work?

4   A.  I held many hats there, so it really just depended on what

5   I was doing.  Sometimes I would be there for eight hours,

6   sometimes 12.  If I was doing a concert in a day and working

7   the nightclub at night, I would be at work from about 4 until

8   4, like 5, 6 in the morning.

9   Q.  And you indicated that while you were working at the

10  Highline Ballroom that you met Kevin, correct?

11  A.  Yes.

12  Q.  And Kevin was the brother or is the brother of, you said,

13  Billy Ortega, correct?

14  A.  Yes.

15  Q.  And you actually had a close personal friendship with

16  Kevin, correct?

17  A.  Yes.

18  Q.  And you guys used to do things together, correct?

19  A.  Yes.

20  Q.  What are some of the things that you did together?

21  A.  We would hang out, go to parties, pretty much just

22  anything that people in their twenties would do, friends, go to

23  bars.

24  Q.  And you were also friends with Will, correct?

25  A.  Yes.

1  Q.  And Will was the same individual that you had testified to

2  that was a runner for Billy, correct?

3  A.  Yes.

4  Q.  And you had a close personal relationship with Will,

5  correct?

6  A.  Yes.

7  Q.  And describe your relationship with Will.

8  A.  We were close friends.

9  Q.  And you used to joke around a lot with Will, correct?

10 A.  Yes.

11 Q.  And when you say you used to joke around with Will, you

12 used to call him -- what were some of the things you used to

13 call Will?

14 A.  I would call him daddy, blue eyes.

15 Q.  I'm sorry, daddy and what?

16 A.  Blue eyes.

17 Q.  Blue eyed?

18 A.  Blue eyes.

19 Q.  Blue eyed.

20        And why did you call him blue eyed?

21 A.  He has blue eyes.

22 Q.  And you took trips with William Drayton, correct?

23 A.  Yes.

24 Q.  And you took trips out west?

25 A.  Yes.

1  Q.  And when you took trips with William Drayton, did you go

2  buy drugs?

3  A.  We went to go buy marijuana, yes.

4  Q.  Did you bring back any -- when you went to -- how many

5  times did you go to California?

6  A.  We went to California three times.

7  Q.  And when was the first time you went to California?

8  A.  I believe it was 2018.

9  Q.  And who did you go with?

10 A.  Will.

11 Q.  And why did you go to California?

12 A.  Will wanted to go to California just to check out the

13 edibles and the weed.

14 Q.  And how long did you stay in California for?

15 A.  About four to five days.

16 Q.  And Will had a child's mother, right, or like a girlfriend,

17 right?

18 A.  Yes.

19 Q.  And when you were out in California with Will, would it be

20 fair to say that Will did not tell his girlfriend that he was

21 on a trip with you?

22 A.  Yes.

23 Q.  And would it be fair to say that you and Will slept in the

24 same bed?

25 A.  Two of the times we went we did.

```
 1   Q.  And would it be fair to say that you used to make sexual

 2   comments to Will?

 3   A.  We joked around, yes.

 4   Q.  And when was the second time that you went to California?

 5   A.  I believe it was 2020.

 6   Q.  And who did you go with?

 7   A.  Will.

 8   Q.  And how long did you stay there?

 9   A.  About four days.

10   Q.  And what did you do in California?

11   A.  Again, just hanging out, we went to go try some of the weed

12   and some of the edibles.

13   Q.  And when you went to -- the first time that you went to

14   California with Will, did you bring back any drugs for Billy

15   Ortega?

16   A.  Not that I believe -- maybe some edibles.

17   Q.  Did you bring back any drugs to sell for Billy Ortega?

18   A.  No.

19   Q.  What about the second time when you went out to California?

20   Did you bring back any drugs for Billy Ortega?

21   A.  Maybe some weed or some edibles.

22   Q.  And was that for -- to sell in the business?

23   A.  No, personal.

24   Q.  And when you went out to California, did you meet with any

25   drug suppliers?
```

1    A.    No.

2    Q.    What about the second time you went to California?  Did you

3    meet with any drug suppliers?

4    A.    We never met with any drug suppliers in California.

5    Q.    And when was the third time you went to California?

6    A.    It was in 2020.

7    Q.    And who did you go with?

8    A.    Will.

9    Q.    And why did you and Will go to California?

10   A.    Again, it was a couple weeks after we had just went.  We

11   just went back because it was COVID and nothing else to do.

12   The flights were cheap, and just to enjoy California.

13   Q.    And it was just you and Will?

14   A.    Yes.

15   Q.    And when you went out -- when you went there the third

16   time, did you in fact meet with any suppliers, drug suppliers?

17   A.    I have never met with drug suppliers in California.

18   Q.    Did you bring back any drugs?

19   A.    Edibles and maybe some marijuana.

20   Q.    And when you brought it back, you -- how did you get there?

21   Did you drive or did you take the plane?

22   A.    Flew.

23   Q.    And you brought back marijuana on the plane?

24   A.    My check-in bag.

25   Q.    And that's illegal to bring marijuana back on the plane,

1    correct?

2    A.   Not in California.

3    Q.   But you were coming from California and you were coming

4    back to New York, right?

5    A.   Yes.

6    Q.   And that's where you lived, right?

7    A.   Yes.

8    Q.   In New York.

9    A.   Yes.

10   Q.   In fact, during that time period, you were living at

11   Josefina's house, correct, that you rented from, correct?

12   A.   Yes.

13   Q.   And you brought back marijuana and edibles to New York on

14   the plane, correct?

15   A.   I brought back edibles with me.

16   Q.   Well, at any time did you ever bring back marijuana from

17   California to New York?

18   A.   I don't believe so.

19   Q.   Did you tell the government that you transported edibles

20   that had cannabis in it?

21   A.   I had mentioned that, yes.

22   Q.   You did mention it to them?

23   A.   Yes.

24   Q.   And when did you mention it to them?

25   A.   In one of our meetings.

 1    Q.   So did you ever transport marijuana from California or out

 2    west to New York?

 3    A.   No.

 4    Q.   When is the last time you went to California?

 5    A.   It was 2020.

 6    Q.   So would it be fair to say that you went three times to

 7    California in 2020?

 8    A.   I went twice in 2020.  The first time was in 2018.

 9    Q.   And you said you had gone how many times to California?

10    A.   Three.

11    Q.   And who did you go with the last time?

12    A.   Will.

13    Q.   Anybody else?

14    A.   No.

15    Q.   Did you send back any packages or boxes from California?

16    A.   I didn't, no.

17    Q.   The three times that you were there, it's fair to say you

18    never sent back any packages or boxes from California,

19    correct?

20    A.   I didn't, no.

21    Q.   Did Will?

22    A.   Will did, yes.

23    Q.   And you were with Will, correct?

24    A.   Yes.

25    Q.   And what did Will send back?

 1    A.   Edibles.

 2    Q.   No other drugs?

 3    A.   Not that I'm aware of.

 4    Q.   So would it be fair to say that around 2015, that's when

 5    you had met people from Billy's family, correct?

 6    A.   Yes.

 7    Q.   And you said -- who did you meet?

 8    A.   At that time I had met Kevin and Lenny.

 9    Q.   And did you meet anybody else?

10    A.   I later on ended up meeting Billy, Josefina, and Melanie.

11    Q.   And you said Melanie is his sister, correct?

12    A.   Yes.

13    Q.   And you testified that Melanie had nothing to do with the

14    drug business, correct?

15    A.   Yes.

16    Q.   And you said you had met her boyfriend at the time, Edgar?

17    A.   Sometime later.

18    Q.   And how long did you say that Edgar worked for Billy?

19    A.   To my knowledge, it was about a year.

20    Q.   And what year was that?

21    A.   2018 to 2019.

22    Q.   So you had indicated that when you first met Billy, he had

23    on some jewelry, correct?

24    A.   Yes.

25    Q.   And what kind of jewelry did he have on?

```
 1   A.  Well, I said he possibly had on jewelry.

 2   Q.  So you don't remember if he did?

 3   A.  I don't remember exactly.

 4   Q.  But you said he had designer clothes?

 5   A.  Yes.

 6   Q.  Designer clothes that you had, right?

 7   A.  Yes.

 8   Q.  In fact, you indicated that when you first met Billy you

 9   said that he was -- how would you describe his aura?

10   A.  I felt like he was very cocky, sure of himself, flashy.

11   Q.  And you were the one who decided to work with Billy,

12   correct?

13   A.  No.  Billy had asked me.

14   Q.  Right.  But it was -- you agreed to, correct?

15   A.  Yes.

16   Q.  And you said that he was a little bit cocky, correct?

17   A.  Yes.

18   Q.  And would you describe yourself as a little bit cocky?

19   A.  Yes.

20   Q.  And so you two were both cocky, right?

21   A.  You could say that.

22   Q.  What do you mean by cocky?  What does that mean?

23   A.  It's more so very confident in themselves.

24   Q.  Very sure of themselves, correct?

25   A.  Yes.
```

1    Q.  And in fact, you developed a friendship with Billy,

2    correct?

3    A.  Yes.

4    Q.  You trusted him, correct?

5    A.  I did.

6    Q.  He trusted you, correct?

7    A.  I thought so.

8    Q.  In fact, he even -- I think you testified that at some

9    point Billy had found out that his brother Kevin was stealing,

10   correct?

11   A.  Yes.

12   Q.  And when Billy found out that his brother Kevin was

13   stealing, he trusted you more, correct?

14   A.  Yes.

15   Q.  And in fact, behind Billy's back, even though he trusted

16   you, you were stealing from Billy, correct?

17   A.  No.

18   Q.  Well, at some point you took drugs that you didn't tell

19   Billy about, you going to particular places and not telling

20   him exactly how much -- how many packs you had, correct?

21   A.  No.

22   Q.  You never -- you never stole anything from Billy from the

23   drugs?

24   A.  No.

25   Q.  Did you ever steal any money from him?

1    A.  No.

2    Q.  I'm sorry?

3    A.  No.

4    Q.  Never?

5    A.  I've never stolen money from Billy.

6    Q.  I'm sorry?

7    A.  I've never taken money from Billy.

8    Q.  Did you -- you testified on direct examination that when

9    you were having a conversation with another person that you

10   didn't want Billy to know that you had extra packs, right?

11   A.  Yes.

12   Q.  So wasn't that stealing from Billy?

13   A.  You could say that.

14   Q.  I'm sorry?

15   A.  Yes, you can say that.

16   Q.  So you did steal from Billy, correct?

17   A.  That one time.

18   Q.  Just one time, right?

19   A.  Yes.

20   Q.  That's the one time that we saw in the text, correct?

21   A.  Yes.

22   Q.  But that's the one time that you would -- you were

23   confronted with a text message, correct?

24   A.  Yes.

25   Q.  About taking product that belonged to Billy and not telling

1  Billy, correct?

2  A.  I had texted Lenny about that.

3  Q.  And the government confronted you with that text message,

4  correct?

5  A.  Yes.

6  Q.  So you couldn't deny that you were stealing from Billy,

7  correct?

8  A.  No.

9  Q.  You indicated that Kevin was working for Billy, correct?

10  A.  Yes.

11  Q.  But wouldn't it be fair to say that it was for a very short

12  time?

13  A.  No.  Kevin worked on and off for Billy throughout all the

14  years that I have known him.

15  Q.  Well, isn't it true that Kevin was on tour with a rapper

16  named CJ?

17  A.  In 2020, yes.

18  Q.  And in fact, he would not -- he did not stay in the -- he

19  did not live in the apartment all the time.  He used to be on

20  tour with that rapper CJ, right?

21  A.  For that one year.

22  Q.  And in fact didn't Kevin still continue to work with CJ

23  after 2020?

24  A.  I can't say.

25  Q.  There came a time when you learned that Kevin was no longer

1    employed because Kevin was dealing drugs and seeing his own

2    customers with Billy's product, correct?

3    A.   Yes.

4    Q.   So Billy had stopped using him as a runner, correct?

5    A.   Yes.

6    Q.   But yet you testified that Billy still allowed Kevin to be

7    involved in the drug business, correct?

8    A.   Yes.

9    Q.   In fact, you testified that you had seen that Kevin would

10   bag up the drugs, correct?

11   A.   Possibly.

12   Q.   When you say possibly, what does that mean?

13   A.   I testified that Kevin -- I have seen Kevin bag up drugs.

14   Q.   So you actually saw him bag up drugs, correct?

15   A.   Possibly.

16   Q.   What does that mean possibly?

17   A.   I possibly have seen Kevin bag up drugs.

18   Q.   Well, you either saw him or you didn't see him or you don't

19   remember.

20   A.   I don't remember.

21   Q.   You don't remember?

22   A.   No.

23   Q.   So your testimony is now that you don't remember ever

24   seeing Kevin bagging up drugs, correct?

25   A.   I don't remember if I mentioned seeing Kevin bag up drugs.

1    Q.  Not about mentioning, but did you see Kevin bagging up

2    drugs?

3    A.  I don't remember.

4    Q.  And you testified that you had met Billy in what year?

5    A.  I believe it was 2015.

6    Q.  And when did you actually start working with Billy?

7    A.  2018.

8    Q.  And what was your relationship with Billy between 2015 and

9    2018?

10   A.  We were friends.

11   Q.  And during that time period, would it be fair to say that

12   you were selling drugs?

13   A.  No.

14   Q.  So from 2015 to 2018, would it be fair to say that you

15   never sold drugs?

16   A.  I didn't sell drugs, no.

17   Q.  You never sold marijuana, correct?

18   A.  No.

19   Q.  You never sold cocaine, correct?

20   A.  No.

21   Q.  So the first time that you ever sold any drugs whatsoever

22   was when you met Billy, correct?

23   A.  Yes.

24   Q.  And Billy asked you to work for him, correct?

25   A.  Yes.

1    Q.    And it was your conscious decision to work for him,

2    correct?

3    A.    Yes.

4    Q.    Because you said you knew what he did, correct?

5    A.    Yes.

6    Q.    It was obvious to everyone that Billy was a drug dealer,

7    correct?

8    A.    Yes.

9    Q.    And when you testified that you worked for a drug dealer,

10   you also were a drug dealer, correct?

11   A.    I delivered drugs for a drug dealer.

12   Q.    And you were a drug dealer, correct?

13   A.    I delivered drugs for a drug dealer.

14   Q.    But you were in the drug business, correct?

15   A.    Yes.

16   Q.    And you got paid for what you did, correct?

17   A.    Yes.

18   Q.    You didn't volunteer to do that.

19   A.    Repeat the question, please.

20   Q.    What I am saying is you were paid for your services,

21   correct?

22   A.    Yes.

23   Q.    You weren't doing it for free.

24   A.    No.

25   Q.    In fact, you got paid $100 per day, correct?

```
 1   A.  Yes.

 2   Q.  No matter how many customers you had, correct?

 3   A.  Yes.

 4   Q.  So you could have been working for -- so you would get paid

 5   even if you didn't have a customer, correct?

 6   A.  No.

 7   Q.  So if you didn't have a customer, you wouldn't get paid.

 8   A.  No.

 9   Q.  If you had -- how much -- withdrawn.

10           Would it be fair to say that you felt that $100 per

11   day was not enough for what you were doing for delivering

12   drugs?

13   A.  I didn't -- it wasn't really much to do, honestly, so I

14   didn't mind it.

15   Q.  I'm sorry?

16   A.  I didn't feel like you were doing much, so I didn't mind

17   $100.

18   Q.  So you had to live -- you paid how much in rent, $650 per

19   month?

20   A.  Yes.

21   Q.  And you had -- did you pay your own cell phone bill?

22   A.  Yes.

23   Q.  And you had two phones, correct?

24   A.  Yes.

25   Q.  And when you were arrested, you only had one phone on you,
```

1    correct?

2    A.  Yes.

3    Q.  And the agents didn't recover the other cell phone,

4    correct?

5    A.  No.

6    Q.  In fact, you also had a laptop, correct?

7    A.  Yes.

8    Q.  And that was a Mac laptop or what was it?

9    A.  A MacBook.

10   Q.  A MacBook, correct?

11   A.  Yes.

12   Q.  And the agents didn't get that, correct?

13   A.  No.

14   Q.  In fact, you left it behind in Josefina's apartment,

15   correct?

16   A.  Yes.

17   Q.  With a lot of other of your stuff, correct?

18   A.  Yes.

19   Q.  And was the phone there, too?

20   A.  The phone was there.

21   Q.  I'm sorry?

22   A.  The phone was there.

23   Q.  The phone was there, correct?

24   A.  Yes.

25   Q.  So it would be fair to say that on February 1 of 2022,

1   when you were arrested by the government or the police or

2   whoever you were arrested by, that you had one phone on you,

3   correct?

4   A.  Yes.

5   Q.  And that was the one phone that you had when you were

6   working with Billy, correct?

7   A.  Yes.

8   Q.  And would it be fair to say that those were the text

9   messages that we saw from that particular phone, correct?

10  A.  They were the same number.  The other phone wasn't an

11  active phone number.  It just worked under wifi.  That was an

12  old phone that I had, so all of the messages and everything

13  were the same.

14  Q.  So it would be fair to say that you did have a phone at --

15  that you left behind in the apartment, correct?

16  A.  Yes.

17  Q.  And the government did not get that phone, correct?

18  A.  No.

19  Q.  Where is that phone today?

20  A.  With my family.

21  Q.  In fact, your family came right after you were arrested and

22  cleared out your room, correct?

23  A.  Yes.

24  Q.  And they took that phone, correct?

25  A.  Yes.

1    Q.  And they took that laptop, correct?

2    A.  Yes.

3    Q.  And they took all your other belongings, correct?

4    A.  Yes.

5    Q.  And your room was pretty messy, correct?

6    A.  I don't remember.

7    Q.  It had a lot of things -- you had a small room, correct?

8    A.  Yes.

9    Q.  And you had a lot of clothes, correct?

10   A.  I had a lot of things.

11   Q.  A lot of things.  And a lot of clothes, correct?

12   A.  Yes.

13   Q.  And a lot of designer clothes, too, correct?

14   A.  Yes.

15   Q.  In fact, you dressed very well every time you pretty much

16   came out of the house, correct?

17   A.  Yes.

18   Q.  Even when you were making deliveries, you always dressed

19   very fly, I would say.

20   A.  Yes.

21   Q.  And you weren't like the other runners that dressed very

22   casually, right?

23   A.  I mean, that's objective.

24   Q.  So it would be fair to say that when you went out to work

25   that people would compliment you on your outfits?

```
 1   A.   Yes.

 2   Q.   In fact, it gave you a lot of pride that people would

 3   compliment on how well you looked, correct?

 4   A.   Yes.

 5   Q.   And how well put together you were, correct?

 6   A.   Yes.

 7   Q.   And it was important to you to look very well when you went

 8   out to make these deliveries, correct?

 9   A.   It's important to me to look very well whenever I leave the

10   house.

11   Q.   You indicated that you had been to Billy's home, correct?

12   A.   Yes.

13   Q.   About the -- you said he lived in New Jersey, correct?

14   A.   Correct.

15   Q.   And you said there came a time that he had a house in

16   New Jersey that was not the big house that you described with

17   the three stables, correct?

18   A.   Yes.

19   Q.   And where was that house located?

20   A.   I'm not sure what area of Jersey it was.

21   Q.   Was that the house that he told you that he had a gun in?

22   A.   I can't remember.

23   Q.   So when did Billy tell you that he had a gun in his house

24   in New Jersey?

25   A.   He mentioned guns over the years, having guns at his house
```

1    over the years.  I can't recall exactly which house he was

2    living at when he said that, but he's mentioned having guns at

3    his house over the years.

4    Q.  So when you went to visit him in the new house, where was

5    that house located in New Jersey?

6    A.  West Milford.

7    Q.  And that was the house that you went and you -- that was

8    all the way up in the woods, right?

9    A.  Yes.

10   Q.  And it had like sort of windy roads, right?

11   A.  Yes.

12   Q.  And you said there was like three stables.  He didn't have

13   horses though, right?

14   A.  No.

15   Q.  He had dogs, right?

16   A.  Yes.

17   Q.  And he was breeding dogs?

18   A.  Not to my knowledge.

19   Q.  So would it be fair to say that Billy was on disability, do

20   you know?

21   A.  I don't know.

22   Q.  And when you went to -- how many times did you go visit him

23   at his house in New Jersey with the three stables?

24   A.  I've been there maybe five times, a little more.

25   Q.  And when you went there, you indicated that you went there

```
1    for business or was it pleasure?

2    A.  It was pleasure.

3    Q.  And what year did you go up to the house?

4    A.  2021.

5    Q.  In 2021, correct?

6    A.  Yes.

7    Q.  And when you went there, who did you go with?

8    A.  I've been by myself, I've been with Kevin, I've been with

9    Will.

10   Q.  And who was home when you went there?

11   A.  Billy would be home and his girlfriend.

12           MR. FERGENSON:  Objection, your Honor.

13           THE COURT:  The objection is specifically to whenever

14   he went there or the different occasions?  What's the objection

15   to?  Do you want her to clarify the question?

16           MR. FERGENSON:  Your Honor, it's an issue that the

17   parties have discussed previously.

18           THE COURT:  Do you want to speak to each other for a

19   second?

20           MS. FLORIO:  Can we have a sidebar?

21           THE COURT:  Sure.

22           (Continued on next page)

23

24

25
```

1                    (At the sidebar)

2          THE COURT:  Is this about being a family man?

3          MR. FERGENSON:  Your Honor asked if there was any

4    relevance to the kids, and I don't think --

5          MS. FLORIO:  The reason why I am bringing it up --

6          THE COURT:  Have the kids been out?  I just heard the

7    girlfriend.

8          MR. FERGENSON:  Not yet.

9          THE COURT:  You think they are going to --

10         MR. FERGENSON:  We are worried about the questioning.

11         MS. FLORIO:  So the reason why I was bringing it out

12   is because he is saying that Billy said that he had guns in

13   the house.  So I wanted to bring out when he went there who

14   was there, so I want to be able to argue like why would Billy

15   have guns in his house?  So I think it's relevant that the

16   times he went up there he had his children there.

17         MR. FERGENSON:  I think she could ask, you know, what

18   adults were there, what other adults were at Billy's house.

19         THE COURT:  Your point is that someone never has guns

20   in front of kids?  Is that your point?

21         MS. FLORIO:  Well, I would like to make the argument

22   that he had his children there and he wouldn't have guns where

23   his children were.

24         THE COURT:  I have to say, sadly, I don't think

25   that's true as a factual matter.  I think lots of people

1    unfortunately do keep guns in houses with kids.  But also you

2    had already indicated that you weren't going to raise the

3    family.  I don't think it's relevant.  If there is some other

4    specific relevance, you will let me know, but just based on the

5    argument that he wouldn't have kept guns where his kids are,

6    yeah, I'm not going to allow that.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court)

 2    Q.  So Mr. Rainey, when you went to visit Billy, you said that

 3    his girlfriend was there, the mother -- his girlfriend,

 4    correct, a female was there?

 5    A.  Yes.

 6    Q.  And you knew her as Hope, correct?

 7    A.  Yes.

 8    Q.  And you knew that she had legitimate jobs, correct?

 9    A.  Yes.

10    Q.  You knew that she had a -- what kind of jobs did she have?

11    A.  She was a hairdresser.

12    Q.  And she also, besides being a hairdresser, she also owned

13    like a salon, correct?

14    A.  Yes.

15    Q.  And she used to -- she was doing wigs for like celebrities,

16    correct?

17    A.  Yes.

18    Q.  And her business was called Cocky?

19    A.  Yes.

20    Q.  And she also flipped houses, correct?

21    A.  Yes.

22    Q.  She was also had a real estate business, correct?

23    A.  To my knowledge, yes.

24    Q.  And in fact, to your knowledge, they were all legitimate

25    businesses, correct?
```

1  A.  To my knowledge, yes.

2  Q.  And to your knowledge, would it be fair to say that Hope

3  was the owner of the house?

4  A.  Yes.

5  Q.  And would it be fair to say that Billy lived in that house

6  since what year?

7  A.  I believe they moved in in 2021.

8  Q.  And in fact, you had -- when did you first meet Hope?

9  A.  Maybe 2016 or '17.

10  Q.  And when you met Hope, where were Hope and Billy living at

11  that time?

12  A.  In Jersey.

13  Q.  And would it be fair to say that it was a smaller

14  residence?

15  A.  Yes.

16  Q.  And that they rented that, correct?

17  A.  To my knowledge, yes.

18  Q.  So would it be fair to say that you started delivering

19  drugs for Billy in 2018, correct?

20  A.  Yes.

21  Q.  And in fact, would it be fair to say that you did about

22  five deliveries?

23  A.  Yes.

24  Q.  And prior to that, you said you never delivered drugs for

25  anybody else, correct?

1    A.   No.

2    Q.   And you did not -- you never got drugs from any drug

3    supplier, correct, besides Billy, correct?

4    A.   I have never received drugs from anyone other than Billy,

5    no.

6    Q.   And you never received marijuana from any drug suppliers,

7    correct?

8    A.   I have gotten marijuana from other friends, yes.

9    Q.   Friends who sold marijuana?

10   A.   Not necessarily.  Friends who would just smoke marijuana.

11   Q.   But would it be fair to say that you ever had to buy

12   marijuana?

13   A.   I rarely bought marijuana.

14   Q.   But have you ever bought marijuana?

15   A.   I have.

16   Q.   And you bought it from a supplier, correct?

17   A.   Yes.

18   Q.   And you had to pay that supplier, correct?

19   A.   Yes.

20   Q.   And that supplier that you bought the marijuana from, did

21   they sell any other drugs?

22   A.   Not to my knowledge.

23   Q.   So it was your testimony that on February of 2019, the

24   Highline Ballroom had closed down, correct?

25   A.   Yes.

1   Q.  So you started to work for Billy more regularly, correct?

2   A.  Over the summer, yes.

3   Q.  So in 2019 you said you worked for him over the summer?

4   A.  Yes.

5   Q.  And in fact, you covered the night shifts?

6   A.  Yes.

7   Q.  And would it be fair to say that you pretty much worked the

8   night shifts?

9   A.  At that time, yes.

10  Q.  And did there come -- and did there come a time that you

11  ever worked the day shifts?

12  A.  If me and Lenny switched, yes.

13  Q.  But would it be fair to say that primarily your shift was

14  the night shift, correct?

15  A.  Yes.

16  Q.  And what hours would you work?

17  A.  After 6.

18  Q.  After 6?

19  A.  After, I believe, after 6 p.m. to like 12.

20  Q.  You worked from 6 to 12, correct?

21  A.  Yes.

22  Q.  And isn't it true that, since you knew Josefina, that

23  Josefina worked?

24  A.  Yes.

25  Q.  In fact, she worked in Macy's, correct?

1    A.   Yes.

2    Q.   And she worked pretty much from the time that you met her

3    to the time you got arrested, correct?

4    A.   Yes.

5    Q.   And she worked the 2 p.m. shift to the 9 p.m. shift,

6    correct?

7    A.   I believe so.

8    Q.   In fact, there would be long periods of time that Josefina

9    wasn't even home, correct?

10   A.   Yes.

11   Q.   And in fact because she was working every day at Macy's,

12   you had to get drugs from the safe, correct?

13   A.   Repeat the question.

14   Q.   Would it be fair to say that if Josefina was not present

15   from all those hours, that you had to get your packs from

16   somebody from the house, correct?

17   A.   Josefina would usually give the packs before she went to

18   work or she would leave them out somewhere in the house.

19   Q.   So it would be fair to say that -- so it's your testimony

20   that Josefina would just leave packs lying around the house?

21   A.   She would place them somewhere where Billy would tell her

22   to hide them and then whenever if you needed them Billy would

23   tell you where they were and you would grab them.

24   Q.   So it would be fair to say that because Josefina wasn't

25   around for all those hours that you never got drugs from the

```
 1   safe?

 2   A.  I only had access to the safe on like two occasions.

 3   Q.  And you said that they were emergency situations?

 4   A.  They were emergency situations, yes.

 5   Q.  And when you -- can you describe the safe that you say

 6   where the drugs were kept?

 7   A.  It was a big safe.  It required a number, a digital

 8   number.

 9   Q.  When you say a big safe, it wasn't like the little safe

10   that you were shown where you say Josefina kept the money,

11   correct?

12   A.  No, it wasn't.

13   Q.  And can you describe the size of the safe?

14   A.  Like a big square, like three feet tall, like, yeah.

15   Q.  So you say about three feet tall and about how wide?

16   A.  I would say like maybe this wide.

17   Q.  Indicating approximately three feet.

18   A.  Yeah.

19         MR. FERGENSON:  Your Honor, I'm sorry.  She is

20   misstating the witness's hand gesturing.  It was, I would

21   respectfully submit, about one foot.  He gestured with his

22   hands the width.

23         THE COURT:  Mr. Rainey, can you characterize -- what

24   would you say, how long is that?  How many feet or inches

25   approximately?
```

```
 1              THE WITNESS:  I would say like maybe two feet wide, a

 2    foot or two feet wide.

 3              THE COURT:  Thank you.  You may proceed.

 4    BY MS. FLORIO:

 5    Q.  So about three feet high and about two feet wide was the

 6    safe, correct.

 7    A.  I believe so.

 8    Q.  And it had to be big enough to hold the packs, correct?

 9    A.  Yes.

10    Q.  And when you opened that safe, the two times that you had

11    access to the safe, what did you see in the safe?

12    A.  Drugs.

13    Q.  And what kind of drugs?

14    A.  Mar -- cocaine, Molly, Adderall.

15    Q.  Is it fair to say you never saw any heroin in the safe?

16    I'm sorry.  I couldn't hear you.

17    A.  No.

18    Q.  And you never saw any fentanyl in the safe.

19    A.  I don't know what they look like, so.

20    Q.  You don't know what fentanyl looks like, right?

21    A.  No.

22    Q.  And would it be fair to say -- but you know what heroin

23    looks like, right?

24    A.  I don't.

25    Q.  You don't.
```

```
 1   A.  No.

 2   Q.  But were you ever told that there was heroin in the

 3   apartment?

 4   A.  No.

 5   Q.  Were you ever told that there was fentanyl in the

 6   apartment?

 7   A.  No.

 8   Q.  You indicated that you knew the dangers of fentanyl,

 9   correct?

10   A.  I had heard about fentanyl, yes.

11   Q.  And what is your understanding about the dangers of

12   fentanyl?

13   A.  I just knew that fentanyl was lethal and that people were

14   dying from it.  I didn't know much else.

15   Q.  So the baggies, the packs that you would receive to deliver

16   to customers, can you describe was the cocaine in the baggies,

17   were they powder, were they rocks, what were they?

18   A.  They could be rocks, could be powder.

19   Q.  When you say -- what was -- can you tell the members of

20   the jury when you were delivering the baggies of cocaine,

21   would it be fair to say that most of them were sort of like

22   rock form?

23   A.  Some were rock, some were powder.

24   Q.  So did you ever -- you say you bagged up just one time?

25   A.  I bagged up one or two times.
```

1  Q.  One or two times.  And you indicate -- when did you do

2  that?  What year?

3  A.  This was 2018.

4  Q.  And you indicated that you were shown how to bag up,

5  correct?

6  A.  Yes.

7  Q.  Because you said you never knew how to bag up before,

8  correct?

9  A.  Right.

10  Q.  And what were you actually told?

11  A.  I was told how to do it, how much, mostly how much to put

12  on the scale and how much to put in the bag.

13  Q.  And when you bagged up, what did you -- what did you

14  actually see?  Like, did you see a rock or did you see powder?

15  A.  It was a rock mostly with a little bit of powder.

16  Q.  And in fact, when you had to bag up, you said you -- how

17  many bags did you bag up?

18  A.  It was a small -- when I did it, it was a smaller rock, so

19  I did about maybe 70, maybe a little more.

20  Q.  And when you bagged up, those -- what was put, the cocaine

21  or the crack that was put -- do you know the difference between

22  crack and cocaine?

23  A.  I do not.

24  Q.  You do not know the difference between crack and cocaine.

25  A.  No.

1   Q.  So when you were delivering, were you delivering cocaine or

2   were you delivering crack?

3   A.  To my knowledge, it was cocaine.

4            MR. FERGENSON:  Objection, your Honor.

5            THE COURT:  You were just asked if you knew the

6   difference and you said no.  So do you -- yeah, so tell me how

7   it is you could answer that question as to what you knew you

8   were delivering if you didn't know the difference?

9            THE WITNESS:  I said to my knowledge it was cocaine.

10           THE COURT:  You can proceed.  I'm overruling the

11  objection and allowing counsel to proceed with questioning.

12  BY MS. FLORIO:

13  Q.  You said that there was -- in the apartment that you were

14  living in that there was just two safes, correct?

15  A.  To my knowledge, yes.

16  Q.  When you say to your knowledge, I mean, you lived there,

17  right?

18  A.  Yes.

19  Q.  And you would go home and you would sleep every night

20  there, correct?

21  A.  Yes.

22  Q.  Except when you were on vacations with Will, correct?

23  A.  Except when I was anywhere else but home.

24  Q.  And in fact, would it be fair to say that you knew exactly

25  what closet the safe was in, correct?

1    A.  I did.

2    Q.  And did you see other people go into the safe?

3    A.  I have.

4    Q.  It would be fair to say that the weekends were the busiest

5    times for the customers, correct?

6    A.  Yes.

7    Q.  And earlier in the week would not be so popular, correct?

8    A.  Yes.

9    Q.  There would be less customers, correct?

10   A.  Yes.

11   Q.  And so you chose the -- at some point, you said you were

12   working Sunday, Monday, and Tuesday?

13   A.  Yes.

14   Q.  And what year was that?

15   A.  2021.

16   Q.  And why did you choose Sunday, Monday, and Tuesday?

17   A.  Billy asked me if I can do a couple of days a week for him.

18   I told him that I could, and those were the days that we came

19   up with.  They were the less busiest days, so. . .

20   Q.  And so when you were not -- in 2021, when you were not

21   working for Billy, what would you do the rest of the time?

22   A.  I was working legitimately.

23   Q.  And where were you working?

24   A.  I resumed working at Zuma again later in the year.  I was

25   working freelance.  I worked in fashion.  I style people, which

```
 1   is dress people.  I go shopping for people.  I do branding work
 2   with different brands.
 3   Q.  And when you style people you are around people that are
 4   like celebrities?
 5   A.  Yes.
 6   Q.  And when you style people, what exactly is it that you do
 7   to style the people?  Would you pick out their clothing?
 8   A.  Pick out outfits, yes.
 9   Q.  And you would get paid to do that?
10   A.  Yes.
11   Q.  So in 2021, when you were working as that Sunday, Monday
12   and Tuesday, you were getting like $100 a day, correct?
13   A.  Yes.
14   Q.  But you had other sources of income, correct?
15   A.  Yes.
16   Q.  But you still continued to work selling drugs, right?
17   A.  Yes.
18   Q.  So basically in an average week you would make $300,
19   correct?
20   A.  From Billy, yes.
21   Q.  And when you went into the safe, you were given a password,
22   correct?
23   A.  Yes.
24   Q.  And in one of the text messages, you actually state that
25   you know the password, correct, for the safe?
```

1   A.   Yes.

2   Q.   And you were confronted with that text message, correct?

3   A.   Yes.

4   Q.   And it's your testimony that you only went in the safe that

5   one time or two times, correct?

6   A.   Like two times.

7   Q.   And it's just a coincidence that the text message indicates

8   that you had gone in the safe that one time and now your

9   testimony is that -- withdrawn.

10          MR. FERGENSON:   Objection.

11          MS. FLORIO:   Withdrawn.

12   BY MS. FLORIO:

13   Q.   And it was the text message with Lenny in 2019 where it

14   describes that you basically were hiding, like you kept the

15   extra money, correct?

16   A.   Yes.

17   Q.   And that was documented in that text message, correct?

18   A.   Yes.

19   Q.   And besides that time, it's your testimony that you never,

20   ever took any other drugs and didn't tell Billy about it,

21   correct?

22   A.   No.

23   Q.   And you -- but you did testify that you shorted Billy,

24   correct?

25   A.   That time, yes.

1    Q.   What about any other times?

2    A.   No, it was pretty much impossible to do that.  Billy knew

3    what you had at all times, so you didn't have access to the

4    drugs yourself to be able to go and get the product to do

5    anything on the side.

6    Q.   So it would fair to say that you would capitalize on the

7    fact that you would get money for telling Billy that you were

8    using, you know, an Uber, but you actually took the train,

9    correct?

10   A.   I have done that a few times, but not many.

11   Q.   But you would keep the money and not tell Billy that you

12   took the train, correct, for the Uber.

13   A.   Yes.

14   Q.   So you had indicated that you had worked for Johnny Utah's?

15   A.   Yes.

16   Q.   And what is Johnny Utah's?

17   A.   Johnny Utah's is a bar and restaurant in midtown Manhattan.

18   Q.   And you worked there for about a month?

19   A.   A little over a month, yes.

20   Q.   And did you quit?

21   A.   I was fired.

22   Q.   You were fired?

23   A.   Yes.

24   Q.   Why were you fired?

25   A.   It wasn't working out.  I didn't get along with the staff.

1    The money wasn't good, and I had got into it with one of the

2    staff members because they had did something that I didn't

3    agree with, so I went and found another job.

4    Q.  But you were fired.

5    A.  Yes.

6    Q.  And didn't you get along with the people at the job,

7    correct?

8    A.  Just a couple.

9    Q.  And so the pandemic came in March of '22 -- I'm sorry, the

10   pandemic came and everything shut down in March of 2020,

11   correct?

12   A.  Yes.

13   Q.  And everyone was on lockdown for a few weeks, correct?

14   A.  Yes.

15   Q.  And can you describe your delivering drugs for Billy during

16   the pandemic.

17   A.  In 2020, I didn't deliver drugs for Billy until later in

18   the year.  I was in and out of New York City most of 2020

19   during the pandemic.  Once we were on lockdown, I went to

20   Buffalo for like three months and then I was going to Atlanta,

21   just traveling around working.  I didn't start doing deliveries

22   again for Billy until maybe September.

23   Q.  September of what year?

24   A.  2020.  I may have done like one prior to when we went on

25   lockdown, but throughout the year I was mostly out of New York

 1  City.

 2  Q.  So you indicated that it was -- Billy had asked to you work

 3  for him but and you agreed, correct?

 4  A.  Yes.

 5  Q.  And he didn't force you to work for him, correct?

 6  A.  No.

 7  Q.  He didn't threaten you to work for him, correct?

 8  A.  No.

 9  Q.  And he would tell you where to go, correct?

10  A.  Yes.

11  Q.  And you went there voluntarily, correct?

12  A.  Yes.

13  Q.  You had a choice, correct?

14  A.  Yes.

15  Q.  And you were selling drugs, correct?

16  A.  I delivered them.

17  Q.  So but you got money for delivering those drugs, correct?

18  A.  Yes.

19  Q.  And you knew that they were cocaine, right?

20  A.  Among others, yes.

21  Q.  And you said that you delivered other drugs as well,

22  correct?

23  A.  Yes.

24  Q.  And what drugs did you deliver?

25  A.  For Billy I delivered Molly sometimes, maybe Adderall.

1   Q.  And do you know what Adderall is?

2   A.  Not exactly.

3   Q.  And you know what Molly was because you took Molly,

4   correct?

5   A.  Yes.

6   Q.  And you never took any Molly from Billy, correct?

7   A.  When I -- the times that I did Molly, it was from Billy.

8   Q.  Right, but what I am saying is when you were delivering

9   Molly for Billy, did you ever take Molly that you were supposed

10  to deliver?

11  A.  Take any for my personal use?

12  Q.  Correct.

13  A.  Any time I did Molly I asked Billy for it.

14  Q.  You said you didn't do cocaine, correct, during the time

15  that you were working for Billy, correct?

16  A.  I have never done cocaine ever in my life.

17  Q.  But you would deliver Molly and you were also taking Molly

18  during that time period, correct?

19  A.  Molly wasn't as common for Billy's service, but there's

20  times where there was delivery.

21  Q.  And you delivered it?

22  A.  Yes.

23  Q.  And when Billy told you to pick up drugs from Will's house

24  in The Fulton Houses, you did that voluntary, correct?

25  A.  I did that because Billy told me to.

1    Q.  Right, but you did that voluntarily, correct?

2    A.  Because Billy told me to.

3    Q.  But you did that voluntarily, correct?

4    A.  Because Billy had told me to.

5    Q.  So you had a choice not to, correct?

6    A.  I did.

7    Q.  And you chose to do it anyway, correct?

8    A.  Billy had paid me to.

9    Q.  And you said that you also did things for Billy, correct,

10   personal things, like you paid his phone bill, correct?

11   A.  Yes.

12   Q.  And you did that voluntary, correct?

13   A.  Yes.

14   Q.  No one forced you to do that, right?

15   A.  No.

16   Q.  No one threatened you to do that, right?

17   A.  No.

18   Q.  And you said that you also -- excuse me.

19            THE COURT:  Ms. Florio, whenever you want to take an

20   afternoon break, let me know.

21            MS. FLORIO:  That's fine.  We can take a break.

22            THE COURT:  All right.  Why don't we take a break now.

23   Remember, keep an open mind, and don't discuss the case.

24            (Continued on next page)

25

```
 1                    (Jury not present)

 2              THE COURT:  I will see you in ten minutes.

 3              (Recess)

 4              THE COURT:  You can be seated.  The jury is on its

 5   way.

 6              MS. FLORIO:  Your Honor, I did speak to AUSA Thomas

 7   Wright, and he indicated in a text that 11:00 would be a good

 8   starting time for us because he felt that the witness would be

 9   complete before 11.

10              THE COURT:  11?  Okay.  Do you want to see if the

11   jury can come early tomorrow and sit from 9 to 11?

12              MS. FLORIO:  No.  He is saying that we would be

13   finished by 11.

14              THE COURT:  Got it.  Sorry.  I misunderstood.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25
```

1              (Jury present)

2              THE COURT:  Folks, I did want to let you know that

3    tomorrow we are going to start a little bit later, we are going

4    to start at 11:00, so I'm going to ask you to get here at

5    10:45.  All right.  You may proceed.

6              MS. FLORIO:  Thank you.

7    BY MS. FLORIO:

8    Q.  So when Billy asked you to make payments for the phone

9    bill, that was in cash, correct?

10   A.  Yes.

11   Q.  And you paid Billy's phone, correct?

12   A.  Yes.

13   Q.  And you paid a Jorge Ramos's phone, correct?

14   A.  Can you repeat the question?

15   Q.  And you paid -- you made a second payment on February 26 of

16   2021.  That's what you testified to on direct, correct?

17             MR. FERGENSON:  Objection, your Honor.

18             THE COURT:  I'll allow it.  Overruled.

19             MR. FERGENSON:  Your Honor, she is mischaracterizing

20   the testimony.

21             THE COURT:  I will just let the witness answer.

22             Did you understand the question?

23   A.  Repeat the question.

24   Q.  Sure.

25             Did there come a time that you made a payment for

1    Billy's phone?

2    A.   Yes.

3    Q.   And did there come a time when you made a payment for

4    Billy's phone that you made another payment for someone by the

5    name of Jorge Ramos Cruz?

6    A.   I didn't make a payment for that.

7    Q.   Now, Jorge Ramos Cruz, do you know who he was?

8    A.   Yes.

9    Q.   And who was he?

10   A.   He was another runner for Billy.

11   Q.   And Billy had asked you to receive money for him, correct?

12   A.   Yes.

13   Q.   And he also asked you to send money for him, correct?

14   A.   Yes.

15   Q.   And you did that voluntarily, correct?

16   A.   Yes.

17   Q.   He didn't force you to do that, correct?

18   A.   No.

19   Q.   And you knew that was drug money, correct?

20   A.   Repeat the question again.

21   Q.   And you knew that was drug money, correct?

22   A.   I didn't know what it was for.

23   Q.   Well, when he asked you to make -- asked you to bring

24   money up to Washington Heights, did you know that was drug

25   money?

1    A.  I assumed it was.

2    Q.  So when Billy directed you to deliver money in person to

3    187th Street and give $2,000 to someone, did you know that was

4    drug money?

5    A.  I believed it was.

6    Q.  And when Billy had asked you to put insurance on the car

7    for Josefina, you did that, correct?

8    A.  Yes.

9    Q.  And you knew that that was a crime, right?

10   A.  I did not.

11   Q.  So you were putting car insurance in your name for a car

12   that wasn't yours, correct?

13   A.  I believe so.

14   Q.  When you say "believe so," you did it, right?

15   A.  I did it, yes.

16   Q.  And the understanding was that Billy would give you $1,000

17   for that favor and you would also be able to drive that car,

18   correct?

19   A.  Yes.

20   Q.  And then you said the insurance had gotten canceled after

21   one month, correct?

22   A.  Around that time, yes.

23   Q.  And in fact the car that Billy asked you to, that was for

24   Billy, right, that car?

25   A.  It was for Josefina, Kevin, Lenny.

1   Q.  And that was also for people to drive that car, correct?

2   A.  Yes.

3   Q.  And for Billy to drive that car, correct?

4   A.  If he was around, yes.

5   Q.  I'm sorry?

6   A.  If he was around, yes.

7   Q.  And in fact, that wasn't -- it was a Nissan, right?

8   A.  I don't remember exactly what car it was.

9   Q.  Didn't you testify it was a Nissan on direct examination?

10  A.  I said I believed it might have been a Nissan.

11  Q.  Well, it wasn't a Mercedes, right?

12  A.  No.

13  Q.  It wasn't a Lexus, right?

14  A.  No.

15  Q.  It was a Nissan, correct?

16  A.  I believe so.

17  Q.  So on a text message that we saw on -- between Lenny and

18  you, Lenny had asked you on May 27 of 2019 for you to -- for

19  you to use his room to bag up, right?

20  A.  I believe so.

21  Q.  And you gave permission to Lenny to use that room, correct?

22  A.  Yes.

23  Q.  And you had a lock on your door, correct?

24  A.  Yes.

25  Q.  And were you present when -- you were not present when

1    Lenny was bagging up, correct?

2    A.  No.

3    Q.  So you had indicated that at the time that you lived in

4    Josefina's apartment you had seen two guns, correct?

5    A.  Yes.

6    Q.  And you said you believed it was 2020?

7    A.  I believe so, yes.

8    Q.  And when did you first move into Josefina's apartment?

9    A.  2018.

10   Q.  And from 2018 to 2020 you never saw a gun, right?

11   A.  I don't believe I did.

12   Q.  When you say you don't believe you did, you mean you didn't

13   see it or you did or you don't remember?

14   A.  I don't remember.

15   Q.  In fact, when you moved into Josefina's apartment you said

16   you had seen drugs all over the place, right?

17   A.  Yes, I had seen drugs, yes.

18   Q.  And you still decided to move in to Josefina's apartment,

19   correct?

20   A.  Yes.

21   Q.  And didn't you vent to Kevin that you were having issues

22   with your previous landlord and that's why you wanted a place

23   to live, you wanted to move?

24   A.  I did have issues with my previous landlord.

25   Q.  And you told Kevin that -- and Kevin said to you that he

1  would ask his mom if you could move in, correct?

2  A.  I don't remember.

3  Q.  In fact, living -- you were still working at the Highline

4  Ballroom at that time when you moved in, correct?

5  A.  Yes.

6  Q.  And it was very convenient for you to move in to Josefina's

7  apartment because it was right across the street, correct?

8  A.  Yes.

9  Q.  And even though that you had known that that was a place

10  where drugs were kept, you still moved in, correct?

11  A.  Yes.

12  Q.  Now, with respect to the guns, so you said the first time

13  that you believe that you saw any physical gun was in 2020,

14  correct?

15  A.  Yes.

16  Q.  Even though you had been living there since 2018, correct?

17  A.  Yes.

18  Q.  And you said that you believed that the gun was kept in --

19  that the gun was kept -- I'm sorry.  A gun was kept in your

20  room, correct?

21  A.  A gun has been kept in my room on a few occasions, yes.

22  Q.  And when it was kept in your room, that was the room with

23  the lock on it, correct?

24  A.  Yes.

25  Q.  And when it was kept in your room, you had knowledge that

1    it was a gun, correct?

2    A.   Honestly most of the times I didn't.  My room was easy to

3    access with the lock on it, so sometimes it would just end up

4    in my drawer.  Like they broke into my room a lot, so . . .

5    Q.   So it's your testimony that someone just broke into your

6    room and left a gun in your drawer, right?

7    A.   Yes.

8    Q.   And it's your testimony that you allowed the gun to stay in

9    your room with the lock in your dresser, correct?

10   A.   It had stayed in my room, yes.

11   Q.   And it's your testimony that the gun was in there for how

12   long a period of time?

13   A.   A couple of days and then Kevin would take it to his room.

14   Q.   So would it be fair to say that that was the black gun that

15   we saw a picture of?

16   A.   Yes.

17   Q.   And would it be fair to say that's the black gun that you

18   took -- that's your hand in that picture, right?

19   A.   Yes.

20   Q.   And in fact, that's the picture that you sent to your best

21   friend?

22   A.   Yes.

23   Q.   And what is your best friend's name?

24   A.   In my phone it's Booty.

25   Q.   What's her real name?

 1    A.   Shayna.

 2    Q.   Shayna.  So you took a picture of the gun, correct?

 3    A.   Yes.

 4    Q.   And you were holding that gun, correct?

 5    A.   My hand was over it.

 6    Q.   And you were smoking weed, right?

 7    A.   Yes.

 8    Q.   And you took a selfie of yourself?

 9    A.   Took a picture of my hand.

10    Q.   And you actually sent it in a text message, correct?

11    A.   Yes.

12    Q.   And when you sent it in the text message, the government

13    confronted you with that picture, correct?

14    A.   Yes.

15    Q.   And there were no other pictures in your phone except that

16    gun, correct?

17    A.   Not to my knowledge.

18    Q.   And you indicated that -- how many times have you held that

19    gun?

20    A.   A handful of times.

21    Q.   When you say a handful, is that more than six?

22    A.   Like less than five.

23    Q.   And what were the occasions that you held the gun?

24    A.   When it was in my dresser.

25    Q.   So you just took it out to play with it?

1   A.   I took it out that one time to take a picture of it and to

2   pass it to Kevin.

3   Q.   So the only time that you actually had the gun in your hand

4   was when you took the picture?

5   A.   I have held it a couple of times, yes.

6   Q.   And what was the reason you held the gun for?

7   A.   As I have said, to pass it to Kevin.

8   Q.   So you never took that gun to do -- to deliver drugs for

9   Billy, right?

10  A.   Never.

11  Q.   And this was a drug delivery service, correct?

12  A.   Yes.

13  Q.   And it would be fair to say that you never had any problems

14  when you were working as a delivery person, correct?

15  A.   No.

16  Q.   No one tried to rob you?

17  A.   No.

18  Q.   No one tried to steal the drugs?

19  A.   No.

20  Q.   No one tried to steal the money?

21  A.   No.

22  Q.   In fact, the clientele were very high end would you say?

23  A.   Yes.

24  Q.   These were people who did not want to -- wanted the privacy

25  of having drugs delivered to them as opposed to going and

1    buying in the street, correct?

2    A.   Yes.

3    Q.   And these were -- many people were -- lived in -- they were

4    professional people, some of them, correct?

5    A.   Yes.

6    Q.   And you would describe them as like elite, correct?

7    A.   Yes.

8    Q.   And would it be fair to say that you didn't have any fear

9    of going to someone's house and delivering the drugs, correct,

10   and getting paid for it, correct?

11   A.   No.

12   Q.   Because the type of clientele, correct?

13   A.   Yes.

14   Q.   And you didn't feel in any danger when you were delivering

15   these drugs, correct?

16   A.   No.

17   Q.   You didn't feel like you needed to carry a gun, correct?

18   A.   No.

19   Q.   And all those times that you made deliveries for Billy

20   Ortega, you didn't feel the need to carry a weapon, correct?

21   A.   No.

22   Q.   And you didn't feel the need to protect the drugs, correct?

23   A.   Repeat the question.

24   Q.   You didn't feel the need to carry a weapon to protect the

25   drugs.

1   A.  Not me, no.

2   Q.  And you didn't feel the need to carry a gun to protect the

3   money, correct?

4   A.  No.

5   Q.  And all the times that you were living in Josefina's

6   apartment for those four years, that apartment never got

7   robbed, right?

8   A.  No.

9   Q.  There was never any issues with violence, correct?

10  A.  In the neighborhood, yes.

11  Q.  I'm talking about in the apartment.

12  A.  No.

13  Q.  No one ever came in and tried to rob the drugs from the

14  safe, correct?

15  A.  No.

16  Q.  No one tried to come into the apartment to rob the packs

17  that may have been secretly hidden by Josefina, correct?

18  A.  No.

19  Q.  No one tried to come in and take the money from the little

20  safe that you say that Josefina kept all the money, correct?

21  A.  No.

22  Q.  So it would be fair to say that at no time in your presence

23  did anyone come in with any guns trying to take the drug

24  proceeds.

25  A.  That never happened.

1    Q.  Or to take the money.

2    A.  No.

3    Q.  Now, you had referred to -- withdrawn.

4          On some of the text messages we saw a gun being

5    referred to as the strap?

6    A.  I haven't seen a text with that, but . . .

7    Q.  Well, did anyone refer to the gun as a strap?

8    A.  That's a nickname for a gun, yes.

9    Q.  And did you ever hear the term "strap" before?

10   A.  Yes.

11   Q.  And where did you hear it?

12   A.  On social media, people mentioning that.  It's just a

13   common reference to a gun.

14   Q.  And through social media, did you ever hear 50 Cent say

15   "get the strap"?

16   A.  Yes.

17   Q.  And what does that mean?

18   A.  Get the gun.

19   Q.  And that's a term that 50 Cent the rapper uses, correct?

20   A.  Yes.

21   Q.  And your best friend that you sent this picture of the gun

22   to, her name was Booty in your phone?

23   A.  Yes.

24   Q.  B-O-O-T-Y?

25   A.  Yes.

1  Q.  And in Exhibit 111-24, the government's exhibit, there was

2  a reference to a text message on July 10 of 2021 where Booty

3  texts to you "I'm getting me a gun as soon as I touch down."

4  Correct?

5  A.  Yes.

6  Q.  And Booty is the one who texted that to you, correct?

7  A.  Yes.

8  Q.  And then you replied, correct?

9  A.  Yes.

10  Q.  And what did you reply?

11  A.  I sent her a picture of the gun.

12  Q.  And when Booty texts you "getting me a gun as soon as I

13  touch down," you just happened to have the picture of a gun and

14  sent that to her, correct?

15  A.  I believe I took the picture.

16  Q.  And did you take it that day that you sent the text to her

17  or did you have it in your phone?

18  A.  I'm not sure.

19  Q.  In fact, you text back and you said "I'm getting more."

20  Correct?

21  A.  Yes.

22  Q.  Were you selling guns?

23  A.  No.

24  Q.  When you said "I'm getting more," you were referring to

25  guns, correct?

1  A.  Yes.

2  Q.  But you weren't selling guns.

3  A.  No.

4  Q.  And that gun that you had in the photograph, the picture

5  that you took of your hand when you were smoking the weed that

6  you sent to Booty, that was your gun, wasn't it?

7  A.  No, it was Billy's.

8  Q.  But you referred to it as "my gun," correct, in the text

9  message?

10 A.  To my friend, yes.

11 Q.  I'm sorry?

12 A.  To my friend, yes.

13 Q.  But you said "it's my gun," right?

14 A.  Yes.

15 Q.  You didn't say it was my boss's gun, right?

16 A.  No.

17 Q.  You didn't say it was Billy's gun, right?

18 A.  No.

19 Q.  You said it was my gun, right?

20 A.  Yes.

21 Q.  But it wasn't your gun.

22 A.  No.

23 Q.  And when you said you were getting more, you were

24 specifically referring to you were getting more guns, correct?

25 A.  Yes.

 1   Q.  And we heard these text messages about you researching --

 2   withdrawn.

 3          During the time of the pandemic, March of 2020,

 4   following, would it be fair to say there were discussions

 5   among you and the other people that you were working with about

 6   guns?

 7   A.  I can't remember.

 8   Q.  Would it be fair to say that you had discussions with them

 9   about it's very dangerous outside and we need to get guns?

10   A.  I don't remember.

11   Q.  Wouldn't it be fair to say that you -- were you concerned

12   about going outside during the pandemic, during the lockdown,

13   about getting robbed?

14   A.  No.

15   Q.  Would it be fair to say that the people that were having

16   the conversation about guns were speaking about the time period

17   of the pandemic?

18          MR. FERGENSON:  Objection.

19          THE COURT:  Sustained.

20   Q.  You said you only saw Billy one time holding a gun?

21   A.  That I can remember, yes.

22   Q.  And what gun was he holding?

23   A.  The black gun.

24   Q.  Your gun?

25   A.  His gun.

1    Q.  And you said you never saw Josefina with the gun, correct?

2    A.  No.

3    Q.  And you said that Josefina told you that she kept a gun in

4    the safe?

5    A.  She's mentioned having a gun in her closet.

6    Q.  In her closet safe?

7    A.  In her closet.

8    Q.  Oh, in her closet?

9    A.  Yes.

10   Q.  But you never saw any guns, right?

11   A.  I've never seen Josefina with a gun, no.

12   Q.  How many times would you say from the time that you met

13   Billy did Billy go to Josefina's apartment?

14   A.  From the time that I met him, I would say like around 30.

15   Q.  Only 30 times?

16   A.  Yeah.  Billy didn't come to the city very often.  2021,

17   2020 he came more frequently, but he didn't come to the city

18   too often.

19   Q.  And was that because -- withdrawn.

20           Did he tell you why he didn't come to the apartment?

21   A.  No.

22   Q.  And when he came to the city, would he take an Uber?

23   A.  Most of the time, yes.

24   Q.  And he would send you Ubers to make deliveries, right?

25   A.  On a few occasions, yes.

1  Q.  When you say a few occasions, did you ever make deliveries

2  outside of the Lower East Side?

3  A.  Yes.

4  Q.  And you made deliveries in the Bronx?

5  A.  Rarely, like maybe three times.

6  Q.  Did you make deliveries in Long Island?

7  A.  Rarely.

8  Q.  I'm sorry?

9  A.  Rarely, like maybe two times.

10  Q.  Did you ever make -- did you ever do deliveries in

11  New Jersey?

12  A.  Yes.

13  Q.  And how many times?

14  A.  It was a few times.

15          THE COURT:  Use the microphone, please.

16  A.  There were a few times, like maybe 30 or 40 or so.

17  Q.  I'm sorry?

18  A.  Like 30 or 40 or so.

19  Q.  30 or 40 times you went to New Jersey?

20  A.  Yes.

21  Q.  So you indicated that you had bagged up about once or

22  twice, correct?

23  A.  Yes.

24  Q.  And you had a scale, correct?

25  A.  Repeat the question.

1    Q.   There was a scale.

2    A.   Yes.

3    Q.   There was a spoon?

4    A.   Yes.

5    Q.   And you would put -- and you said that there was like a

6    rock-like substance, correct?

7    A.   Yes.

8    Q.   And it was like in the size of a cantaloupe?

9    A.   About maybe a little smaller.

10   Q.   And you said that you would put what was the -- what was --

11   you would put what was from the rock-like substance into the

12   little baggies, correct?

13   A.   Yes.

14   Q.   And you didn't grind it up, right?

15   A.   We would just break it, break a piece off.

16   Q.   You would just break a piece off, right, and you put it in

17   the little baggy, correct?

18   A.   You put it on the scale and weigh it.

19   Q.   But you wouldn't grind it, right?

20   A.   No.

21   Q.   You wouldn't make it all powder, correct?

22   A.   No, you would just break it off until you had enough on the

23   scale and then you put whatever the right amount was in the

24   baggy.

25   Q.   And you said you wore gloves when you did that, correct?

1    A.   Yes.

2    Q.   And you wore a mask?

3    A.   Yes.

4    Q.   And why did you wear a mask?

5    A.   So you wouldn't inhale it.

6    Q.   And you said you had seen people bagging up about 30 times?

7    A.   Yes.

8    Q.   And when you saw people bagging up about 30 times, you also

9    saw it from like a rock-like substance?

10   A.   Yes.

11   Q.   And you saw the people break up that rock, correct?

12   A.   I didn't watch when they were doing it.  I was more so in

13   passing when I have seen it, so I can't say exactly how they

14   were to doing it.

15   Q.   But you said that you saw people doing it about 30 times,

16   correct?

17   A.   Yes.

18   Q.   And when you saw people doing it, did you see what they

19   were putting in the bag?

20   A.   Yes.

21   Q.   And it was like a little Rock-like substance, correct?

22   A.   Yes.

23   Q.   And they would weigh it first, correct?

24   A.   Yes.

25   Q.   To make sure that they had the proper amount in the bag,

1  correct?

2  A.  Yes.

3  Q.  And you didn't see anybody like grinding that rock up,

4  correct?

5  A.  Not that I can remember.

6  Q.  And you indicated that the one time that you were -- that

7  you had bagged up that you had gotten paid for it, correct?

8  A.  Yes.

9  Q.  And you got $150?

10  A.  I believe so.

11  Q.  When you say "believe so," what do you mean by "believe

12  so"?

13  A.  I believe it was like $150, $200.

14  Q.  And when you would go do a delivery, you would only get

15  $100, correct?

16  A.  Yes.

17  Q.  Did you ask Billy if you could bag up so you could make

18  more money?

19  A.  No.

20  Q.  And when you were bagging up, you didn't add any other

21  agents to what you were putting in the bag, correct?

22  A.  No.

23  Q.  And you said you don't know what fentanyl looks like,

24  correct?

25  A.  I do not.

1    Q.  And you said you don't know what heroin looks like,

2    correct?

3    A.  No.

4                (Continued on next page)

5    BY MS. FLORIO:

6    Q.  And people would refer to bagging up as doing homework;

7    correct?

8    A.  Yes.

9    Q.  And in one of the text messages, you had referenced that --

10   pardon my language -- "niggas took my toy."

11               Correct?

12   A.  Yes.

13   Q.  And you referred to the gun as your "toy"; correct?

14   A.  Yes.

15   Q.  Your gun.

16   A.  Billy's gun.

17   Q.  But you didn't say niggas took Billy's gun; correct?

18   A.  I was talking to Billy.  So there was no need for me to say

19   his name.

20   Q.  But you said, "niggas took my toy."

21   A.  Jokingly.

22   Q.  Now, you indicated that -- do you have an independent

23   recollection of doing deliveries on March 16 of 2021?

24   A.  No, I do not.

25   Q.  Do you have an independent recollection of doing deliveries

 1   on March 15, 2021?

 2   A.  No.  I do not.

 3   Q.  As you sit here today, you have refreshed your recollection

 4   about what happened by reviewing your text messages with Billy;

 5   correct?

 6   A.  Over the last year that I've been reviewing the text

 7   messages, my recollection has been refreshed.

 8   Q.  Now, do you recall what day of the week March 17 of 2021

 9   was?

10   A.  I do not.

11   Q.  You said that you had worked in 2021 doing drug deliveries

12   Sundays, Mondays, and Tuesdays; correct?

13   A.  Correct.

14   Q.  So if March 17 of 2021 was St. Patrick's Day; right?

15   A.  I'm not sure.

16   Q.  So would it be fair to say if St. Patrick's Day was on

17   Wednesday, that you had taken over a shift for somebody else?

18             MR. FERGENSON:  Objection.

19             MS. FLORIO:  I'll withdraw the question, your Honor.

20             THE COURT:  Why don't you do that.

21   BY MS. FLORIO:

22   Q.  Do you recall a text that you had with Billy when Billy had

23   asked you on March 17 of 2021 will you take over?

24   A.  Yes.

25   Q.  And you said yes; correct?

1    A.   That I can.

2    Q.   That you can.  And that was -- would that be fair to say

3    that that was not your regular day?

4    A.   It wasn't my regular day.  No.

5    Q.   And in fact, you had -- who was supposed to work that

6    Wednesday?

7    A.   I'm not sure.

8    Q.   Was William Drayton, Will, still working in 2021?

9    A.   He worked in 2021.  Yes.

10   Q.   If it Billy had asked you to take over, would that mean

11   that that was not your regular day to work?

12   A.   Yes.  That it wasn't my regular day.

13   Q.   And you indicated that on March 17 of 2021, that you didn't

14   know that anyone had passed away.  Correct?

15   A.   Yes.

16   Q.   And that there was any problems -- correct? -- with the

17   drugs?

18   A.   I didn't.

19   Q.   And that the first time you ever learned that anyone had

20   died of the customers that you serviced was when you were

21   arrested.  Correct?

22   A.   Yes.

23   Q.   And Billy never told you that anybody died; correct?

24   A.   He didn't.

25   Q.   Will never told you that anyone died; correct?

1  A.  He didn't.

2  Q.  No one ever told you that anyone died until February 1 of

3  2022.  Correct?

4  A.  Correct.

5  Q.  So would it be fair to say that from the time of March 17,

6  2021, until the time of February 1 of 2022, that you had no

7  idea that there were any problems with any of the drugs?

8  A.  Billy had mentioned something about a bad batch, but that

9  was it.

10 Q.  Well, if Billy had mentioned something about a bad batch,

11 was that before March 17 of 2021 or before or after?  Or you

12 don't remember?

13 A.  I don't remember.

14 Q.  Do you have a recollection of Billy sending you a package

15 to bring back to a drug supplier?

16 A.  No.

17 Q.  Do you have any recollection of taking a package to

18 Yonkers?

19 A.  No.

20 Q.  Do you have any recollection of Billy telling you that he

21 believed that there was fentanyl or the "F" word in the drugs?

22 A.  No.

23 Q.  Do you have any recollection of Billy telling you to return

24 the drugs to the supplier?

25 A.  That never happened.

1  Q.  Do you have any recollection of Billy telling you that he

2  never wanted you to use this particular supplier?

3  A.  That never happened.

4  Q.  Did Billy ever tell you -- did Billy ever make you promise

5  for you not to use fentanyl in any of the drugs that you would

6  deliver to people?

7  A.  Me and Billy never discussed fentanyl.

8  Q.  Did Billy ever tell you that the drugs that he -- the

9  cocaine that he had had been laced with any fentanyl?

10  A.  He didn't.

11  Q.  Did Billy ever tell you that he had a situation where he

12  had learned that a kilo had been laced with fentanyl?

13  A.  No.

14  Q.  Did Billy ever instruct you never to serve any customers if

15  fentanyl was mixed with cocaine?

16  A.  That never happened.

17  Q.  But there were times Billy asked you to take drugs,

18  packages of drugs, to other people.  Correct?

19  A.  What do you mean?

20  Q.  Were there times that Billy asked you to deliver drugs to

21  other people that were not his customers?

22  A.  Not to my knowledge.

23  Q.  Didn't you testify earlier that you would deliver packages

24  for Billy but not to the customers?

25  A.  Can you repeat the question.

1   Q.   Did you give testimony that you would deliver packages for

2   Billy but not to the customers?

3   A.   I don't remember that.

4   Q.   Prior to the date that the people had passed away, do you

5   have any recollection of Billy telling you not to ever use any

6   product that had fentanyl?

7   A.   That never came up.

8   Q.   In fact, would it be fair to say that you have no

9   recollection whatsoever of Billy ever telling you about

10  fentanyl?

11  A.   Me and Billy never discussed fentanyl ever.

12  Q.   And you said you never even knew what fentanyl was;

13  correct?

14  A.   I had heard about fentanyl, but I didn't know enough about

15  it.  No.

16  Q.   And even though you were delivering cocaine and you were in

17  the part scene, you had never seen heroin before; correct?

18  A.   No.

19  Q.   And you had never seen fentanyl; correct?

20  A.   No.

21  Q.   And you didn't even know what they looked like; correct?

22  A.   No.

23  Q.   So on March 17 of 2021, do you have any recollection of how

24  many people that you went to deliver drugs to that day?

25  A.   I believe it was four.

1  Q.  And was one of the people that you delivered drugs to a

2  lady that you felt was very kind?

3  A.  Yes.

4  Q.  And the lady that cooked very well?

5  A.  Yes.

6  Q.  And the lady that would always offer you food?

7  A.  Yes.

8  Q.  And had the cute little dog?

9  A.  Yes.

10  Q.  So you remember that particular person; correct?

11  A.  Yes.

12  Q.  And you remember you had delivered cocaine that day to her.

13  Correct?

14  A.  Yes.

15  Q.  Do you have an independent recollection of the first person

16  that you delivered to that day?

17          Do you remember what you delivered?

18  A.  I believe it was cocaine.

19  Q.  Could it have been any other drugs?

20  A.  Cocaine was all I knew.

21  Q.  What about the second person?

22          What did you deliver to that person?

23  A.  From my knowledge, it was cocaine.

24  Q.  What about the third person?  What did you deliver to that

25  third person?

1  A.  To my knowledge, it was cocaine.

2  Q.  To the fourth person, do you remember what you delivered to

3  that person?

4  A.  To my knowledge, it was cocaine.

5  Q.  Did you deliver any other drugs to any of those four people

6  that you remember?

7  A.  Not to my knowledge.

8  Q.  And after that day, you testified that you kept delivering

9  drugs for Billy; correct?

10  A.  Yes.

11  Q.  Up until the time that you had gotten arrested; correct?

12  A.  Yes.

13  Q.  Would it be fair to say that in all of the years that you

14  were working for Billy, that nobody ever overdosed to your

15  knowledge?

16  A.  To my knowledge, no.

17  Q.  Would it be fair to say that in all those years that you

18  have been delivering drugs for Billy, that you had knowledge of

19  anyone getting sick and going to the hospital?

20  A.  Not to my knowledge.  No.

21  Q.  Would it be fair to say that in all the time that you were

22  working for Billy up until the time of your arrest on

23  February 1 of 2022, that you had absolutely no knowledge that

24  anyone had died?

25  A.  No.  I did not.

1    Q.  On March 16 of 2021, the day before the people had passed

2    away -- I'm sorry.  The day that you had delivered to those

3    four people -- you were selling drugs that day.  Correct?

4    A.  I don't remember.

5    Q.  Did you deliver cocaine to 303 Lexington Avenue on that

6    date?

7    A.  I believe so.

8    Q.  In fact, you had brought that person at 303 Lexington

9    Avenue -- you're familiar with that address; correct?

10   A.  Yes.

11   Q.  And do you recall how many times you went to that address?

12   A.  Just the day before and the 17th.

13   Q.  In fact, you remember that because it was a hotel; correct?

14   A.  Yes.

15   Q.  And you went to the same room as you had done the day

16   before.  Correct?

17   A.  Yes.

18   Q.  And when you had arrived and you made the delivery the day

19   before, on March 16 of 2021, was there anybody else in the

20   hotel room besides -- you said the gentleman.  Correct?

21   A.  I believe so.

22   Q.  And was there anyone else on March 16 of 2021 in that room?

23   A.  I don't remember.

24   Q.  And on March 17 of 2021, when you served that person, was

25   there anyone else in the room?

1   A.  I don't remember.

2   Q.  And it's fair to say that on March 16 of 2021, when you

3   served Ross Mtangi at 303 Lexington Avenue, that you sold him

4   three bags of cocaine.  Correct?

5   A.  I don't remember.

6   Q.  Would it be fair to say that on March 17 of 2021, you also

7   sold -- withdrawn.

8          Would it be fair to say that on March 17 of 2021, you

9   had sold three bags of cocaine to Ross Mtangi?  Correct?

10  A.  I don't remember how much it was.

11  Q.  And when you gave the bags to -- when you delivered the

12  bags on March 16 and March 17 to 303 Lexington Avenue, your

13  testimony is you don't recall how many.  But you recall that

14  you did deliver to that person.  Correct?

15  A.  Yes.

16  Q.  And you were sent to that address two times consecutively.

17  Correct?

18  A.  Yes.

19  Q.  Day after day; right?

20  A.  Yes.

21  Q.  And do you recall the baggies that you delivered, even

22  though you don't remember how many, do you recall if it was a

23  hard substance like a rock form or if it was powder?

24  A.  I don't remember.

25  Q.  And when you had returned to the location of 303 Lexington

1    Avenue the next day, did the person that you had sold the

2    cocaine in the baggies to complain about the day before?

3    A.  I don't remember.

4    Q.  Did he complain about the quality of the drugs?

5    A.  I don't remember.

6    Q.  Or the strength of the drugs?

7    A.  I don't remember.

8    Q.  And you don't remember if the person, Ross, that you had

9    sold the drugs to raised any issues as to the quality of what

10   he had purchased -- correct? -- the previous day?

11   A.  I don't remember.

12   Q.  Do you recall who you serviced first?

13   A.  No.

14   Q.  After reviewing the text messages and after reviewing the

15   videos of you actually delivering the drugs on March 17 of

16   2021, does that refresh your recollection of who you served

17   first?

18   A.  I believe I served Avenue B first.

19   Q.  I'm sorry?

20   A.  I believe I served Avenue B first.

21   Q.  And Avenue B, do you recall where on Avenue B that you

22   served?

23   A.  What do you mean?

24   Q.  The address.

25   A.  185.

1    Q.  So that would be 185 Avenue B; correct?

2    A.  Yes.

3    Q.  And it was a female that you served; correct?

4    A.  I believe so.

5    Q.  And it wasn't your favorite customer that you later learned

6    to be Amanda Scher; correct?

7    A.  What do you mean?  Can you repeat the question.

8    Q.  Sure.  So the first person that you served was not Amanda.

9    Correct?

10   A.  No.

11   Q.  It was another lady; correct?

12   A.  Yes.

13   Q.  And how many times prior to March 17 of 2021 had you been

14   to the location of 185 Avenue B?

15   A.  I don't know.  I can't remember.

16   Q.  Had you been there before?

17   A.  I believe so.

18   Q.  You say you believe so.

19           Is it that you don't remember?

20   A.  It's possible.

21   Q.  And how many times, prior to March 17 of 2021, did you

22   respond to 50 East 8th Street, which is Amanda's residence, the

23   lady that you liked?

24   A.  How many times had I been there?

25   Q.  Prior to March 17 of 2021.

 1   A.   Maybe three.

 2   Q.   And the times that you had been to that location, did

 3   Amanda ever complain to you about the quality of the drugs?

 4   A.   No.

 5   Q.   Now, on the location of 37 Warren Street, do you recall

 6   that location?

 7   A.   Yes.

 8   Q.   And do you recall when you actually served that person?

 9   A.   No.

10   Q.   Do you remember that person?

11   A.   Yes.

12   Q.   So that location of 37 Warren Street, how many times, prior

13   to March 17 of 2021, had you been there?

14   A.   Maybe ten or less.

15   Q.   And was that the location that Billy had told you to go

16   back and switch out the product?

17   A.   Yes.

18   Q.   And when you switched out the product, can you tell us:

19   Did you have a conversation with that person?

20   A.   I don't remember.

21   Q.   What did Billy tell you specifically about why he was

22   switching out that drug?

23   A.   He didn't say.  He just asked me to put it to the side.

24   Q.   Did you question him as to why or why he switched out that

25   product?

```
 1   A.  No.

 2   Q.  Did you ever have to switch out product before?

 3   A.  Not that I remember.

 4   Q.  This was the first time, sometime in March 17 of 2021, that

 5   you ever had to switch out product.  Correct?

 6   A.  Yes.

 7   Q.  So in March of 2021, can you describe your relationship

 8   with Billy.

 9   A.  We were friends.

10   Q.  In fact, you still trusted Billy; correct?

11   A.  Yes.

12   Q.  And you relied upon him; correct?

13   A.  In what way?

14   Q.  Well, he would always pay you; correct?

15   A.  When I did things for him, he paid me.  Yes.

16   Q.  I'm sorry?

17   A.  When I did things for him, he paid me.  Yes.

18   Q.  And he didn't try to, you know, not pay you.  Correct?

19   A.  No.

20   Q.  And did you ever ask for a raise?

21   A.  No.

22   Q.  You were satisfied with the amount of money you were

23   getting; correct?

24   A.  Yes.

25   Q.  And in fact, you had other sources of income; correct?
```

1  A.  Correct.

2  Q.  But you still continued to do delivery for Billy; correct?

3  A.  Yes.

4  Q.  And would it be fair to say that you and him had other

5  personal discussions besides the drug business?

6  A.  Yes.

7  Q.  And when you say you were friends with him in March of

8  2021, would you speak to each other almost everyday?

9  A.  We mostly only spoke if I was doing deliveries.

10  Q.  And at no time did Billy ever tell you that he was putting

11  cut in the cocaine.  Correct?

12  A.  He didn't.  No.

13  Q.  Do you know what "cut" is?

14  A.  No.

15  Q.  You never heard of "cut" before?

16  A.  I've heard the term, but I don't know what it means.

17  Q.  You've heard the term.

18       Where did you hear it?

19  A.  I've heard people say it.

20  Q.  And what do you understand "cut" to be?

21  A.  I just know it has something to do with cocaine.  I don't

22  know exactly what it is.

23  Q.  So it's your testimony that you've been living in that

24  house for four years; correct?

25  A.  It's more like three.

 1   Q.  Three years.  And you would go there on a regular basis

 2   when you were not up in Buffalo; correct?

 3   A.  Yes.

 4   Q.  So you were not on vacation with Will in Cali; correct?

 5   A.  I'm a busy person.  I'm hardly home.  I'm working a lot.

 6   Q.  Right.  But it would be fair to say that you're living in a

 7   place and there's drug dealing going on and you don't know what

 8   "cut" is?

 9   A.  Yes.

10   Q.  And would it be fair to say that you're living in an

11   apartment -- and it's a small apartment; correct?

12   A.  Yes.

13   Q.  It's not luxurious; correct?

14   A.  Not really, no.

15   Q.  It's very basic; correct?

16   A.  Yes.

17   Q.  In fact, you didn't -- there was not expensive items in the

18   apartment.  Correct?

19   A.  Not really.

20   Q.  It was just regular furniture; correct?

21          THE COURT:  I'm sorry.  I didn't hear your last

22   answer.

23          THE WITNESS:  Not really.

24   BY MS. FLORIO:

25   Q.  I'm sorry?

```
 1   A.  Not really.

 2   Q.  When you say "not really," are you agreeing with me or

 3   disagreeing with me?

 4   A.  What was your question?

 5   Q.  My question was:  Was there expensive furniture in that

 6   apartment?

 7   A.  That's subjective.  Josefina's liked nice jewelry, nice

 8   furniture.

 9   Q.  My question is:  This was on the Lower East Side; correct?

10   A.  The apartment we lived in was in Chelsea.

11   Q.  I'm sorry?

12   A.  The apartment we lived in was in Chelsea.

13   Q.  Where was it?

14   A.  Chelsea, Manhattan.

15   Q.  Was this a luxurious building?

16   A.  No.

17   Q.  This was a housing project; correct?

18   A.  Yes.

19   Q.  And about two weeks after March 17 of 2021, you spoke to

20   Billy about that you were going to go get a plate from your

21   girl.

22            Correct?

23   A.  Yes.

24   Q.  And when you had said that, you were referring to Amanda

25   Scher; correct?
```

1   A.   Yes.

2   Q.   The same lady that lived at 50 East 8th Street.  Correct?

3   A.   Yes.

4   Q.   And when you had said that, did Billy say anything to you?

5   A.   No.

6   Q.   Did Billy tell you that he was no longer servicing Amanda?

7   A.   No.

8   Q.   When you were arrested on February 1 of 2022, were you

9   alone when you were arrested?

10  A.   No.

11  Q.   Who were you with?

12  A.   At the moment, I was actually arrested?

13  Q.   Right.  At the moment that they came up and they put you in

14  handcuffs.

15  A.   Josefina and Kevin were at the apartment.

16  Q.   So you were actually at the apartment when you were

17  arrested?

18  A.   Yes.

19  Q.   Can you describe it.

20       How you were arrested?  Did you let them in the door?

21  Did Josefina let them in the door?  What happened?

22  A.   Kevin had opened the door and said the police were here for

23  me.  He came to my room and said the police were here for me.

24  And then they went to my door and told me that they wanted to

25  speak to me.  And two one of the officers came with me into my

1   room, watched me put on clothes, and they arrested me and

2   carried me out.

3   Q.  Did you see the officers look in the apartment?

4   A.  No.

5   Q.  Did the officers look in your room?

6   A.  They browsed around.  They saw my phone.  And that's when

7   they grabbed it.

8   Q.  So the phone that they grabbed, was that the one that

9   was -- they only grabbed one phone; correct?

10  A.  Yes.

11  Q.  Did you have your phone on you?

12  A.  No.  It was on my dresser.

13  Q.  And they took it off your dresser; correct?

14  A.  Correct.

15  Q.  And you said Josefina and Kevin were there.

16          Correct?

17  A.  Yes.

18  Q.  And you indicated that you were taken out and you were

19  eventually placed under arrest.

20          Correct?

21  A.  Yes.

22  Q.  And would it be fair to say that -- were they federal

23  agents, or were they regular police?

24  A.  I don't remember.

25  Q.  Did there come a time that you spoke, when you were

1    arrested, the same day, to a federal agent?

2    A.   Yes.

3    Q.   And you lied to that federal agent; correct?

4    A.   Yes.

5    Q.   And did you know it was a crime to lie to a federal agent?

6    A.   Yes.

7    Q.   But you still lied; correct?

8    A.   Yes.

9    Q.   And you weren't -- you were not prosecuted for lying to a

10   federal agent; correct?

11   A.   No.

12   Q.   That's not one of the things that you actually pled guilty

13   to; correct?

14   A.   No.

15   Q.   You pled guilty to the things that you told us on direct

16   about.

17   A.   Yes.

18   Q.   And you indicated that when you lied to the federal agent,

19   that you did not have a lawyer.  Correct?

20   A.   I didn't.  No.

21   Q.   And you indicated that there came a time that you had a

22   lawyer; correct?

23   A.   I don't remember.

24   Q.   Well, at some point, you had a lawyer for this case.

25   Right?

```
 1    A.  Yes.

 2    Q.  Someone to defend you; right?

 3    A.  Yes.

 4    Q.  In fact, your lawyer is sitting right here in the

 5    courtroom; correct?

 6    A.  Correct.

 7    Q.  And you and your lawyer at some point came in and spoke to

 8    the government.  Correct?

 9    A.  Yes.

10    Q.  And you did that pretty quickly after your arrest; correct?

11    A.  Yes.

12    Q.  Was it your idea to speak to the government?

13    A.  Yes.

14    Q.  And you asked -- withdrawn.

15        And you wanted to help yourself; correct?

16    A.  No.

17    Q.  Well, you knew that you were facing some serious charges;

18    correct?

19    A.  Correct.

20    Q.  Would it be fair to say that when you found out that there

21    were three people that were dead, that you decided to

22    cooperate?  Correct?

23    A.  Yes.

24    Q.  And you made that decision voluntarily.  Correct?

25    A.  Correct.
```

1   Q.  Nobody forced you to do that; correct?

2   A.  No.

3   Q.  Just like no one forced you to sell drugs; correct?

4   A.  No.

5   Q.  Just like no one forced you to deliver the cocaine to

6   Amanda -- correct? -- that day on March 17, 2021?

7   A.  Correct.

8   Q.  And no one forced you to deliver cocaine to Julia on

9   March 17 of 2021.  Correct?

10  A.  Correct.

11  Q.  And no one forced you to deliver cocaine to Ross on

12  March 17 of 2021.  Correct?

13  A.  Correct.

14  Q.  Then you decided to work with the government; correct?

15  A.  Yes.

16  Q.  And that's called cooperation?

17  A.  Yes.

18  Q.  Do you know what "cooperation" means?

19  A.  Yes.

20  Q.  And did you know what "cooperation" meant before you

21  started to cooperate?

22  A.  Yes.

23  Q.  What was your understanding what "cooperation" was before

24  you started to cooperate?

25  A.  To tell the truth to the government about your crimes and

1   the crimes committed with the people that you committed them

2   with.

3   Q.  But before you actually had a meeting with the government,

4   did you know what that meant?

5   A.  Yes.

6   Q.  How did you know that you had to do all these things before

7   speaking with the government?

8            MR. FERGENSON:  Your Honor, objection.  Privilege.

9            THE COURT:  Yes.  I don't know that you can ask

10  anything that may entail discussions with defense counsel.

11           MS. FLORIO:  Understood, your Honor.  I'll move on.

12  Q.  Would it be fair to say that you had your first meeting

13  with the government?  Correct?

14  A.  Yes.

15  Q.  And you remember that day; correct?

16  A.  No, I don't.

17  Q.  It was a significant moment in your life; correct?

18  A.  Yes.

19  Q.  Because you decided that you were going to tell the

20  government about all of your crimes; correct?

21  A.  Yes.

22  Q.  And tell them about people that you cared about; correct?

23  A.  Yes.

24  Q.  And also, when you had that meeting, your lawyer was

25  present; correct?

1  A.  Correct.

2  Q.  And there were agents present from the government; correct?

3  A.  Yes.

4  Q.  So your first meeting was on February 15 of 2022,

5  approximately two weeks after.  Correct?

6  A.  I'm not sure of the exact date.

7  Q.  Would it be fair to say that it was a short period of time,

8  within two weeks?  Do your best.

9  A.  Possibly.

10  Q.  So would it be fair to say that there was a prosecutor in

11  the room with you the very first meeting?

12  A.  Yes.

13  Q.  Would it be fair to say that there was a New York police

14  Detective Samantha Gill present?

15  A.  Yes.

16  Q.  And would it be fair to say that there was an analyst

17  present?

18  A.  I believe so.

19  Q.  Would it be fair to say that there was a DEA agent,

20  Special Agent Kareem Freckleton?

21  A.  Yes.

22  Q.  And would it be fair to say that you had to sign a piece of

23  paper; correct?

24  A.  Correct.

25  Q.  And you absolutely understood what you were signing;

1   correct?

2   A.   Yes.

3   Q.   And would it be fair to say that you found out that was

4   called a proffer agreement?

5   A.   I believe so.

6   Q.   Was it explained to you that when you first gave testimony

7   to the government, that you were not automatically going to get

8   a cooperation agreement?  Correct?

9   A.   Repeat the question, please.

10          MR. FERGENSON:  Objection, your Honor, because, again,

11  potentially privileged areas.

12          MS. FLORIO:  I'll withdraw the question.

13  Q.   Were you told by the government that just because you came

14  to talk to them that you were not going to get -- this was not

15  a cooperation agreement?  Correct?

16  A.   Possibly.

17  Q.   So the first time you didn't sign a cooperation agreement;

18  correct?

19  A.   I don't remember.

20  Q.   In fact, you had to meet many times with the government

21  before you entered into a cooperation agreement.  Correct?

22  A.   I don't remember.

23  Q.   Well, would it be fair to say that you met with the

24  government on February 15 of 2022?

25  A.   I don't remember the exact date.

1    Q.  Would it be fair to say that you met with the government

2    again on March 11 of 2022?

3    A.  I don't remember the exact days I met with the government.

4    Q.  Would it be fair to say that you met with the government on

5    June 2 of 2022?

6    A.  I don't remember the exact days.

7    Q.  Would it be fair to say that you met with the government on

8    another date and then on December 1 of 2022, December 14 of

9    2022, December 21 of 2022, January 4 of 2023, and January 6 of

10   2023?

11   A.  Possibly.

12   Q.  Would it be fair to say that there were at least a dozen

13   meetings with the government?

14   A.  Yes.

15   Q.  And when was the last time that you spoke with the

16   government?

17   A.  A couple days ago.

18   Q.  And when was the time before that?

19   A.  Last week.

20   Q.  And do you recall what day you spoke with them?

21   A.  I believe it was Monday.

22   Q.  Did you speak with them on a Sunday?  Last Sunday.

23   A.  This past Sunday.  I believe so, yes.

24   Q.  And when you speak to them, you actually are brought to

25   their office?

1    A.   I go to their office, yes.

2    Q.   And from the time that you were arrested on February 1 of

3    2022 up until now, you've been in jail the whole entire time;

4    correct?

5    A.   Yes.

6    Q.   And you are housed at the Metropolitan Detention Facility;

7    correct?

8    A.   Correct.

9    Q.   And that's short for the MDC?

10   A.   Yes.

11   Q.   And that is a jail for federal prisoners in Brooklyn;

12   correct?

13   A.   Correct.

14   Q.   That's actually where the jail is; correct?

15   A.   Yes.

16   Q.   So on your first proffer agreement on February 15 of 2022,

17   did you tell the government that you had possessed a gun?

18   A.   I don't remember.

19   Q.   Did you tell the government that you had a gun?

20   A.   I don't remember.

21   Q.   Did you mention anything to the government at all about

22   guns?

23   A.   We have talked about guns.  Yes.

24   Q.   But on the first time.

25   A.   I don't remember.

1 Q. Did you occasionally ship packages for Billy of drugs?

2 A. Yes.

3 Q. And did you go to the post office to mail those drugs?

4 A. Yes.

5 Q. How many times did you do that?

6 A. Like four or five.

7 Q. And do you remember sending them to Rochester?

8 A. I believe so.

9 Q. Do you remember sending them to Detroit?

10 A. Yes.

11 Q. Do you remember sending them to California?

12 A. I don't remember.

13 Q. And when you took those drugs to the post office, did Billy

14 tell you to take them?

15 A. Yes.

16 Q. And you knew there were drugs in there; right?

17 A. Yes.

18 Q. And you got paid for that; right?

19 A. Yes.

20 Q. Did Billy tell you what type of drugs were in those

21 packages?

22 A. It was cocaine.

23 Q. And how did you know it was cocaine?

24 A. They were packed.  They were like baggies.  It was like a

25 couple of baggies, or it would be like a pack of ten.

1  Q.  And were you there when -- so did he instruct you to do

2  that by phone, by text, or in person?

3  A.  We did it by text.

4  Q.  And you were paid to do that; correct?

5  A.  Yes.

6  Q.  The same hundred dollars per day; correct?

7  A.  Yes.

8        THE COURT:  Ms. Florio, it's almost 5:00.  So tell me

9  when it's a good time to adjourn for the day.

10        MS. FLORIO:  I just have one more question.

11        THE COURT:  Yes.  Sure.

12  BY MS. FLORIO:

13  Q.  So did you describe the cars that people were driving?

14  A.  In what way?

15        MS. FLORIO:  Withdrawn.  I'm sorry.

16  Q.  Did Will have a car?

17  A.  Yes.

18  Q.  And what kind of car did Will have?

19  A.  A white Jeep.

20  Q.  Did you go with Will to do deliveries at all?

21  A.  I have on a couple of occasions.

22  Q.  And he would drive you in the white Jeep?

23  A.  Will was driving.  Yes.

24        MS. FLORIO:  Your Honor, this is a good time to stop.

25        THE COURT:  Okay.  So, folks, I'll see you tomorrow at

1    11:00.  We're going to start.  So please be here at 10:45.

2    Just remember don't discuss the case and keep an open mind.

3    Thanks and have a nice evening.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (In open court; jury not present)

 2                (Witness temporarily excused)

 3           THE COURT:  Everyone can be seated.

 4           Are they any issues you all would like to raise?

 5           MR. FERGENSON:  Your Honor, we have two brief ones.

 6  One is that we would ask permission to speak with Mr. Rainey's

 7  lawyer about some logistical issues related to his place of

 8  confinement and some safety issues but not discuss any of the

 9  substance of his testimony or cross but just merely confer with

10  him about those logistics.

11           THE COURT:  Any objection?

12           MS. FLORIO:  I have no objection.

13           THE COURT:  Yes.  That's fine.

14           MR. FERGENSON:  And just one other matter which

15  your Honor may cover anyway.  We just want to know, if we were

16  to rest tomorrow, if your Honor thinks we'll go directly into

17  the defense case or if you would give them the rest of the day

18  and start in the morning.

19           THE COURT:  So let's talk about that.  Let's just talk

20  about scheduling.

21           Ms. Florio, do you have any sense of your cross and

22  how long it would be?

23           MS. FLORIO:  I would say I will be done by lunch and

24  probably before lunch.

25           THE COURT:  If that's the case, Mr. Fergenson, do you
```

1    have a sense of when you anticipate that you'll rest?

2         MR. FERGENSON:  It's always difficult to estimate.  I

3    would estimate probably mid to late afternoon we may in fact

4    rest.  I doubt, although, again, very difficult to say, given

5    the length -- we don't know the length of cross-examinations.

6    I doubt we would not rest tomorrow afternoon.

7         THE COURT:  So, Ms. Florio, will you be ready to go

8    right into your defense case, if in fact the government does

9    rest tomorrow?

10        MS. FLORIO:  No, your Honor.  I would ask for the next

11   day because our intention would be to call Maurice Whyte.

12        THE COURT:  On Thursday morning.

13        MS. FLORIO:  Right.

14        THE COURT:  And I will let you finish the cross.  And

15   then after Mr. Rainey completes his testimony, I'll hear you

16   out on the DeLaura issue, if there is anything else you want to

17   say on that.  But I will rule on that tomorrow morning or

18   tomorrow early in the day.

19        Mr. Fergenson, did you want to be heard on that issue

20   or something else?

21        MR. FERGENSON:  No.  Something else, your Honor.

22        THE COURT:  Okay.

23        MS. FLORIO:  So, your Honor, I would ask for the

24   government to produce, because I can't produce, Maurice Whyte

25   or Reese Whyte for the testimony and, depending upon

1   your Honor's ruling, with respect to DeLaura.

2          THE COURT:  You can do that tomorrow.  So that's not

3   going to be a problem, if I rule on the DeLaura testimony

4   tomorrow.  I've already ruled on Ms. Whyte's testimony.  You

5   can have them produced.  I don't anticipate that's going to be

6   a problem.  We're talking about Thursday.  So you can deal with

7   this tomorrow.

8          MR. FERGENSON:  Correct, your Honor.

9          THE COURT:  Are they any other applications from you?

10         MS. FLORIO:  No, your Honor.

11         THE COURT:  Mr. Fergenson?

12         MR. FERGENSON:  Yes, your Honor.  I know the defense

13  said they were calling Maurice Whyte.  They had said earlier

14  they're also calling the defendant.  I just wanted to put on

15  the record, again, we have not received any exhibits and we

16  have not received any response to the if, as, and when

17  subpoena.

18         MS. FLORIO:  Your Honor, most of the requests by the

19  government they have already in their possession.  Like they've

20  subpoenaed the tax records -- or I should say the lack of tax

21  records -- of my client.  They have all of his bank records.  I

22  believe that whatever they have asked for -- we don't have

23  anything else.

24         THE COURT:  You're not going to be introducing any

25  exhibits.

1          MS. FLORIO:  Correct.

2          THE COURT:  Other than ones that the government is

3  already in possession of.

4          MS. FLORIO:  Correct.

5          THE COURT:  Okay.

6          MR. FERGENSON:  Your Honor, I think we would ask for a

7  written response to the subpoena, just a formal response.

8          THE COURT:  I think it's sufficient if she's stating

9  it on the record.  We have a court reporter here.  So I don't

10  think that there is a need to get that in writing.

11          I did just want to note one thing.  I kept out mention

12  of Mr. Ortega's kids through Mr. Rainey because I really

13  thought that that was more prejudicial than it was probative

14  and significantly so.

15          But if Mr. Ortega does testify and he is going to

16  testify along the lines of what you said at sidebar,

17  essentially that he didn't keep a gun anywhere near his kids, I

18  would allow that testimony.

19          I do think that that is substantially more probative

20  than it is prejudicial coming from him, which I did not think

21  was the case coming from Mr. Rainey.  So I did just want to

22  note that so you know that in advance.

23          Are they any additional issues that we need to

24  address?

25          MR. SEIDLER:  When does your Honor anticipate doing

1    the charge conference?

2              THE COURT:  So let's talk about that.  I can have a

3    draft for you tomorrow night, and I can send it to you tomorrow

4    night.  So I was going to propose after court on Thursday, if

5    that works for all of you.  If not, we can do it Friday

6    morning.

7              MR. SEIDLER:  My presence won't be needed.

8              THE COURT:  I'm sorry?

9              MR. SEIDLER:  I have another trial starting.  So I'm

10   not going to be able to do it tomorrow night.  I'll waive my

11   presence for the charge conference I guess.

12             THE COURT:  Does that work for everyone?

13             MR. FERGENSON:  That's fine for the government.

14             THE COURT:  I think that's better, to do it Thursday

15   night, because if there are things that we need to revise or

16   there are cases that you want me to read, I want to make sure

17   to have the time to do that and not keep the jury waiting on

18   Friday.  So I'll email you all the charge tomorrow evening as

19   early as I can.  And then we'll talk about it right after court

20   on Thursday.

21             Any other applications?  Questions?

22             MR. FERGENSON:  No, your Honor.

23             MS. FLORIO:  No, your Honor.

24             THE COURT:  I should note -- my deputy rightly

25   reminded me -- I do have a sentencing at 4:00 on Friday.  And,

1    unless you're in the middle of summations, in which case I

2    wouldn't cut you off, I'm going to ask that we end at 4:00 that

3    day.  If need be, I'll move the sentencing later in the day and

4    have it at 5:00.  But if we can end it at 4:00, I'd like to do

5    so.

6            MS. FLORIO:  No objection.

7            THE COURT:  So I'll just advise you that Ms. Cavale is

8    just relaying comments made by jurors who are concerned about

9    timing and asking questions about if this is going to go into

10   the next week.

11           She's just indicated that she doesn't know; that it

12   may, but it may not.  But I did just want to let you know what

13   I know.  But we'll move as quickly as we can.  Thank you.  And

14   I'll see you at -- be here at 10:45 if you can.

15           I understand, Ms. Florio, you may not be here until

16   11:00.  But just try and be here a little bit early so if we

17   need to talk about anything, we won't keep the jury waiting.

18   Thanks.  Have a nice evening.

19           (Adjourned to January 25, 2023, at 10:45 a.m.)

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

KAYLEN RAINEY

Direct By Mr. Fergenson  . . . . . . . . . . . 591
Cross By Ms. Florio  . . . . . . . . . . . . . 711

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 413   . . . . . . . . . . . . . . . . . . 592

 201D   . . . . . . . . . . . . . . . . . . 617