UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/20/2023

UNITED STATES OF AMERICA,

v.

BILLY ORTEGA, *a/k/a "Jason"*

Defendant.

No. 22-CR-91 (RA) (1)

<u>OPINION & ORDER</u>

RONNIE ABRAMS, United States District Judge:

Defendant Billy Ortega was convicted following a nine-day jury trial of distributing cocaine containing fentanyl which killed three young New Yorkers, conspiring to do the same, and possessing a firearm in furtherance of the narcotics conspiracy. The evidence at trial demonstrated that Ortega operated a drug delivery service in Manhattan for more than seven years, that he stored his drugs and guns in his mother's downtown apartment, that he personally bagged the fentanyl-laced cocaine which killed the victims, and that he directed a co-conspirator, Kaylen Rainey, to deliver the deadly drugs to the victims on the day of their deaths.

Ortega now moves for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or, in the alternative, for a new trial pursuant to Rule 33. For the reasons set forth below, and given the abundance of evidence presented against him before the jury, Ortega's motions are denied in their entirety.

## BACKGROUND

On March 18, 2021, the New York City Police Department ("NYPD") was dispatched to three separate locations in Manhattan where apparent overdose deaths had been discovered. Each victim was found unresponsive and was pronounced dead at the scene—Julia Ghahramani and

Amanda Scher, each at their own apartment, and Ross Mtangi, in a Manhattan hotel room.  *See* GX 824, 826, 832, 834, 846, 848.  The testimony at trial underscored the tragic nature of each loss of life: Julia Gharamani, for instance, was only twenty-six years old, had recently graduated from Columbia Law School, and had just begun practicing as an attorney; Amanda Scher, thirty-eight, was a social worker and lived with her dog downtown; Ross Mtangi, forty, was a trading executive and was expecting a newborn child.  *See, e.g.,* Tr. 34, 57–58.  While the victims did not know each other, in the hours before their deaths on March 17, 2021, each had texted the same drug delivery service, a person they referred to as "Jay" or "Jason," via a cellphone number that would later be connected to Defendant Ortega.  *See* GX S2, S4, 302-C, 111-127, GX 111-127A.  Each had then been visited by the same drug courier, an individual later identified as Kaylen Rainey.  *See* Tr. 515–16, 655.  And each been found located only feet away from black zip-lock bags containing a white powdery substance that would later test positive for cocaine and, critically, fentanyl.  *See* GX 804, 808, 810, 824, 832, 848.

## I.    The Charges Against Ortega

The operative Second Superseding Indictment (hereafter, the "Indictment") charged Ortega with operating a narcotics delivery service that distributed drugs killing three people, conspiring to do the same, and possessing a firearm in furtherance of the conspiracy.  *See* Dkt. 70.[1] Specifically, Count One charged that, between at least 2015 and February 2022, Ortega was involved in a conspiracy that distributed, and possessed with intent to distribute, five kilograms or

---

[1]    A complaint was initially unsealed on January 27, 2022, charging Ortega with a narcotics conspiracy, along with co-conspirators Kaylen Rainey and William Drayton, *see* Dkt. 1; the three were then indicted by the grand jury, in a single-count Indictment charging a narcotics conspiracy causing death, on February 10, 2022, *see* Dkt. 12. Drayton pleaded guilty on August 19, 2022, *see* Dkt. 39, and Rainey pleaded guilty after entering into a cooperation agreement with the Government on September 9, 2022.  A Superseding Indictment was then filed on October 6, 2022, adding four substantive counts against Ortega and also naming his mother, Josefina Marine, as an additional co-conspirator.  *See* Dkt. 43.  Marine pleaded not guilty on October 14, 2022, and—upon the Government's consent— the Court granted a motion to sever her trial from Ortega's.  *See* Tr., Oct. 14, 2022.  The Second Superseding Indictment was filed on December 13, 2022.  *See* Dkt. 70.

more of mixtures and substances containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A), and mixtures and substances containing fentanyl and acetylfentanyl, in violation of 21 U.S.C. § 841(b)(1)(C), and that the use of controlled substances distributed by the conspiracy resulted in the deaths of Julia Ghahramani, Amanda Scher, and Ross Mtangi, on or about March 17, 2021, in violation of 21 U.S.C. § 846. Counts Two, Three, and Four charged Ortega for the separate substantive offenses of distributing the drugs that resulted in the deaths of Ghahramani (Count Two), Scher (Count Three), and Mtangi (Count Four), each in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2. Count Five charged Ortega with the use and carrying of a firearm during and in relation to, or possession of a firearm in furtherance of, the narcotics conspiracy charged in Count One, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.

## II.     The Evidence at Trial

Ortega's trial began on January 18, 2023 and concluded on January 30, after the jury heard the testimony of seventeen separate witnesses. The Government called sixteen witnesses to prove its case: three responding NYPD detectives, two civilian witnesses, three NYPD criminalists, three forensic toxicologists, an expert medical toxicologist, a narcotics trafficking expert, an investigative analyst, a summary witness, and Kaylen Rainey—a cooperating witness and the courier who delivered the drugs to the victims on the day of their deaths. It also introduced more than 350 separate exhibits into evidence. The Defense called a single witness, Maurice "Reese" Whyte, Rainey's former cellmate at the Metropolitan Detention Center ("MDC").

The Government's first civilian witness and the responding NYPD detectives described the discovery of the three victims' bodies on March 18, 2021, as well as law enforcement's initial response and investigation into the drug delivery service. As the evidence demonstrated, following an investigation conducted by the NYPD and other agencies, Ortega was connected to the

3

cellphone used to communicate about the drug sales with the victims, and to dispatch the drug deliveries via Rainey on the day of their deaths.  Specifically, the Government established that Ortega used the cell phone with the number 646-421-5555 through an analysis of his iCloud accounts and text messages.  *See* GX S2, S4, 302-C, 111-127, 111-127A.  The Defense conceded that Ortega operated the phone, and that he used it to dispatch drug deliveries.  *See, e.g.,* Tr. 1246.

The second civilian witness, Jason Ienner, described his long-time use of the drug delivery service to purchase cocaine,  *see id.* 238–41, and identified Ortega in court, who he had known as "Jay," as the person responsible for managing the drug deliveries, *id.* at 242.  *See also* GX 102-C (text exchange between Ienner and Ortega).  He further testified that he purchased cocaine from Ortega on the day that the victims died, March 17, 2021, *see id.* at 257–59, and that, shortly afterword, Ortega texted him saying that the "batch is really strong," and encouraging him to "[d]o small amounts," *id.* at 260.  Three days later, Ortega had a courier replace the cocaine Ienner initially received with a different batch.  *See id.* at 264.  At no point did Ortega warn Ienner that the cocaine may have contained fentanyl, nor that any other customers who had used cocaine from the same batch died from ingesting it.  *See id.*  Indeed, the Government showed the jury text messages indicating that, even *after* Ortega learned that Ghahramani, Scher, and Mtangi had each died after using drugs from the very same batch of cocaine, Ortega instructed a drug-runner to take a remaining portion of the batch and "[g]ive it to some girls."  *See id.* at 1201.

The NYPD criminalists called by the Government then described how they examined and tested the drugs found near each of the victims' bodies, all of which had been stored in black translucent ziplock bags.  *See, e.g.*, Tr. 81–82; GX 824, 832, 848.  They explained that the white powdery substance in each of the bags tested positive for the presence of fentanyl.  *See id.* at 213–215, 224–25.  The three forensic toxicologists thereafter testified that each of the victims' blood

samples tested positive for the presence of fentanyl as well—and, in the case of Ghahramani, positive for both fentanyl and acetylfentanyl.   *see* GX 801 (Gharamani—fentanyl and acetylfentanyl), 802 (Mtangi—fentanyl), 803 (Scher—fentanyl).

After outlining her medical experience and credentials at considerable length, and being subject to *voir dire* by the Defense, Dr. Stacey Hail, a medical toxicologist, explained the concepts of "opioid toxidrome" (which is connected to drugs like "morphine," "heroin," and "fentanyl"), *id*. at 458–61, and "sympathomimetic toxidrome" (connected to "drugs like cocaine or methamphetamine"), *id*. at 461–63.   She opined, based upon the results of the toxicology lab reports, as well as photographs of the positions and other features of the victims' bodies when they were found, how each of the deaths was consistent with opioid toxidrome, *id*. at 475–98.   She thus concluded that fentanyl overdose was the "but for" cause of death for Ghahramani, Scher, and Mtangi.   *See id*.

Significantly, Kaylen Rainey, the courier who delivered the drugs to the victims on the day of their deaths, then testified as a cooperating witness for the Government over the course of three days, providing a detailed description for how he started working for Ortega to deliver his drugs, how Ortega stored his drugs and guns, and how he had managed the delivery service for years. *See id*. 511–894.   He explained, consistent with the contents of seized cellphones and iCloud accounts, that Ortega had operated the drug delivery service from at least 2015 until the time of his arrest in 2022.   *See id*. at 525.   Rainey further testified that Josefina Marine, Ortega's mother, was an active participant in the narcotics conspiracy and stored the drugs in her downtown apartment, provided those drugs to couriers like Rainey, and thereafter received money from the couriers which she stored in a safe protected by several firearms.   *See id*. at 517–19.   Rainey explained that Ortega also worked with other runners who would deliver drugs to Marine's

apartment, and that he would use the apartment to break down and bag cocaine. *See id*. at 515, 519–25.  Rainey testified that he delivered the cocaine to each of the victims on the day of their death on Ortega's instructions, and described his interaction with one victim, Scher, in detail, *see id*. at 515–16, 655.  He also explained that he became a cooperating witness with the Government following his arrest in early 2022, *see id*. at 513, and was cross-examined at some length about the mandatory sentence he would face if the Government were not to file a 5K1.1 letter attesting to his cooperation, *see id*. at 851–56.

Cellphone evidence from the "5555" drug dispatcher phone operated by Ortega in turn demonstrated that, on March 15, 2021, he and unindicted co-conspirator Jorge Ramos Cruz bagged up the drugs that Ortega asked Rainey to distribute to the victims two days later, on March 17.  *See* GX 1006.  Additional evidence from the cellphone further demonstrated Ortega's firearms possession and use, including his own descriptions of his Glock pistol and photographs of the same.  *See, e.g.,* GX 111-125A; GX 101-16F; GX 111-124B.  Finally, the Government's summary witness provided analysis and summary charts documenting the breadth of the narcotics conspiracy based upon entries in a drug ledger that Ortega had kept in the Notes app of his iPhone, as well as text messages he exchanged with drug runners, thereby establishing that the drug delivery service had involved more than five kilograms of cocaine during the charged period.  *See, e.g.*, GX 1007.

After the Government rested, the Court overruled a motion in limine to exclude the testimony of a proposed Defense witness, and Ortega was permitted to call Maurice "Reese" Whyte, Rainey's former cellmate at the MDC, for the limited purpose of establishing alleged prior inconsistent statements Rainey purportedly made while the two were housed together.  *See id*. at

1082–1151.[2]  Ms. Whyte alleged that Rainey told her that he intended to lie at Ortega's trial, and

that he confessed that he had instead obtained the drugs delivered to the victims from a different

source.  *See id*. at 1090–97.  As the Court instructed the jury, Whyte's testimony was admitted not

for the truth of the matter asserted, but only for the "limited purpose of helping [the jury] decide

whether to believe [Rainey's] trial testimony."  *Id*. at 1105–06.  Ortega elected not to testify in his

own defense.  *See id*. at 1156.

Ortega moved for a judgment of acquittal at the close of the evidence, and the Court denied

the motion.  *See* Tr. 1169.  The jury returned a unanimous verdict convicting Ortega on all five

counts on January 30, 2023.  *See id*. at 1389–92.  It further made special findings that the

conspiracy charged in Count One involved five kilograms or more of substances or mixtures

containing a detectable amount of cocaine, and that the drugs Ortega distributed to each of the

victims caused their deaths.  *See id*.; Jury Verdict Form, Dkt. 119 at 1.  Ortega timely filed the

instant motions in February 2023, and the Government filed an opposition.  *See* Dkts. 142, 146.

## LEGAL STANDARDS

Pursuant to Rule 29, "on the defendant's motion," a Court must "enter a judgment of

acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R.

Crim. P. 29(a).  "As a general matter, a defendant challenging the sufficiency of the evidence that

led to his conviction at trial bears a heavy burden."  *United States v. Coplan*, 703 F.3d 46, 62 (2d

Cir. 2012) (cleaned up).  To prevail, a defendant must show, "considering all of the evidence,

direct and circumstantial, that no rational trier of fact could have found the defendant guilty beyond

a reasonable doubt."  *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (cleaned up).  In

evaluating a challenge to the sufficiency of the evidence, the Court views "the evidence in the light

---

[2]      Whyte is a transgender woman, *see* Tr. 863; consistent with the Court's understanding of her preference, this opinion uses female pronouns when discussing her testimony.

most favorable to the government, and draw[s] all reasonable inferences in support of the jury's verdict." *United States v. Anderson*, 747 F.3d 51, 54 (2d Cir. 2014).   This is an "exceedingly deferential standard of review," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008), and a defendant's burden in making a Rule 29 motion is "very heavy," *United States v. Gonzalez*, 110 F.3d 936, 940 (2d Cir. 1997).

"The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam) (cleaned up).   Indeed, the Second Circuit has repeatedly cautioned that, in reviewing the sufficiency of the evidence, "the court must be careful not to usurp the role of the jury," and may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (cleaned up).   A court, for instance, "defer[s] to the jury's evaluation of the credibility of the witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence." *United States v. Jones*, 482 F.3d 60, 68 (2d Cir. 2006).

Of particular relevance here, deference to the jury's assessment of the evidence in conspiracy cases is "especially important because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010) (cleaned up).   "[B]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence," *United States v. Wexler*, 522 F.3d 194, 207–08 (2d Cir. 2008), and even "[s]eemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general," *United States v. Mariani*,

8

725 F.2d 862, 865–66 (2d Cir. 1984).  Finally, the evidence must be viewed "in its totality, not in isolation," *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008), "as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).  "[T]he standard for granting such a motion is strict," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and should only be granted in "extraordinary circumstances," *McCourty*, 562 F.3d at 475.  *See also United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997) (observing a "district court must exercise great caution in determining whether to grant a retrial . . . and may grant the motion only in the most extraordinary circumstances") (cleaned up); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993).

## DISCUSSION

Ortega makes six arguments in support of his motions for a judgment of acquittal, or, in the alternative, for a new trial.  For the reasons set forth below, and given the wealth of evidence adduced supporting his convictions, each of his arguments are without merit.

### I.    Ortega's Motion for a Judgment of Acquittal Pursuant to Rule 29 Fails

#### A.    Sufficient Evidence Supported the Jury's Special Finding as to Drug Weight

Ortega first argues that his conviction on Count One should be vacated, and a judgment of acquittal entered, because insufficient evidence supported the jury's special finding that the conspiracy involved five kilograms or more of cocaine.  The question for that special finding asked the jury to determine: "Did the defendant **either** have personal involvement with, **or** was it

9

reasonably foreseeable to him that the narcotics conspiracy involved, five kilograms or more of mixtures or substances containing a detectable amount of cocaine over the course of the conspiracy?" Jury Verdict Form, Dkt. 119 at 1 (emphasis in original). Specifically, Ortega argues that a witness called by the Government, Intelligence Analyst Rosanna Corrado, offered a "totally unsupported conclusion" regarding the drug quantity distributed, and that "[t]here is nothing in the record, other than bare speculation" to support the jury's special finding as to the weight of cocaine the conspiracy involved. Mot. at 2.

The Court disagrees. As demonstrated below, a rational juror could have determined that the Government's evidence at trial established that the conspiracy distributed a quantity of cocaine exceeding five kilograms throughout the period alleged in the Indictment. *See Eppolito*, 543 F.3d at 45 (requiring a defendant, on a Rule 29 motion, to establish that "no rational trier of fact could have found [him] guilty"); *see also Anderson*, 747 F.3d at 54 (the Court must view "the evidence in the light most favorable to the government, and drawing all reasonable inferences in support of the jury's verdict"). Because the jury could thus have reasonably answered the special question regarding drug weight in the affirmative, Ortega's Rule 29 motion as to Count One is denied.

First, Intelligence Analyst Corrado's testimony regarding the quantity of cocaine distributed by the conspiracy was reasonably based upon the drug ledger that Ortega himself kept on his cellphone. That ledger, as Corrado explained and the jury was able to see for itself across numerous exhibits, was stored in the "Notes" app of Ortega's iPhone, and was organized by month, with line-items reflecting drug deliveries on a given day. *See* Tr. 1021–26; GX 101-14. Using these ledger entries, Corrado told the jury, she was able to create a summary chart. *See* Tr. 1021. The entries in the ledger used the same terminology that Ortega employed when texting his runners to make drug deliveries. *See* GX 101-14; *see also* Tr. 558 (Rainey interpreting a text message

from Ortega, stating "[t]he code for cocaine was 'will.'"); GX 111-120; Tr. 598 (Question: "you say: 'But I only got two will.' What did that mean?" Answer: "I only had two baggies of cocaine left."); GX 111-120. One ledger note on Ortega's phone, for instance, was created in November 2020 and labeled "November 1 earnings," with a first line item that read "4:00 pm p 200$ 2will," as reflected in Corrado's chart below:



GX 101-14 at 1. Corrado explained that, where a quantity of "will" was listed for a transaction in Ortega's ledger, she included the specified sum in her chart as follows:

> Q: And to the right of that, it says P $200 2 will. Now where it says something like 2 will, is that something that you would have counted in the Excel you were creating?
>
> A: Yes. In the will column, I would put the number 2.
>
> Q: Did you also keep track of the money that was listed there?
>
> A: Yes. I kept track of prices as well.

Tr. 1022 (describing GX 101-14 at 1). Where a ledger line item listed only a dollar amount connected to "will," however, Corrado explained that her chart treated the entry as only 1 "will." *See* Tr. 1024–25. She did so even if the dollar figure listed—"$200 or $300 or $600," for instance—appeared on its face to be a multiplier above the standard cost of 1 "will" for $100. *Id.* at 1025. Taking that "conservative approach," *id.* at 1024, Corrado explained that her evaluation

of Ortega's drug ledger yielded 4,205 "will" in the ledger, GX 1007 at 1.

Thereafter, because Ortega's drug ledger did not include any entries for April 2020, September 2020, or December 2020 through December 2021, Corrado explained that she used the same methodology in examining Ortega's text messages about drug deliveries for those months not included in the ledger.  *See* Tr. 1026–29; GX 1007 at 2–3.  In total, Corrado testified, using her "conservative" methodology, her chart yielded a total count of 5,506 "will."  Tr. 1035; GX 1007 at 3.  In turn, the Government convincingly argued—based upon the testimony of Ienner, one of Ortega's cocaine customers, and Rainey, one of the conspiracy's runners—that Ortega typically charged $100 per gram of cocaine, and that the individual bags of cocaine referred to as one "will" each contained one gram of cocaine.  *See* Tr. 249, 254–55, 559, 626.  Corrado's conservative tabulation of 5,506 "will" thus translated into at least 5,506 grams (or 5.506 kilograms) of cocaine.  Perhaps most significantly, Corrado's calculation was made using only ledger entries or text messages from May 2019 to December 2021, *see id*. at 1034–35, merely a two-and-a-half-year period from the much longer seven-year conspiracy charged in Count One. On the basis of this evidence alone, a rational jury could have concluded that Ortega's conspiracy involved more than five kilograms of substances or mixtures containing cocaine.

But Corrado's testimony was, of course, only one source of evidentiary support adduced at trial for the jury's special finding as to drug weight.  Rainey testified, for instance, that he personally witnessed Ortega and other conspirators bagging up a "block" of cocaine on over thirty separate occasions.  *See id*. at 626.  Had such blocks contained just 200 grams each—an amount text message evidence supported, given the occasions described where Ortega and his co-conspirators bagged 200 grams of cocaine in single sittings, *see id*. at 1204—even just the thirty blocks personally seen by Rainey would yield more than six kilograms in sum.  And while

12

Rainey's testimony was corroborated by multiple sources—Ortega's own drug ledger, for instance, *see* GX 101-14, video of a pressed kilogram of cocaine seized from Ortega's home, *see* Tr. 299–300, 320; GX 101-21B, and an extensive series of text messages to drug runners over the course of several years—even his uncorroborated testimony, without more, is sufficient, as a matter of law, to support the jury's special finding as to drug weight.  *See United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) ("[A] federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.").

Because a "rational trier of fact could have found" that the conspiracy involved five kilograms or more of cocaine over its seven year operation, *see United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011), Ortega's motion to vacate his conviction on that basis is denied.

**B.    Sufficient Evidence Supported the Jury's Special Finding as to the Causes of the Victims' Deaths**

Ortega next argues that insufficient evidence supported the jury's special findings that the drugs Ortega distributed resulted in the deaths of Amanda Scher, Ross Mtangi, and Julia Ghahramani.  First, he asserts that the Government presented a toxicology expert, Dr. Stacey Hail, with "no expertise in forensic pathology" who referred to the purportedly unrecognized and illegitimate "excited delirium" syndrome, and whose testimony allegedly "contradicted her conclusions."  Mot. at 2–3.  More generally, Ortega argues that there was insufficient evidence, setting aside what he argues were improper conclusions from Dr. Hail, to support the Government's burden with respect to causation.

Each of these arguments is unavailing.  As set forth below, the jury was entitled to credit Dr. Hail's testimony, already heard—and evidently rejected—Ortega's attacks as to her conclusions on cross-examination, and was presented with an abundance of additional evidence

supporting its special findings as to the causes of death for Scher, Mtangi, and Ghahramani.

As an initial matter, "it is well-settled that when reviewing the sufficiency of the evidence [courts] defer to the jury's assessment of witness credibility." *Untied States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) (cleaned up); *see also United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (observing that the appropriate "place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury") (cleaned up).  Although Ortega now argues that Dr. Hail's opinion regarding the causes of death was not supported, "the jury remained free to accept or reject [her] opinion based on its assessment of the sufficiency of the data and experience informing the proffered opinion, [Dr. Hail's] credibility generally, and the jury's own evaluation of the [evidence]." *United States v. Felder*, 993 F.3d 57, 74 (2d Cir. 2021).  Indeed, the Court specifically instructed the jury that it remained free to "disregard" expert opinions, including Dr. Hail's, "entirely or in part."  Tr. 1329–30.  In like contexts, the Second Circuit has found no error in a jury's reliance on an expert witness's opinion where, as here, counsel had an "opportunity" to cross examine the expert witness, and the "district court advised the jurors that they were free to give [the] opinion testimony whatever weight they thought it deserved or to disregard it entirely." *United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000).  The Court thus cannot "second-guess [the] jury's credibility determination" regarding Dr. Hail's testimony, "particularly when, as is the case here, trial counsel already presented these same credibility arguments to the jury." *United States v. Baker*, 899 F.3d 123, 130 (2d Cir. 2018).  On cross-examination, for instance, Ortega's counsel questioned Dr. Hail at length regarding the acceptability within the medical community of the term "excited delirium" to describe certain symptoms.  *See* Tr. 500.  And in summation, Defense counsel argued that Dr. Hail "did not examine the victims," "did not pronounce them dead," and "did not perform any autopsy or examination."  *Id*. at 1241.  Each of

Ortega's present arguments were therefore already before the jury when it assessed, and evidently credited, the reliability of Dr. Hail's opinion. *See Roman*, 870 F.2d at 71 ("[T]he proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury . . . .").

Regardless, the decision to credit Dr. Hail's testimony was one the jury was entitled to make, as ample evidence was introduced on direct examination which would allow a reasonable juror to credit Dr. Hail's opinion on the merits. She began by explaining her credentials in considerable detail, which include a degree in chemistry, a medical doctorate, a residency at Parkland Hospital (the "single busiest emergency department" in the nation), a two-year fellowship in medical toxicology, board certifications in both emergency medicine and medical toxicology, and her work both as a practicing physician and on university faculty. Tr. 442–44. For more than "24 years," she explained, she worked in an emergency department treating "patients experiencing drug intoxication" and overdose symptoms, including due to fentanyl—observing that the number of patients she had treated in such circumstances was "too numerous to count." *Id*. at 444–45. Dr. Hail described the process by which she makes a differential diagnosis, *id*. at 446, 52–53, the effects of opioid narcotics more generally, *id*. at 448, and fentanyl specifically, *id*. at 449–50, and how she goes about attempting to make a "but for" cause of death determination, *id*. at 450–52. Acknowledging the limits of her methodology, she explained to the jury that such a determination regarding causation cannot be made, in her experience, "[a]bout half of [the] time," and that, accordingly, she frequently testifies on behalf of criminal defendants as well as the Government. *Id*. at 451. Following counsel's *voir dire* regarding her qualifications and methodology, *see id*. at 454, the Defense had "no objection" to Dr. Hail being qualified as an expert in medical toxicology, *id*. at 455.

Dr. Hail then explained the concepts of "opioid toxidrome" (which is connected to drugs like "morphine," "heroin," and "fentanyl"), *id.* at 458–61, "sympathomimetic toxidrome" (connected to "drugs like cocaine or methamphetamine"), *id.* at 461–63, and "sedative-hypnotic toxidrome" (connected to drugs like "alcohol" and "benzodiazepines" and other "sedatives"), *id.* at 463–64.  Finally, she concluded, based upon the results of toxicology reports and photographs of the positions and other features of the victims' bodies when they were found, how each of the deaths was consistent with opioid toxidrome—in other words, that fentanyl overdose was the "but for" cause of death for each victim.  *Id.* at 475–98.  On the record of her thorough direct examination, the Court finds that Dr. Hail's testimony was supported by substantial evidence, and that a rational jury could have credited her conclusions regarding the causes of death.

Moreover, Ortega's argument proceeds as if the only evidence supporting the jury's special findings as to the causes of death was Dr. Hail's testimony, but that is far from the case.  Instead, Dr. Hail's conclusion was but one of many sources of evidence from which a reasonable juror could have concluded that the narcotics distributed by Ortega contained fentanyl and caused the victims' deaths.  The Government presented evidence, for instance, that each of the victims ordered cocaine directly from Ortega, *see* GX S2, S4, 302-C, 111-127, GX 111-127A; that Ortega dispatched Rainey to deliver each of the victims drugs and Rainey in fact did so, *see id.* at 515–16, 655; that the victims' bodies were all found beside the same drugs the following day, *see* GX 824, 832, 848; that lab results established that fentanyl was found in the bags delivered to all three victims, *see* GX 804 (Ghahramani), 808 (Mtangi), 810 (Scher); and that all three victims had fentanyl in their blood at the time that they died, *see* GX 801 (Gharamani—fentanyl and acetylfentanyl), 802 (Mtangi—fentanyl), 803 (Scher—fentanyl).  The logical inference from this evidence at the very least strongly supported the conclusion that the drugs distributed by Ortega

(and delivered by Rainey at his direction) caused the victims' deaths—and a reasonable juror was

entitled to so conclude.

Because a "rational trier of fact could have found," *Persico*, 645 F.3d at 105, that the drugs

Ortega distributed led to the deaths of Gharamani, Mtangi, and Scher, his motion to vacate his

convictions as to Counts Two through Four on this basis is denied.[3]

### C.   Sufficient Evidence Supported the Jury's Verdict on Count Five

Ortega also argues that his conviction on Count Five should be vacated, and a judgment of

acquittal entered, on the basis that the evidence was "wholly insufficient," "sorely lacking," and

---

[3]       In the same section of Ortega's motion where he challenges the sufficiency of the evidence supporting the special findings regarding death causation, he also appears to argue that the conspiracy charged in Count One did not encompass the victims' deaths, and that the Government's proof at trial thus constructively amended the Indictment. This, too, is without merit.  During trial, the Court overruled an objection on the same basis, explaining why the "defense's narrow reading of the conspiracy count [Count One] is not a reasonable one."  *See* Tr. 1165–68.  At trial, Ortega contended that Count One only alleged "that *the defendant* distributed narcotics resulting in death" and used "no words . . . at all that the March 17 conduct is in furtherance of the conspiracy or that any other people were involved in it."  *Id.* at 1166 (emphasis added).  The Court expressly rejected that logic and reaffirms its ruling here.

        To briefly restate the Court's rationale:  A "constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted."  *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021).  In determining whether constructive amendment has taken place, an Indictment should be read as a whole.  In *United States v. Agrawal*, for instance, the Circuit found that the charging language of one count in an indictment was properly incorporated by reference into subsequent counts.  *See* 726 F.3d 235, 261 (2d Cir. 2013); *see also United States v. Schesinger*, 261 F. App'x 355, 358 (2d Cir. 2008).  Ortega's argument—at trial and again here—attempts to isolate paragraphs four and five of Count One without the context of the preceding paragraphs.  Paragraph one, for instance, alleged that the defendant "and others known and unknown . . . did conspire, confederate, and agree together . . . to commit a narcotics offense."  Indictment ¶ 1.  Paragraphs two and three similarly refer to "others known and unknown" who "conspired" to distribute narcotics.  *Id.* ¶¶ 2, 3.  Thus, when Count One is read as a whole, the distribution of narcotics described in paragraphs four and five is clearly part of the same conspiracy charged in paragraphs one to three.  In any event, Ortega's narrow reading of paragraphs four and five misinterprets the meaning of "distribute" as used by 18 U.S.C. §§ 841 and 846.  As courts in this district have instructed, "distribute" in this context means not only personal, physical delivery, but also "causing to be" distributed or delivered.  *See, e.g., United States v. Scales*, 19-cr-96, Jury Charge at 18; *United States v. Ellison*, 18-cr-834, Jury Charge at 39; *United States v. Mathews*, 18-cr-124, Jury Charge at 31.  Thus, when Ortega is alleged to have "distributed" controlled substances in Count One, such distribution could have been effected by co-conspirators if he nevertheless "caused" it to occur.

        Finally, Ortega also relies upon out-of-Circuit authority, *United States v. Keller*, 916 F.2d 628 (11th Cir. 1990), but that case is unavailing.  In *Keller*, the Eleventh Circuit held that an indictment had been constructively amended where a district court's instructions had the effect of adding in the phrase "with other named and unnamed conspirators" to a conspiracy charge.  *Id.* at 636.  Here, by stark contrast, the grand jury specifically *did* include such language in the Indictment: "BILLY ORTEGA, a/k/a 'Jason,' the defendant, *and others known and unknown*, intentionally did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States."  Indictment ¶ 1 (emphasis added).

that there is purportedly "no evidence any [firearm] possession was related in any way to the narcotics conspiracy." Mot at 4. He further suggests that any text messages about guns sent by Ortega "cannot be taken seriously" and were "obviously [] joke[s]." *Id*. at 4–5. The Court disagrees. The Government presented sufficient evidence, through both electronic exhibits from Ortega's phone and Rainey's testimony based upon his personal observations, demonstrating Ortega's use of firearms in furtherance of the conspiracy. A reasonable juror thus could have concluded that Ortega was guilty on Count Five beyond a reasonable doubt. *See Persico*, 645 F.3d at 105.

Text messages and photographs from Ortega's phones and iCloud accounts which the Government introduced, for instance, demonstrated Ortega's firearms possession and use. GX 111-125A (audio message of Ortega saying "I had to make two runs, and where I was going I needed it"); Tr. 640–41 (Rainey explaining that Ortega was referring to "the gun," that he was "making two [drug] runs and—where he felt like he needed to take the gun with him"); *see also* GX 101-16F (Ortega's search history showing a photograph of a Glock 30); GX 101-16D (search history showing image search for ammunition). Rainey, moreover, testified directly about the conspiracy's gun use: he explained that several drug runners used guns for "protection for the drugs and the money," and that the guns were "supplied" by "Billy." Tr. 518. He also described two guns that were kept in Marine's apartment "to protect the drugs and the drug money." *Id*. at 630–32. One of those guns was a "black handgun"—a "pistol" that he personally witnessed Ortega holding. *Id*. at 632–33. Rainey also testified that Ortega would discuss guns with his co-conspirators (referring to them as "straps"), said that he needed more guns, and that Ortega would leave the black pistol in the dresser drawer of Rainey's room when he was staying at Marine's apartment. *See* Tr. 629–33; GX 111-124B (photograph of the black Glock pistol taken by Rainey).

18

Upon a Rule 29 motion, "the court must be careful not to usurp the role of the jury," and may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Jabar*, 19 F.4th at 76 (cleaned up). The cellphone evidence and Rainey's testimony was sufficient to permit the jury to find Ortega guilty of the firearms charge; accordingly, his Rule 29 motion on that basis is also denied.

**II.   Ortega's Motion for a New Trial Pursuant to Rule 33 Fails**

**A.   Rainey's Tweets Do Not Constitute "Newly Discovered Evidence" Under Rule 33**

Ortega next argues that six Tweets posted by cooperating witness Kaylen Rainey predating his arrest in this action constitute "newly discovered evidence" warranting him a new trial. This, too, is plainly without merit.

A motion for a new trial pursuant to Rule 33 based on newly discovered evidence should be granted only when "(1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Owen*, 500 F.3d 83, 87–88 (2d Cir. 2007). This is a particularly "strict" standard, *Gambino*, 59 F.3d at 364, and a motion for a new trial is thus only to be granted in "extraordinary circumstances," *McCourty*, 562 F.3d at 475. "The balance between protecting the finality of judgments and the interests of justice is inherent in the Rule 33 analysis," *United States v. Forbes*, 790 F.3d 403, 408 (2d Cir. 2015), and the Circuit has "never before held that a new trial may be granted pursuant to Rule 33 on the basis of evidence that was known by the defendant prior to trial, but became newly available after trial," *Owen*, 500 F.3d at 89. The "ultimate test" is whether "letting a guilty verdict stand would be a manifest injustice." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005).

Ortega argues that five Tweets posted by @Qing__k on Twitter—an account that Kaylen Rainey admitted on the stand to be his—warrant him a new trial. *See* Tr. 870–82 (acknowledging Tweets posted by the account were his own). Each of the Tweets was posted prior to Rainey's arrest and cooperation in this action, and two were posted approximately a decade prior to any of the events giving rise to Ortega's Indictment. *See* Mot. at 5 (citing (1) Tweet dated Jan. 26, 2021 ("I just be lying lmao"); (2) Tweet dated Dec. 24, 2021 ("I lie when necessary"); (3) Tweet from Dec. 25, 2011 ("LMFAO girl I'm a liar"); (4) Tweet dated Dec. 31, 2011 ("I'm such a liar but hey I be wanting shit to myself.  Can't spoil the secret."); (5) Tweet dated June 23, 2011 ("I'm a liar too shit so we even")).  In Ortega's telling, these Tweets show Rainey to be a self-described liar, and that, particularly the Tweets from December 2021, shortly before Rainey's arrest in February 2022, demonstrate he is willing to "lie when necessary," thereby calling his "credibility into question in a manner that requires a new trial in the interests of justice."  Mot. at 5.

The Court is unpersuaded.  Significantly, Ortega was well aware of Rainey's Twitter account at the time of trial, as demonstrated by his counsel's cross-examination of Rainey regarding other Tweets from the same account, *see* Tr. 870–72; he thus cannot make "a showing that the evidence could not with due diligence have been discovered before or during trial." *Owen*, 500 F.3d at 87 (quoting *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980)).  Counsel cross-examined Rainey regarding his "consistent[]" Twitter usage "before [he] w[as] arrested," Tr. 870, for instance, his self-promotion on that platform as a "professional shit-talker," *id.*, and the fact that he Tweeted things such as "[l]ife is a game I've mastered how to play," *id*. *See also id*. at 1257 (Defense counsel referencing Rainey's Twitter account during her summation).  It is black letter law that a defendant does not "newly discover" evidence that was "known by the defendant prior to trial, but became newly available after trial." *Owen*, 500 F.3d at 89.  That the Defense

chose to limit its cross-examination of Rainey's Twitter activity to other content is irrelevant to whether it could have, at the time, cross-examined him about the messages now cited in the Rule 33 motion. Because Ortega makes no showing that these additional Tweets could not "with due diligence have been discovered before or during trial," *Alessi*, 638 F.2d at 479, they cannot form the basis for granting the relief he seeks.

In any event, the Tweets are also "merely cumulative or impeaching," are not "material," and would not "likely [have] result[ed] in an acquittal." *Owen*, 500 F.3d at 88. As described above, Defense counsel's meandering cross-examination of Rainey was premised almost exclusively on attacking his credibility and making him out to be a "liar" and "shit-talker." *See, e.g.*, Tr. 721 (cross of Rainey about his self-description as a "professional shit-talker"); *id*. at 825–31 (Rainey acknowledging on cross that he "lied for most of the interview" when he first met with the Government for a proffer); *id*. at 850–51 (cross of Rainey regarding past failure to report income on tax forms); *id*. at 851–56 (cross regarding Rainey's incentives by cooperating with the Government and his desire to obtain a 5K1.1 letter to avoid a 25-year mandatory minimum sentence); *id*. at 870–72 (cross regarding Twitter posts where Rainey described himself as a "professional shit-talker"); *id*. at 1270 (Counsel on summation arguing that Rainey "professes on his Instagram and on his Twitter account" that he is a "shit-talker," that he "talks his shit," and is a "master manipulator" who "knows exactly what he needs to do to get his deal"). And, indeed, the Defense's *only* witness during its case-in-chief, Rainey's former cell-mate, Maurice "Reese" Whyte, was called only to further attack Rainey's credibility by arguing that his trial testimony was fabricated. *See id*. 1090–99 (Defense direct-examination of Whyte, wherein she alleged that Rainey told her that he planned to "lie" at trial to "blame Ortega"). Additional evidence in the form of the five Tweets described in the present motion would only have served to further impeach

Rainey's credibility—a point already made to the jury at length over the course of the nine-day trial. *See, e.g., Zagari*, 111 F.3d at 320–21 (finding, where the jury already "had information with which to evaluate [a witness's] credibility" via extensive cross-examination, that "[t]his alone might be enough to make the evidence . . . cumulative and non-material"); *United States v. Diaz*, 922 F.2d 998, 1006–07 (2d Cir. 1990) (finding that purportedly newly discovered evidence that an informant had stolen money would have provided redundant impeachment of a witness whose credibility "had in fact been attacked repeatedly"). The Court is similarly unconvinced that, newly equipped with these five Tweets—including two from 2011, when Rainey was 19 years old— Ortega would have "likely" been acquitted. *Owen*, 500 F.3d at 88. As explained above, the evidence at trial against Ortega was considerable, and was introduced via sixteen Government witnesses and more than 350 Government exhibits. Any addition of these outdated Tweets from Rainey would have made little difference in the jury's weighing of his guilt.

The Court thus has little difficulty concluding that Ortega fails to meet the "strict" standard attendant to Rule 33 motions premised on newly discovered evidence, *Gambino*, 59 F.3d at 364, and his motion does not present the "extraordinary circumstances" necessary to grant him a new trial, *McCourty*, 562 F.3d at 475.

**B.  Any Error in the Government's Summation was Cured by the Court's Instruction**

Fifth, Ortega argues that he is entitled to a new trial given what he characterizes as misstatements of law by the Government during its closing argument. Mot. at 5–6. To the extent that the Government made any misstatement of law, the Court immediately made a curative instruction to the jury at the time. Any confusion the Government's limited reference may have created for the jury regarding the elements required to convict Ortega of the charged offenses was thus remedied before the jury began its deliberations, and did not affect the fairness of Ortega's

trial on the whole, as is his burden to establish. *See United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2011) (observing that, when seeking a new trial based on allegedly improper arguments in summation, a defendant bears "a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial").

Government counsel observed early in his summation that "[l]ater today, Judge Abrams will give you detailed instructions on the law," emphasized that the Court's "instructions govern," and noted that "if anything I say is different from what Judge Abrams tells you, you must follow what she says." Tr. 1176. Later, in describing the substantive offenses charged in the Indictment, the Government observed:

> You don't have to make a finding that it was the [D]efendant's drugs. As I said before, all you have to find is that he intended to distribute drugs. But if you look closely and you read the text messages, you'll see that not only did he intend to distribute drugs of any kind, these were his. He bagged them up.
>
> . . .
>
> [W]hat I expect Judge Abrams is going to instruct you is that it doesn't matter where the fentanyl came from that killed the victims or even whether the [D]efendant knew that he was distributing fentanyl. As I said, if you look closely, you'll see the evidence shows that the defendant and Jorge bagged up all the drugs that killed the victims on March [1]5, 2021, two days before their deaths, right at the stash house.

*Id*. at 1191–92. Following the Government's summation, Ortega's counsel objected, claiming that the victims could have had "two different drug dealers" and that the drugs Ortega distributed were not necessarily the drugs that caused their deaths. *Id*. at 1223. Although his counsel was somewhat unclear on the theory he was advancing, Ortega appeared to argue that it was not true, as the Government had suggested, that the jury could convict the Defendant for the distribution of narcotics if they were instead drugs that the victims had procured from another source. *See id*. The Government responded, explaining that, to the extent the Defense was arguing that Ortega did not know that Rainey was delivering fentanyl, as a legal matter, the jury did not have to find that

23

Ortega knew that Rainey was delivering fentanyl, or even the source from which Rainey obtained the drugs. *See id.* at 1228–30. The Government argued, "[t]he point is the charge is distributing drugs and that includes directing someone to distribute drugs and it doesn't say the drugs have to have been owned or procured by the person causing the distribution." *Id.* at 1230.

After a recess, the Court denied Ortega's motion for a mistrial, *id.*, but expressed some agreement with the notion that, when the Government made the statement that "it doesn't matter if these were the [D]efendant's drugs, that it just may be misleading to the jury," *id.* at 1233. Accordingly, the Court elected to give an instruction to the jury to remedy any confusion prior to the Defense's summation. *See id.* at 1234–35. When the jury returned, the Court explained that it would offer them more detailed legal instructions after closing arguments, but, with that said:

> [I]n the context of making a particular argument, the government made a statement in passing to the effect that it doesn't matter whether these drugs were the [D]efendant's drugs. Among other things, I'm going to instruct you that in order to be found guilty of distributing controlled substances, you must find that the [D]efendant distributed controlled substances or caused them to be distributed and I am going to explain what that instruction entails further today.

*Id.* at 1236. The Defense then argued during its summation that the fentanyl which killed the three victims "was not distributed by Billy Ortega or Kaylen Rainey" but rather came from an entirely different unnamed drug dealer. *Id.* at 1248.

As observed above, in seeking a new trial based on purportedly improper arguments in a summation, Ortega bears "a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial." *Banki*, 685 F.3d at 120 (quoting *United States v. Locasio*, 6 F.3d 924, 945 (2d Cir. 1993)). Specifically, "[f]laws in the government's summation will require a new trial only in the rare case in which improper statements—viewed against the entire argument to the jury—can be said to have deprived the defendant of a fair trial." *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010); *see also*

*United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002).  This is not one of those "rare" cases, *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992), and Ortega is not entitled to a new trial based upon the purported misstatement he identifies in the Government's summation.

As an initial matter, the Government's statement was responding to Ortega's previously articulated theory, one he explored during his opening statement and in pretrial submissions, that, even if Ortega had intended to sell cocaine to the victims, after being dispatched by Ortega, Rainey then obtained the drugs he sold from a different supplier.  *See* Tr. 46–47 (Defense opening regarding this theory); Dkt. 95 at 1 (Defense letter stating "Ortega's defense is that . . . Rainey was specifically told never to obtain narcotics from the subject specific cocaine supplier with Mexican connections because her cocaine was laced with deadly amounts of fentanyl.").  The Government argues that, when it made the statement with which Ortega took issue during summation, it was simply responding to what it previously believed to be Ortega's proffered defense.  And, to be sure, as the Court later instructed, it is true that "the law permits a defendant to be found guilty of a narcotics offense, including a narcotics offense causing death . . . where the defendant intended to distribute one drug, such as cocaine, but actually distributed or caused another individual to distribute another drug or another drug containing a mixture such as fentanyl." Tr. 124–25.  The Second Circuit has recognized, for instance, that "drug dealers convicted under § 841(a) need not know the type and quantity of drugs," and that the *mens rea* element of the offense referred only to knowingly distributing or causing to be distributed a controlled substance under the statute. *United States v. King*, 345 F.3d 149, 153 (2d Cir. 2003).

More importantly, and in any event, the Court mitigated any discrepancies that the Government's statement during summation may have had with the Court's later instructions by making an additional curative instruction prior to the Defense's summation.  *See* Tr. 1236.  Given

that instruction, as well as those the Court offered when the case was submitted to the jury, Ortega's effort to now claim that he was prejudiced by the Government's remark falls well short of Rule 33's "strict" demands. Because any error during the Government's summation does not rise to the level of the "rare case in which improper comments in a prosecutor's summation are so prejudicial," *Rodriguez*, 968 F.2d at 142, and "significant as to result in the denial of [the Defendant's] right to a fair trial," *Banki*, 685 F.3d at 120, Ortega's motion on this basis is denied.

### C.   DeLaura's Testimony was Properly Excluded

Finally, Ortega argues that he is entitled to a new trial because the Court improperly precluded the testimony of his proposed witness Jonathan DeLaura, which, he claims, would have "directly contradicted" the testimony of cooperating witness Kaylen Rainey. Mot. at 6. Ortega's argument with respect to Mr. DeLaura's proposed testimony was extensively briefed previously, however, *see* Dkt. 87 at 1–2; Dkt. 90 at 1–5; Dkt. 95; Dkt. 98; Dkt. 104. On the basis of that briefing and lengthy arguments from counsel, the Court properly granted the Government's motion in limine to exclude DeLaura's testimony—while expressly allowing the Defense to cross-examine Rainey regarding the same matters about which DeLaura would have testified—pursuant to Federal Rules of Evidence 608(b) and 404(b). *See* Tr. 999–1004. The Court finds that Ortega's terse and summary reassertion of his argument regarding DeLaura's testimony in the present motion falls far short of the demanding standard attendant to a Rule 33 motion.

First, while Rule 608(a) provides that a "witness's credibility may be attacked . . . by testimony about the witness's reputation for having a character for truthfulness or untruthfulness," Rule 608(b) expressly prohibits "extrinsic evidence" offered to "prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608. Instead, Rule 608(b) makes clear that a "court may, on cross-examination, allow

[specific instances of conduct] to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness." *Id*. 608(b). Because the Defense sought to call DeLaura, another inmate at the MDC, to testify exclusively about specific instances of Rainey's alleged criminal activity subsequent to the charged conspiracy—namely, that Rainey engaged in prostitution and marijuana distribution while incarcerated—to establish a character for untruthfulness, the Court concluded that such testimony was prohibited by Rule 608(b). *See* Tr. 999–1002. The Court did, however, permit the Defense to "cross Rainey about his alleged crimes to attack his truthfulness," observing that permitting such questioning on cross-examination "is all that Rule 608 requires." *Id*. at 1002. Moreover, the Court determined—even setting aside Rule 608(b)'s prohibition—that any effort to call DeLaura under the so-called doctrine of "impeachment by contradiction" was also improper, given that the purportedly impeaching testimony would have related exclusively to collateral issues. The Court cited the Second Circuit's decision in *United States v. Purdy*, which explained that "[e]xtrinsic evidence offered for impeachment on a collateral issue is properly excluded." 144 F.3d 241, 245–46 (2d Cir. 1998); *see also United States v. Jackson*, 540 F.3d 578, 587–99 (7th Cir. 2008) (explaining that a party may not impeach by contradiction on collateral matters). And it noted the Circuit's more recent observation in *United States v. Rivera*, that a witness may be "impeached by extrinsic proof of a prior inconsistent statement only as to matters which are not collateral, *i.e.*, as to those matters which are relevant to the issues in the case and could be independently proven." 273 F. App'x 55, 58 (2d Cir. 2008); *accord Bermudez v. City of N.Y.*, 2019 WL 136633, at *18 (E.D.N.Y. Jan. 9, 2019) (Judge Matsumoto adopting the same rationale for excluding impeachment testimony on a collateral issue). Because DeLaura's proposed testimony would have been "definitionally collateral to the issues at trial"—that is, whether Ortega was guilty of the charges against him—

the Court properly excluded it on that basis as well. *See Jackson*, 540 F.3d at 587–88 (explaining such testimony is "not a proper purpose of impeachment by contradiction"); *United States v. Higa*, 55 F.3d 448, 452 (9th Cir. 1995) (same).

As to the Defense's alternative attempt to admit DeLaura's testimony under Rule 404(b), the Court determined at trial that the evidentiary bases articulated by Ortega were prohibited by the rule. The Court found that the testimony would have been used improperly to prove propensity based on Rainey's purportedly bad character—that because Rainey prostituted himself or sold drugs at the MDC, the Defense was arguing, he must also have been capable of other wrongdoing. Challenged by the Court on this point, the Defense offered no permitted purposes for the testimony under Rule 404(b) at trial, and it offers none now. There is nothing to suggest that prostitution, for instance, or alleged drug trafficking at the MDC, was part of a "common scheme" with the narcotics conspiracy charged in the Indictment. Rather, the Defense argued only that the testimony about Rainey's wholly unrelated crimes was generally "probative of Kaylen Rainey's character," Tr., Jan. 13, 2023 at 25, and should have been admitted to "show the full picture of Kaylen Rainey the person," Dkt. 95 at 3. *See also* Tr., Jan. 23, 2023 at 25 ("It is Rainey's sense of being."). The Court gave Defense counsel repeated opportunities to cite any cases supporting its contention that DeLaura's testimony should have been admitted as proper 404(b) testimony and it failed to do so at trial, *see* Tr. at 1002–03; it fails once again to do so in the present motion, and indeed cites no authority in contending that exclusion of the testimony was error, *see* Mot. at 6.

Lastly, the Court concluded that even if DeLaura's testimony were not plainly prohibited by Rules 608(b) and 404(b), it also was inadmissible under Rule 403, as allowing it would have risked creating a so-called "trial within a trial," with the Government then calling rebuttal witnesses to attack DeLaura's testimony about Rainey's post-conspiracy crimes, and so forth. *See*

*United States v. Johnson*, 816 F. App'x 604, 610 (2d Cir. 2020) (explaining that Rule 403 permits a district court to exclude evidence that, even if probative to some limited degree, would create a "real risk of distraction" for the jury and could create a "trial within a trial").  Such distraction here would have created a substantial risk that the jury could have been confused as to the critical issues of fact before it, and that risk substantially outweighed the limited probative value (if any) of Rainey's alleged unrelated crimes.

Accordingly, the Court did not err in excluding DeLaura's inadmissible testimony, while allowing the Defense to cross-examine Rainey about the same allegations, and Ortega's motion for a new trial on this basis is also denied.

## CONCLUSION

For the foregoing reasons, Ortega's motions brought under Federal Rules of Criminal Procedure 29 and 33 are denied in their entirety.  The Clerk of Court is respectfully directed to terminate the motions pending at Dkt. 142.

As previously ordered, sentencing remains scheduled for October 4, 2023, at 2:30 p.m.


SO ORDERED.

Dated:      September 20, 2023
            New York, New York

Hon. Ronnie Abrams
United States District Judge