**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

UNITED STATES OF AMERICA,

         v.                                Case No. 22-CR-091-RA

Billy Ortega,

                       Defendant.

-------------------------------------------------------------------- X


**<u>SENTENCING MEMORANDUM ON BEHALF OF BILLY ORTEGA</u>**


Dawn M. Florio, Esq
DAWN M. FLORIO LAW FIRM
488 Madison Avenue, 20th Floor
NEW YORK, NY 10022
212.939.9539

Attorney for Billy Ortega

Dated:  September 15, 2023

To:    Honorable Ronnie Abrams
       AUSA Michael Herman
       AUSA Micah Fergenson
       USPO Johnny Y. Kim

## TABLE OF CONTENTS

I.      RELIEF SOUGHT

II.     INTRODUCTION AND SUMMARY OF CASE

        A.  SUMMARY

            PROCEDURAL POSTURE

III.    ARGUMENT

        A.  SENTENCING PURSUANT TO 18 U.S.C. § 3553(a)

IV.     HISTORY AND CHARACTER OF THE DEFENDANT

V.      SENTENCING REQUEST

VI.     ATTACHED CHARACTER LETTERS

## I.   <u>RELIEF SOUGHT</u>

Defendant Billy Ortega, by and through his attorney of record Dawn M. Florio, Esq., pursuant to 18 U.S.C. § 3553(a) hereby respectfully submits this Memorandum requesting the Court sentence him to a non-guideline sentence of 300 months, which is justified by the circumstances and factors to be considered, and is sufficient, but not greater, than necessary to comply with the purposes of sentencing.

## II.   <u>INTRODUCTION AND SUMMARY OF THE CASE</u>

This Memorandum is respectfully submitted on behalf of my client, BILLY ORTEGA, who is scheduled for sentencing on October 4, 2023, at 2:30 PM. Provided herein is pertinent background and legal argument for your Honor's consideration in determining the appropriate sentence.

### A.   <u>SUMMARY</u>

Billy Ortega was arrested on February 1, 2022 and was ordered detained. On December 13, 2022 Billy Ortega was charged in a five count superseding indictment. Count One of the indictment charged Mr. Ortega with participating in a conspiracy from at least 2015 to February 2022 to distribute and possess with intent to distribute 5 kilograms or more of a substance containing a detectable amount of cocaine, a substance containing a detectable amount of fentanyl, and a substance containing a detectable amount of acetylfentanyl in violation of 21 U.S.C. § 841(b)(1)(A) and (b)(1)(C). It further charged that the use of the cocaine, fentanyl, and acetylfentanyl distributed by the Defendant resulted in the death of Julia Ghahramani on March 17, 2022 and that the use of the cocaine and fentanyl distributed by the Defendant resulted in the death of Amanda Scher and Ross Mtangi on March 17, 2022. Count Two through Count Four of the indictment charged narcotics conspiracy resulting in the death of Julia Ghahramani, Amanda Scher, and Ross Mtangi respectively. Count Five of the indictment charged Mr. Ortega with possessing a firearm in furtherance of a narcotics conspiracy in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (c)(2).

**Procedural Posture**

The Defendant appeared before the Honorable Ronnie Abrams and pled not guilty to the superseding indictment, S4, on December 16, 2022. Trial commenced on January 18, 2023 with jury selection, and ended on January 30, 2023 with the jury convicting Mr. Ortega of all counts. Probation calculated the offense level as 43 and the criminal history category as I. Probation calculated the guideline range as life, with a statutory minimum of 240 months as to Counts One through Four, to be followed by a statutory minimum and consecutive of 60 months as to Count Five. Probation recommended the minimum sentence of 300 months; 240 months on Counts One through Four run concurrently, followed by a mandatory consecutive term of 60 months on Count Five. Probation recommended a total of five years supervised release; five years for each count to run concurrently. Probation did not recommend a fine, nor does Mr. Ortega have the ability to pay a fine.

### III.   ARGUMENT

#### A.   SENTENCING PURSUANT TO 18 U.S.C. § 3553(a):

In accordance with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and the Second Circuit's decision in *United States v. Perez*, 397 F.3d 103 (2d Cir. 2005), the sentencing court must consider all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines (the "Guidelines") established by the United States Sentencing Commission. Those factors are, in relevant part:

(1)    The nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    The need for the sentence imposed –

(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) To afford adequate deterrence to criminal conduct;

(C) To protect the public from further crimes of the defendant; and

(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)      The kinds of sentences available;

(4)      The kinds of sentence and the sentencing range established for –

(A) The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines...

(5)      Any pertinent policy statement ... [issued by the Sentencing Commission];

(6)      the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)      The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

A sentencing court is permitted to find all the facts appropriate for determining a sentence, whether or not that sentence falls within the Guidelines. *See Perez*, 397 F.3d at 114-15.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory Sentencing Guidelines system violated the Sixth Amendment. Pursuant to the *Booker* remedial opinion (and as further explained in subsequent Supreme Court cases), the sentencing court is to apply the factors set forth in 18 U.S.C. § 3553(a). Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the traditional goals of sentencing." *United States v. Kimbrough*, 123 S.Ct. 558, 570 (2007) (citing sentencing goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)).

The district court need not presume the Guidelines range is reasonable, and it must make an individualized evaluation of the facts and circumstances before it. In so doing, the sentencing court should consider the possibility that a Guidelines sentence is not just unnecessary to accomplish the goals set forth in § 3553(a), but that such a sentence would be "greater than necessary" – put differently, that a Guidelines sentence will actually thwart application of § 3553(a)'s command to impose the minimum sentence necessary to achieve the goals of sentencing. *Rita v. United States*, 127 S.Ct. 2456, 2465 (2007). The court is "free to make its own reasonable

application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 128 S.Ct. at 577 (Scalia, J., concurring).

In addition the COVID-19 pandemic laid bare the horrific conditions in our prisons and their inability to keep prisoners safe from disease, this warrants consideration. In *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) Justice Kennedy, concurring, called for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant. *See Id.*. In *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) the Honorable Victor Marerro, a District Judge in the Southern District of New York, granted a downward departure where the defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case." Judge Marerro also stated that "potential conditions of confinement that a particular defendant is likely to encounter while in custody after sentencing" merit consideration, citing to *Koon v. United States*, 518 U.S. 81 (1996). *See also United States v. Lara*, 905 F.2d 599, 601 (2d Cir. 1990) (upholding a downward departure grounded on defendants potential for victimization in prison).

## IV. HISTORY AND CHARACTER OF THE DEFENDANT

BILLY ORTEGA is 37 years old and was born in Manhattan. He has a high school education. Prior to his arrest Billy Ortega was on disability.

Billy was born to the union of Luis Ortega, a factory worker who is in his 60's, and Josefina Marine, age 59, who is unemployed. Both reside in Manhattan.

Billy has two maternal half siblings. Melanie Quezada, age 30, works at JPMorgan Chase; Kevin Quezada, age 29, works as a barback at a restaurant in Manhattan. He additionally has two paternal half siblings. Kenneth Ortega works at an airport, and Steven Ortega works at a homeless shelter.

Billy had a difficult upbringing, his parents were separated and his father was barely in his life. He resided with his mother and grandmother, though his grandmother was his primary caretaker as his mother was in and out of rehab. It is reported that Billy's mother was using drugs while

6

pregnant with Billy, and had drugs in her system when she gave birth to him. Both Billy's mother and grandmother were on public assistance, and barely managed to make ends meet.

Billy Ortega has never been legally married. He has four biological children. His oldest, Avant Ortega, is 16 years old and lives with his mother, Latesha Beltre. He has twins, Patrick and Penelope Santana, age 10, with Irene Santana. His youngest, Chloe Ortega, is three years old, born of his relationship with Hope Cooper. Additionally Billy helped to raise Hope's other children, ages 10 and 13, from a prior relationship.

Letishia Beltre, the mother of Billy's oldest child, says that Billy is an amazing soul, a genuine loving, and generous individual. Melanie Quezada, Billy's sister, says that Billy has a heart of gold and speaks of how Billy helped her raise her child when she became a single teenage mother. Steven Ortega, Billy's brother, says that Billy was always a good role model growing up who showed Steven how to be a good family man. Luis Ortega says that his son is good hearted and a great older brother. Rosa Ortega, Billy's stepmother, says that Billy is a caring and decent young man who is a loving father to his children. Yuberkis Vargas says that Billy is a kind and genuine person who puts his family first. Avanta Ortega, Billy's oldest son, says that Billy is kind, loving, selfless, and caring, and always put his kids and family first, a man with a big heart always willing to help. Kenneth Diaz says that Billy Ortega showed him what a real father figure looked like.

## A. History of Drug Abuse, Mental Health Issues, Physical Condition

Billy Ortega does have a history of substance use and feels that he would benefit from participation in drug treatment programs including RDAP. Mr. Ortega drank on weekends with friends, but stopped in 2016 because of instances of binge drinking, and felt that he became aggressive when drinking. Billy Ortega reported daily marijuana use before his arrest. He further reported using cocaine on a near weekly basis, as well as using ecstasy and molly, as much as multiple times a week.

Billy Ortega has no history of diagnosed mental health issues, however he has indicated that he may have Post Traumatic Stress Disorder from being attacked in 2015, and that he has dyslexia. Billy has received disability payments since he was 11 years old as a result of his condition.

Billy Ortega has a history of physical health issues. In 2001 Billy was hospitalized for one week after he was stabbed at school, puncturing his right lung. In 2002 Billy was hospitalized again after he was slashed. In 2009 or 2010 Billy Ortega was the passenger in a taxi which was hit by a car, he suffered a concussion and reported that he has lasting memory problems from this incident.

## V. HARSH CONDITIONS AT MDC

Under 18 U.S.C. 3553(a), the District Court can consider harsh conditions of the Defendant's pre-trial confinement which may merit mitigation. Numerous District Courts have agreed that the Metropolitan Detention Center ("MDC") are facilities which are harsh and inhumane and this warrants consideration for mitigation. The conditions in these facilities are shocking and unacceptable.

The Second Circuit has held that "pre-sentencing confinement conditions may in appropriate cases be a permissible basis for a downward departure." See, United States v. Francis, 129 F. Supp. 2d 612 (S.D.N.Y. 2001) (departing one level because of harsh conditions of pre-trial confinement). Likewise, District Courts have mitigated or departed downward on the grounds of the harsh conditions the MDC and, formerly, the Metropolitan Corrections Center ("MCC") for those awaiting trial and sentencing. See, United States v. Mendola, S2 03 Cr. 449. (the Court took into consideration the harsh conditions of Mendola's confinement at MCC and departed from the recommended sentence by 10 months.) See also, United States v. Mateo, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004); United States v. Hernandez- Santiago, 92 F. 3d 97, 101 (2nd Cir. 1996) (the court departed three levels based on 22 months of harsh confinement in the facility); United States v. Lara, 905 F.2nd 599 (2nd Cir. 1990) (the district court departed from a guideline of 121 – 151 months, imposing the minimum sentence of 60 months. This decision relied in part, on consideration of the defendant's harsh confinement while awaiting trial and sentencing).  See e.g. United States v. Carty,

264 F.3d 191 (2d Cir. 2001) (holding, per curium, that abnormally harsh presentence conditions can be grounds for a downward departure), United States v. Mateo, 299 F.Supp.2d 20l (S.D.N.Y. 2004) (downward departure of nine levels where denial of medical attention and sexual harassment of a female inmate "inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration proscribed by the Guidelines"); United States v. Speed Joyeros, 5.A., 204 F. Supp. 2d 412, 441 (E.D.N.Y 2002) (Judge Weinstein downwardly departing because of, inter alia, "the physical deterioration of the defendant" while in pretrial custody).

The Supreme Court recognized that because pre-trial confinement is an administrative, as opposed to judicial form of detention, the confinement must not rise to the level of punishment or otherwise violate the constitutional rights of those detained. See, Bell v. Wolfish, 441 U.S. 520, 537 (1979). Judge Weinstein of the Eastern District observed, "[t]he inevitable consequences of pre-trial incarceration, particularly when prolonged beyond a short period, are undeniably severe." See, United States v. Gallo, 653 F Supp.2d 320 (EDNY 1986).

In Gaston v. Coughlin, 249 F.3d 156, 164-165 (2nd Cir. 2001), the Second Circuit held that rodent infested units and the presence of human waste in and around cells can constitute cruel and unusual punishment. Chief Judge Jack Weinstein also determined that inhumane conditions and lengthy pre-sentence detention conditions can violate due process. The unusually harsh conditions at MDC deprive pre-trial inmates of their constitutional rights and have not kept up with contemporary standards of decency. They represent substantially harsher conditions from those the defendant would have experienced if he had been designated to a federal prison camp or low security prison. In other words, during the period that the Defendant has been incarcerated, he has been punished more than a similarly situated offender who serves the same time of detention at a minimum-security prison.

These conditions were highlighted in 2021 by the former Chief Judge of the Southern District of New York, the Honorable Judge Colleen McMahon[1]. According to a transcript of the April 29th, 2021 sentencing in <u>United States v. Days</u>, 19-CR-00619 obtained by the Washington Post and New York Daily News Judge McMahon stated that there is "no excuse for the conditions" in the MDC and MCC and that the "treatment of… prisoners, the inmates, in the last 14 months have been nothing short, in my opinion, of inhumane, cruel and harsh, and unreasonably unjust."[2] Judge McMahon called the conditions "as disgusting [and] inhuman as anything I've heard about [in] any Columbian prison."[3] Judge McMahon continued saying "[t]he single thing in the five years that I was Chief Judge of this court that made me the craziest was my complete and utter inability to do anything meaningful about the conditions at the MCC… and the MDC, two federal correctional facilities located in the City of New York that are run by morons."[4] After the comments by Judge McMahon were reported the BOP sent a team to visit the MCC, allegedly dispatching them on the very same day those comments were reported[5].

In May of 2021 the New York Post reported on a sentencing before the Honorable Judge Paul Oetken wherein Judge Oetken likewise highlighted the brutal and inhumane conditions at the MCC, stating that the conditions were "extraordinarily harsh" and that the frequent lockdowns impose conditions that are "basically like solitary confinement." Inmates have limited programming, next to no family visits, and severely limited ability to meet with lawyers. Judge Oetekn further stated that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served… [s]o I think

---

[1] Judge McMahon stepped down as Chief Judge when she took senior status on April 10, 2021.
[2] Shayna Jacobs, Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions (May 7, 2021) https://www.washingtonpost.com/national-security/jails-run-by-morons-judge-says/2021/05/07/3b8b00c4-af46-11eb-acd3-24b44a57093a_story.html; IN HER OWN WORDS: Federal Judge slams 'morons' running NYC Federal Jails (May 7, 2021) https://www.nydailynews.com/new-york/ny-judge-mcc-mdc-20210507-nhcuujw6kjbmnm7qjus5pfrpdm-story.html
[3] Id.
[4] Id.
[5] Stephen Rex Brown, NYC federal jails visited by Bureau of Prisons bigwigs after judges criticism (May 14, 2021) https://www.nydailynews.com/new-york/ny-mcc-mdc-federal-bureau-of-prisons-nyc-visit-20210514-hizzf5dcw5h3nm2zz6ysyqwlyy-story.html

having served 24 months is equivalent to having served three years."[6] The conditions in the MDC are similarly severe and should be similarly credited.

Simply put the conditions that Billy Ortega has experienced since being detained are unacceptable at even the best of times. The conditions that Mr. Ortega and other inmates have described are deplorable, unacceptable, and shocking to the conscience.

During the pandemic, and after, the facility has frequently been on lockdown, sometimes for more than a week at a time. On these occasions inmates are confined to a 6 foot by 10 foot cell with another individual for up to 23 hours a day. One inmate reported that that during 2022 the facility was on lockdown for 161 days. During this period of time there were two blackouts, the facility was reportedly without power for six days in May and five days in September. On weekends inmates are frequently unable to leave their cells at all due to understaffing. The MDC is dirty and inmates live in squalor. Due to the frequent lockdowns, and the fact that the facility is overcrowded, social distancing is impossible. Individuals are given a cloth mask upon entry but are not given new masks. Inmates are not given gloves, hand sanitizer, or disinfectant sprays. Inmates are often seen without masks and some staff are seen wearing masks improperly. During the fall and winter it is cold in the facility and inmates are not given sufficiently warm clothing or blankets.

There is a lack of structure in the religious services department. There is a denial of religious services and inmates are often unable to attend services due to understaffing.

The medical department is understaffed and those staff are not properly trained. It can take an inmate more than one month to see medical staff after making a "sick call," if they see medical staff at all. Most sick calls are dismissed with minimal inquiry. The dental department is understaffed and improperly trained. Dental calls can take months to be answered. Mr. Ortega has been requesting to see a psychologist/therapist for at least three months, yet there has been no appointment scheduled.

---

[6] Stephen Rex Brown, NYC federal jail is so bad inmates get 'time and a half': Judge (May 24, 2021)
https://www.nydailynews.com/new-york/ny-mcc-mdc-hard-time-20210524-cwatz2asojglhm4cvjldbdx33e-story.html

There is a lack of programs and educational opportunities within the MDC. The maximum level of security is imposed on pre-trial detainees.

In addition, the facility and its conditions are shocking and unsanitary. There is no washing machine or dryer readily available. Inmates may only wash their clothes and exchange bedding once per week. Inmates have reported that during the lockdowns resulting from the pandemic inmates have sometimes had to go weeks without being able to do laundry, as a result they must wear dirty underwear and sleep on dirty bedding. On one occasion Mr. Ortega was unable to do laundry for three weeks as the machine was broken. Computer terminals are rarely cleaned. Due to limited cleaning supply access, inmates are constantly in danger of transmitting diseases in shared areas. There are mice and rodents in and around inmates' property. Rodents climb over inmates' clothing, belongings, and food often leaving feces. Cockroaches and other vermin infest the facility, food is frequently swarmed by flies, and inmates have reported finding cockroaches in their food. The food served to inmates is often expired, many times far past the expiration date.

The sinks in most of the cells are broken. Toilets expel water onto the floor, leaving a foul odor and spreading bacteria. Toilets which are broken often remain unrepaired for substantial periods of time. Water is often shut off for hours at a time while inmates are locked in their cells; as a result, inmates cannot take a shower or wash their hands. Toilets frequently do not flush, requiring inmates to cover toilets with a towel to block the smell of urine and feces.

There have been numerous days where toilets were unusable due to plumbing issues. At times when the water is turned off inmates have been forced to urinate or defecate in buckets and bags. Cells have a contaminated odor of human waste and sewage; the odor causes nausea, discomfort, and vomiting. This odor makes it difficult for inmates to peacefully rest.

Showers are consistently without regulators and/or showerheads. Floors in the showers are damaged; they have sharp edges and mold. Shower curtains are rarely replaced or washed, and are usually torn and covered in mildew. Tattered shower curtains allow water to splash on the floor outside the showers causing the floors within to be slippery and dangerous. Water temperature is

generally uncontrollable, on occasion exceeding 170 degrees Fahrenheit; these excessive temperatures have caused burns on several occasions.

There is a lack of cleaning and hygiene supplies. Inmates are forced to purchase bars of soap to wash their hands. Toilet paper is supposed to be issued once a week, but there have been instances where weeks have gone by without the issuance of toilet paper. Cleaning supplies are rarely issued for in-cell use, and those that are issued are of poor quality. Spray bottles are rarely operable and cleaning solutions appear to be diluted. Gloves are not provided for cleaning the bathrooms, forcing inmates attempting to maintain a clean living environment to touch human waste with bare hands. Spills and flooding are cleaned up with blankets and jumpsuits that staff then require inmates to use.

There are no means of ventilation in the bathrooms. Due to this lack of ventilation, condensation builds up on the ceiling and drops down onto the clothes and inmates alike. The MDC has ineffective and damaged ventilation and duct systems, limiting free flow of clean air. Vent covers are caked with dust and grime. This poses a threat to inmates at any time, but during a pandemic it is particularly dire. Poor ventilation significantly increases the transmissibility of respiratory viruses such as COVID-19.

Barbers do not have proper training and practice unsanitary work habits. Inmates have complained of being cut while receiving haircuts, and that barbers leave blood and skin particles between clippers and blades.

Living conditions in the MDC are unsafe and unacceptable. Cells housing two inmates on a more than temporary basis measure a mere 44 sq. ft.. Elevators are unstable and constantly in need of repair. Electrical outlets and wiring are damaged or nonfunctional. Inmates are afforded only one light, and a thin blanket even on the coldest of days or when the air conditioning (AC) is on full blast.

Likewise, there are issues with staff and staffing. During the morning and afternoon hours there have been occasions where just one Correction Officer is responsible for 96 inmates.

The MDC permits significantly less visitation hours than other federal facilities, even before the pandemic. This is a significant policy difference which further illustrates the inhumanity of the

conditions at the MDC. Counsel believes that these facts regarding the shocking and inhumane conditions at the MDC warrant mitigation. On these grounds, it is respectfully requested that the defendant's harsh pre-trial and pre-sentence confinement be taken into consideration pursuant to 18 U.S.C. 3553(a). It has been reported that the MDC failed it's last inspection. The conditions of confinement warrant mitigation.

## VI.   <u>SENTENCING REQUEST</u>

Based on all the factors set forth above, I ask that the Court sentence Billy Ortega to a total term of 300 months. This sentence is appropriate given the history and character of the Defendant as well as the nature and circumstances of the offense.

   a.   <u>Nature and Circumstances of the Offense, History and Character of the Defendant</u>

18 U.S.C. § 3553(a)(1) states that the court shall consider the nature and circumstances of the offense as well as the history and character of the defendant. These factors warrant mitigation. This is Mr. Ortega's first offense.

   b.   <u>Seriousness of Offense Conduct, Promotion of Respect for Law, Provision of Just Punishment</u>

18 U.S.C. § 3553(a)(2)(A) states that a sentence imposed shall reflect the seriousness of the offense conduct, promote respect for the law, and provide just punishment. While below the guideline range a sentence of 300 months, 25 years in prison, is far from trivial. The requested sentence would have a maximum expiration in 2047 when Billy Ortega is 62 years old. Additionally, a sentence of 300 months provides a just punishment for Mr. Ortega, which in turn promotes respect for the law.

While the charges here are incredibly serious this is Mr. Ortega's first conviction in any court. In addition the period of time when these deaths occurred compared to the conspiracy as a whole merits consideration. There is no allegation that anyone died from using drugs that Mr.

Ortega sold on any other dates, while the Government has contended that Mr. Ortega was a drug

dealer for a period of 7 years.

The high mandatory minimum sentences, combined with his lack of criminal history show

that the requested sentence does reflect the seriousness of the conduct and promotes respect for the

law.

### c.   Affording Adequate Deterrence to Criminal Conduct

Under 18 U.S.C. § 3553(a)(2)(B) a sentence must provide adequate deterrence to

criminal conduct. A sentence of 300 months accomplishes that result. 25 years in prison is an

incredibly severe sanction which serves both general and specific deterrence.

### d.   Protecting the Public from Further Crimes by the Defendant

Under 18 U.S.C. § 3553(a)(2)(C) the sentencing judge must take into account the need

for a sentence imposed to protect the public from further crimes by the defendant. During this

time Mr. Ortega has engaged in deep, careful, and probing self-reflection. The self-reflection

and regret that Mr. Ortega has exhibited shows that there is little risk of further criminal

conduct by the defendant.

Mr. Ortega has no prior criminal record, and he does not pose an appreciable risk of

reoffending. Billy Ortega is 37 years old, when released he will be 62. Evidence shows that

the risk of re-offending drops precipitously with age. According to the United States

Sentencing Commission 2022 report on older offenders in the federal system the recidivism

rate for offenders who are 50 or older is less than half that of offenders under the age of 50[7].

Additionally older offenders in the 2010 release cohort had less serious recidivist offenses

than younger offenders[8].

---

[7] The recidivism rate of older offenders, those over 50, is 21.3%, the recidivism rate of those under 50 is 53.4%; https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf
[8] The most common recidivism events for older offenders were supervision violations (16.0%) and administration of justice offenses (12.3%). Older offenders were significantly less likely to have violent recidivist offenses (19.2%) than younger offenders (32.1%).

e. Provision of Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

18 U.S.C. § 3553(a)(2)(D) states that the court should take into account the need for a sentence imposed to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. These needs are best served by a term of 300 months.

The correctional treatment and rehabilitation of Mr. Ortega is not served by a life sentence or a sentence in excess of 300 months. Mr. Ortega has tried to use this time to better himself and improve his decision-making. A sentence of 300 months would serve to provide correctional treatment in the most effective manner under these circumstances. 18 U.S.C. § 3553(a)(2)(D).

f. The Kinds of Sentences Available

Regarding 18 U.S.C. § 3553(a)(3) there is no prohibition on a sentence of 300 months.

g. Kinds of Sentence and Sentencing Range

The guideline range for this case, as calculated by probation, is life. Probation recommended 300 months in prison. A sentence of 300 months is warranted for the reasons discussed above. As a result, the requested sentence would not be prohibited by 18 U.S.C. § 3553(a)(4)(A). This is not a case regarding a violation of probation or supervised release, so 18 U.S.C. § 3553(a)(4)(B) does not apply.

h. Pertinent Policy Statements

Counsel has not uncovered any applicable policy statement under 18 U.S.C. § 3553(a)(5) that would impact the requested sentence.

i. Avoidance of Unwarranted Sentencing Disparities

This is Mr. Ortega's first offense, he has no prior contacts with the criminal justice system aside from a case which was dismissed. Therefore, a sentence of 300 months would not create an unwarranted disparity among defendants with similar records found guilty of similar conduct as contemplated by 18 U.S.C. § 3553(a)(6).

j.   Restitution

There is no restitution in this case, therefore 18 U.S.C. § 3553(a)(7) does not apply.

## VI. CONCLUSION

We strive to strike a balance between the interests of society and the rights of the individual. Each case is different. Our Congress has made it clear that we are not to function as machines in purely technical terms. We respectfully ask this honorable Court to see this Defendant on individual terms, human terms, and sentence him accordingly. When the nature and character of Billy Ortega is taken into account along with the sentencing factors, the PSR, and the conditions of confinement it becomes evident that a sentence of 300 months is fitting for the seriousness of the crime and is also consistent with 18 U.S.C. § 3553(a), which calls for a sentence sufficient, but not greater than necessary.

Respectfully yours,

*Dawn M. Florio*

Dawn M. Florio, Esq
DAWN M. FLORIO LAW FIRM
488 Madison Avenue, 20th Floor
New York, NY 10022
212.939.9539

Attorney for BILLY ORTEGA